UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                         :

DANYELL THOMAS, RASHAUN F. FRAZER,
ANDRAE WHALEY and ELENI MIGLIS, individually    :    Civil Action No. 16-cv-8160
and on behalf of all other employees similarly situated    :
                         :

      Plaintiffs                       :
                         :

v.                                    :

BED BATH AND BEYOND, INC.            :
                         :

      Defendant.                    :
------------------------------------------------------------------ x

# BED BATH & BEYOND INC.'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR
## <u>CONDITIONAL COLLECTIVE CERTIFICATION</u>

GREENBERG TRAURIG, LLP
*Attorneys for Defendant*
*Bed Bath and Beyond Inc.*
200 Park Avenue
New York, New York 10166
212.801.9200

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

FACTS ...............................................................................................................................4

    A.    The Company's Decentralized Operations ................................................ 4

    B.    The Assistant Store Manager Position ..................................................... 6

          i.    The ASM Plaintiffs' Exercise of Managerial Duties .................................. 8

    C.    The Department Manager Position ......................................................... 13

    D.    The Named Plaintiffs and the Putative Classes ..................................... 17

          i.    The Department Manager Class................................................. 17

          ii.    The Assistant Store Manager Class ......................................... 19

ARGUMENT ....................................................................................................................20

    A.    Plaintiffs Have Not Met Their Burden.................................................... 21

    B.    The Company's Assistant Store Managers Were Properly Classified, and Any Disputes Regarding Individual Status Cannot be Resolved On A Collective Basis ................................................................................. 22

    C.    Whether the DM Plaintiffs' Putative Class Members Lacked A "Clear Mutual Understanding" That BBB Would Pay A Fixed Salary Regardless Of The Number Of Hours Worked Can Only Be Determined On An Individualized Basis........................................................................... 27

    D.    Under Plaintiffs' "Meaningfully Fluctuate" Standard—Created Out Of Whole Cloth—Whether Putative Class Members' Hours "Meaningfully Fluctuated" Could Only Be Determined On An Individualized Basis. .............. 30

    E.    Plaintiffs Have Not Met Their Burden For State-Wide Or Nationwide Notice............................................................................................ 31

CONCLUSION..................................................................................................................35

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahmed v. T.J. Maxx Corp.*,
  103 F. Supp. 3d 343 (E.D.N.Y. 2015) ...............................................................1, 3

*Ahmed v. T.J. Maxx Corp.*,
  No. 10 Civ. 3609 (ADS), 2013 WL 2649544 (E.D.N.Y. June 8, 2013)...................2, 3, 24, 34

*Bahr v. PNW Enters., LLC*,
  No. 16–1223-PKC, 2017 WL 816140 (S.D.N.Y. March 1, 2017) ..........................33

*Eng-Hatcher v. Sprint Nextel Corp.*,
  No. 07 CIV 7350, 2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009) ..........................25

*Griffin v. Wake Cnty*,
  142 F.3d 712 (4th Cir. 1998) ........................................................................27, 29

*Guillen v. Marshalls of MA, Inc.*,
  750 F. Supp. 2d 469 (S.D.N.Y. 2010).............................................................2, 23, 24

*Guillen v. Marshalls of MA, Inc.*,
  841 F. Supp. 2d 797 (S.D.N.Y. 2012).............................................................2, 25, 26

*Hamadou v. Hess Corp.*,
  915 F. Supp. 2d 651 (S.D.N.Y. 2013).............................................................32

*Jenkins v. TJX Companies Inc.*,
  853 F. Supp. 2d 317 (E.D.N.Y. 2012) ...........................................................2, 24, 25, 26

*Johnson v. Carlo Lizza & Sons Paving, Inc.*,
  160 F. Supp. 3d 605 (S.D.N.Y. 2016).............................................................29

*Khan v. Airport Mgmt. Servs., LLC*,
  No. 10 CIV. 7735 NRB, 2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011)..............2, 30

*Korenblum v. Citigroup, Inc.*,
  195 F. Supp. 3d 475, 488 (S.D.N.Y. 2016).....................................................34

*Martin v. Sprint/united Mgmt. Co.*,
  No. 15 CIV. 5237 (PAE), 2016 WL 30334 (S.D.N.Y. Jan. 4, 2016) ...................25, 33

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010)..........................................................................30

*Ramos v. Telgian Corp.*,
    176 F. Supp. 3d 181 (E.D.N.Y. 2016) ...........................................................30, 31

*Sanchez v. JMP Ventures, L.L.C.*,
    No. 13 Civ. 7264 (KBF), 2014 WL 465542 (S.D.N.Y. Jan. 27, 2014) ...................................33

*Scott, et al. v. Chipotle Mexican Grill, Inc., et al.*,
    12 CIV. 8333 (ALC-SN) (Dkt. 1135) (S.D.N.Y. March 29, 2017).........................................25

*She Jian Guo v. Tommy's Sushi Inc.*,
    No. 14 CIV. 3946 PAE, 2014 WL 5314822 (S.D.N.Y. Oct. 16, 2014).................................21

*Stein v. Guardsmark, LLC*,
    No. 12–4739 (JPO), 2013 WL 3809463 (S.D.N.Y. 2013)....................................27, 29, 30, 31

*Trinidad v. Pret A Manger (USA) Ltd.*,
    962 F. Supp. 2d 545 (S.D.N.Y. 2013)...................................................................3, 21, 31, 32

*Vasquez v. Vitamin Shoppe Indus. Inc.*,
    No. 10 CIV. 8820 LTS THK, 2011 WL 2693712 (S.D.N.Y. July 11, 2011).........................26

*Wills v. RadioShack Corp.*,
    981 F.Supp.2d 245 (S.D.N.Y. 2013)......................................................................................17

**Statutes**

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ........................................................... *passim*

Wage Theft Prevention Act, NYLL § 195, 2010 N.Y. Laws 1446 ............................15, 18, 19, 20

**Other Authorities**

29 C.F.R. § 541.100 ...............................................................................................................22

29 C.F.R. § 778.114 .........................................................................................................17, 27

## **INTRODUCTION**

Bed Bath and Beyond Inc. ("BBB" or the "Company") respectfully submits this Memorandum in Opposition to Plaintiffs' Motion for Conditional Collective Certification. As we show in detail below, the motion should be denied.

The Company is one of the largest retailers in the home furnishing industry, employing over 45,000 employees. BBB operates approximately 1,000 stores throughout all fifty (50) states, each of which varies in size and operation depending on regional variations, sales volume, and the local competitive environment. *See* (Declaration of Tina Suojanen ("Suojanen Dec."), at ¶ 6). BBB's success and growth has been driven by its unique decentralized culture, which leverages the knowledge, independence, and unique experiences and skills of its local personnel and associates[1] around the country. (Suojanen Dec., at ¶ 25).

Plaintiffs ignore the diversity of experiences of the Company's Assistant Store Managers ("ASMs") and Department Managers ("DMs"), and ask the Court to issue notice to thousands of current and former employees working in over 850 stores[2] around the country, based on nothing more than their own testimony concerning their extremely limited personal experience in the same slice of New York.

Although the showing required is minimal, because Plaintiffs have no personal knowledge or competent evidence of other stores, they cannot meet their burden. They fail to meet even the minimal burden here because the declarations they produce cover only two stores for the DMs (both in New York City) and only five stores for the ASMs (all in New York City and Long Island). Yet, Plaintiffs seek Court mandated notice to over 600 DMs and

---

[1] BBB refers to its employees as "associates."
[2] These stores span across 48 states, excluding California and Alaska where ASMs are paid hourly. *See* (Suojanen Dec., ¶¶ 35–36).

approximately 4,000 ASMs in hundreds of stores. That should be denied. *See Ahmed v. T.J. Maxx Corp.*, 103 F. Supp. 3d 343, 357 (E.D.N.Y. 2015) ("*TJ Maxx II*"); *Ahmed v. T.J. Maxx Corp.*, No. 10 Civ. 3609 (ADS), 2013 WL 2649544, at *14 (E.D.N.Y. June 8, 2013) ("*TJ Maxx I*"); *Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 800 (S.D.N.Y. 2012), *adopted*, No. 09 CIV. 9575 LAP GWG, 2012 WL 2588771 (S.D.N.Y. July 2, 2012) ("*Guillen II*"); *Jenkins v. TJX Companies Inc.*, 853 F. Supp. 2d 317, 324 (E.D.N.Y. 2012); *Khan v. Airport Mgmt. Servs., LLC*, No. 10 CIV. 7735 NRB, 2011 WL 5597371, at *4 (S.D.N.Y. Nov. 16, 2011); *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 477 (S.D.N.Y. 2010) ("*Guillen I*").

The burden of producing evidence of other locations is particularly important here where Plaintiffs' claims are on their face of a highly individualized nature.

The ASM Plaintiffs' assertion that each did not perform the exempt role for which they were hired—resulting in each being disciplined by BBB because they were not managing as required by the Company—raises only individual questions.

BBB's declarations show the differences in operations, staffing levels, mix of employees, and volumes of sales among and between the 100+ BBB stores in the tri-state area alone, each operating under a different Store Manager, with the tri-state area being an area with 18 different districts, operating under separate Regional and District Managers.

