UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
                               :

DANYELL THOMAS, RASHAUN F. FRAZER,
ANDRAE WHALEY, ELENI MIGLIS, CHERYL A.
STRYCHARZ, and DANIELLE BROWN, individually
and on behalf of all other employees similarly situated,

    Plaintiffs,

 v.

 BED BATH AND BEYOND, INC.

    Defendant.

:   Civil Action No. 16-cv-8160

------------------------------------------------------------------- x

**BED BATH & BEYOND INC.'S MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR**
**<u>CONDITIONAL COLLECTIVE CERTIFICATION</u>**

GREENBERG TRAURIG, LLP
*Attorneys for Defendant*
*Bed Bath and Beyond Inc.*
200 Park Avenue
New York, New York 10166
212.801.9200

## TABLE OF CONTENTS

Page(s)

INTRODUCTION .................................................................................................................. 1

FACTS ................................................................................................................................... 4

    A.    The Company's Decentralized Operations ........................................................ 4

    B.    The Assistant Store Manager Position ............................................................ 6

           i.    The ASM Plaintiffs' Exercise of Managerial Duties ............................. 9

    C.    The Department Manager Position .................................................................. 17

    D.    The Named Plaintiffs and the Putative Classes .............................................. 22

           i.    The Department Manager Class ............................................................ 22

           ii.    The Assistant Store Manager Class ...................................................... 23

ARGUMENT ........................................................................................................................ 26

    A.    Plaintiffs Have Not Met Their Burden ........................................................... 26

    B.    The Company's Assistant Store Managers Were Properly Classified, and Any Disputes Regarding Individual Status Cannot be Resolved On A Collective Basis .............................................................................................. 27

    C.    Whether the DM Plaintiffs' Putative Class Members Lacked A "Clear Mutual Understanding" That BBB Would Pay A Fixed Salary Regardless Of The Number Of Hours Worked Can Only Be Determined On An Individualized Basis ........................................................................................ 32

    D.    Under Plaintiffs' "Meaningfully Fluctuate" Standard—Created Out Of Whole Cloth—Whether Putative Class Members' Hours "Meaningfully Fluctuated" Could Only Be Determined On An Individualized Basis ................ 36

    E.    Plaintiffs Have Not Met Their Burden For Notice .......................................... 37

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmed v. T.J. Maxx Corp.*,
   103 F. Supp. 3d 343 (E.D.N.Y. 2015) ...............................................................2, 3

*Ahmed v. T.J. Maxx Corp.*,
   No. 10-CV-3609 ADS, 2013 WL 2649544 (E.D.N.Y. June 8, 2013) ........................... *passim*

*Bahr v. PNW Enters., LLC*,
   No. 16-CV-1223 PKC, 2017 WL 816140 (S.D.N.Y. March 1, 2017) ....................................38

*Brown v. Barnes and Noble, Inc.*,
   No. 16-CV-07333 KHP, 2017 WL 1653576 (S.D.N.Y. May 2, 2017) ............................23, 30

*Eng-Hatcher v. Sprint Nextel Corp.*,
   No. 07-CV-7350 BSJ, 2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009) ...................................31

*Griffin v. Wake Cnty*,
   142 F. 3d 712 (4th Cir. 1998) .................................................................32, 35, 36

*Guillen v. Marshalls of MA, Inc.*,
   750 F. Supp. 2d 469 (S.D.N.Y. 2010)................................................................. *passim*

*Guillen v. Marshalls of MA, Inc.*,
   841 F. Supp. 2d 797 (S.D.N.Y. 2012)..............................................................2, 31

*Hamadou v. Hess Corp.*,
   915 F. Supp. 2d 651 (S.D.N.Y. 2013)..............................................................29, 31

*Jenkins v. TJX Companies Inc.*,
   853 F. Supp. 2d 317 (E.D.N.Y. 2012) .............................................................2, 30, 31, 32

*Johnson v. Carlo Lizza & Sons Paving, Inc.*,
   160 F. Supp. 3d 605 (S.D.N.Y. 2016).................................................................35

*Khan v. Airport Mgmt. Servs., LLC*,
   No. 10-CV-7735 NRB, 2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011).......................2, 31, 34

*Korenblum v. Citigroup, Inc.*,
   195 F. Supp. 3d 475 (S.D.N.Y. 2016).................................................................39

*Martin v. Sprint/united Mgmt. Co.*,
   No. 15-CV-5237 PAE, 2016 WL 30334 (S.D.N.Y. Jan. 4, 2016).........................................31

*McEarchen, et al. v Urban Outfitters, Inc.*,
   No. 13-CV-03569 RRM (Dkt. 268) (E.D.N.Y. March 7, 2017)...........................................31

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)............................................................................................36

*Ramos v. Telgian Corp.*,
   176 F. Supp. 3d 181 (E.D.N.Y. 2016) ...........................................................................36, 37

*Rojas v. Kalesmeno Corp.*,
   No. 17-CV-0164 JCF, 2017 WL 3085340 (S.D.N.Y. July 19, 2017).....................................30

*Sanchez v. JMP Ventures, L.L.C.*,
   No. 13-CV-7264 KBF, 2014 WL 465542 (S.D.N.Y. Jan. 27, 2014).......................................38

*Scott, et al. v. Chipotle Mexican Grill, Inc., et al.*,
   No. 12-CV-8333 ALC, 2017 WL 1287512 (S.D.N.Y. Mar. 29, 2017) ...................................31

*She Jian Guo v. Tommy's Sushi Inc.*,
   No. 14-CV-3946 PAE, 2014 WL 5314822 (S.D.N.Y. Oct. 16, 2014) ...................................27

*Stein v. Guardsmark, LLC*,
   No. 12-CV-4739 JPO, 2013 WL 3809463 (S.D.N.Y. 2013).............................32, 35, 36, 37

*Summa v. Hofstra Univ.*,
   715 F. Supp. 2d 378 (E.D.N.Y. 2010) .............................................................................23

*Trinidad v. Pret A Manger (USA) Ltd.*,
   962 F. Supp. 2d 545 (S.D.N.Y. 2013)................................................................3, 26, 27, 38

*Vasquez v. Vitamin Shoppe Indus. Inc.*,
   No. 10-CV-8820 LTS THK, 2011 WL 2693712 (S.D.N.Y. July 11, 2011).........................32

*Wills v. RadioShack Corp.*,
   981 F. Supp. 2d 245 (S.D.N.Y. 2013)..............................................................................22

**Statutes**

29 U.S.C. § 201 *et. seq*..........................................................................................*passim*

Wage Theft Prevention Act, NYLL § 195.............................................................................19

**Other Authorities**

29 C.F.R. § 541.100 ..........................................................................................................28

29 C.F.R. § 778.114..........................................................................................................22

## INTRODUCTION

Bed Bath and Beyond Inc. ("BBB" or the "Company") respectfully submits this Memorandum in Opposition to Plaintiffs' Motion for Conditional Certification under the Fair Labor Standards Act ("FLSA"). As we show in detail below, the motion should be denied.

The Company is one of the largest retailers in the home furnishing industry operating approximately 63 stores in New York with about 3,500 employees and 100+ stores in the tri-state area with about 6,100 employees altogether. Each store varies in size and operation depending on regional differences, sales volume, and the local competitive environment. There are substantial differences among BBB stores in terms of numbers of personnel and categories of employees. *See* (Declaration of Tina Suojanen ("Suojanen Dec."), at ¶¶ 14, 17, 18, and 27). BBB's success and growth has been driven by its unique decentralized culture, which leverages the knowledge, independence, and unique experiences and skills of its local personnel and associates[1]. (Suojanen Dec., at ¶ 29).

Plaintiffs' motion overlooks and ignores the differences among stores and resulting diversity of experiences of the Company's Assistant Store Managers ("ASMs") and Department Managers ("DMs"). Instead Plaintiffs offer only their own personal, individualized experience covering just a small fraction of the New York City area and Long Island BBB stores.

Because Plaintiffs have no personal knowledge and offer no competent evidence of other stores, they cannot meet their minimal burden on this motion. The declarations they submit cover only two stores for the DMs (both in Manhattan) and only six stores for the ASMs (all in the New York City area and Long Island). As shown in the charts submitted with BBB's declarations, the stores where Plaintiffs worked are certainly not representative of the other stores for which Plaintiffs ask this Court to send notice. (Suojanen Dec., at ¶¶ 37, 42, Exhibits 1

---

[1] BBB refers to its employees as "associates."

and 2). Yet, Plaintiffs still seek Court mandated notice to over 600 DMs across 100+ stores in the tri-state area and to approximately 400 ASMs across 63 stores in the State of New York. That should be denied. *See Ahmed v. T.J. Maxx Corp.*, 103 F. Supp. 3d 343, 357 (E.D.N.Y. 2015) ("*TJ Maxx II*"); *Ahmed v. T.J. Maxx Corp.*, No. 10-CV-3609 ADS, 2013 WL 2649544, at *14 (E.D.N.Y. June 8, 2013) ("*TJ Maxx I*"); *Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 800 (S.D.N.Y. 2012), *adopted*, No. 09-CV-9575 LAP GWG, 2012 WL 2588771 (S.D.N.Y. July 2, 2012) ("*Guillen II*"); *Jenkins v. TJX Companies Inc.*, 853 F. Supp. 2d 317, 324 (E.D.N.Y. 2012); *Khan v. Airport Mgmt. Servs., LLC*, No. 10-CV-7735 NRB, 2011 WL 5597371, at *4 (S.D.N.Y. Nov. 16, 2011); *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 477 (S.D.N.Y. 2010) ("*Guillen I*").

The burden of producing evidence of other locations is particularly important here where Plaintiffs' claims are on their face of a highly individualized nature.

BBB's declarations and Plaintiffs' own deposition testimony show the differences in operations, staffing levels, mix of employees, and volumes of sales among and between the 63 BBB stores in the State of New York alone, each operating under a different Store Manager. New York State is divided into 9 different districts. Each operates under a separate District Manager. The New York City District (unlike other Districts in the State of New York) effectively functions as its own separate Region. There are 7 BBB stores in the New York City District.

BBB's declarations show that store-to-store differences precluding collective treatment exist. ASM Plaintiffs say that they did not behave as managers and argue they were misclassified as exempt essentially because of the nature of the specific store in which each was employed. But these ASM Plaintiffs failed to do their jobs and were disciplined for failing to manage. Yet,

in their limited number of stores, because of particular operations there, each had sufficient autonomy to ignore directions and corrective discipline and continue not to manage. Because they fail to provide any evidence that anything similar happened at other stores, under *Guillen I*, *Guillen II*, *TJ Maxx I*, and *TJ Maxx II*, conditional certification would not be proper.[2] For the reasons set forth below, Plaintiffs' motion should be denied in its entirety.