Those declarations show that store-to-store differences exist based on a variety of factors. Plaintiffs say that they, failing to do their jobs, did not behave as managers and were misclassified as exempt essentially because of the nature of the specific store in which each was employed. Plaintiffs claim that, between incidents leading to being disciplined for failing to manage, each had sufficient autonomy to ignore directions and corrective discipline and continue not to manage. Because they fail to provide any evidence that anything similar happened at other

stores, given the undisputed substantial differences among and between stores, under *Guillen I*, *Guillen II*, *TJ Maxx I*, and *TJ Maxx II*, conditional certification would not be proper.[3] For the reasons set forth below, Plaintiffs' motion should be denied in its entirety.

In like manner, the DM Plaintiffs claim that the Fluctuating Workweek ("FWW") methodology could not be applied to them because they each lacked a clear mutual understanding of the pay arrangement. Yet, BBB's declarations show that many former DMs understood perfectly well the way they were being paid. *See* (Declaration of Lauren Alvarez ("Alvarez Dec."), ¶ 12; Declaration of Judy Cohen ("Cohen Dec."), ¶¶ 9–10; Declaration of Michael Furlong ("Furlong Dec."), ¶ 9). Plainly, Plaintiffs raise a factual question specific to individuals.

And if that set of individualized experiences was not enough, BBB's declarations also lay out that, in addition to providing documents plain on their face about the FWW methodology, each DM, upon hire or promotion, also was individually informed by a BBB Manager or Human Resources representative about the arrangement. This included numerous communicators and scores of new DMs producing hundreds of individual conversations about the FWW—all of which by Plaintiffs' argument would, of necessity, have to be the subject of proof and review in any trial. (Cohen Dec., ¶ 7; Furlong Dec., ¶ 6; Alvarez Dec., ¶ 10). If Plaintiffs are to prevail, it will be their burden to prove every member of the class similarly misunderstood the pay arrangement—similarly misunderstood being a legally untenable oxymoron and not a basis for a Fair Labor Standards Act ("FLSA") collective action.[4] Because all Plaintiffs' declarations show

---

[3] Even assuming the ASM Plaintiffs have somehow demonstrated similarities in their work experiences at the five stores in which they worked, *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545 (S.D.N.Y. 2013), and its progeny call for conditional certification sharply limited to the geographic area in which these ASM Plaintiffs worked.

[4] We believe Plaintiffs are quite wrong and that BBB will establish all elements of a valid FWW application, but their theory is nevertheless of plainly individual claims not admitting of representative proof.

is that they individually claim not to have understood communications, and do not lay out a basis for saying the putative class is otherwise similarly situated, conditional certification of the DM class should be denied.

## FACTS

### A.  The Company's Decentralized Operations

BBB's stores are organized into seven regions covering various parts of the country. The regions are: Canada-Northwest; Central; Mid-Atlantic; Midwest; Northeast; Southeast; and West. Each region is overseen by a Regional Vice President. Under the Regional VP is a Regional Manager. The Regions are further divided into 100 Districts. (Suojanen Dec., ¶¶ 7–10).

Each region has its own Human Resources function, which is overseen by a Regional Human Resources Director and Regional HR Managers. Each district also has its own District HR Manager. Numerous other regional and district-level management personnel ensure that the stores under their responsibility operate smoothly and meet customer needs. (Suojanen Dec., ¶ 10).

The Plaintiffs in this case all worked in New York which is part of the Northeast region.[5] The Northeast Region is overseen by a Regional Vice President, supported by three Regional Managers. There are 15 distinct districts within the Northeast Region, each with its own District Manager.[6] Within the State of New York alone, there are nine districts, all with their own District Managers. (Suojanen Dec., ¶¶ 11–13).

The Northeast Region is home to some of BBB's highest-volume and busiest stores, which are located in New York City. New York City is its own district and has its own separate

---

[5] The Northeast Region also includes Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Maryland, Vermont and parts of New Jersey.

[6] While the Northeast Region has 15 Districts, some Districts in New Jersey are in the Northeast Region while others are in the Mid-Atlantic Region. Accordingly, the number of Districts in the tri-state area totals 18.

Regional Human Resources Manager, and effectively functions as its own region. (Alvarez Dec., ¶ 6). Thus, one Regional Human Resource Director oversees HR matters in New York City (Lauren Alvarez), while another Regional Human Resource Director (Judy Cohen) oversees HR matters for the rest of the state of NY and the other states in the Northeast region. *Id.*

The Company's stores are diverse and varied, and no two stores are alike. They range in size from under 20,000 square feet in various parts of the country to over 100,000 square feet in New York City. The smallest stores employ as few as ten employees; the larger stores employ over 100 employees, and one of the largest stores in the country, located in Chelsea, NY (Store 42), employs over 300 employees. ***In New York State alone, there are 63 stores, which employ over 3,500 employees.*** (Suojanen Dec., ¶¶ 14; 18–26).

Staffing levels for each BBB location vary depending on the store size, the number and type of specialty departments within the store, hours of operation, volume of sales, and numerous other factors. (Suojanen Dec., ¶ 17). Higher volume stores typically have the greatest number of employees, customers, and revenue, and lower volume stores typically have the least. Store 42, in New York City's Chelsea neighborhood, is one of the highest volume stores in the entire Company. (Suojanen Dec., ¶ 18).

The lowest volume stores range in size from 18,000 to 28,000 square feet, and typically have either one or two ASMs, zero to one DM, and anywhere from 15 to 20 hourly associates. (Suojanen Dec., ¶ 22). Mid-volume stores range in size from 18,000 square feet up to 65,000 square feet and typically have either one to three ASMs, one or two DMs, and anywhere from 25 to 35 hourly associates. (Suojanen Dec., ¶ 21). High volume stores range in size from 24,000 square feet to 80,000 square feet and employ anywhere from 50 to 80 employees on average, typically with approximately three to five ASMs and two to four DMs. (Suojanen Dec., ¶ 20).

And the very high volume stores have anywhere from three to nine ASMs, six to 17 DMs, and 110 to 175 hourly associates, with the Chelsea store (Store 42) having 12 ASMs, 18 DMs, and approximately 325 hourly associates. (Suojanen Dec., ¶¶ 18–19).

### B. The Assistant Store Manager Position

The day-to-day operation of each store is overseen by a Store Manager, who is responsible for all of the operations within his or her store. An ASM assists the Store Manager with the overall operation of the store and is responsible for managing and supervising the hourly associates in the store, writing schedules, issuing discipline, and interviewing and hiring. (Suojanen Dec., ¶¶ 28–32; Declaration of Danny Salas ("Salas Dec."), ¶ 6; Declaration of Daniel Peet ("Peet Dec."), ¶ 6; 10–11; 18; Declaration of Chantal Doherty ("Doherty Dec."), ¶¶ 5–6; 12). The number of ASMs employed at any given store ranges from as few as one in smaller stores, to more than ten in the highest-volume stores. (Suojanen Dec., ¶¶ 18; 22). ASMs supervise and are responsible for between 10 to over 100 hourly associates, varying from store to store. ASMs are required to perform supervisory duties and are trained, evaluated, and compensated accordingly. (Suojanen Dec., ¶¶ 27–31). As alleged in the Complaint, ASMs are considered exempt from overtime and paid an annual salary. *See* Plaintiffs' First Amended Complaint, ¶ 56.

Within the ASM classification, there are two different positions: Operations ASMs ("Operations Managers") and Merchandising ASMs ("Merchandise Assistant Managers"). The job requirements for both Operations Managers and Merchandise Assistant Managers include: (i) directing the daily activities of DMs and hourly associates; (ii) training and development of staff; (iii) participating in interviewing and hiring of hourly associates; and (iv) counseling, disciplining, and assisting in terminations. (Suojanen Dec., ¶¶ 27–28).

Operations Managers and Merchandise Assistant Managers have additional and differing job responsibilities. In addition to the general responsibilities listed above, Operations Managers are also responsible for: (i) ensuring that the area of the store where customers' purchases are transacted (referred to as the "front end") is operating according to proper procedures through management of staff; (ii) ensuring that the area of the store where merchandise is received and shipped out of (referred to as the "back end") is operating according to proper procedures through management of staff; (iii) performing and/or overseeing new hire associate orientations; (iv) processing of new hire/benefits paperwork; and (v) scheduling associate shifts within the store. (Suojanen Dec., ¶ 29). In a large store, an Operations Manager typically oversees more than 20 associates. (Salas Dec., ¶ 10).

Merchandise Assistant Managers, on the other hand, are primarily responsible for the hourly associates who work on the store floor in the various departments. At any given time, the number of hourly associates working on the floor can range from two to 118, depending on the size of the store. (Suojanen Dec., ¶ 30; Peet Dec., ¶ 13).

The work experiences of both Operations Managers and Merchandise Assistant Managers vary markedly depending upon the size, geographic region, and the particular challenges and other realities that each particular store faces. Staffing also influences how much time an ASM spends on interviewing and hiring. Thus, in stores that do more hiring throughout the year, ASMs engage more in the interviewing and hiring process. (Doherty Dec., ¶¶ 11–16; Peet Dec., ¶¶ 15–16; Salas Dec., ¶ 9).