In like manner, the DM Plaintiffs claim in their declarations that the Fluctuating Workweek ("FWW") methodology could not be applied to them because they each lacked a clear mutual understanding of the pay arrangement. *See* Declaration of Danyell Thomas, ("Thomas Dec."), ¶ 10; Declaration of Andrae Whaley ("Whaley Dec."), ¶ 7; Declaration of Rashaun F. Frazer ("Frazer Dec."), ¶ 10; Declaration of Elizabeth Padilla ("Padilla Dec."), ¶ 9; Declaration of Byron Villacres ("Villacres Dec."), ¶ 13; Declaration of Radica Kutwaru ("Kutwaru Dec."), ¶¶ 20–21. At best, Plaintiffs' declarations raise individualized factual questions. Significantly, BBB's declarations show that many former DMs understood perfectly well the way they were being paid. *See* (Declaration of Lauren Alvarez ("Alvarez Dec."), ¶ 9, 12; Declaration of Judy Cohen ("Cohen Dec."), ¶¶ 6–11; Declaration of Michael Furlong ("Furlong Dec."), ¶ 9). BBB's declarations and Plaintiffs' own deposition testimony also lay out that, in addition to receiving documents plain on their face about the FWW methodology, each DM, upon hire or promotion, also was individually informed by a BBB Manager or Human Resources representative about the arrangement. This included numerous communicators and scores of new DMs, resulting in hundreds of individual conversations about the FWW—all of which by

---

[2] Even assuming the ASM Plaintiffs had demonstrated similarities in their work experiences—and they have not—at the six stores in which they worked, *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545 (S.D.N.Y. 2013), and its progeny call for conditional certification sharply limited to the geographic area and six stores in which these ASM Plaintiffs worked.

Plaintiffs' argument would, of necessity, have to be the subject of proof and review in any trial. (Cohen Dec., ¶¶ 7–11; Furlong Dec., ¶ 6; Alvarez Dec., ¶ 10).

If the DM Plaintiffs are to prevail, it will be their burden to prove every member of the class similarly misunderstood the pay arrangement—"similarly misunderstood" being a legally untenable oxymoron and not a basis for an FLSA collective action.

Seeking to deflect attention from this in their brief, the DM Plaintiffs also say that FWW treatment was improper because their individual hours did not "meaningfully fluctuate" week to week. But that "standard" is concocted from thin air, is not the law in this District, and itself spotlights another set of individual factual issues—at no point do DM Plaintiffs say each of them worked the same hours. How much fluctuation there was is an individual question. So as Plaintiffs' arguments themselves show, that each DM received overtime pursuant to the FWW methodology does not create the factual predicate sufficient for collective certification.

## FACTS

### A. The Company's Decentralized Operations

BBB's stores are organized into seven regions covering various parts of the country.[3] Each region is overseen by a Regional Vice President. Under the Regional VP is a Regional Manager. The regions are further divided into 100 Districts. (Suojanen Dec., ¶¶ 7–10).

Each region has its own Human Resources function, which is overseen by a Regional HR Director and Regional HR Managers. Each district also has its own District HR Manager. Numerous other regional and district-level management personnel ensure that the stores under their responsibility operate smoothly and meet customer needs. (Suojanen Dec., ¶ 10).

The Plaintiffs in this case all worked in New York, which is part of the Northeast region.[4] The Northeast Region is overseen by a Regional Vice President, supported by three Regional

---

[3] The regions are: Canada-Northwest; Central; Mid-Atlantic; Midwest; Northeast; Southeast; and West.

Managers. There are 15 distinct districts within the Northeast Region, each with its own District Manager.[5] Within the State of New York alone, there are nine districts, all with their own District Managers. (Suojanen Dec., ¶¶ 11–13).

The Northeast Region is home to some of BBB's highest-volume and busiest stores, which are located in New York City. New York City is its own district and has its own separate Regional Human Resources Manager, and effectively functions as its own region. (Alvarez Dec., ¶ 6). Thus, one Regional Human Resource Director oversees HR matters in New York City (Lauren Alvarez), while another Regional Human Resource Director (Judy Cohen) oversees HR matters for the rest of the State of New York and the other states in the Northeast region. *Id*.

The Company's stores in the tri-state area are diverse and varied, and no two stores are alike. They range in size from under 20,000 square feet to over 100,000 square feet in New York City. The smallest stores in the tri-state area employ as few as 15 employees; the larger stores employ over 150 employees, and one of the largest stores in the country, located in Chelsea, NY (Store 42 where 3 of the 6 DM Plaintiffs worked), employs over 325 employees. **In New York State alone, there are 63 stores, which employ over 3,500 employees.** (Suojanen Dec., ¶¶ 14–23).

Staffing levels for each BBB location vary depending on the store size, the number and type of specialty departments within the store, hours of operation, volume of sales, and numerous other factors. (Suojanen Dec., ¶ 18). Higher volume stores typically have the greatest number of employees, customers, and revenue, and lower volume stores typically have the least. Store 42,

---

[4] The Northeast Region also includes Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Maryland, Vermont and parts of New Jersey.
[5] While the Northeast Region has 15 Districts, some Districts in New Jersey are in the Northeast Region while others are in the Mid-Atlantic Region. Accordingly, the number of Districts in the tri-state area totals 18.

in New York City's Chelsea neighborhood, is one of the highest volume stores in the entire Company. (Suojanen Dec., ¶ 19).

The lowest volume stores in the tri-state area range in size from 18,000 to 26,000 square feet and typically have either one or two ASMs, zero to one DM, and anywhere from 15 to 25 employees. (Suojanen Dec., ¶ 23). Mid-volume stores range in size from 18,000 square feet up to 41,000 square feet and typically have either one to three ASMs, zero to two DMs, and anywhere from 20 to 55 employees. (Suojanen Dec., ¶ 22). High volume stores range in size from 24,000 square feet to 51,000 square feet and employ anywhere from 35 to 60 employees on average, typically with approximately three or four ASMs and typically with approximately one to four DMs. (Suojanen Dec., ¶ 21). And the very highest volume stores in the tri-state area have anywhere from three to nine ASMs, three to 17 DMs, and 45 to 150 hourly associates, with the Chelsea store (Store 42) having 12 ASMs, 18 DMs, and approximately 300 hourly associates. (Suojanen Dec., ¶¶ 19–20).

### B. The Assistant Store Manager Position

The day-to-day operation of each store is overseen by a Store Manager, who is responsible for all of the operations within his or her store. An ASM assists the Store Manager with the overall operation of the store and is responsible for managing and supervising the DMs and hourly associates in the store, writing schedules, issuing discipline, and interviewing and hiring. (Suojanen Dec., ¶¶ 31–35; Declaration of Chantal Doherty ("Doherty Dec."), ¶¶ 5–6; 12). The DM Plaintiffs here testified in their depositions that they viewed ASM's as being part of senior management. (*See* (Plaintiffs' Exhibit M ("Padilla Dep."), at 14:4–9 (describing the ASMs as her "bosses")); (Plaintiffs' Exhibit O ("Thomas Dep."), at 19:9–18; 73:10–25 and the

Deposition of Andrae Whaley ("Whaley Dep.")[6], at 51:21 – 52:5 (describing ASMs as "senior" managers)).

The number of ASMs employed at any given store in the State of New York ranges from as few as one in smaller stores to more than 10 in the highest-volume stores. (Suojanen Dec., ¶¶ 19–23). ASMs supervise and are responsible for between 10 to over 100 hourly associates and anywhere from zero to 18 DMs, varying from store-to-store. ASMs are required to perform supervisory duties and are trained, evaluated, and compensated accordingly. (Suojanen Dec., ¶¶ 32–33). ASMs are exempt from overtime and paid an annual salary. (Suojanen Dec., ¶ 31).

Within the ASM classification, there are two different positions: Operations ASMs ("Operations Managers") and Merchandising ASMs ("Merchandise Assistant Managers"). The job requirements for both Operations Managers and Merchandise Assistant Managers include: (i) directing the daily activities of DMs and hourly associates; (ii) training and development of staff; (iii) participating in interviewing and hiring of hourly associates; and (iv) counseling, disciplining, and assisting in terminations. (Suojanen Dec., ¶ 32).

Operations Managers and Merchandise Assistant Managers have additional and differing job responsibilities. In addition to the general responsibilities listed above, Operations Managers are also responsible for: (i) ensuring that the area of the store where customers' purchases are transacted (referred to as the "front end") is operating according to proper procedures through management of staff; (ii) ensuring that the area of the store where merchandise is received and shipped out of (referred to as the "back end") is operating according to proper procedures through management of staff; (iii) performing and/or overseeing new hire associate orientations; (iv) processing of new hire/benefits paperwork; and (v) scheduling associate shifts within the

---

[6] The Whaley Dep. is attached to the Declaration of Jonathan L. Sulds ("Sulds Dec."), at Exhibit 1.

store. (Suojanen Dec., ¶ 33). In a large store, an Operations Manager typically oversees more than 20 associates. (Suojanen Dec., ¶ 34).

Merchandise Assistant Managers are primarily responsible for the hourly associates who work on the store floor in the various departments. At any given time, the number of hourly associates working on the floor in a New York store can range from a handful to more than 100, depending on the size of the store.

The work experiences of both Operations Managers and Merchandise Assistant Managers vary markedly depending upon the size, geographic region, and the particular challenges and other realities that each unique store faces. Staffing also influences how much time an ASM spends on interviewing and hiring—in stores that do more hiring throughout the year, ASMs engage more in the interviewing and hiring process. (Doherty Dec., ¶¶ 11–16).

The mix of ASM duties is also impacted by the management style of the Store Manager within each store. For example, while some Store Managers participate throughout the hiring process in their stores, many others delegate the process to ASMs. The mix of duties is also affected by the Store Manager's relationship with his or her ASMs and that Store Manager's delegation of managerial tasks to the ASMs. (Doherty Dec., ¶ 11). ASM Plaintiff Kutwaru testified that she worked under two different Store Managers, each with their own style of management. According to Kutwaru, one Store Manager "has to always be in charge and manage everything in a certain way," while the other "would listen to my input." (*See* Plaintiffs' Exhibit Q ("Kutwaru Dep."), at 100:16 – 101:15).