The mix of ASM duties is also impacted by the management style of the Store Manager within each store. For example, while some Store Managers participate throughout the hiring process in their stores, many others delegate the process to ASMs. The mix of duties is also

affected by the Store Manager's relationship with his or her ASMs and that Store Manager's delegation of managerial tasks to the ASMs. (Doherty Dec., ¶ 11; Salas Dec., ¶¶ 10; 13; Peet Dec., ¶ 14). The ASM's managerial and supervisory role is also affected by each individual ASM's experience, ability, and level of motivation. For example, an unmotivated ASM in a higher volume store that employs many ASMs can more easily "hide behind" their more diligent counterparts than in a lower volume store where there are fewer ASMs to pick up his or her slack, as compared to an ASM in a low volume store who has no one but himself or herself to rely upon for management duties. (Salas Dec., ¶ 8; Doherty Dec., ¶ 14).

Differences also abound in how ASMs approach their supervisory duties—including how and when they schedule team meetings, conduct staff evaluations, and train their associates. Most ASMs develop their own personal style of managing associates, with some opting to train and teach on the floor itself, and others training through informal discussions. (Doherty Dec., ¶ 14).

### i. The ASM Plaintiffs' Exercise of Managerial Duties

The two ASM Plaintiffs in this case—Eleni Miglis and opt-in Hector Caraballo—both regularly exercised managerial responsibilities. For example:

- In March 2012, *Miglis* issued a warning to an associate[7] for changing her own schedule without requesting approval.

- On March 20, 2012, *Miglis* issued a warning to an associate for reporting to work late on more than one occasion.

- On March 21, 2012, *Miglis* issued a warning to an associate for reporting to work late on more than one occasion.

---

[7] To protect their privacy, names of the individual associates and Department Managers interviewed, disciplined, or reviewed by Caraballo and Miglis have been omitted from this Memorandum of Law and redacted from exhibits accompanying BBB's declarations. BBB will promptly provide the Court with non-redacted exhibits for an in camera review if the Court so desires. BBB will also provide Plaintiffs' counsel with non-redacted exhibits upon entry of an appropriate confidentiality order.

- On March 23, 2012, *Miglis* issued a warning to an associate for reporting to work late on more than one occasion.

- On March 31, 2012, *Miglis* issued a warning to an associate for reporting to work late on more than one occasion.

- On April 5, 2012, *Miglis* issued a warning to an associate for reporting to work late on more than one occasion.

- On April 5, 2012, *Miglis* also issued a warning to an associate for reporting to work late on more than one occasion.

- On April 12, 2012, *Miglis* issued a warning to an associate for failing to consistently offer her suggested sell item, and instructing the associate to offer it 100% of the time.

- On May 29, 2012, *Miglis* issued a warning to an associate for failing to offer a suggested sell item and explained to the associate the company expectation is that all associates offer it 100% of the time.

- On May 31, 2012, *Miglis* issued a similar warning to another associate for failing to offer a suggested sell item and explained to the associate the company expectation is for associates to offer it 100% of the time.

- On June 4, 2012, *Miglis* issued a warning to an associate for demonstrating inappropriate behavior while working.

- On July 12, 2012, *Miglis* issued a warning to an associate for processing a $500 return of an item marked "donation" without getting a Manager on Duty involved.

- On November 19, 2012, **Caraballo** disciplined an associate for wearing a nose ring while on the selling floor, memorizing his conversations with the associate in a Note to File.

- On December 17, 2012, *Miglis* disciplined an associate for reporting to work late on more than one occasion.

- On January 11, 2013, **Caraballo** issued a formal warning to an associate for issuing a customer refund over the phone without proper verification.

- On March 11, 2013, *Miglis* disciplined an associate for failing to follow company policies and procedures.

- On March 13, 2013, *Miglis* disciplined an associate yet again for time and attendance violations.

- On April 9, 2013, **Caraballo** issued a formal warning to an associate for reporting to work late without calling ahead.

9

- On May 11, 2013, **Caraballo** issued a formal warning to an associate for time and attendance violations.

- On November 17, 2013, **Caraballo** issued a formal warning to an associate for failure to complete assigned tasks.

- On February 6, 2015, **Caraballo** disciplined an associate for leaving her department while another employee was also on break without approval by a manager, memorizing his conversations with the associate in a Note to File.

(Alvarez Dec., ¶ 16, Exhibit 10; Cohen Dec., ¶ 13, Exhibit 1).

The ASM Plaintiffs also completed performance reviews for the associates they supervised:

- On April 28, 2012, *Miglis* reviewed a store associate. Miglis is the only manager listed on the review.

- On July 22, 2012, *Miglis* reviewed a store associate. Miglis is the only manager listed on the review.

- On August 27, 2012, *Miglis* reviewed an overnight receiving and maintenance associate. Miglis is the only manager listed on the review.

- On August 31, 2012, *Miglis* reviewed a store associate. Miglis is the only manager listed on the review.

- On September 23, 2012, *Miglis* reviewed a store associate. Miglis is the only manager listed on the review.

- On October 18, 2012, *Miglis* reviewed a store associate. Miglis is the only manager listed on the review.

- On October 20, 2012, *Miglis* reviewed a store associate. Miglis is the only manager listed on the review.

- On December 20, 2012, *Miglis* reviewed a store associate. Miglis is the only manager listed on the review.

- On February 28, 2013, *Miglis* reviewed a store associate. Miglis is the only manager listed on the review.

- On February 28, 2013, *Miglis* also reviewed an inventory control lead supervisor. Miglis is the only manager listed on the review.

- On March 29, 2013, *Miglis* reviewed a store associate.

10

- On June 30, 2013, *Miglis* reviewed a store associate. Miglis is the only manager listed on the review.

- On September 9, 2014, **Caraballo** reviewed a store associate. Caraballo is the only manager listed on the review.

- On January 28, 2014, **Caraballo** reviewed a Department Manager.

- On November 19, 2014, **Caraballo** conducted another performance review for a Department Manager.

- On June 21, 2014, **Caraballo** conducted a performance review of an associate.

- On November 24, 2014, **Caraballo** conducted a performance review of an associate. Caraballo is the only manager listed on the review.

- On November 19, 2014, **Caraballo** conducted another performance review of a Department Manager. Caraballo is the only manager listed on the review.

- During her time as an ASM, *Miglis* also issued 36 certifications relating to associates' completion of training on lifting, knife safety, and the use of ladders in the store.

(Alvarez Dec., ¶ 17, Exhibit 11; Cohen Dec., ¶ 14, Exhibit 2).

Miglis also played a key role in the hiring and firing of store associates:

- On February 8, 2012, *Miglis* hired a store associate to work as a cashier.

- In December 2012, *Miglis* interviewed an associate candidate.

- On December 31, 2012, *Miglis* conducted a reference check of an associate candidate.

- On February 1, 2013, *Miglis* conducted a reference check of another associate candidate.

- On February 11, 2013, *Miglis* issued an employee separation form relating to a mutual agreement between an associate and the company for her to cease employment.

- On March 7, 2013, *Miglis* issued an employee separation form terminating a store associate for violating company policy.

(Cohen Dec., ¶ 15, Exhibit 3).

And, as part of their performance reviews, Miglis and Caraballo completed self-evaluations, confirming their managerial responsibilities and duties:

- On August 10, 2010, *Miglis* reviewed herself as "meeting expectations" with respect to her management skills and listed teaching and training associates to find information on their own as a goal that Miglis accomplished during the employee appraisal period.

- On September 28, 2012, *Miglis* listed her goal for the next review period was to "teach [and] train all cashiers [and] customer service to better utilize JDA [and] Bed Net."

- On July 16, 2013, *Miglis* reviewed herself as "significantly exceeding expectations" with respect to some of her management skills and listed her goals for the next review period to "hire, staff teach [and] train new staff to company standard [and] expectation" and to "maintain teaching [and] training."

- On October 31, 2013, **Caraballo** reviewed himself as "meeting expectations" for almost all of his management skills.

- On July 22, 2014, *Miglis* reviewed herself as "exceeding expectations" with respect to a majority of her management skills and listed her goals for the next review period as "get Dept managers through MDP" and "run store operations."

- On December 11, 2014, **Caraballo** reviewed himself as "meeting expectations" for all of his management skills.

(Alvarez Dec., ¶ 18, Exhibit 12; Cohen Dec., ¶ 16, Exhibit 4).

The Company held Miglis and Caraballo accountable when they failed to discharge their managerial responsibilities. For example, on May 16, 2011, Miglis was disciplined for her failure to address dress code violations of the staff within the store. The Store Manager wrote "that by failing to communicate the company best practices to her staff and holding the staff accountable to the standard she is not setting up her staff for success and causing potential employee relations and customer service issues in the store." Similarly, on September 30, 2009, Miglis was disciplined for failing to maintain adequate employee staffing in the store which resulted in a customer complaint due to substandard coverage. (Cohen Dec., ¶ 17, Exhibit 5); *see also*, (Declaration of Dawn Mihalek ("Mihalek Dec."), ¶¶ 5–11).