The ASM's managerial and supervisory role is also affected by each individual ASM's experience, ability, and level of motivation. For example, an unmotivated ASM in a higher volume store that employs many ASMs can more easily "hide behind" their more diligent

counterparts than in a lower volume store where there are fewer ASMs to pick up his or her slack, as compared to an ASM in a low volume store who has no one but himself or herself to rely upon for management duties. (Doherty Dec., ¶ 14).

Differences also abound in how ASMs approach their supervisory duties—including how and when they schedule team meetings, conduct staff evaluations, and train their DMs and associates. Most ASMs develop their own personal style of managing associates, with some opting to train and teach on the floor itself, and others training through informal discussions. (Doherty Dec., ¶ 14). At no point, and in no way, do ASM Plaintiffs address any of these undisputed facts.

### i.   The ASM Plaintiffs' Exercise of Managerial Duties

The five ASM Plaintiffs in this case—Eleni Miglis, and opt-in Plaintiffs Hector Caraballo, Bryan LaForest, Radica Kutwaru[7], and John Cutajar—all regularly exercised managerial responsibilities. For example:

- In March 2012, Miglis issued a warning to an associate[8] for changing her own schedule without requesting approval.

- On March 20, 2012, Miglis issued a warning to an associate for reporting to work late on more than one occasion.

- On March 21, 2012, Miglis issued a warning to an associate for reporting to work late on more than one occasion.

- On March 23, 2012, Miglis issued a warning to an associate for reporting to work late on more than one occasion.

- On March 31, 2012, Miglis issued a warning to an associate for reporting to work late on more than one occasion.

---

[7] Kutwaru was both a DM and ASM during the three year limitations period.
[8] To protect their privacy, names of the individual associates and Department Managers interviewed, disciplined, or reviewed by the ASM Plaintiffs have been omitted from this Memorandum of Law and redacted from exhibits accompanying BBB's declarations. BBB will promptly provide the Court with non-redacted exhibits for an in camera review if the Court so desires. BBB will also provide Plaintiffs' counsel with non-redacted exhibits upon entry of an appropriate confidentiality order.

- On April 5, 2012, Miglis issued a warning to an associate for reporting to work late on more than one occasion.

- On April 5, 2012, Miglis also issued a warning to an associate for reporting to work late on more than one occasion.

- On April 12, 2012, Miglis issued a warning to an associate for failing to consistently offer her suggested sell item, and instructing the associate to offer it 100% of the time.

- On May 29, 2012, Miglis issued a warning to an associate for failing to offer a suggested sell item and explained to the associate the company expectation is that all associates offer it 100% of the time.

- On May 31, 2012, Miglis issued a similar warning to another associate for failing to offer a suggested sell item and explained to the associate the company expectation is for associates to offer it 100% of the time.

- On June 4, 2012, Miglis issued a warning to an associate for demonstrating inappropriate behavior while working.

- On July 12, 2012, Miglis issued a warning to an associate for processing a $500 return of an item marked "donation" without getting a Manager on Duty involved.

- On November 19, 2012, Caraballo disciplined an associate for wearing a nose ring while on the selling floor, memorizing his conversations with the associate in a Note to File.

- On December 17, 2012, Miglis disciplined an associate for reporting to work late on more than one occasion.

- On January 11, 2013, Caraballo issued a formal warning to an associate for issuing a customer refund over the phone without proper verification.

- On March 11, 2013, Miglis disciplined an associate for failing to follow company policies and procedures.

- On March 13, 2013, Miglis disciplined an associate yet again for time and attendance violations.

- On April 9, 2013, Caraballo issued a formal warning to an associate for reporting to work late without calling ahead.

- On May 11, 2013, Caraballo issued a formal warning to an associate for time and attendance violations.

- On November 17, 2013, Caraballo issued a formal warning to an associate for failure to complete assigned tasks.

- On February 6, 2015, Caraballo disciplined an associate for leaving her department while another employee was also on break without approval by a manager, memorizing his conversations with the associate in a Note to File.

- On May 3, 2016, Kutwaru issued a written warning to an associate for tardiness and absence issues.

- On May 7, 2016, Kutwaru issued a written warning to an associate for reporting to work late on more than one occasion.

- On July 10, 2016, Kutwaru issued a written warning to an associate for reporting to work late on more than one occasion.

- On October 22, 2016, LaForest issued a written warning to an associate for performance issues.

- On November 12, 2016, LaForest issued a warning to an associate for lying on his timesheet.

- On February 6, 2017, LaForest issued a warning to an associate for reporting to work late on more than one occasion.

- On March 1, 2017, LaForest issued a warning to an associate for accepting returns of items without a receipt.

(Alvarez Dec., ¶ 16, Exhibits 14 and 15; Cohen Dec., ¶ 13, Exhibits 1 and 2).

The ASM Plaintiffs also completed performance reviews for the associates they supervised:

- On April 28, 2012, Miglis reviewed a store associate. Miglis is the only manager listed on the review.

- On July 22, 2012, Miglis reviewed a store associate. Miglis is the only manager listed on the review.

- On August 27, 2012, Miglis reviewed an overnight receiving and maintenance associate. Miglis is the only manager listed on the review.

- On August 31, 2012, Miglis reviewed a store associate. Miglis is the only manager listed on the review.

- On September 23, 2012, Miglis reviewed a store associate. Miglis is the only manager listed on the review.

- On October 18, 2012, Miglis reviewed a store associate. Miglis is the only manager listed on the review.

11

- On October 20, 2012, Miglis reviewed a store associate. Miglis is the only manager listed on the review.

- On December 20, 2012, Miglis reviewed a store associate. Miglis is the only manager listed on the review.

- On February 28, 2013, Miglis reviewed a store associate. Miglis is the only manager listed on the review.

- On February 28, 2013, Miglis also reviewed an inventory control lead supervisor. Miglis is the only manager listed on the review.

- On March 29, 2013, Miglis reviewed a store associate.

- On June 30, 2013, Miglis reviewed a store associate. Miglis is the only manager listed on the review.

- On January 28, 2014, Caraballo reviewed a Department Manager.

- On June 21, 2014, Caraballo conducted a performance review of an associate.

- On August 21, 2014, Cutajar reviewed a store associate. Cutajar is the only manager listed on the review.

- On September 9, 2014, Caraballo reviewed a store associate. Caraballo is the only manager listed on the review.

- On November 19, 2014, Caraballo conducted a performance review for a Department Manager.

- On November 19, 2014, Caraballo conducted another performance review of a Department Manager. Caraballo is the only manager listed on the review.

- On November 24, 2014, Caraballo conducted a performance review of an associate. Caraballo is the only manager listed on the review.

- On November 26, 2014, Cutajar conducted a performance review of a store associate. Cutajar is the only manager listed on the review.

- On February 21, 2015, Cutajar conducted a performance review of a store associate. Cutajar is the only manager listed on the review.

- On July 24, 2015, Cutajar conducted a performance review of a store associate.

- On August 2, 2015, Cutajar conducted a performance review of a store associate. Cutajar is the only manager listed on the review.

- On October 14, 2015, Cutajar conducted a performance review of a store associate.

- On February 23, 2016, Cutajar conducted a performance review of a store associate.

- On April 26, 2016, Kutwaru completed a performance review of a store associate.

- On June 13, 2016, Cutajar conducted a performance review of a store associate. Cutajar is the only manager listed on the review.

- On June 20, 2016, Cutajar issued an associate a 90-day progress report. Cutajar is the only manager listed on the report.

- On June 21, 2016, Cutajar issued an associate a 90-day progress report. Cutajar is the only manager listed on the report.

- On June 30, 2016, Kutwaru completed a performance review of a store associate.

- On August 7, 2016, LaForest completed a progress report review of an associate.

- On September 26, 2016, Cutajar conducted a performance review of a store associate.

- On October 9, 2016, Cutajar issued an associate a 90-day progress report. Cutajar is the only manager listed on the report.

- On January 19, 2017, Cutajar issued an associate a 90-day progress report. Cutajar is the only manager listed on the report.

- On January 19, 2017, Cutajar issued another associate a 90-day progress report. Cutajar is the only manager listed on the report.

- On January 19, 2017, Cutajar issued a third associate a 90-day progress report. Cutajar is the only manager listed on the report.

- On February 13, 2017, Kutwaru completed a performance review of a store associate.

- On February 15, 2017, Kutwaru completed a performance review of a store associate.

- On April 5, 2017, LaForest completed a performance review of a store associate.

- During her time as an ASM, Miglis also issued 36 certifications relating to associates' completion of training on lifting, knife safety, and the use of ladders in the store.

(Alvarez Dec., ¶ 17, Exhibits 16 and 17; Cohen Dec., ¶ 14, Exhibits 3, 4, and 5).

Miglis and LaForest also played a key role in the hiring and firing of store associates:

13

- On February 8, 2012, Miglis hired a store associate to work as a cashier.

- In December 2012, Miglis interviewed an associate candidate.

- On December 31, 2012, Miglis conducted a reference check of an associate candidate.

- On February 1, 2013, Miglis conducted a reference check of another associate candidate.

- On February 11, 2013, Miglis issued an employee separation form relating to a mutual agreement between an associate and the company for her to cease employment.

- On March 7, 2013, Miglis issued an employee separation form terminating a store associate for violating company policy.

- On August 23, 2016, LaForest signed an associate's termination notice.

- On February 7, 2017, LaForest signed an associate's termination notice.

(Cohen Dec., ¶ 15, Exhibits 6 and 7).

And, as part of their performance reviews, Miglis, Caraballo, LaForest, and Cutajar completed self-evaluations, confirming their managerial responsibilities and duties:

- On August 10, 2010, Miglis reviewed herself as "meeting expectations" with respect to her management skills and listed teaching and training associates to find information on their own as a goal that Miglis accomplished during the employee appraisal period.

- On September 28, 2012, Miglis listed her goal for the next review period was to "teach [and] train all cashiers [and] customer service to better utilize JDA [and] Bed Net."

- On January 28, 2013, LaForest reviewed himself and listed his goal for the next review period to "train and develop more managers."

- On July 16, 2013, Miglis reviewed herself as "significantly exceeding expectations" with respect to some of her management skills and listed her goals for the next review period to "hire, staff teach [and] train new staff to company standard [and] expectation" and to "maintain teaching [and] training."

- On October 31, 2013, Caraballo reviewed himself as "meeting expectations" for almost all of his management skills.

- On October 31, 2013, LaForest reviewed himself as "meeting expectations" for his overall management skills.

- On July 22, 2014, Miglis reviewed herself as "exceeding expectations" with respect to a majority of her management skills and listed her goals for the next review period as "get Dept managers through MDP" and "run store operations."