Caraballo was also repeatedly warned and disciplined for failing to meet performance expectations. On April 16, 2014, for example, Caraballo's Store Manager had a conversation with him about whether he was capable of doing the job of an ASM and suggested that Caraballo "seriously consider taking a step down" because he was not performing in accordance with the requirements of an ASM. On May 19, 2014, Caraballo was warned for having a "lack of ownership" over his area of the store and showing a "lack of interest with" his staff by failing to have regular sit downs or provide them feedback. Similarly, on June 30, 2014, Caraballo was warned for failing to "train or develop his managers or associates or give [them] directions" and failing to "regularly meet with his managers [and] … follow-up on Department Manager routines." Caraballo was also warned for failing to "hold his managers accountable for incomplete tasks." On February 16, 2015, Caraballo was warned for failing to "give directions to his team" and failing to "follow-up on tasks he assigns." (Alvarez Dec., ¶ 19, Exhibit 13); *see also*, (Declaration of Leticia DelRio ("DelRio Dec."), ¶¶ 5–15).

Unsurprisingly, both Miglis and Caraballo were terminated for performance issues. Miglis was terminated for providing her key turn authorization numbers to a supervisor in order to allow the supervisor to process transactions without Miglis having to be present—a clear abdication of her managerial responsibilities. When Miglis was informed of her termination, she was told that this violation, coupled with "judgment that had fallen far below the Company's expectation of any manager," warranted immediate separation from the Company. (Cohen Dec., ¶ 17, Exhibit 5). Similarly, Caraballo was terminated for continuing "to not meet performance expectations" with respect to his management responsibilities in his role as an ASM. (Alvarez Dec., ¶ 19, Exhibit 13; DelRio Dec., ¶ 15).

### C.  The Department Manager Position

Underneath the Assistant Store Manager level are the Company's Department Managers. DMs are generally responsible for overseeing a specific department or area of a store. There are different types of DMs depending on which department of the store each manager is responsible for. These include: Customer Service Managers, Front End Managers, Receiving Managers, Freight Managers, Hardside Managers, and Softside Managers. (Suojanen Dec., ¶ 33). Some stores also have DMs of specialty departments such as Wedding, Fine China, or Gourmet Foods. *Id*.

DMs are responsible for overseeing hourly associates and ensuring that the merchandise in their particular area is properly stocked, displayed, and accessible for customers. *Id*. Depending on the store location and store volume, some stores have no DM while others have more than ten. (Suojanen Dec., ¶¶ 18–22). Today, the Company employs approximately 1,400 DMs. (Suojanen Dec., ¶ 37).

All DMs are classified as non-exempt employees and are paid overtime for all hours worked over 40.[8] (Suojanen Dec., ¶ 34). Prior to March 2015, BBB paid DMs in New York, New Jersey, and Connecticut overtime pursuant to the FLSA's FWW methodology. (Suojanen Dec., ¶ 35). When individuals were hired or promoted to the position of DM, they were explicitly told how their pay would be calculated and were informed of BBB's use of the FWW. (Cohen Dec., ¶¶ 6–8; Alvarez Dec., ¶¶ 9–10; Furlong Dec., ¶¶ 6–9). Specifically, DMs were told what their base annual salary would be if they worked 40 (or less) hours per week, and what their expected total earnings would be if they worked 47 hours per week, including overtime. *Id*. DMs were told that the dollar value (per overtime hour) for hours worked above 40 hours would vary due to BBB's use of the FWW, but that additional overtime hours were nevertheless encouraged in order for the DM to gain experience and advance to the position of ASM. *Id*.

---

[8] The classification of DMs is not at issue in this case.

The Company utilized a variety of communications to ensure that its DMs understood that they would receive a fixed base salary each week, which would be paid regardless of the number of hours worked. DMs—including each DM Plaintiff in this case—received and signed a Department Level Manager Compensation acknowledgement ("DM Compensation Acknowledgement"), that states:

> At the time I was hired, I was told what my anticipated weekly compensation will be and how it will be calculated.
>
> I understand that my weekly compensation consists of two components: (1) a base weekly salary; and (2) an additional amount for all hours over 40 that I work during a week.
>
> I understand that my base weekly salary is compensation for all hours I work in a week. I will be paid this base salary for each week I work, whether or not I work 40 hours in that week, subject to the Company's sick day and leave policies.
>
> I further understand that I will be scheduled for no less than 47 hours per week, but that my actual hours worked will fluctuate depending on the needs of my store. (Alvarez Dec., ¶ 13, Exhibits 1, 2, 3, and 4).

Along with the DM Compensation Acknowledgement, all DMs—including each of the DM Plaintiffs in this case—were also given an example pay stub, explaining exactly how the FWW worked, with clear examples. (Alvarez Dec., ¶ 13, Exhibits 1, 2, 3, and 4). The example pay stubs shows that the DM would receive his/her weekly salary, regardless of the number of hours worked. (Alvarez Dec., ¶ 14, Exhibit 5).

Additionally, pursuant to the Wage Theft Prevention Act, NYLL § 195, 2010 N.Y. Laws 1446, every year all DMs—including all DM Plaintiffs in this case—in New York state were given a Notice and Acknowledgement of Pay Rate form ("Annual Pay Acknowledgment"), signed by the DM, which unequivocally stated:

> Overtime rate of pay: rate fluctuates based on hours worked in excess of 40*.
>
> *As a Department Manager, your base weekly salary is compensation for all hours you have worked in the week, regardless of the number of hours you work.*

*You will also be paid an additional amount for any hours worked over 40 in one week. Please refer to the attached Department Manager's Bi-Weekly Pay Stub for a detailed explanation.*

(Alvarez Dec., ¶ 15, Exhibits 6, 7, 8, and 9 (emphasis original)). The DM Plaintiffs in this action all received, signed, and returned the Annual Pay Acknowledgment form. *Id*.

DMs were also required to attend orientation training where they were, again, informed of BBB's pay practices, that they would be paid under the FWW methodology, and that they would receive both a fixed weekly salary for all hours worked and overtime pay for hours worked over 40. (Cohen Dec., ¶ 8).

Thus, to the extent that any DMs now claim after the fact that they did not understand that they would receive a fixed weekly salary—they are the exception. (Cohen Dec., ¶¶ 6–8; Alvarez Dec., ¶ 9; Furlong Dec., ¶¶ 6–9).

The way in which an individual DM who needed further explanation of his/her pay came to understand the Company's pay practices varies DM-to-DM, state-to-state, and store-to-store. For the time during which BBB utilized the FWW methodology, Regional Human Resources Directors were responsible for implementing policies relating to the hiring of DMs.

This resulted in hundreds of conversations between Human Resources personnel and DM candidates relating to BBB's pay practices. In many cases, Human Resources Directors followed up with DMs after they received their first paycheck—resulting in further conversations—in order to ensure that the DM understood how they were being paid, while others spoke with DMs if they had specific questions. (Alvarez Dec., ¶ 11; Furlong Dec., ¶¶ 6; 9; Cohen Dec., ¶¶ 7; 9).

Some DMs were already familiar with the FWW due to past experience working at other retailers, while others had no prior experience with it. (Furlong Dec., ¶ 7). These highly-individualized experiences are borne out in the stores' experience when explaining pay to new DMs. While some store locations never had DMs with questions as to how their pay was

16

calculated, other stores had DMs come back with questions about 20% of the time after receiving their first paycheck or orientation where more conversations were had. (Furlong Dec., ¶ 9; Cohen Dec., ¶ 9; Alvarez Dec., ¶ 10). After discussing the breakdown of their first paycheck, most DMs never had follow up questions, and others seemed to care more about their total compensation and less about how it was actually calculated. (Alvarez Dec., ¶ 12; Cohen Dec., ¶¶ 10–11).

The amount of overtime hours actually worked week-to-week by any DM, and the amount of fluctuation, varied significantly. This variation resulted from a host of variables, including store location, store size and volume, number and type of DMs working at the store, and the individual DMs' initiative. (Declaration of Joseph Carpino ("Carpino Dec."), ¶¶ 8–17; Declaration of Kim Campbell ("Campbell Dec."), ¶¶ 7–11; Declaration of Nick Grew ("Grew Dec."), ¶¶ 9–14).

### D. The Named Plaintiffs and the Putative Classes

#### i.  The Department Manager Class

Plaintiffs Danyell Thomas, Rashaun Frazer, and Andrae Whaley (collectively referred to as the "DM Plaintiffs")[9] bring this collective action claiming that BBB failed to satisfy certain prerequisites before utilizing the FWW compensation methodology and therefore allegedly underpaid the DM Plaintiffs for their overtime. Of the five prerequisites required under the FWW[10], the DM Plaintiffs base their claims on BBB's alleged failure to meet two: (i) the DMs did not understand that they would receive a fixed weekly salary for purposes of establishing a

---

[9] Three other individuals filed opt-in consent forms, but no declarations or evidence on their behalf has been submitted.