- On December 11, 2014, Caraballo reviewed himself as "meeting expectations" for all of his management skills.

- On January 14, 2015, LaForest listed one of the goals that he accomplished as successfully assisting with a store renovation and executing store rotations.

- On February 2, 2015, Cutajar reviewed himself as "meeting expectations" for providing ongoing training and development to managers and associates and for conducting disciplinary actions in a fair and constructive manner.

- On September 11, 2015, LaForest reviewed himself as "meeting expectations" for almost all of his management skills and listed a goal for the next period as: "Although I have written a few associates up, I need to hold my people accountable more."

- On March 1, 2016, Cutajar reviewed himself and one of the objectives he listed as accomplishing is that he "wrote the schedule for the hardside to ensure proper coverage for the departments."

- On September 16, 2016, LaForest listed one of his accomplishments as being that he "conducted reviews and write ups in a timely manner."

- On January 6, 2017, Cutajar reviewed himself as "meeting expectations" with respect to his overall management skills.

(Alvarez Dec., ¶ 18, Exhibit 18; Cohen Dec., ¶ 16, Exhibits 8, 9, and 10).

The Company held the ASM Plaintiffs accountable when they failed to discharge their managerial responsibilities. For example, on May 16, 2011, Miglis was disciplined for her failure to address dress code violations of the staff within the store. The Store Manager wrote "that by failing to communicate the company best practices to her staff and holding the staff accountable to the standard she is not setting up her staff for success and causing potential employee relations and customer service issues in the store." Similarly, on September 30, 2009, Miglis was disciplined for failing to maintain adequate employee staffing in the store which resulted in a

customer complaint due to substandard coverage. (Cohen Dec., ¶ 17, Exhibit 11); *see also*, (Declaration of Dawn Mihalek ("Mihalek Dec."), ¶¶ 5–11).

Caraballo was also repeatedly warned and disciplined for failing to meet performance expectations. On April 16, 2014, for example, Caraballo's Store Manager had a conversation with him about whether he was capable of doing the job of an ASM and suggested that Caraballo "seriously consider taking a step down" because he was not performing in accordance with the requirements of an ASM. On May 19, 2014, Caraballo was warned for having a "lack of ownership" over his area of the store and showing a "lack of interest with" his staff by failing to have regular sit downs or provide them feedback. Similarly, on June 30, 2014, Caraballo was warned for failing to "train or develop his managers or associates or give [them] directions" and failing to "regularly meet with his managers [and] … follow-up on Department Manager routines." Caraballo was also warned for failing to "hold his managers accountable for incomplete tasks." On February 16, 2015, Caraballo was warned for failing to "give directions to his team" and failing to "follow-up on tasks he assigns." (Alvarez Dec., ¶ 19, Exhibit 19); *see also*, (Declaration of Leticia DelRio ("DelRio Dec."), ¶¶ 5–15).

On August 15, 2016, LaForest was informed that his job was in jeopardy for poor performance in closing the store and leaving an associate locked inside. LaForest was also disciplined on September 9, 2016, for failing to appropriately monitor the schedules of minor employees in order to remain compliant with New York State law. LaForest also received poor performance reviews, one of which indicated that he "sometimes struggles with day to day functions of being a senior manager." (Cohen Dec., ¶ 17, Exhibit 12).

Unsurprisingly, Miglis, Caraballo, LaForest, and Kutwaru were terminated for performance issues. Miglis was terminated for providing her key turn authorization numbers to a

supervisor in order to allow the supervisor to process transactions without Miglis having to be present—a clear abdication of her managerial responsibilities. When Miglis was informed of her termination, she was told that this violation, coupled with "judgment that had fallen far below the Company's expectation of any manager," warranted immediate separation from the Company. (Cohen Dec., ¶ 17, Exhibit 11). Similarly, Caraballo was terminated for continuing "to not meet performance expectations" with respect to his management responsibilities in his role as an ASM. (Alvarez Dec., ¶ 19, Exhibit 19; DelRio Dec., ¶ 15). LaForest was terminated for stealing Company property and was arrested. (Declaration of Keith Haack, ¶ 10). Kutwaru was terminated for marking down the price of an item to purchase it herself, and upon being terminated she acknowledged that "as a senior manager" she was "held at a higher standard" that she failed to meet. (Alvarez Dec., ¶ 19, Exhibit 20).

### C.  The Department Manager Position

Underneath the Assistant Store Manager level are the Company's Department Managers who are not classified as exempt for wage and hour purposes. DMs are generally responsible for overseeing a specific department or area of a store. There are different types of DMs depending on which department of the store each manager is responsible for. These include: Customer Service Managers, Front End Managers, Receiving Managers, Freight Managers, Hardside Managers, and Softside Managers. (Suojanen Dec., ¶ 38). Some stores also have DMs of specialty departments such as Wedding, Fine China, or Gourmet Foods. *Id*.

DMs monitor hourly associates and ensure that the merchandise in their particular area is properly stocked, displayed, and accessible for customers. *Id*. Depending on the store location and store volume, some stores in the tri-state area have no DM while others have up to 18. (Suojanen Dec., ¶ 42, Exhibit 2). Today, the Company employs approximately 1,400 DMs. (Suojanen Dec., ¶ 43).

All DMs are classified as non-exempt employees and are paid overtime for all hours worked over 40.[9] (Suojanen Dec., ¶ 39). Prior to March 2015, BBB paid DMs in New York, New Jersey, and Connecticut overtime pursuant to the FLSA's FWW methodology. (Suojanen Dec., ¶ 40). When individuals were hired or promoted to the position of DM, they were explicitly told how their pay would be calculated and were informed of BBB's use of the FWW. (Cohen Dec., ¶¶ 6–11; Alvarez Dec., ¶¶ 9–12; Furlong Dec., ¶¶ 6–9). Specifically, DMs were told what their base annual salary would be if they worked 40 (or less) hours per week, and what their expected total earnings would be if they worked 47 hours per week, including overtime. *Id*. DMs were told that the dollar value (per overtime hour) for hours worked above 40 hours would vary due to BBB's use of the FWW. *Id*.

The Company utilized a variety of communications to ensure that its DMs understood that they would receive a fixed base salary each week, which would be paid regardless of the number of hours worked. DMs—including each DM Plaintiff in this case—received and signed a Department Level Manager Compensation acknowledgement ("DM Compensation Acknowledgement"), that states:

> At the time I was hired, I was told what my anticipated weekly compensation will be and how it will be calculated.
>
> I understand that my weekly compensation consists of two components: (1) a base weekly salary; and (2) an additional amount for all hours over 40 that I work during a week.
>
> I understand that my base weekly salary is compensation for all hours I work in a week. I will be paid this base salary for each week I work, whether or not I work 40 hours in that week, subject to the Company's sick day and leave policies.
>
> I further understand that I will be scheduled for no less than 47 hours per week, but that my actual hours worked will fluctuate depending on the needs of my store. (Alvarez Dec., ¶ 13, Exhibits 1–6).

---

[9] The classification of DMs is not at issue in this case.

Along with the DM Compensation Acknowledgement, all DMs—including each of the DM Plaintiffs in this case—were also given an example pay stub, explaining exactly how the FWW worked, with clear examples. (Alvarez Dec., ¶ 14, Exhibit 7). The example pay stubs shows that the DM would receive his/her weekly salary, regardless of the number of hours worked. *Id*.

Additionally, pursuant to the Wage Theft Prevention Act, NYLL § 195, 2010 N.Y. Laws 1446, annually all DMs—including all DM Plaintiffs in this case—in New York state were given a Notice and Acknowledgement of Pay Rate form ("Annual Pay Acknowledgment"), signed by the DM, which unequivocally stated:

Overtime rate of pay: rate fluctuates based on hours worked in excess of 40*.

*\*As a Department Manager, your base weekly salary is compensation for all hours you have worked in the week, regardless of the number of hours you work. You will also be paid an additional amount for any hours worked over 40 in one week. Please refer to the attached Department Manager's Bi-Weekly Pay Stub for a detailed explanation.*

(Alvarez Dec., ¶ 15, Exhibits 8–13 (emphasis original)). The DM Plaintiffs in this action all received, signed, and returned the Annual Pay Acknowledgment form. *Id*. And, contrary to their statements in their declarations, admitted during depositions that they had received and signed these documents. (Thomas Dep., at 35:24–25; 48:3; 50: 23; 90:9; 92:22; 95:10; 98:5); (Plaintiffs' Exhibit P ("Frazer Dep."), at 48:15–18; 59:6;62:8; 64:4; 66:6; 68:4); (Kutwaru Dep., at 23:9–11; 29:10; 32:15; 34:19; 35:5, 11, 18); (Padilla Dep., 37:14; 38:17; 40:25; 42:14; 58:15); (Whaley Dep., at 61:23; 64:24; 65:15; 65:25; 66:12; 67:14).

In addition to receiving and signing these clear documents, Plaintiffs also received pay stubs each pay period showing that their pay consisted of two components: their base weekly salary, as well as overtime paid under the FWW. The documents produced in discovery *by Plaintiffs* leave no room for any "misunderstanding." (*See* Declaration of Jonathan L. Sulds, at

Exhibits 2 and 3)[10]. For example, for the pay period ending October 25, 2014, Kutwaru received a pay stub reflecting her regular salary of $2,040.74 and "Fluctuating O T" of $185.29. *Id*. at Exhibit 2. Similarly, for the pay period ending March 2, 2014, Padilla received a pay stub reflecting her regular salary of $1,789.80 and "Fluctuating O T" of $141.30. *Id*. at Exhibit 3.

DMs were also required to attend orientation training where they were, again, informed of BBB's pay practices, that they would be paid under the FWW methodology, and that they would receive both a fixed weekly salary for all hours worked and overtime pay for hours worked over 40. (Cohen Dec., ¶¶ 8–9).

The way in which an individual DM who needed further explanation of his/her pay came to understand the Company's pay practices varies DM-to-DM, state-to-state, and store-to-store. For the time during which BBB utilized the FWW methodology, Regional Human Resources Directors were responsible for implementing policies relating to the hiring of DMs. This resulted in hundreds of conversations between Human Resources personnel and DM candidates relating to BBB's pay practices. In many cases, Human Resources Directors followed up with DMs after they received their first paycheck—resulting in further conversations—in order to ensure that the DM understood how they were being paid, while others spoke with DMs if they had specific questions. (Alvarez Dec., ¶ 12; Furlong Dec., ¶¶ 6; 9; Cohen Dec., ¶¶ 7; 11).