[10] "Under § 778.114, employers may use the FWW method if the following five conditions are met: (1) the employee's hours fluctuate from week to week; (2) the employee receives a fixed weekly salary which remains the same regardless of the number of hours the employee works during the week (excluding overtime premiums); (3) the fixed amount is sufficient to provide compensation at a regular rate not less than the legal minimum wage; (4) the employer and employee have a clear mutual understanding that the employer will pay the employee a fixed salary regardless of the number of hours worked; and (5) the employee receives a fifty percent (50%) overtime premium in addition to the fixed weekly salary for all hours worked in excess of 40 during the week." *Wills v. RadioShack Corp.*, 981 F.Supp.2d 245, 255 (S.D.N.Y. 2013) (citations omitted); 29 C.F.R. § 778.114.

clear mutual understanding between the DMs and BBB; and (ii) the DM's hours did not fluctuate from week-to-week. The DM Plaintiffs listed below, all of whom worked in one of only two stores in Manhattan, maintain that because they *personally* did not understand how they would be paid, their experience can be applied to a diverse class of over 600 DM's working in 119 stores across three states.[11]

- ***Danyell Thomas***: Thomas was employed as a DM for approximately 2.5 years from December 2012 to May 11, 2015. *See* Declaration of Danyell Thomas, ("Thomas Dec."), ¶ 3. Thomas worked at Stores 42 and Stores 361—two of BBB's highest volume stores in the country, both of which are in NYC. *Id.* Despite the existence of signed documents to the contrary, Thomas asserts that at the time of his hire, no one from BBB either verbally or via written document informed him or explained to him how to calculate his salary or overtime. (Thomas Dec., ¶¶ 10–11). The only personal observations or conversations Thomas references were with respect to other DMs in Stores 42 and 361. (Thomas Dec., ¶¶ 30–32). Thomas then alleges that he ***believes*** all DMs in New York were subject to the same practices. (Thomas Dec., ¶¶ 33–34 (emphasis added)).

- ***Andrae Whaley***: Whaley was employed as a DM for approximately five years from July 17, 2011 to July 23, 2016. *See* Declaration of Andrae Whaley ("Whaley Dec."), ¶ 3. Whaley worked at Store 42 in NYC throughout his entire time with the company. *Id.* Despite the existence of signed documents to the contrary, Whaley asserts that no one from BBB ever verbally or via written document informed him of how his salary or overtime would be calculated. (Whaley Dec., ¶¶ 7–9). The only personal observations or conversations Whaley alleges that he had with other DMs involving the FWW occurred at Store 42. (Whaley Dec., ¶¶ 13–14; 25–26). Yet, Whaley declares, that "All DMs' responsibilities are similar from store to store." (Whaley Dec., ¶ 18). Throughout Whaley's five years with the Company, he claims to have spent one day at a store in Long Island, but does not allege which store it was, whether he had personal conversations or interactions with DMs during his one day in Long Island, or whether he discussed the FWW with the Long Island DMs. (Whaley Dec., ¶ 28). Whaley then concludes that he ***believes*** all DMs in New York and "very likely New Jersey" are similarly situated with respect to BBB's use of the FWW. (Whaley Dec., ¶¶ 28–30 (emphasis added)).

- ***Rashaun Frazer***: Frazer worked as a DM for approximately three years from October 2011 to January 2015. *See* Declaration of Rashaun F. Frazer ("Frazer Dec."), ¶ 3. Frazer worked at Store 361 in NYC throughout his entire time with the company. *Id.* In the same cookie-cutter form, and despite the existence of signed documents to the contrary, Frazer alleges that no one from BBB either verbally or via written document informed him or

---

[11] Upon preliminary review of the number of potential class members during the relevant time period, there were approximately 58 DMs in Connecticut, 205 DMs in New Jersey, and 348 DMs in New York, approximately 150 of which were in New York City stores. (Suojanen Dec., ¶ 36).

explained to him how to calculate his salary or overtime. (Frazer Dec., ¶¶ 10–12). The only personal observations or conversations Frazer alleges to have had with other DMs were with DMs from Store 361. (Frazer Dec., ¶¶ 14; 30–37). Frazer alleges that "Because BBB switch DMs among its different stores all the time, I *believe* that all DMs in BBB's stores, at least stores in all of the State of New York are following the same policy…" (Frazer Dec., ¶ 18 (emphasis added)). At no point does Frazer allege that he personally switched stores or spoke to any DMs from other stores.

- *Hector Caraballo*: Caraballo is an opt-in plaintiff who worked as a DM until November of 2012 when he was promoted to an ASM. *See* Declaration of Hector Caraballo ("Caraballo Dec"), ¶ 3). During his time as a DM, Caraballo worked at Stores 42 and 361 in NYC. *Id.* Despite the existence of signed documents to the contrary, Caraballo alleges that, upon being hired and shortly thereafter, no one from BBB mentioned overtime compensation to him or how overtime for hours worked in excess of 47.5 would be compensated. (Caraballo Dec., ¶¶ 7–8; 17–19). The only personal observations or conversations Caraballo alleges to have had with other DMs relating to the FWW were with DMs from Stores 42 and 361. (Caraballo Dec., ¶¶ 38–41). Caraballo alleges that all DMs *at his stores* were subjected to the same wage and hour practices, and he *believes* BBB was paying DMs in other New York stores and New Jersey stores under the FWW. (Caraballo Dec., ¶ 43). Caraballo bases his belief about New Jersey DMs not on his personal knowledge or conversations with New Jersey DMs, but on his awareness of a pending lawsuit brought by former New Jersey DMs against BBB. *Id*.

### ii. The Assistant Store Manager Class

Eleni Miglis brings this collective action claiming that BBB improperly classified her as an exempt employee and therefore failed to pay her overtime. Miglis, who worked at four stores on Long Island, claims that her primary duties were not managerial in nature and she was therefore misclassified. She alleges that her personal experience can be extrapolated to a diverse class of nearly 4,000 ASMs[12] working in over 850 stores throughout the United States. In pursuit of her efforts to send notice to these 4,000 individuals, she offers (i) her own declaration regarding her personal work experience, (ii) the declaration of an opt-in Plaintiff, Hector Caraballo, who worked in a single store in Manhattan, and (iii) an attempt at "common" proof in the form of an ASM job description and compensation method (Miglis and Caraballo are collectively referred to as "ASM Plaintiffs.").

---

[12] Upon preliminary review, there are approximately 4,000 potential class members in the ASM group. (Suojanen Dec., ¶ 32).

But whether any of the nearly 4,000 putative class members were properly classified can only be determined through an individualized inquiry that is not susceptible to class-wide proof where the duties of ASMs vary person-to-person and store-to-store, influenced by a significant number of individual and variable factors which the declarations of the two individuals do not begin to address.

- **Eleni Miglis**: Miglis was employed by BBB as a DM from February 2008 through late 2009 when she was promoted to an ASM.[13] *See* Declaration of Eleni Miglis ("Miglis Dec.), ¶ 3. Throughout her entire time as an ASM, Miglis worked in only four stores, all on Long Island: Store 507 in Oceanside, NY; Store 754 in Plainview, NY; Store 105 in Manhasset, NY; and Store 2 in Lawrence, NY. *Id.* Miglis alleges that no one told her what her responsibilities or duties would be as an ASM and she spent her time primarily doing the non-managerial work that she previously did as a DM. (Miglis Dec., ¶¶ 13, 18). Miglis does not allege that she had any conversations with other ASMs about their duties and responsibilities in the stores she worked, or in any other stores.[14] Miglis instead claims that she observed other ASMs in her stores performing the same type of work she did, and she **believes** "that is the case for A[S]Ms in all of BBB's stores throughout the United States." (Miglis Dec., ¶ 19).

- **Hector Caraballo**: Caraballo, an opt-in plaintiff, worked as an ASM from November of 2012 to March of 2015 at a store in Manhattan. (Caraballo Dec., ¶ 3). Caraballo claims that he was never told what his responsibilities were as an ASM and that he spent the majority of his time performing the non-managerial tasks he previously performed as a DM. (Caraballo Dec., ¶¶ 14, 43). Caraballo does not allege that he had any conversations with other ASMs in his store or from other store locations about their duties and responsibilities, but instead claims that he observed other ASMs **at his store** perform the same type of non-managerial tasks and that he **believes** "that is the case for A[S]Ms in all of BBB's stores throughout the United States." (Caraballo Dec., ¶ 45).

## ARGUMENT

The Plaintiffs here are not the first exempt retail managers to assert nationwide collective actions by pointing to their own work experiences—which deviated from the exempt managerial

---

[13] Miglis acknowledges in the Complaint that her claims are not based on BBB's use of the FWW during the time she was employed as a DM, as her claims in that regard are time barred. *See* Plaintiffs' First Amended Complaint, p. 7 n.2. Nevertheless, a majority of Miglis' declaration is dedicated to discussing her time as a DM and her understanding of the FWW. Because Miglis admits that her claims with respect to the FWW are time barred, the proffer of any facts surrounding her time as a DM is improper.

[14] It appears as though Miglis' fill-in-the-blank declaration was drafted to allude to conversations with other ASMs, but never did. (Miglis Dec., ¶ 31 ("Throughout my time with BBB, on separate occasions, I had conversations with some" . . . )).

responsibilities they were charged with as ASMs—as evidence of improper classification. In those cases, Courts have consistently found that the anecdotal tales of a handful of individuals working in a small number of stores falls short of even the minimal showing required by an FLSA plaintiff, given the highly individualized analysis required.

The DM Plaintiffs fare no better, with each offering nothing more than claimed confusion over clear documents involving their compensation, rendering them similarly situated to no one except themselves.