Some DMs were already familiar with the FWW due to past experience working at other retailers, while others had no prior experience with it. (Furlong Dec., ¶ 7). These highly-individualized experiences are borne out in the stores' experience when explaining pay to new DMs. While some store locations never had DMs with questions as to how their pay was calculated, other stores had DMs come back with questions about 20% of the time after receiving their first paycheck or orientation where more conversations were had. (Furlong Dec., ¶ 9; Cohen

---

[10] For the sake of the Plaintiffs' privacy, personally identifiable information has been redacted from these exhibits.

Dec., ¶ 11; Alvarez Dec., ¶ 12). After discussing the breakdown of their first paycheck, most DMs never had follow up questions, and others seemed to care more about their total compensation and less about how it was actually calculated. (Alvarez Dec., ¶ 12; Cohen Dec., ¶¶ 10–11).

These individualized experiences are further borne out by the DM Plaintiffs' own deposition testimony:

- ***Danyell Thomas***: Thomas testified in her deposition that she discussed her pay with an HR manager at the time she got hired, that her orientation process did not involve a discussion of how she would be paid, and that she later had a conversation "down the line" in her employment with someone else from HR named Azure Dee where Azure Dee "tried to explain the calculations" but Thomas "didn't really understand it" and didn't "really remember what she was saying." (Thomas Dep., at 34:20 – 36:4; 36:20 – 42:19; 57:3 – 58:6);

- ***Rashaun Frazer***: Frazer testified that he had a conversation with an HR representative at the time of his hire named Michelle who was "telling [him] about [his] salary" and that he needed to work 45 hours per week. Frazer further testified that he was given a piece of paper to sign during this conversation that contained his salary information, but at the time he was unaware that he was eligible for any overtime. (Frazer Dep., at 43:24 – 46:5);

- ***Radica Kutwaru***: Kutwaru testified that she came to learn of the FWW through two conversations with other DMs, but at her time of hire did not read any of the paperwork she signed and thought she was only paid her salary for working 47.5 hours per week. (Kutwaru Dep., at 21:13 – 28:24);

- ***Andrae Whaley***: Whaley testified about a telephone conversation he had with an HR representative named Francis McKinley, where Francis offered him a job as a DM and "told [him] that the first 40 hours is your regularly hourly rate and then after that whatever you do after that it's time-and-a-half or whatever you call it overtime after that so she broke it down." (Whaley Dep., at 37:4 – 38:11); and

- ***Elizabeth Padilla***: Padilla testified that she recalls one conversation four or five years into her employment and a second conversation two years thereafter where she discussed her total pay with her Store Manager and asked for a raise. Padilla further testified that she knew she was being paid overtime for hours worked over 40, but did not hear of the phrase Chinese overtime until shortly after starting at BBB. (Padilla Dep., at 31:17 – 36:10; 53:15 – 54:10).

Moreover, the amount of overtime hours actually worked week-to-week by any DM, and the amount of fluctuation, varied significantly. This variation resulted from a host of variables, including store location, store size and volume, number and type of DMs working at the store, and the individual DMs' initiative. (Declaration of Joseph Carpino ("Carpino Dec."), ¶¶ 8–17; Declaration of Kim Campbell ("Campbell Dec."), ¶¶ 7–11; Declaration of Nick Grew ("Grew Dec."), ¶¶ 9–14).

### D.  The Named Plaintiffs and the Putative Classes

#### i.   *The Department Manager Class*

Plaintiffs Danyell Thomas, Rashaun Frazer, Andrae Whaley, Elizabeth Padilla, Byron Villacres, and Radica Kutwaru (collectively referred to as the "DM Plaintiffs")[11] bring this collective action claiming that BBB failed to satisfy certain prerequisites before utilizing the FWW compensation methodology and therefore allegedly underpaid the DM Plaintiffs for their overtime. Of the five prerequisites required under the FWW[12], Plaintiffs' Complaint and their declarations largely focus on two of these factors: (i) the DMs did not understand that they would receive a fixed weekly salary for purposes of establishing a clear mutual understanding between the DMs and BBB; and (ii) the DM's hours did not fluctuate from week-to-week.

The DM Plaintiffs listed below, all of whom worked in one of only two stores in Manhattan during the relevant time period[13] (Stores 42 or 361), maintain in their declarations

---

[11] Four other Department Managers filed opt-in consent forms, but no declarations or evidence on their behalf has been submitted.

[12] "Under § 778.114, employers may use the FWW method if the following five conditions are met: (1) the employee's hours fluctuate from week to week; (2) the employee receives a fixed weekly salary which remains the same regardless of the number of hours the employee works during the week (excluding overtime premiums); (3) the fixed amount is sufficient to provide compensation at a regular rate not less than the legal minimum wage; (4) the employer and employee have a clear mutual understanding that the employer will pay the employee a fixed salary regardless of the number of hours worked; and (5) the employee receives a fifty percent (50%) overtime premium in addition to the fixed weekly salary for all hours worked in excess of 40 during the week." *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 255 (S.D.N.Y. 2013) (citations omitted); 29 C.F.R. § 778.114.

[13] Plaintiffs reference the relevant time period as being three-years prior to the date each opt-in plaintiff filed a written consent to join the action. (*See* Plaintiffs' Brief, p. 2). BBB disputes that any alleged willful violation of the

that because they *personally* did not understand how they would be paid, their experience should be applied to a diverse class of over 600 DM's working in 119 stores across three states based on nothing more than their belief that other DMs in these stores likewise misunderstood their pay.[14] *See* (Thomas Dec., ¶¶ 3, 30–34); (Whaley Dec., ¶¶ 3, 13–14, 25–30); (Frazer Dec., ¶¶ 3, 14, 18, 30–37); (Padilla Dec., ¶¶ 3, 9–11, 21); (Villacres Dec., ¶¶ 3, 13–14, 33); (Kutwaru Dec., ¶¶ 3, 15, 17, 27, and 30). None of the DM Plaintiffs testify to any personal observations or conversations with DMs from any other stores other than those in which they worked. Each one of the DM Plaintiffs testified in their depositions that, aside from generally observing other BBB employees while shopping in stores, they have no personal knowledge of any other DM's experience in any other stores except for those in which they worked, and all DMs deposed as of the date of this submission admitted they lacked personal knowledge outside the stores they worked.[15]

### ii.   *The Assistant Store Manager Class*

Eleni Miglis alleges that BBB improperly classified her as an exempt employee and therefore failed to pay her overtime. Miglis, who worked *at one store* on Long Island during the relevant time period, claims that her primary duties were not managerial in nature. She alleges

---

FLSA occurred and that the statute of limitations should be two years; however, for purposes of this motion only, BBB assumes that the relevant time period is three years. As such, the facts contained in each of the Plaintiffs' declarations relating to stores they worked in beyond the three year limitations period are not probative and should not be considered for purposes of determining whether conditional certification is proper. *Summa v. Hofstra Univ.*, 715 F. Supp. 2d 378, 388 (E.D.N.Y. 2010); *see also, Brown v. Barnes and Noble, Inc.*, No. 16-CV-07333 KHP, 2017 WL 1653576, at *10, n. 4 (S.D.N.Y. May 2, 2017) (allegations from named Plaintiff whose FLSA claim was time-barred "have no bearing on the issue of whether all [Café Managers] across the nation are similarly situated….")

[14] Upon preliminary review of the number of potential class members during the relevant time period, there were approximately 58 DMs in Connecticut, 205 DMs in New Jersey, and 348 DMs in New York, approximately 150 of which were in New York City stores. (Suojanen Dec., ¶ 41).

[15] *See* (Padilla Dep., at 25:16–25; 26:1–25; 27:1–13); (Thomas Dep., at 77:19–25; 78:1–25; 79:1–25; 80:1–25; 81:1–25; 82:1–25; 83:1–25; 84:1–12); (Frazer Dep., at 78:7–18); (Kutwaru Dep., at 103:3–9); (Whaley Dep., at 100:7–18).

that her personal experience can be extrapolated to a diverse class of over 400 ASMs[16] working in over 63 stores throughout the State of New York. The chart submitted by BBB shows that the stores in which the ASM Plaintiffs worked are not representative of the other stores in New York, particularly with respect to staffing levels and geography—factors which impact an ASM's individualized experience. (Suojanen Dec., at Exhibit 1).

In pursuit of her efforts to send notice to these 400 individuals, Miglis offers (i) her own declaration regarding her personal work experience, (ii) the declaration of opt-in Plaintiffs Hector Caraballo, Bryan LaForest, Radica Kutwaru, and John Cutajar who worked in a total of only five other stores in Manhattan and Long Island, and (iii) an attempt at "common" proof in the form of an ASM job description and compensation method (Miglis, Caraballo, LaForest, Kutwaru, and Cutajar are collectively referred to as "ASM Plaintiffs.").

But whether any of the nearly 400 putative class members were misclassified can only be determined through an individualized inquiry that is not susceptible to class-wide proof where the duties of ASMs vary person-to-person and store-to-store, influenced by a significant number of individual and variable factors which the declarations of the five individuals do not begin to address.

- *Eleni Miglis*: Miglis was employed by BBB as a DM from February 2008 through late 2009 when she was promoted to an ASM. *See* Declaration of Eleni Miglis ("Miglis Dec.), ¶ 3. Throughout her entire time as an ASM, Miglis **worked in only four stores**, all on Long Island, *only one of which she worked at during the relevant time period*: Store 2 in Lawrence, NY. *Id.* Miglis alleges that no one told her what her responsibilities or duties would be as an ASM and she spent her time primarily doing the non-managerial work that she previously did as a DM. (Miglis Dec., ¶¶ 13, 18). Miglis does not allege that she had any conversations with other ASMs about their duties and responsibilities in the stores she worked, or in any other stores.[17] Miglis testified in her deposition that she

---

[16] Upon preliminary review, there are approximately 402 potential class members in the ASM group. (Suojanen Dec., ¶ 36).

[17] It appears as though Miglis' fill-in-the-blank declaration was drafted to allude to conversations with other ASMs, but never did. (Miglis Dec., ¶ 31 ("Throughout my time with BBB, on separate occasions, I had conversations with

has no personal knowledge of the duties and responsibilities of other ASMs outside the stores in which she worked. (Plaintiffs' Exhibit R ("Miglis Dep."), at 274:14–25; 275: 1–25). Miglis instead claims that she observed other ASMs in her store performing the same type of work she did, and she *believes* "that is the case for A[S]Ms in all of BBB's stores throughout the United States." (Miglis Dec., ¶ 19).