Finally, the cases require that, where plaintiffs in FLSA cases seek notice reaching beyond a single location, they must provide evidentiary support for doing so. Here, Plaintiffs have utterly failed to establish that notice would be proper even as to the stores in which they worked, let alone the hundreds of stores across the country where thousands of other employees worked. The Plaintiffs' Motion should be denied.

## A. Plaintiffs Have Not Met Their Burden

Courts within the Second Circuit apply a two-step analysis to determine whether an action should be certified as an FLSA collective action. *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 552 (S.D.N.Y. 2013) ("In determining whether to [conditionally certify class] the district courts of this Circuit appear to have coalesced around a two-step method which the Second Circuit has endorsed as 'sensible.'" (*quoting Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010)). First, the Court makes "an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Id.* This requires plaintiffs to "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Id.* (quoting *Myers*, 624 F.3d at 555). While the first stage of the certification process is a low burden, "it is not non-existent." *She Jian Guo v. Tommy's Sushi Inc.*, No. 14 CIV. 3946

PAE, 2014 WL 5314822, at *3 (S.D.N.Y. Oct. 16, 2014). And, Plaintiffs' burden "cannot be satisfied simply by unsupported assertions." *Id*. at 553.

The ASM Plaintiffs' deeply individualized experiences provide no basis for presuming that common experiences exist among thousands of current and former ASMs across the country. Similarly, the DM Plaintiffs' personal experiences in just two stores—some of the largest stores in the Company in New York City—are woefully insufficient to presume that other individuals in those same stores are similarly situated, let alone in the 100+ stores in the tri-state area.

**B. The Company's Assistant Store Managers Were Properly Classified, and Any Disputes Regarding Individual Status Cannot be Resolved On A Collective Basis**

Individuals qualify as exempt executives under the FLSA if: (i) they are compensated on a salary basis; (ii) their primary duty is management; (iii) they customarily and regularly direct the work of two or more other employees; and (iv) they have the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, promotion, or change in status of other employees are given particular weight. 29 U.S.C. § 213(a); 29 C.F.R. § 541.100. Here, Miglis and Caraballo—relying on nothing more than their own declarations and experience in just five stores— ask this Court to extrapolate their claimed work experiences to a nationwide class of approximately 4,000 ASMs, in over 850 stores across the country.

Plaintiffs challenge their exempt status by claiming that they did not meet the managerial duties test, pointing to certain tasks that they claim they performed as ASMs, and attempting to distance themselves from their managerial responsibility and authority. But the record evidence is overwhelmingly to the contrary. There are nearly ***fifty*** documented examples of the two ASM Plaintiffs interviewing employees, participating in hiring, conducting performance reviews, and disciplining the hourly employees working under them.[15]

---

[15] As to Plaintiffs' individual claims, BBB will move for summary judgment at the close of discovery.

In any event, even though the ASM Plaintiffs claim that they primarily performed non-exempt tasks, their personal experiences are insufficient to demonstrate that nearly 4,000 other ASMs across more than 850 stores also performed the same allegedly non-exempt duties to the same degree. To meet the similarly situated burden, Plaintiffs have to show personal knowledge that the experience in their stores is the same as in others, and have failed to do so. Other plaintiffs working in jobs for similar retailers have made these same speculative claims, which the Courts have rightly rejected.

For example, in *Guillen I*, ASMs at Marshalls sought nationwide certification in a case challenging their exempt status. In support, they offered "affidavits from five ASMs who experienced the allegedly illegal activities at nine of the 820 Marshalls stores nationwide." *Guillen I*, 750 F. Supp. 2d at 477. Like the ASM Plaintiffs here, "[t]he nine stores [were] exclusively in the New York City metropolitan area." *Id*. Also like the Plaintiffs here, the plaintiffs in *Guillen I* premised their challenge to exempt status on the allegation that they spent most of their time doing non-exempt tasks. The Court characterized plaintiffs' evidence as "extremely thin" and denied conditional certification because "there [wa]s virtually no basis on which to conclude that ASMs nationwide [we]re similarly situated to [plaintiffs] with respect to [their] allegation that [they] spent the majority of [their] time performing non-managerial tasks." *Id*. at 477.

The teachings of *Guillen I* are particularly instructive here, given the similar organizational structures of the defendant in that case and BBB—both companies employ two types of ASMs (operations and merchandise), divide their stores into multiple districts, and utilize regional managers to oversee different parts of the country. As the Court in *Guillen I*

concluded, the declarations of a handful of ASMs cannot justify a collective action "as there may be vast differences in the practices of individual stores across the country." *Id.* at 477–78.

Similarly, in *TJ Maxx I*, former assistant managers at TJ Maxx sought certification of a nationwide class, challenging their exempt status by pointing to their personal experiences, "most of which they attributed to their individual Store Managers." *T.J. Maxx I*, 2013 WL 2649544, at *14. The plaintiff provided evidence from ASMs who worked in the tri-state area at a handful of stores, and from another ASM's experience working in two stores in Arkansas. *Id.* Pointing to the individualized inquiries necessary to resolve the question of each individual's exempt status, and only having a limited number of ASMs discussing their personal experiences, the Court could not "presume the existence of a de facto illegal policy common to all Assistant Store Managers in more than 4,000 stores across the entire nation based only on allegations from three Assistant Store Managers working in merely a handful of stores in the tri-state area and in Arkansas." *Id*.

Likewise, in *Jenkins*, a former assistant store manager of HomeGoods brought a nationwide FLSA collective action, seeking certification of a class of over 700 employees at more than 200 stores. Like the plaintiffs in *Guillen I and TJ Maxx I*, Jenkins relied on his own testimony "describing his personal circumstances at the stores at which he worked" in support of his contention that HomeGoods' assistant managers primarily did non-exempt work. *Jenkins*, 853 F. Supp. 2d at 324. The Court denied conditional certification, concluding that "the Plaintiff has not provided the Court with anything other than conclusory allegations and his own deposition testimony to support his assertion that other HomeGoods' ASMs also primarily performed non-exempt job duties." *Id*. at 324–25.

Here, the ASM Plaintiffs offer nothing more than their own personal experiences working in just five stores, and on that basis ask the Court to ignore the individualized nature of their claims, along with the fact that they have presented no evidence whatsoever from **99.75+%** of the stores and **99.95%** of the putative class members. *Guillen*, *TJ Maxx*, and *Jenkins* stand as guardians against such tactics, and call for denial of Plaintiffs' motion here.

The fact that all of the putative class members were classified as exempt and had a similar job title cannot save Plaintiffs' case. "[C]ourts in th[e] [Second] Circuit have held that the fact of a common job description or a uniform training regimen does not, alone, make those persons subject to it "similarly situated" under the FLSA." *Martin v. Sprint/united Mgmt. Co.*, No. 15 CIV. 5237 (PAE), 2016 WL 30334, at *8 (S.D.N.Y. Jan. 4, 2016) ("[P]laintiff's reliance on the centralized job descriptions maintained by defendants is misplaced." (citing *Khan*, 2011 WL 5597371, at *4)); *Eng-Hatcher v. Sprint Nextel Corp.*, No. 07 CIV 7350, 2009 WL 7311383, at *3 (S.D.N.Y. Nov. 13, 2009) (denying conditional certification where, as to practices of general application, plaintiff pointed only to a presumptively lawful official policy, and, in alleging FLSA violations, relied solely upon her deposition testimony as to her own treatment)). *See also Scott, et al. v. Chipotle Mexican Grill, Inc., et al.*, 12 CIV. 8333 (ALC-SN) (Dkt. 1135) (S.D.N.Y. March 29, 2017) (decertifying collective action in misclassification case and stating that "'[t]o find otherwise would reduce Section 216(b)'s requirement that plaintiffs be 'similarly situated' to a mere requirement that plaintiffs share an employer, a job title, and a professed entitlement to additional wages.'" (quoting *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 300 (S.D.N.Y. 2015)); *McEarchen, et al. v Urban Outfitters, Inc.*, 13 CV 03569 (RRM-JO) (Dkt. 268) (E.D.N.Y. March 7, 2017) (decertifying collective action in misclassification case finding

that defendant's "blanket classification decision and uniform corporate policies and training do not on their own render the plaintiffs similarly situated.").

In this same vein, the mere classification of a group of employees as exempt does not automatically dictate whether collective action treatment is appropriate. The Court in *Guillen II* rejected this very argument. There, in seeking certification, the plaintiff relied on his classification as exempt and the allegation that he was required to perform as non-exempt to support the notion that other ASMs were similarly situated based on their classification status. In rejecting this argument, the Court held that the plaintiff's "argument boil[ed] down to the proposition that any employee classified as exempt by a company that does business nationwide is entitled to approval of a collective action for all employees of that business—who may number in the thousands and be spread across 50 states—simply based on the employee's testimony that he was required to perform non-exempt tasks." *Guillen II*, 841 F. Supp. 2d at 801. The simple fact that other ASMs are employed by BBB nationwide is insufficient to assume that all 4,000 ASMs' primary duties were to perform non-exempt work. *See also Vasquez v. Vitamin Shoppe Indus. Inc.*, No. 10 CIV. 8820 LTS THK, 2011 WL 2693712, at *4 (S.D.N.Y. July 11, 2011) ("the mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes.") (internal citations and quotation marks omitted); *Jenkins*, 853 F. Supp. 2d at 323 (explaining that a plaintiff may not rely on mere exemption status but must "demonstrate a nationwide policy pursuant to which ASMs are assigned duties that render [the Company's] exempt classification inappropriate.")