- *Hector Caraballo*: Caraballo, an opt-in plaintiff, worked as an ASM from November of 2012 to March of 2015 at a store in Manhattan. *See* Declaration of Hector Caraballo ("Caraballo Dec."), ¶ 3. Caraballo claims that he was never told what his responsibilities were as an ASM and that he spent the majority of his time performing the non-managerial tasks he previously performed as a DM. (Caraballo Dec., ¶¶ 14, 43). Caraballo does not allege that he had any conversations with other ASMs in his store or from other store locations about their duties and responsibilities, but instead claims that he observed other ASMs *at his store* perform the same type of non-managerial tasks and that he *believes* "that is the case for A[S]Ms in all of BBB's stores throughout the United States." (Caraballo Dec., ¶ 45). Caraballo further testified in his deposition that he has never had occasion to observe the work of ASMs in other stores. (Plaintiffs' Exhibit N ("Caraballo Dep."), at 72:6–8).

- *Bryan LaForest*: LaForest, an opt-in plaintiff, worked as an ASM from 2011 to 2017. *See* Declaration of Bryan LaForest ("LaForest Dec."), ¶ 3. During the relevant time period, LaForest worked as an ASM at Store 361 in Manhattan and Store 467 in Brooklyn. (LaForest Dec., ¶ 48). LaForest claims that he was never told what his responsibilities were as an ASM and that he spent the majority of his time performing the non-managerial tasks he previously performed as a DM. (LaForest Dec., ¶ 52). LaForest does not allege that he had any conversations with other ASMs in other store locations about their duties and responsibilities, but instead claims that he spoke to one ASM *in his store* about ASMs being "over worked and underpaid." (LaForest Dec., ¶ 53).

- *Radica Kutwaru*: Kutwaru, an opt-in plaintiff, worked as an ASM from September 2015 to February 2017 at the same store as Caraballo in Manhattan. (Kutwaru Dec., ¶ 3). Kutwaru claims that she was never told what her responsibilities were as an ASM and that she spent the majority of her time performing the non-managerial tasks she previously performed as a DM. (Kutwaru Dec., ¶ 45). Kutwaru does not allege that she had any conversations with other ASMs in her store or from other store locations about their duties and responsibilities, but instead claims that she observed other ASMs *at her store* perform the same type of non-managerial tasks.[18] (Kutwaru Dec., ¶¶ 46–47). Kutwaru further testified in her deposition that she has no personal knowledge of individuals' experience in any other stores other than those in which she worked. (Kutwaru Dep., at 103:3–9).

---

some" . . . )). Despite being afforded the opportunity to file their second motion for conditional certification, Plaintiffs failed to submit a revised declaration from Ms. Miglis.

[18] Kutwaru also alleges that, for the one month period she worked as a DM at a store in Alpharetta, Georgia, she observed ASMs there. However, because Plaintiffs now limit their request for conditional certification of the ASM class to the State of New York, Kutwaru's statements relating to ASMs in Georgia is irrelevant.

- ***John Cutajar***: Cutajar, an opt-in plaintiff, worked as an ASM from February 2014 to June 2017. *See* Declaration of John Cutajar ("Cutajar Dec."), ¶ 3. During his time as an ASM, Cutajar worked at three stores in Long Island: the same store Miglis worked at in Lawrence, a store in Oceanside, and a store in Plainview. *Id*. Cutajar claims that he did not receive any training on how to be an ASM and that he spent the majority of his time performing the non-managerial tasks he previously performed as a DM. (Cutajar Dec., ¶¶ 33, 35). Cutajar does not allege that he had any conversations with other ASMs ***in his store*** or from other store locations about their duties and responsibilities, but instead claims that he observed other ASMs at his store perform the same type of non-managerial tasks. (Cutajar Dec., ¶ 36).

## ARGUMENT

The ASM Plaintiffs here are not the first retail managers to assert collective actions by pointing to their own work experiences—which they say deviated from the exempt managerial responsibilities they were charged with as ASMs—as evidence of improper classification. In those cases, Courts have consistently found that the anecdotal tales of a handful of individuals working in a small number of stores falls short of even the minimal showing required by an FLSA plaintiff, particularly given the highly individualized analysis required.

The DM Plaintiffs fare no better, with each offering in their declarations and deposition testimony nothing more than claimed confusion over clear documents involving their compensation, rendering them similarly situated to no one except themselves.

Finally, the cases require that, where plaintiffs in FLSA cases seek notice reaching beyond a single location, they must provide evidentiary support for doing so. Here, Plaintiffs have failed to establish that notice would be proper even as to the stores in which they worked, let alone 63 stores in the State of New York and 100+ stores across the tri-state area where over a thousand other employees worked. The Plaintiffs' Motion should be denied.

### A.  Plaintiffs Have Not Met Their Burden

Courts within the Second Circuit apply a two-step analysis to determine whether an action should be certified as an FLSA collective action. *Trinidad v. Pret A Manger (USA) Ltd.*,

962 F. Supp. 2d 545, 552 (S.D.N.Y. 2013) ("In determining whether to [conditionally certify class] the district courts of this Circuit appear to have coalesced around a two-step method which the Second Circuit has endorsed as 'sensible.'" (*quoting Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010)). First, the Court makes "an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Id*. This requires plaintiffs to "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Id*. (quoting *Myers*, 624 F.3d at 555). While the first stage of the certification process is a low burden, "it is not non-existent." *She Jian Guo v. Tommy's Sushi Inc.*, No. 14-CV-3946 PAE, 2014 WL 5314822, at *3 (S.D.N.Y. Oct. 16, 2014). And, Plaintiffs' burden "cannot be satisfied simply by unsupported assertions." *Id*. at 553.

The ASM Plaintiffs' deeply individualized experiences provide no basis for presuming that common experiences exist among over 400 current and former ASMs across the State of New York, especially where the ASM Plaintiffs utterly fail to account for store to store differences and their lack of familiarity with all but a fraction of stores.

Similarly, the DM Plaintiffs' personal experiences in just two stores—some of the Company's largest stores in New York City—cannot establish that other individuals in those same stores are similarly situated, let alone in the 100+ stores in the tri-state area.

**B. The Company's Assistant Store Managers Were Properly Classified, and Any Disputes Regarding Individual Status Cannot be Resolved On A Collective Basis**

Individuals qualify as exempt executives under the FLSA if: (i) they are compensated on a salary basis; (ii) their primary duty is management; (iii) they customarily and regularly direct the work of two or more other employees; and (iv) they have the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, promotion, or

change in status of other employees are given particular weight. 29 U.S.C. § 213(a); 29 C.F.R. § 541.100. Here, the ASM Plaintiffs—relying on nothing more than their own declarations and experience in just six total stores in Manhattan and Long Island— ask this Court to extrapolate their claimed work experiences to a nationwide class of approximately 400 ASMs in 63 stores across the State of New York.

Plaintiffs challenge their exempt status by claiming that they did not meet the managerial duties test, pointing to certain tasks that they claim they performed as ASMs, and attempting to distance themselves from their managerial responsibility and authority. But the record evidence is overwhelmingly to the contrary. There are over ***eighty*** documented examples of the ASM Plaintiffs interviewing employees, participating in hiring, conducting performance reviews, disciplining the hourly employees working under them, and taking part in terminations. The ASM Plaintiffs' deposition testimony further confirms their exercise of managerial authority. *See, e.g.*, Miglis Dep., at 195:3–8 (when asked how many interviews Miglis conducted as an ASM at BBB, and if it was more than 50, Miglis testified "Probably somewhere around there."); Caraballo Dep., at 93:9–14 (where Caraballo testified that he evaluated and wrote up hourly associates); Kutwaru Dep., at 61:19–22 (where Kutwaru testified that in her opinion, ASMs at Store 42 are likely to supervise more people).

The ASM Plaintiffs' claim that they personally primarily performed non-exempt tasks is insufficient to demonstrate that nearly 400 other ASMs across 63 stores also performed the same allegedly non-exempt duties to the same degree. Other plaintiffs working in jobs for similar retailers have made these same speculative claims, which the Courts have rightly rejected.

For example, in *Guillen I*, ASMs at Marshalls sought nationwide certification in a case challenging their exempt status. In support, they offered "affidavits from five ASMs who

experienced the allegedly illegal activities at nine of the 820 Marshalls stores nationwide." *Guillen I*, 750 F. Supp. 2d at 477. Like the ASM Plaintiffs here, "[t]he nine stores [were] exclusively in the New York City metropolitan area." *Id*. Also like the Plaintiffs here, the plaintiffs in *Guillen I* premised their challenge to exempt status on the allegation that they spent most of their time doing non-exempt tasks. The Court characterized plaintiffs' evidence as "extremely thin" and denied conditional certification because "there [wa]s virtually no basis on which to conclude that ASMs nationwide [we]re similarly situated to [plaintiffs] with respect to [their] allegation that [they] spent the majority of [their] time performing non-managerial tasks." *Id*. at 477.

The teachings of *Guillen I* are particularly instructive here, given the similar organizational structures of the defendant in that case and BBB—both companies employ two types of ASMs (operations and merchandise) and divide their stores into multiple districts. As the Court in *Guillen I* concluded, the declarations of a handful of ASMs cannot justify a collective action "as there may be vast differences in the practices of individual stores. . . ." *Id*. at 477–78. While Plaintiffs have shied away from their attempt at nationwide certification, Courts in this Circuit still require that Plaintiffs "demonstrate that a 'statewide' policy or practice exists." *Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 662 (S.D.N.Y. 2013) (citations omitted). The rationale of *Guillen I* and the cases discussed herein continue to point toward a proper resolution in this case.

In *TJ Maxx I*, former assistant managers at TJ Maxx sought certification of a nationwide class, challenging their exempt status by pointing to their personal experiences, "most of which they attributed to their individual Store Managers." *T.J. Maxx I*, 2013 WL 2649544, at *14. Like this case, the plaintiff provided evidence from ASMs who worked in the tri-state area at a

handful of stores, and from another ASM's experience working in two stores in Arkansas. *Id*. Pointing to the individualized inquiries necessary to resolve the question of each individual's exempt status, the Court could not "presume the existence of a de facto illegal policy common to all Assistant Store Managers. . . ." *Id*.