**C. Whether the DM Plaintiffs' Putative Class Members Lacked A "Clear Mutual Understanding" That BBB Would Pay A Fixed Salary Regardless Of The Number Of Hours Worked Can Only Be Determined On An Individualized Basis**

Plaintiffs do not dispute that BBB may utilize the FLSA's well-established FWW methodology to calculate and pay overtime. Nor do they claim that BBB failed to pay them overtime for all hours worked. Instead, they claim that BBB did not satisfy two of the factors required by the regulations and the caselaw. Specifically, Plaintiffs allege that they lacked the required "clear mutual understanding" that the employee will receive a fixed salary regardless of the number of hours worked, and also claim their hours did not fluctuate. 29 C.F.R. § 778.114(a).

Plaintiffs' attack on the clear mutual understanding prong rests upon the notion that, despite clear documents that they received and signed numerous times, each of them individually misunderstood their pay. Plaintiffs offer no evidence that anyone else is similarly situated based on a "similarly misunderstood" standard (which, in any event, is not the law), and to the extent there are any other individuals who may claim to not understand their pay, that determination cannot be made without individualized inquiries.

The law does not require that employers and employees reach an agreement regarding the FWW, nor does it require that employees understand the precise contours of the FWW. *Stein v. Guardsmark, LLC*, No. 12–4739 (JPO), 2013 WL 3809463, at *7–8 (S.D.N.Y. 2013) (collecting cases and noting that "many courts have deemed it irrelevant that an employee did not actually understand the full details of how her employer's FWW program operated."); *Griffin v. Wake Cnty*, 142 F.3d 712, 716–17 (4th Cir. 1998) (finding understanding where plaintiffs were aware of the payment method, even though they did not agree with the method); *see also Wage and Hour Div. Opinion Letter,* FLSA 2009–3 (Jan. 14, 2009). In order to use the FWW, all that BBB need demonstrate is that DMs understood that their weekly salary would be paid each week, regardless of the number of hours worked. This is demonstrated conclusively by the DM

Compensation Acknowledgement and Annual Pay Acknowledgments that each DM Plaintiff signed.[16]

Presumably in an effort to manufacture a group of individuals who Plaintiffs say all misunderstood clear documents, Plaintiffs have submitted a handful of declarations that all say the same thing—no one told me that my weekly salary would be paid regardless of the number of hours worked. Putting aside Plaintiffs' plain proof issues, this is more than the regulations and the cases require.

The documents show that Plaintiffs' assertions are false. For example, Plaintiff Thomas swears that "no one from BBB, either verbally or via written document, informed me or explained to me how to calculate my salary." (Thomas Dec., ¶ 10). Yet he signed a Department Level Manager Compensation acknowledgement on January 6, 2010, and signed four Annual Pay Acknowledgments from 2012–2015. (Alvarez Dec., ¶¶ 13, 15, Exhibits 1 and 6).

In his declaration, Plaintiff Whaley claims that "No one from BBB ever, either verbally or via written document, informed me that my salary is to cover whatever hours I may work in a workweek and that BBB would pay the salary even if I work less hours than the full number of hours scheduled." (Whaley Dec., ¶ 7). He goes on to claim that "My understanding about my compensation, at the time of my hire and throughout my employment with BBB, was that I would be compensated at one-half time (1.5) my regular rate for hours I worked over 40." (Whaley Dec., ¶ 8). Again, these statements offered in support of Plaintiffs' motion are directly at odds with the clear documents that Mr. Whaley signed over the course of his employment. Like Thomas, he signed a Department Level Manager Compensation acknowledgment in 2011, and signed four Annual Pay Acknowledgments from 2011–2014. (Alvarez Dec., ¶¶ 13, 15, Exhibits 3 and 8).

---

[16] As to Plaintiffs' individual claims, BBB will move for summary judgment at the close of discovery.

28

None of the other declarants fare any better, all making similar claims of confusion over documents they claim never to have received, but in reality signed many times. (Alvarez Dec., ¶¶ 13, 15, Exhibits 2, 4, 7, and 9).

The declarations submitted by Plaintiffs suggest an improbable level of confusion, are contrary to the facts and the documents signed by each declarant, and therefore cannot establish the existence of a group of similarly situated individuals. "These vague and conclusory assertions of similarity generally do not suffice." *Johnson v. Carlo Lizza & Sons Paving, Inc*., 160 F. Supp. 3d 605, 610–11 (S.D.N.Y. 2016) (citing *Guo,* 2014 WL 5314822, at *3 (finding insufficient plaintiffs' declarations that they would discuss wages with their co-workers and were aware of several kitchen workers—named plaintiffs were deliverymen—who did not receive lawful wages); *Sanchez v. JMP Ventures, L.L.C*., No. 13 Civ. 7264 (KBF), 2014 WL 465542, at *2 (S.D.N.Y. Jan. 27, 2014) (denying conditional certification where plaintiff provided only "generalized allegations" without "any detail as to a single such observation or conversation.")).

Moreover, Plaintiffs offer no explanation as to how they would prove a lack of understanding in a collective action at trial on behalf of 600+ DMs across three states. Of course, they cannot do so, because the question of whether any particular DM possessed the required understanding is inherently individualized.

The DM Plaintiffs assert that there were no communications to them. Yet, as set forth in BBB's declarations, the process of communicating how each DM would be compensated came from several different HR personnel through various means and involved hundreds of different conversations with each individual DM. (Cohen Dec., ¶¶ 7, 11; Furlong Dec., ¶ 6, 9; Alvarez Dec., ¶ 10). And, the DM Plaintiffs signed documents clearly demonstrating their understanding. (Alvarez Dec., ¶¶ 13, 15). Thus, if there is any similarity, it is only between and among them—a

class of people who apparently have similarly convenient recollections about communications made to them—and not a broader class. *See, e.g., Stein,* 2013 WL 3809463 (evidence relevant to clear mutual understanding included plaintiffs failure to complain about overtime calculation and communications between plaintiff and employer); *Griffin*, 142 F.3d at 717 (understanding may be based on policies, practices, and procedures, or employee's conduct).

Further, the fact that the DM Plaintiffs list a number of individuals who also worked as DMs in the same two stores in which they worked (Stores 42 and 361) reveals nothing about whether these DM's also lacked a clear mutual understanding with BBB that they would be paid the same fixed salary regardless of the number of hours they worked. A list of names is insufficient to demonstrate that these individuals are similarly situated for purposes of conditional certification. *See Khan*, 2011 WL 5597371, at *4 (denying conditional certification where plaintiff identified several individuals by name who he considered "to have been 'similar employees' … [but where] none of these individuals ha[d] submitted declarations supporting [plaintiff's] claims….")

### D. Under Plaintiffs' "Meaningfully Fluctuate" Standard—Created Out Of Whole Cloth—Whether Putative Class Members' Hours "Meaningfully Fluctuated" Could Only Be Determined On An Individualized Basis

Finally, the DM Plaintiffs' assertion that their hours did not "meaningfully fluctuate" misstates the law and provides no basis for certification. All that is required is fluctuation (not, as Plaintiffs suggest, any particular degree of fluctuation), which Plaintiffs admit occurred. *See* Plaintiffs' Brief at p. 8 (where Plaintiffs themselves concede that "the number of hours they worked has moderate variations from week to week."). Plaintiffs' concession on this point is sufficient to defeat conditional certification because they cannot show a common policy that *violates* the FLSA. *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010). "Meaningful fluctuation"—whatever that may mean to Plaintiffs—is not a prerequisite to utilizing the FWW

methodology in the Second Circuit. *See Stein*, 2013 WL 3809463, at *4 (concluding that fluctuation requirement was met where plaintiff's hours fluctuated between 50–55+ hours per week); *Ramos v. Telgian Corp.*, 176 F. Supp. 3d 181, 195 (E.D.N.Y. 2016) (finding that Plaintiffs' 50–55 hour work weeks were sufficient for fluctuation where regulations reference "hours worked each workweek, *whatever their number* … plainly contemplates that an employee's work hours could be either more or less than the 40-hour or other fixed workweek, or both.") (emphasis in original). Plaintiffs are seeking certification based on a legal requirement that does not exist. The Second Circuit recently declined the invitation to opine on this issue, despite the urging of the Plaintiffs in the *Telgian* case. *See* USCA Mandate, *Ramos v. Telgian Corp.*, 14 CV 03422 (PKC-LC) (Dkt. No. 70) (Sept. 13, 2016). Thus, under *Stein* and *Telgian*— and in light of Plaintiffs' admission that their hours did in fact fluctuate week-to-week—BBB has satisfied the fluctuation prong; and there is therefore no basis to issue notice.