Likewise, in *Jenkins*, a former assistant store manager of HomeGoods sought certification of a class of over 700 employees at more than 200 stores. Like the plaintiffs in *Guillen I and TJ Maxx I*, Jenkins relied on his own testimony "describing his personal circumstances at the stores at which he worked" in support of his contention that HomeGoods' assistant managers primarily did non-exempt work. *Jenkins*, 853 F. Supp. 2d at 324. The Court denied conditional certification, concluding that "the Plaintiff has not provided the Court with anything other than conclusory allegations and his own deposition testimony to support his assertion that other HomeGoods' ASMs also primarily performed non-exempt job duties." *Id*. at 324–25.

Here, the ASM Plaintiffs offer nothing more than their own personal experiences working in just **six stores** in New York City and Long Island, and on that basis ask the Court to ignore the individualized nature of their claims, along with the fact that they have presented no evidence whatsoever from stores in other areas of the State of New York or from other putative class members. *Rojas v. Kalesmeno Corp.*, No. 17-CV-0164 JCF, 2017 WL 3085340, at *5 (S.D.N.Y. July 19, 2017) ("The plaintiffs' mere belief that the policies are the same at the other [locations] is insufficient to justify collective action certification."); *Brown v. Barnes and Noble, Inc.*, No. 16-CV-07333 KHP, 2017 WL 1653576, at *8 (S.D.N.Y. May 2, 2017) (denying conditional certification where "Plaintiffs' cookie-cutter declarations … assert that they are aware of other [Café Managers] who primarily performed non-exempt duties because of their

observations and discussions... [But where Plaintiffs] fail to provide any details about these observations or conversations....") Plaintiffs' inability to produce declarations from other individuals who worked in other stores in the State of New York is "telling." *Khan*, 2011 WL 5597371, at *5.

*Guillen*, *Hamadou*, *TJ Maxx*, and *Jenkins* stand as guardians against such tactics, and call for denial of Plaintiffs' motion here.

The fact that all of the putative class members were classified as exempt and had a similar job title cannot save Plaintiffs' case. "[C]ourts in th[e] [Second] Circuit have held that the fact of a common job description or a uniform training regimen does not, alone, make those persons subject to it "similarly situated" under the FLSA." *Martin v. Sprint/united Mgmt. Co.*, No. 15-CV-5237 PAE, 2016 WL 30334, at *8 (S.D.N.Y. Jan. 4, 2016) ("[P]laintiff's reliance on the centralized job descriptions maintained by defendants is misplaced." (citing *Khan*, 2011 WL 5597371, at *4)); *Eng-Hatcher v. Sprint Nextel Corp.*, No. 07-CV-7350 BSJ, 2009 WL 7311383, at *3 (S.D.N.Y. Nov. 13, 2009) (denying conditional certification where, as to practices of general application, plaintiff pointed only to a presumptively lawful official policy, and, in alleging FLSA violations, relied solely upon her deposition testimony as to her own treatment)). *See also Scott, et al. v. Chipotle Mexican Grill, Inc., et al.*, No. 12-CV-8333 ALC, 2017 WL 1287512, at *9 (S.D.N.Y. Mar. 29, 2017) (decertifying collective action in misclassification case and stating that "'[t]o find otherwise would reduce Section 216(b)'s requirement that plaintiffs be 'similarly situated' to a mere requirement that plaintiffs share an employer, a job title, and a professed entitlement to additional wages.'" (quoting *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 300 (S.D.N.Y. 2015)); *McEarchen, et al. v Urban Outfitters, Inc.*, 13-CV-03569 RRM (Dkt. 268) (E.D.N.Y. March 7, 2017) (decertifying collective action in misclassification case finding

that defendant's "blanket classification decision and uniform corporate policies and training do not on their own render the plaintiffs similarly situated.").

The simple fact that other ASMs are employed by BBB in the same state as the ASM Plaintiffs is insufficient to assume that all 400 ASMs' primary duties were to perform non-exempt work. *See also Vasquez v. Vitamin Shoppe Indus. Inc.*, No. 10-CV-8820 LTS THK, 2011 WL 2693712, at *4 (S.D.N.Y. July 11, 2011) ("the mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes.") (internal citations and quotation marks omitted); *Jenkins*, 853 F. Supp. 2d at 323 (explaining that a plaintiff may not rely on mere exemption status but must demonstrate a "policy pursuant to which ASMs are assigned duties that render [the Company's] exempt classification inappropriate.")

## C. Whether the DM Plaintiffs' Putative Class Members Lacked A "Clear Mutual Understanding" That BBB Would Pay A Fixed Salary Regardless Of The Number Of Hours Worked Can Only Be Determined On An Individualized Basis

Plaintiffs' attack on the FWW's clear mutual understanding prong rests upon the notion that, despite clear documents that they received and signed numerous times, each of the DM Plaintiffs individually misunderstood their pay. Plaintiffs offer no evidence that anyone else is similarly situated based on a "similarly misunderstood" standard (which, in any event, is not the law)[19], and to the extent there are any other individuals who may claim to not understand their pay, that determination cannot be made without individualized inquiries.

---

[19] The law does not require that employers and employees reach an agreement regarding the FWW, nor does it require that employees understand the precise contours of the FWW. *Stein v. Guardsmark, LLC*, No. 12-CV-4739 JPO, 2013 WL 3809463, at *7–8 (S.D.N.Y. 2013) (collecting cases and noting that "many courts have deemed it irrelevant that an employee did not actually understand the full details of how her employer's FWW program operated."); *Griffin v. Wake Cnty*, 142 F. 3d 712, 716–17 (4th Cir. 1998) (finding understanding where plaintiffs

The DM Plaintiffs signed documents clearly demonstrating their understanding, attested to their signatures during depositions, and confirmed that they failed to ask for clarification of the documents they themselves reviewed and signed multiple times. (Alvarez Dec., ¶¶ 13–15, Exhibits 1–13) (Thomas Dep., at 35:24–25; 48:3; 50: 23; 90:9; 92:22; 95:10; 98:5); (Frazer Dep., at 48:15–18; 59:6;62:8; 64:4; 66:6; 68:4); (Kutwaru Dep., at 23:9–11; 29:10; 32:15; 34:19; 35:5, 11, 18); (Padilla Dep., 37:14; 38:17; 40:25; 42:14; 58:15); (Whaley Dep., at 61:23; 64:24; 65:15; 65:25; 66:12; 67:14).

Presumably in an effort to manufacture a group of individuals who Plaintiffs say all misunderstood clear documents, Plaintiffs have submitted a handful of declarations that all say the same thing—no one told me that my weekly salary would be paid regardless of the number of hours worked. Putting aside Plaintiffs' plain proof issues—particularly in light of the conflicting deposition testimony—the DM Plaintiffs do not properly state and apply the law. .

The documents and their own deposition testimony show that Plaintiffs' assertions are false. First, Plaintiff Thomas swears that "no one from BBB, either verbally or via written document, informed me or explained to me how to calculate my salary." (Thomas Dec., ¶ 10). Yet she signed a Department Level Manager Compensation acknowledgement on January 6, 2010 which states "[a]t the time I was hired, I was told what my anticipated weekly compensation will be and how it will be calculated," and signed four Annual Pay Acknowledgments from 2012–2015, each of which stated "[o]vertime rate of pay: rate fluctuates based on hours worked in excess of 40*". (Alvarez Dec., ¶¶ 13, 15, Exhibits 1–6 and 8–13).

---

were aware of the payment method, even though they did not agree with the method); *see also Wage and Hour Div. Opinion Letter,* FLSA 2009–3 (Jan. 14, 2009).

In order to use the FWW, all that BBB need demonstrate is that DMs understood that their weekly salary would be paid each week, regardless of the number of hours worked. This is demonstrated conclusively by the DM Compensation Acknowledgement and Annual Pay Acknowledgments that each DM Plaintiff signed. As to Plaintiffs' individual claims, BBB will move for summary judgment at the close of discovery.

Thomas further testified at her deposition that she understood that she would be getting paid under the FWW methodology for any hours worked over 40. *See* Thomas Dep., at 60:18–25; 61:1–2 ([BBB's Counsel]: "And you understood you were getting Chinese overtime for all the hours you worked over 40, correct?" [Thomas]: "Any – yeah, for any hours over 40.")

In his declaration, Plaintiff Whaley claims that "No one from BBB ever, either verbally or via written document, informed me that my salary is to cover whatever hours I may work in a workweek and that BBB would pay the salary even if I work less hours than the full number of hours scheduled." (Whaley Dec., ¶ 7). He goes on to claim that "My understanding about my compensation, at the time of my hire and throughout my employment with BBB, was that I would be compensated at one-half time (1.5) my regular rate for hours I worked over 40." (Whaley Dec., ¶ 8). Again, these statements offered in support of Plaintiffs' motion are directly at odds with the clear documents that Mr. Whaley signed over the course of his employment. Like Thomas, he signed a Department Level Manager Compensation acknowledgment in 2011, and signed four Annual Pay Acknowledgments from 2011–2014. (Alvarez Dec., ¶¶ 13, 15, Exhibits 3 and 10).

None of the other declarants fare any better, all making similar claims of confusion over documents they claim never to have received, but in reality signed many times. (Alvarez Dec., ¶¶ 13–15, Exhibits 1–13).[20]

The declarations relied on by Plaintiffs suggest an improbable level of confusion, are contrary to the facts and the documents signed by each declarant, and therefore cannot establish

---

[20] The fact that the DM Plaintiffs list a number of individuals who also worked as DMs in the same two stores in which they worked (Stores 42 and 361) reveals nothing about whether these DM's also lacked a clear mutual understanding with BBB that they would be paid the same fixed salary regardless of the number of hours they worked. A list of names is insufficient to demonstrate that these individuals are similarly situated for purposes of conditional certification. *See Khan*, 2011 WL 5597371, at *4 (denying conditional certification where plaintiff identified several individuals by name who he considered "to have been 'similar employees' … [but where] none of these individuals ha[d] submitted declarations supporting [plaintiff's] claims….")

the existence of a group of similarly situated individuals. "These vague and conclusory assertions of similarity generally do not suffice." *Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 610–11 (S.D.N.Y. 2016) (citing *Guo,* 2014 WL 5314822, at *3 (finding insufficient plaintiffs' declarations that they would discuss wages with their co-workers and were aware of several kitchen workers—named plaintiffs were deliverymen—who did not receive lawful wages); *Sanchez v. JMP Ventures, L.L.C*., No. 13-CV-7264 KBF, 2014 WL 465542, at *2 (S.D.N.Y. Jan. 27, 2014) (denying conditional certification where plaintiff provided only "generalized allegations" without "any detail as to a single such observation or conversation.")).