Even if it were somehow relevant, the question of the degree and reason for fluctuation is yet another inherently individualized inquiry inappropriate for collective treatment. As the declarations submitted by BBB show, the amount of hours worked by DMs week-to-week varied significantly depending on the location, volume, and size of the store; the department in which the DM worked; the number of other DMs and associates in the store; the time of year; individual practices of local store management; and the level of initiative undertaken by the different DMs. *See* (Carpino Dec., ¶¶ 8–17; Campbell Dec., ¶¶ 7–11; Grew Dec., ¶¶ 9–14).

### E.  Plaintiffs Have Not Met Their Burden For State-Wide Or Nationwide Notice

Plaintiffs have failed to demonstrate that they are similarly situated to other individuals within their own stores, much less to over 4,000 putative class members across the country. "To decide where to provide notice, the Court must determine **which stores had employees that were 'similarly situated'** with regard to the allegedly unlawful overtime policies." *Pret A Manger*

*(USA) Ltd*., 962 F. Supp. 2d at 557 (emphasis added). To the extent there has been *any* showing by Plaintiffs of a common practice, that showing is limited to the very small geographic area in which Plaintiffs worked—two stores in Manhattan with respect to the DMs' claims and five stores on Long Island and in Manhattan with respect to the ASMs' claims. There is simply no basis to extend a collective action beyond these New York City and Long Island stores to nearly 120 stores in the tri-state area, let alone 850+ stores *nationwide*.[17] The personal experiences of the Plaintiffs here reveal nothing about the experiences of the thousands of other individuals throughout the country.

The Plaintiffs' request for conditional certification is entirely premised on the notion that, since other individuals elsewhere in the country had their same job title and worked for the same Company, they must be similarly situated. But under the law in this Circuit, declarations concerning only seven stores—all in Long Island and New York City—cannot form the basis for issuing notice.

As this Court recently held in *Trinidad v. Pret a Manger*, even where FLSA plaintiffs can meet their similarly situated burden, notice should not issue to any locations where the Court has

---

[17] Presumably, the DM Plaintiffs were aware of these shortcomings and therefore intentionally sought to limit the DM class to putative members in New York, Connecticut and New Jersey. The geographic proximity of these three states, however, does nothing to overcome the clear lack of factual allegations needed to warrant conditional certification across approximately 120 stores in these three states on the basis of thin declarations submitted by a handful of individuals who all worked in the same two stores. *See e.g., Pret A Manger (USA) Ltd.,* 962 F. Supp. 2d at 545; *Hamadou*, 915 F.Supp.2d at 666 (finding Plaintiffs' allegations insufficient to even merit statewide certification in New York where the allegations related only to Defendant's locations in Queens and the Bronx and Plaintiffs offered "no evidence—not even hearsay—about [Defendant's locations] elsewhere in the New York City metropolitan area or further upstate."). Plaintiffs' suggestion that the mere possibility that they could have been transferred to another store somehow excuses their failure of proof is unavailing. In any event, while all of the DM Plaintiffs allege that they were aware they *could have* been transferred to assist other stores, only one DM alleges that he *actually was* transferred to another store in Long Island. (Whaley Dec., ¶ 28). But this "transfer"—which forms a large part of the support for Plaintiffs' efforts to reach stores outside of those in which they actually worked—actually undermines Plaintiffs' case. Whaley's transfer was for one day, happened once in Whaley's five years as a DM, and reveals nothing about the DMs in the Long Island—or anywhere outside the store in which he actually worked—or whether Whaley had any conversations or interactions with the DMs about their experiences with the FWW. There are simply *no facts* regarding *any* DMs in *any* other stores other than the two stores in which the DM Plaintiffs worked—Stores 42 and 361 in NYC.

not been provided with actual evidence pertaining to those locations. "Plaintiffs ha[d] not come close to alleging facts 'to support an inference [of] a uniform policy' of FLSA–violative overtime practices across *all* [33] Pret stores in New York City." *See Pret a Manger (USA) Ltd.*, 962 F. Supp. 2d at 558 (emphasis in original) (quoting *Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 662 (S.D.N.Y. 2013)); *see also, Bahr v. PNW Enters., LLC*, No. 16–1223-PKC, 2017 WL 816140, at *2 (S.D.N.Y. March 1, 2017); *Sanchez*, 2014 WL 465542, at *2.

As this Court has stated: "it is questionable whether such a numerically and geographically limited number of declarations would suffice to permit the inference of a unitary practice across all states." *Martin*, 2016 WL 30334, at *8 (citing *T.J. Maxx I*, 2013 WL 2649544, at *14). To that end "courts in this Circuit have commonly rejected the notion that a plaintiff can meet her burden for justifying nationwide certification merely by providing declarations of plaintiffs from more than single geographic area." *Id*. ("On the basis of these common experiences, plaintiffs ask the Court to infer a nationwide [company] policy to foment unlawful practices. This leap does not logically follow." (citing *T.J. Maxx II*, 2015 WL 2189959, at *10)).

Here, the Plaintiffs rely on nothing more than their own declarations to assert that a pool of potential opt-in plaintiffs numbering approximately 600 DMs in the tri-state area and approximately 4,000 ASMs at more than 850 stores across the country must therefore be similarly situated. Here, measured against a pool of over 4,000 individuals, Plaintiffs' evidence is not even a thimble.

Finally, as Plaintiffs point out in their declarations, there is currently a pending putative class action being brought on behalf of former DMs against BBB in New Jersey, also challenging BBB's use of the FWW (the "NJ Action").[18] Faced with an utter lack of declarants

---

[18] The New Jersey Action is captioned *Brent Carter, Robert Haynes, and Kenneth Cuoco, on behalf of themselves and all others similarly situated v. Bed Bath & Beyond, Inc.*, Docket No. MID-L-06178–16 (Sup. Ct. Law Div. Oct.

with any personal knowledge of New Jersey stores or BBB practices in New Jersey, Plaintiffs point to the pending litigation as evidence that DMs in New Jersey are similarly situated to the DM Plaintiffs. What Plaintiffs fail to say, however, is that the issue in the NJ Action is *not* whether BBB failed to establish the clear mutual understanding and fluctuation prongs of the FWW. Rather, the issue in that case is purely one of state law, with those plaintiffs making the novel legal argument that the wage and hour laws of New Jersey forbid the FWW, full stop.[19]

BBB moved to dismiss or stay the New Jersey Action pending the outcome of this action based on the first-filed rule. However, after finding that the issues there are not based on whether BBB complied with the federal prerequisites in utilizing the FWW, but instead are based on whether the FWW is lawful under New Jersey state law, the Honorable Arthur Bergman declined to dismiss or stay the New Jersey Action. Because the New Jersey Court has already ruled that comity should not extend to this Court, any putative class members in New Jersey should be excluded from this case while their claims are pursued in that pending litigation. *See Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 488 (S.D.N.Y. 2016) ("Put simply, to the extent that the collective-action process is intended to promote efficiency, the law should not allow, and thus encourage, plaintiffs to bring piecemeal litigation.").

---

24, 2016). A true and accurate copy of the Third-Amended Complaint in the New Jersey Action is attached hereto as Exhibit 1.

[19] In any event, the propriety of considering complaints and affidavits from alleged similarly situated individuals who filed separate actions but declined to opt-into the present action has been questioned. *See, e.g., TJ Maxx I*, 2013 WL 2649544, at *13 (noting that the Magistrate Judge declined to consider a complaint and affidavit filed by a plaintiff in Arkansas State Court where such plaintiff "elected not to join in this matter.")

## **CONCLUSION**

For the foregoing reasons, BBB respectfully requests that the Court deny Plaintiffs'

Motion for Conditional Collective Certification in its entirety.[20]


Dated: April 7, 2017                              Respectfully submitted,

                                                  BED BATH & BEYOND INC.

                                                  /s/ Jonathan L. Sulds
Justin F. Keith                                   Jonathan L. Sulds
Greenberg Traurig                                 Greenberg Traurig, LLP
One International Place                            MetLife Building
Boston, MA 02110                                  200 Park Avenue, 34th Floor
Telephone: 617.310.6230                           New York, NY 10166
Fax: 617.897.0930                                 Telephone: 212.801.9200
keithj@gtlaw.com                                  Fax: 212.801.6400
                                                  suldsj@gtlaw.com

---

[20] In the event the Court determines that notice should issue with respect to any stores, BBB respectfully requests the opportunity to be heard regarding the appropriate language and process for issuance of notice.

35

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
                                                                     :
DANYELL THOMAS, RASHAUN F. FRAZER,                                   :
ANDRAE WHALEY and ELENI MIGLIS, individually                         :   Civil Action No. 16-cv-8160
and on behalf of all other employees similarly situated              :
                                                                     :
       Plaintiffs                                                    :
                                                                     :
v.                                                                   :
                                                                     :
   BED BATH AND BEYOND, INC.                                         :
                                                                     :
       Defendant.                                                    :
------------------------------------------------------------- x

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on April 7, 2017 a true copy of the above document was served upon
the attorney of record for each other party by ECF filing.

Dated: April 7, 2017

New York, New York

                                        /s/ Jonathan L. Sulds
                                        Jonathan L. Sulds
                                        Greenberg Traurig, LLP
                                        MetLife Building
                                        200 Park Avenue, 34th Floor
                                        New York, NY 10166
                                        Telephone: 212.801.9200
                                        Fax: 212.801.6400
                                        suldsj@gtlaw.com