Second, Plaintiffs offer no explanation as to how they would prove a lack of understanding in a collective action at trial on behalf of 600+ DMs across three states. Of course, they cannot do so, because the question of whether any particular DM lacked the required understanding is inherently individualized. *See, e.g., Stein,* 2013 WL 3809463 (evidence relevant to clear mutual understanding included plaintiffs failure to complain about overtime calculation and communications between plaintiff and employer); *Griffin*, 142 F. 3d at 717 (understanding may be based on policies, practices, and procedures, or employee's conduct).

Third, the DM Plaintiffs assert that there were no communications to them. Yet, as set forth in BBB's declarations, the process of communicating how each DM would be compensated came from several different HR personnel through various means and involved hundreds of different conversations. (Cohen Dec., ¶¶ 7, 11; Furlong Dec., ¶ 6, 9; Alvarez Dec., ¶ 10). The DM Plaintiffs themselves testified in their depositions about these various conversations, and each recounted different stories on what they were told: some either did not think they were getting paid overtime at all; others thought they would only receive overtime for working over 47 hours; and others knew they would be paid overtime under the FWW, but were not sure how

it was calculated. (Thomas Dep., at 56:13 – 58:6); (Frazer Dep., at 45:19–25; 46:1–5); (Kutwaru Dep., at 21:19–25; 22:1–5); (Padilla Dep., 53:25; 54:1–4); (Whaley Dep., at 37:15 – 38:11).

In other words, among the DM Plaintiffs who have been deposed to date, there is not a group of similarly situated individuals even in that small sample set. If five DMs who are all part of the same lawsuit and worked at the same two stores do not share similar experiences, how can those divergent experiences form the basis for presuming that the other 600+ DMs across more than 100 stores had uniform experiences?

### D. Under Plaintiffs' "Meaningfully Fluctuate" Standard—Created Out Of Whole Cloth—Whether Putative Class Members' Hours "Meaningfully Fluctuated" Could Only Be Determined On An Individualized Basis

The DM Plaintiffs' place great weight on their allegation that their hours did not "meaningfully fluctuate." (*See* Plaintiffs' Brief, pp. 7–8). But this misstates the law and provides no basis for certification. All that is required is fluctuation (not, as Plaintiffs suggest, any particular degree of fluctuation), which Plaintiffs admit occurred. *See id.* (where Plaintiffs themselves cite deposition testimony that DMs "work extra hours" or their hours "could go up" during busy seasons); *see also*, (Thomas Dep., at 63:10–18); (Padilla Dep., at 42:24 – 43:2); (Frazer Dep., at 52:20 – 53:9); (Whaley Dep., at 75:13 – 76:11); (Kutwaru Dep., at 20:23 – 21:8).

Plaintiffs' concession on this point is sufficient to defeat conditional certification because they cannot show a common policy that *violates* the FLSA. *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010). "Meaningful fluctuation"—whatever that may mean to Plaintiffs—is not a prerequisite to utilizing the FWW methodology in the Second Circuit. *See Stein*, 2013 WL 3809463, at *4 (concluding that fluctuation requirement was met where plaintiff's hours fluctuated between 50–55+ hours per week); *Ramos v. Telgian Corp.*, 176 F. Supp. 3d 181, 195 (E.D.N.Y. 2016) (finding that Plaintiffs' 50–55 hour work weeks were sufficient for fluctuation

where regulations reference "hours worked each workweek, *whatever their number* … plainly contemplates that an employee's work hours could be either more or less than the 40-hour or other fixed workweek, or both.") (emphasis in original). Plaintiffs are seeking certification based on a legal requirement that does not exist. The Second Circuit recently declined the invitation to opine on this issue, despite the urging of the plaintiffs in the *Telgian* case. *See* USCA Mandate, *Ramos v. Telgian Corp.*, 14 CV 03422 (PKC-LC) (Dkt. No. 70) (Sept. 13, 2016). Thus, under *Stein* and *Telgian*—and in light of Plaintiffs' admission that their hours did in fact fluctuate week-to-week—BBB has satisfied the fluctuation prong.

Even if it were somehow relevant, the question of the degree and reason for fluctuation is yet another inherently individualized inquiry inappropriate for collective treatment. As the declarations submitted by BBB show, the amount of hours worked by DMs week-to-week varied significantly depending on the location, volume, and size of the store; the department in which the DM worked; the number of other DMs and associates in the store; the time of year; individual practices of local store management; and the level of initiative undertaken by the different DMs. *See* (Carpino Dec., ¶¶ 8–17; Campbell Dec., ¶¶ 7–11; Grew Dec., ¶¶ 9–14).

### E.  Plaintiffs Have Not Met Their Burden For Notice

Plaintiffs have failed to demonstrate that they are similarly situated to other individuals within their own stores, much less to over 1,000 putative class members across the tri-state area. At best, if Plaintiffs have shown any similarities—and they have not—it would only be with respect to two stores in Manhattan for the DMs' claims and six stores on Long Island and New York City for the ASMs' claims. Because Plaintiffs have failed to meet their burden justifying notice to even the eight stores in which they worked, there is certainly no basis to extend a collective action beyond these New York City and Long Island stores to nearly 120 stores in the tri-state area and 63 stores in the State of New York. "To decide where to provide notice, the

Court must determine **which stores had employees that were 'similarly situated'** with regard to the allegedly unlawful overtime policies." *Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d at 557 (emphasis added).

As this Court recently held in *Trinidad v. Pret a Manger*, even where FLSA plaintiffs can meet their similarly situated burden, notice should not issue to any locations where the Court has not been provided with actual evidence pertaining to those locations. "Plaintiffs ha[d] not come close to alleging facts 'to support an inference [of] a uniform policy' of FLSA–violative overtime practices across *all* [33] Pret stores in New York City." *See Pret a Manger (USA) Ltd.*, 962 F. Supp. 2d at 558 (emphasis in original) (quoting *Hamadou*, 915 F. Supp. 2d at 662); *see also, Bahr v. PNW Enters., LLC*, No. 16-CV-1223 PKC, 2017 WL 816140, at *2 (S.D.N.Y. March 1, 2017); *Sanchez*, 2014 WL 465542, at *2.

Here, the Plaintiffs rely on nothing more than their own declarations to assert that a pool of potential opt-in plaintiffs numbering approximately 600 DMs in the tri-state area and approximately 400 ASMs at 63 stores across the State of New York must therefore be similarly situated. Measured against a pool of approximately 1,000 individuals, Plaintiffs' evidence is not even a thimble. Under *Pret a Manger*, there certainly is no basis for the broad notice Plaintiffs seek.

Finally, as Plaintiffs point out in their declarations, there is currently a pending putative class action being brought on behalf of former DMs against BBB in New Jersey, also challenging BBB's use of the FWW (the "NJ Action").[21] Faced with an utter lack of declarants with any personal knowledge of New Jersey stores or BBB practices in New Jersey, Plaintiffs point to the pending litigation as evidence that DMs in New Jersey are similarly situated to the

---

[21] The New Jersey Action is captioned *Brent Carter, Robert Haynes, and Kenneth Cuoco, on behalf of themselves and all others similarly situated v. Bed Bath & Beyond, Inc*., Docket No. MID-L-06178–16 (Sup. Ct. Law Div. Oct. 24, 2016). (*See* Sulds Dec., at Exhibit 4).

DM Plaintiffs. What Plaintiffs fail to say, however, is that the issue in the NJ Action is *not* whether BBB failed to establish the clear mutual understanding and fluctuation prongs of the FWW. Rather, the issue in that case is purely one of state law, with those plaintiffs making the novel legal argument that the wage and hour laws of New Jersey forbid the FWW, full stop.[22]

BBB moved to dismiss or stay the New Jersey Action pending the outcome of this action based on the first-filed rule. However, after finding that the issues there are not based on whether BBB complied with the federal prerequisites in utilizing the FWW, but instead are based on whether the FWW is lawful under New Jersey state law, the Honorable Arthur Bergman declined to dismiss or stay the New Jersey Action. Because the New Jersey Court has already ruled that comity should not extend to this Court, any putative class members in New Jersey should be excluded from this case while their claims are pursued in that pending litigation. *See Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 488 (S.D.N.Y. 2016) ("Put simply, to the extent that the collective-action process is intended to promote efficiency, the law should not allow, and thus encourage, plaintiffs to bring piecemeal litigation.").

---

[22] In any event, the propriety of considering complaints and affidavits from alleged similarly situated individuals who filed separate actions but declined to opt-into the present action has been questioned. *See, e.g., TJ Maxx I*, 2013 WL 2649544, at *13 (noting that the Magistrate Judge declined to consider a complaint and affidavit filed by a plaintiff in Arkansas State Court where such plaintiff "elected not to join in this matter.")

## CONCLUSION

For the foregoing reasons, BBB respectfully requests that the Court deny Plaintiffs'
Motion for Conditional Collective Certification in its entirety.[23]


Dated: August 2, 2017                          Respectfully submitted,

                                               BED BATH & BEYOND INC.

                                               /s/ Jonathan L. Sulds
Justin F. Keith                                Jonathan L. Sulds
Greenberg Traurig                              Greenberg Traurig, LLP
One International Place                         MetLife Building
Boston, MA 02110                               200 Park Avenue, 34th Floor
Telephone: 617.310.6230                        New York, NY 10166
Fax: 617.897.0930                              Telephone: 212.801.9200
keithj@gtlaw.com                               Fax: 212.801.6400
                                               suldsj@gtlaw.com

---

[23] In the event the Court determines that notice should issue with respect to any stores, BBB respectfully requests the opportunity to be heard regarding the appropriate language and process for issuance of notice.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
:
DANYELL THOMAS, RASHAUN F. FRAZER,            :
ANDRAE WHALEY, ELENI MIGLIS, CHERYL A.        :   Civil Action No. 16-cv-8160
STRYCHARZ, and DANIELLE BROWN, individually   :
and on behalf of all other employees similarly situated   :
:
    Plaintiffs                                    :
:
v.                                                            :
:
  BED BATH AND BEYOND, INC.                    :
:
    Defendant.                                    x
-----------------------------------------------------------------

## CERTIFICATE OF SERVICE

      I hereby certify that on August 2, 2017 a true copy of the above document was served upon the attorney of record for each other party by ECF filing.

Dated: August 2, 2017

New York, New York

                                                  /s/ Jonathan L. Sulds
                                                  Jonathan L. Sulds
                                                  Greenberg Traurig, LLP
                                                  MetLife Building
                                                  200 Park Avenue, 34th Floor
                                                  New York, NY 10166
                                                  Telephone: 212.801.9200
                                                  Fax: 212.801.6400
                                                  suldsj@gtlaw.com