UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------- x
                                                   :

DANYELL THOMAS, RASHAUN F. FRAZER,       :
ANDRAE WHALEY, ELENI MIGLIS, CHERYL
A. STRYCHARZ, and DANIELLE BROWN,
individually and on behalf of all other employees
similarly situated,

         Plaintiffs,

                                                 :

                   v.              :      Civil Action No. 16-cv-8160

                                                 :

BED BATH AND BEYOND, INC.                :

         Defendant.

                                                   :
-------------------------------------------------------------------------- x

## DECLARATION OF JONATHAN L. SULDS

      I, Jonathan L. Sulds, an attorney admitted to the practice of law before the Courts of the

State of New York and the United States District Court for the Southern District of New York,

hereby declares under penalty of perjury the following:

      1.      I am an attorney and shareholder at the firm of Greenberg Traurig, LLP, attorneys

for the Defendant Bed Bath and Beyond Inc. ("BBB"). I am over the age of 18 and am otherwise

competent to testify to the matters contained in this Declaration.

      2.      All of the statements in this Declaration are true and accurate to the best of my

knowledge.

      3.      A true and accurate copy of the Deposition transcript of Andrae Whaley is

attached hereto as Exhibit 1.

      4.      A true and accurate copy of a document produced by opt-in Plaintiff Radica

Kutwaru bearing bates number P00133RK is attached hereto as Exhibit 2.

5.      A true and accurate copy of a document produced by opt-in Elizabeth Padilla bearing bates number P00032EP is attached hereto as Exhibit 3.

6.      A true and accurate copy of the third amended complaint in the New Jersey Action captioned *Brent Carter, Robert Haynes, and Kenneth Cuoco, on behalf of themselves and all others similarly situated v. Bed Bath & Beyond, Inc.*, Docket No. MID-L-06178–16 (Sup. Ct. Law Div. Oct. 24, 2016) is attached hereto as Exhibit 4.


Dated: August 2, 2017.


                                        /s/      *Jonathan L. Sulds* _____
                                                Jonathan L. Sulds

# EXHIBIT 1

*DANYELL THOMAS, ET AL. VS.*
*BED BATH AND BEYOND, INC.*

---

*ANDRAE WHALEY*
*July 19, 2017*

---



ELLEN GRAUER
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P: 212-750-6434   F: 212-750-1097
www.ellengrauer.com

*Original File 115286.TXT*
*Min-U-Script® with Word Index*

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK
   --------------------------------------------x
3  DANYELL THOMAS, RASHAUN F. FRAZER,
   ANDRAE WHALEY and ELENI MIGLIS,
4  individually and all other employees
   similarly situated,

5
                        Plaintiffs,
6
        -against-
7
   BED BATH AND BEYOND, INC.,
8
                        Defendant.
9
   Civil Action No. 16-cv-8160
10 --------------------------------------------x

11

12                      200 Park Avenue
                        New York, New York
13
                        July 19, 2017
14                      11:35 a.m.

15

16         Videotaped Deposition of ANDRAE WHALEY,

17 before Shari Cohen, a Notary Public of the State

18 of New York.

19

20

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24            New York, New York 10022
                   212-750-6434
25                 REF:  115286

```
 1   A P P E A R A N C E S:

 2

 3   HANG & ASSOCIATES, PLLC

 4   Attorneys for Plaintiffs

 5         136-18 39th Avenue, Suite 1003

 6         Flushing, New York  11354

 7   BY:  KELI LIU, ESQ.

 8         PHONE  718-353-8588

 9         EMAIL  kliu@hanglaw.com

10

11

12   GREENBERG TRAURIG, LLP

13   Attorneys for Defendant

14         200 Park Avenue

15         New York, New York  10166

16   BY:  JONATHAN L. SULDS, ESQ.

17         PHONE  212-801-6882

18         FAX    212-309-9582

19         EMAIL  suldsj@gtlaw.com

20

21

22   ALSO PRESENT:

23         LAUREN ALVAREZ

24         KRISTIN THOMPSON

25
```

```
1   ------------------ I N D E X ------------------

2   WITNESS                  EXAMINATION BY        PAGE

3   ANDRAE WHALEY            MR. SULDS               7

4                           MS. LIU               112

5

6

7   --------------- E X H I B I T S ---------------

8   DEFENDANT'S    DESCRIPTION                 FOR I.D.

9   Whaley 1       Declaration                     20

10  Whaley 2       Plaintiffs' Objections and      59

11                 Responses to to Defendant's

12                 First Request for the

13                 Production of Documents

14  Whaley 3       Department Level Manager        61

15                 Compensation

16  Whaley 4       Pay Stub                        63

17  Whaley 5       Document                        63

18  Whaley 6       Document                        63

19  Whaley 7       Document                        63

20  Whaley 8       Document                        64

21  Whaley 9       Document                        64

22  Whaley 10      Associate Disciplinary          81

23                 Notice

24  Whaley 11      Associate Disciplinary          84

25                 Notice
```

```
 1      ----------- E X H I B I T S (Cont'd)------------

 2    DEFENDANT'S      DESCRIPTION                 FOR I.D.

 3    Whaley 12       Associate Disciplinary          86

 4                    Notice

 5    Whaley 13       Performance Improvement          97

 6                    Plan

 7

 8

 9

10                 (EXHIBITS TO BE PRODUCED)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **S T I P U L A T I O N S**

2

3          IT IS HEREBY STIPULATED AND AGREED by

4     and between the attorneys for the respective

5     parties herein, that the filing, and sealing

6     of the within deposition be waived.

7          IT IS FURTHER STIPULATED AND AGREED

8     that all objections, except as to the form of

9     the question, shall be reserved to the time

10    of the trial.

11         IT IS FURTHER STIPULATED AND AGREED

12    that the within deposition may be sworn to

13    and signed before any officer authorized to

14    administer an oath with the same force and

15    effect as if signed and sworn to before the

16    Court.

17

18                    -oOo-

19

20

21

22

23

24

25

```
1              P R O C E E D I N G S

2                THE VIDEOGRAPHER: This is card

3       one.  We are now on the record at

4       11:37 a.m. on July 19, 2017.  This is

5       the opening of the deposition of

6       Andrae Whaley in the matter of Danyell

7       Thomas, et al., versus Bed Bath and

8       Beyond, Inc.

9                This deposition is being held

10      at the offices of Greenberg Traurig

11      located at 200 Park Avenue, New York,

12      New York 10166.

13               The court reporter is Shari

14      Cohen with Ellen Grauer Court

15      Reporting.  I'm the legal videographer

16      Nathaniel Armstrong also with Ellen

17      Grauer Court Reporting.

18               Counsel please introduce

19      themselves and state whom they

20      represent.

21               MS. LIU: This is Keli Liu from

22      Hang & Associates. I'm representing

23      the plaintiffs.

24               MR. SULDS: On behalf of

25      defendant Greenberg Traurig by
```

1           Jonathan L. Sulds, S-U-L-D-S.

2               THE VIDEOGRAPHER: Will the

3       court reporter please swear in the

4       witness.

5   A N D R A E   W H A L E Y, called as a

6       witness, having been duly sworn by the

7       Notary Public, was examined and

8       testified as follows:

9

10  EXAMINATION BY

11  MR. SULDS:

12          Q.     How are you, Mr. Whaley?

13          A.     I'm all right.

14          Q.     Did I pronounce that correctly?

15          A.     Yes. You are one of the first

16  people.

17          Q.     Excellent.  I have a very

18  difficult to pronounce last name so I want to

19  make sure that I get that right.

20          A.     Thank you.

21          Q.     Have you ever had your

22  deposition taken before?

23          A.     Regarding?

24          Q.     Just in any kind of proceeding

25  have you sat in a room like this and had

```
 1                        WHALEY
 2   testimony taken under oath?
 3          A.    No.
 4          Q.    Have you ever testified in a
 5   court or regulatory agency of some kind?
 6          A.    No.
 7          Q.    Do you have an understanding
 8   what the purpose of being here today is?
 9          A.    Yes.
10          Q.    Tell me what you understand the
11   purpose to be?
12          A.    It's about overtime pay.
13          Q.    This is what lawyers call a
14   deposition.  Have you heard that term before?
15          A.    Yes.
16          Q.    Do you know what a deposition
17   is?
18          A.    Not really too clear on it.
19          Q.    In a lawsuit both sides get an
20   opportunity to engage in what we call
21   discovery so that all the facts can come out
22   and the parties can understand better once
23   they are into the lawsuit what the strengths
24   and weaknesses of their positions are and in
25   the discovery process what happens is that
```

**WHALEY**

1
2  Bed Bath and Beyond as the defendant gets an
3  opportunity to ask questions of you and other
4  folks who are bringing this lawsuit under
5  oath for the purpose of getting your
6  testimony down, do you understand that?
7          A.    Yes.
8          Q.    Get a chance to ask you
9  questions in writing, those are called
10 interrogatories and gets a chance to ask you
11 to produce documents as well that might be in
12 your possession and which are relevant to the
13 lawsuit.  Do you understand all that?
14         A.    Yes.
15         Q.    The important thing about a
16 deposition is for you to give the fullest and
17 most complete truthful answer that you can to
18 my questions.  Do you understand?
19         A.    Yes.
20         Q.    If some time later on in this
21 lawsuit you testify in a way that's different
22 from what you say here today, I'll be
23 entitled to tell the judge look, he changed
24 his testimony or I'll be able to tell a jury
25 something like that.  Do you understand that?

1                          WHALEY

2          A.    Yes.

3          Q.    So if you do not understand a

4    question that I ask today, it's important for

5    you to say I don't understand it, okay?

6          A.    Yes.

7          Q.    If you don't understand the

8    question, I'll rephrase, all right.  Now one

9    other thing that you need to do is you need

10   to verbalize your answer so we have a

11   videographer who is taking pictures of you,

12   could be a motion picture or a video, but

13   also this court reporter and if you don't say

14   yes or no and you just nod your head, she's

15   not going to be able to take that down so if

16   your answer is a yes, please say yes, if it's

17   a no please say no, okay?

18         A.    Yes.

19         Q.    Do you understand that?

20         A.    I understand.

21         Q.    Excellent.  It's also important

22   that you give me your fullest and most

23   complete answer so, for example, if you say

24   yes, but there is an explanation to yes, this

25   is your chance to give it, do you understand?

**WHALEY**

1

2      A.     I understand.

3      Q.     Because later on if you say but

4  I wanted to explain that answer and you

5  didn't do it here, then I'll be able to say

6  to a judge or a jury well, he had a chance to

7  explain and he didn't do it then, okay?

8      A.     I understand.

9      Q.     Excellent.  Do you have any

10  questions for me before we start?

11      A.     No, I do not.

12      Q.     One of the things that we try

13  and make sure of is that a witness who's in a

14  deposition is able to understand the

15  questions and answer them truthfully.  Do you

16  have any reason you can think of as you sit

17  here now why you cannot understand the

18  questions I'm asking you?

19      A.     No.

20      Q.     Do you have any reason you can

21  think of why you can't answer those questions

22  truthfully?

23      A.     No.

24      Q.     Have you had any prescription

25  medication in the last 24 hours?

```
1                      WHALEY
2          A.    No.
3          Q.    Have you done any non
4  prescription medication in the last 24 hours?
5          A.    No.
6          Q.    Have you had anything alcoholic
7  to drink within the last 24 hours?
8          A.    No.
9          Q.    Do you suffer from any medical
10 condition which would make it difficult for
11 you either to hear or understand these
12 questions I'm asking you?
13         A.    No.
14         Q.    Do you have any medical
15 condition which would interfere with your
16 ability to answer these questions truthfully?
17         A.    No.
18         Q.    Where are you currently
19 employed?
20         A.    I'm at TJ Maxx.
21         Q.    For how long have you been at
22 TJ Maxx?
23         A.    I have been at TJ Maxx for
24 eight months.
25         Q.    What job do you have at TJ
```

1                      WHALEY

2   Maxx?

3          A.    I'm a manager.

4          Q.    Is there a particular TJ Maxx

5   store at which you are employed?

6          A.    Yes.

7          Q.    What store is that?

8          A.    The store located on 57th

9   Street and Eighth Avenue.

10         Q.    57th and?

11         A.    57th and Eighth Avenue.

12         Q.    Prior to being employed by TJ

13   Maxx, where were you employed?

14         A.    I was at Forever 21 prior to

15   that.

16         Q.    For how long were you at

17   Forever 21?

18         A.    I was there for about four

19   months.

20         Q.    What was your job at Forever

21   21?

22         A.    I was a manager there as well.

23         Q.    As a manager at Forever 21, did

24   you receive overtime?

25                 MS. LIU: Objection.

14

```
 1                    WHALEY
 2        A.    Yes.
 3        Q.    As a manager at TJ Maxx, are
 4  you paid overtime?
 5        A.    No.
 6        Q.    Do you work over 40 hours a
 7  week at TJ Maxx?
 8        A.    No.
 9        Q.    Before you worked at Forever
10  21, where did you work?
11        A.    I worked at Bed Bath and
12  Beyond.
13        Q.    What were the dates of your
14  employment at Bed Bath and Beyond?
15        A.    From July -- you want the
16  actual date?
17        Q.    As best as you can recall?
18        A.    From July of 2011 to July of
19  2016.
20        Q.    How did you come to leave Bed
21  Bath and Beyond's employ?
22        A.    I left Bed Bath and Beyond to
23  seek opportunity at Forever 21.
24        Q.    Did you voluntarily resign from
25  Bed Bath?
```

```
 1                    WHALEY
 2         A.    Yes, I did.
 3         Q.    Before you worked at Bed Bath
 4  and Beyond, where did you work?
 5         A.    I worked at Toys R Us.
 6         Q.    For how long did you work at
 7  Toys R Us?
 8         A.    I would say about a year and --
 9  I believe it was about a year and ten months
10  or a year and ten months.
11         Q.    What was your job at Toys R Us?
12         A.    I was a manager at Toys R Us as
13  well.
14         Q.    Were you any specific kind of
15  manager as well?
16         A.    I was an assistant store
17  manager and I was in charge of operations.
18         Q.    Did you work over 40 hours a
19  week at Toys R Us?
20         A.    Yes.
21         Q.    Did you receive overtime for
22  the hours over 40?
23         A.    No.
24         Q.    Have you brought a lawsuit
25  against Toys R Us?
```

1                         WHALEY

2           A.    No.

3           Q.    Did you ever complain about

4    your pay at Toys R Us?

5                 MS. LIU: Objection.

6           Q.    You can go ahead.

7           A.    No.

8           Q.    Prior to working at Toys R Us,

9    where did you work?

10          A.    I worked at Circuit City.

11          Q.    What were the years

12   approximately you were at Circuit City?

13          A.    I believe it was 2002.  I can't

14   remember the first year I started at Circuit

15   City.

16          Q.    For how long did you work at

17   Circuit City?

18          A.    I stayed there until it closed

19   down at the year of I believe it was 2009 of

20   April.

21          Q.    Did you have a manager's role

22   at Circuit City at any point in that tenure

23   there?

24          A.    Yes, I did.

25          Q.    What was the manager's role?

```
1                         WHALEY
2                   MS. LIU: Objection.
3         A.    I don't understand the
4    question. What do you mean?
5         Q.    What was the job you had as a
6    manager at Circuit City?
7         A.    At Circuit City I was an
8    assistant store manager as well as I was a
9    district operations manager later on.
10        Q.    When you worked as an assistant
11   store manager at Circuit City, did you work
12   over 40 hours a week at any point?
13        A.    Yes.
14        Q.    Did you receive overtime for
15   those hours over 40?
16                   MS. LIU: Objection.
17        A.    No.
18        Q.    When you worked as a district
19   operations manager at Circuit City, did you
20   work over 40 hours in any week?
21        A.    Yes.
22        Q.    Did you receive overtime
23   payment for those hours over 40?
24        A.    No.
25        Q.    Did you ever complain to
```

1                    WHALEY

2    Circuit City that you were not properly paid?

3                 MS. LIU: Objection.

4         A.    No.

5         Q.    Did you bring a lawsuit against

6    Circuit City?

7         A.    Sorry?

8         Q.    Did you bring any lawsuits

9    against Circuit City?

10        A.    No.

11        Q.    What's your educational

12   background?

13        A.    College graduation from Long

14   Island University.

15        Q.    What year?

16        A.    2000 -- I can't remember the

17   year I graduated.  I'm sorry.

18        Q.    Would it have been 2009?

19        A.    Yes.

20        Q.    Do you have a BA from them?

21        A.    Yes.

22        Q.    In what field?

23        A.    Education.

24        Q.    Any part of your degree have to

25   do with history?

```
 1                        WHALEY
 2          A.     Yes.
 3          Q.     Be fair to say as a graduate
 4   with a degree in education that you read
 5   documents before you sign them?
 6               MS. LIU: Objection.
 7          A.     I don't understand.
 8          Q.     When you are asked to sign a
 9   document, do you read it before you sign it?
10               MS. LIU: Objection.
11               MR. SULDS: What's the grounds
12          of the objection?
13               MS. LIU: Leading.
14               MR. SULDS: This is a
15          deposition.  Okay.
16          Q.     You can go ahead and --
17          A.     I'm sorry. Repeat the question
18   one more time, please?
19               MR. SULDS: Would you read the
20          question back, please.
21               (Record read.)
22          A.     I ask questions before I sign
23   it.
24          Q.     So do you remember signing a
25   declaration in this case?
```

WHALEY

1

2       A.    Yes.

3            MR. SULDS: Let's make this

4       Whaley 1.

5            (Defendant's Exhibit Whaley 1,

6       Declaration, marked for

7       Identification.)

8       Q.    You have got a document in

9  front of you which is Exhibit 1.  Do you

10 recognize that document?

11      A.    Yes, I do.

12      Q.    If you will take a look at the

13 last page, it looks like page 7, did you sign

14 that document?

15      A.    Yes, I did.

16      Q.    Did you read this document

17 before you signed it?

18      A.    Yes, I did.

19      Q.    Did you write this document?

20            MS. LIU: Objection.

21      A.    I did not write this document.

22 I spoke to my lawyer --

23            MS. LIU: Objection.

24      Q.    So one of the things that I'm

25 not allowed to ask you about are

1                    WHALEY

2     conversations with your lawyer that's covered

3     by the attorney/client privilege.

4          A.    Correct.

5          Q.    So I'm not interested in what

6     you said to your lawyer and what your lawyer

7     said to you, but I can ask you questions

8     about how the document came to be created.

9          A.    Okay, sure.

10         Q.    So I think it's sufficient for

11    my purposes right now that you read this

12    document?

13         A.    I read this document.

14         Q.    And you signed it, correct?

15         A.    I signed the document, yes.

16         Q.    Did you know that you were

17    signing this under penalty of perjury?

18         A.    Yes.

19         Q.    Do you know that the oath you

20    swore here today is to tell the truth under

21    penalty of perjury?

22         A.    Correct.

23         Q.    Tell me if you would, please,

24    about how you came to be employed at Bed Bath

25    and Beyond?

1                        WHALEY

2          A.    At the time I had a friend that

3     worked there.  He told me about the job.

4          Q.    Who was the friend?

5          A.    His name is Jose.  I don't

6     recall his last name.

7          Q.    Okay.

8          A.    He was a department manager at

9     that time and I filled out an application and

10    Francis McKinley contacted me.

11         Q.    Hold on one second. Where did

12    you get an application?

13         A.    From the actual store.

14         Q.    So you went to the store?

15         A.    Yes.

16         Q.    Which store?

17         A.    18th Street.

18         Q.    Do you know if that store had a

19    number?

20         A.    Yes, store 42.

21         Q.    So you went to store 42 on 18th

22    Street and obtained an application?

23         A.    Yes.

24         Q.    You filled out the application?

25         A.    Yes.

```
 1                     WHALEY
 2          Q.    Did you fill it out on the day
 3   that you were at store 42?
 4          A.    Yes.
 5          Q.    Did you fill it out there at
 6   the store?
 7          A.    I filled it out at the store.
 8          Q.    So describe what happened that
 9   day?
10          A.    That was it.  I went to the
11   store, filled out an application, submitted
12   it to one of the department managers there
13   and I left.
14          Q.    Where did you go within the
15   store to get the application?
16          A.    Customer service area.
17          Q.    To whom did you give the
18   application once you had finished filling it
19   out?
20          A.    That I don't recall.
21          Q.    What happened next in that
22   process?
23          A.    I think a couple of days later
24   Francis McKinley called me up.  We had a
25   conversation over the phone.
```

1                    **WHALEY**

2          Q.     Who is Francis McKinley?

3          A.     At that time I think she was a

4    recruiter if I'm not mistaken.

5          Q.     For Bed Bath?

6          A.     For Bed Bath and Beyond.

7          Q.     And do you remember the

8    conversation that you had with her?

9          A.     Real quick conversation just

10   about where I worked at and just my

11   experience as a manager.

12         Q.     What happened next?

13         A.     She called me back.  Then after

14   that I met her.  She set me up for an

15   interview and I spoke to her while she

16   interviewed me basically about the same

17   things that we spoke about over the phone.

18         Q.     So let me make sure I got this

19   right. You went to store 42, got an

20   application, filled it out, gave it to

21   somebody at the store.  Francis McKinley

22   called you, talked to you on the phone.

23   Short time later, couple of days, whatever,

24   she called you back and what happened in that

25   second phone call?

1                     **WHALEY**

2          A.    She just said come in for an

3    interview.  Excuse me, she would like me to

4    come in for an interview.

5          Q.    Where were you supposed to come

6    in?

7          A.    I came in at 18th Street.

8          Q.    Were you supposed to ask for

9    someone in particular?

10         A.    Yes, I was supposed to ask for

11   Francis McKinley.

12         Q.    Did you do that?

13         A.    Yes, I did.

14         Q.    So please describe as best as

15   you can now recall what that process was?

16         A.    We spoke about my background as

17   a manager as I stated.  Then she told me

18   about the Bed Bath and Beyond culture.  That

19   was pretty much about it.

20         Q.    Was there any discussion at

21   that point about what job you were seeking?

22         A.    At that point it was a

23   department manager job.

24         Q.    How did you know that?

25         A.    She told me it was a department

```
 1                         WHALEY
 2   manager job.
 3          Q.    How much did that job pay?
 4          A.    We did not discuss that.
 5          Q.    Why?
 6          A.    That was not brought up.
 7          Q.    Why didn't you ask?
 8          A.    Wasn't something that was asked
 9   for me to ask so I didn't ask the question.
10          Q.    On the day that you went in and
11   spoke with Francis McKinley, did you speak to
12   anybody else?
13          A.    The same day?
14          Q.    The same day?
15          A.    No.
16          Q.    How was it left after that
17   interview?
18          A.    She said that she will pass on
19   the information from what me and her spoke
20   about to I believe another manager.
21          Q.    Where did that interview take
22   place in the store physically?
23          A.    She had an office.  It was in
24   the office.
25          Q.    What time of day was it?
```

1                      WHALEY

2          A.     It was day time.  I can't give

3   you exact time.

4          Q.     How long did that last?

5          A.     Probably about 25 to 30

6   minutes.

7          Q.     Did you ask any questions

8   during the interview?

9          A.     Yes, I did.

10         Q.     What questions did you ask?

11         A.     I just asked about the culture

12  of the company, the type of like standards

13  that they had, operational procedures.

14         Q.     Did you ask about the hours?

15         A.     No, I did not.

16         Q.     Did it matter to you whether it

17  would be a night shift or a day shift that

18  you would be hired for or at least being

19  interviewed for?

20         A.     No, it did not.

21         Q.     Did you ask what the duties and

22  responsibilities would be for the job for

23  which you were being interviewed?

24         A.     Yes.

25         Q.     What were you told?

```
 1                        WHALEY
 2          A.    She said that you would be a
 3    department manager and so I never heard of
 4    the term actually department manager.  I was
 5    told that everyone who comes into Bed Bath
 6    and Beyond starts as a department manager and
 7    you lead your own team.
 8          Q.    Was there a particular
 9    department for which you were being
10    interviewed?
11          A.    No.
12          Q.    Then what happened next in this
13    interviewing process?
14          A.    The same day or --
15          Q.    Just what was the next step
16    either that day or the next day or whatever?
17          A.    I would say probably like a
18    week later she called me and said she was
19    going to set me up for another interview with
20    a store manager on the west side.
21          Q.    Did that happen; were you set
22    up for an interview?
23          A.    Yes, I was.
24          Q.    Where on the west side was that
25    store?
```

```
1                        WHALEY

2          A.    I have a store number, but I

3    can't remember the address.

4          Q.    I'll take the store number?

5          A.    565.

6          Q.    Did you go to 565 for that

7    interview?

8          A.    Yes, I did.

9          Q.    Was that about a week or so

10   later?

11         A.    About a week or so.

12         Q.    Was there any interchange

13   between you and Bed Bath in that interim

14   between the time that you saw Ms. McKinley at

15   store 42 and the time you went to 565?

16         A.    No.

17         Q.    Who was the person that you

18   went to interview with at 565?

19         A.    His name was Dennis.  I don't

20   recall his last name.

21         Q.    Do you recall what job he had?

22         A.    He was a store manager.

23         Q.    You met him at 565?

24         A.    Yes.

25         Q.    Was there a space within 565
```

```
 1                      WHALEY
 2   where you had your interview?
 3           A.    His office.
 4           Q.    Do you remember what time of
 5   day?
 6           A.    Day time.
 7           Q.    Was anybody else present?
 8           A.    No.
 9           Q.    How long did that interview
10   take?
11           A.    About the same time period 20,
12   25 minutes.
13           Q.    What did you two talk about?
14           A.     The same thing that we spoke
15   about with Francis, just about my background,
16   the culture of Bed Bath and Beyond.  I asked
17   the same questions again about the operations
18   and procedures.  That was it.
19           Q.    Approximately how much were you
20   earning at Toys R Us at that time?
21           A.    At the time I left?
22           Q.    At the time you -- let me start
23   back.  At the time you were interviewing with
24   Bed Bath, were you then employed at Toys R
25   Us?
```

```
 1                      WHALEY
 2          A.    Yes.
 3          Q.    Approximately how much were you
 4  earning?
 5          A.    I was making at that time maybe
 6  65,000, 66,000 if I'm not mistaken.
 7          Q.    You were not making overtime;
 8  is that correct?
 9          A.    No.
10          Q.    You were not working over 40
11  hours a week?
12          A.    In Toys R Us, yes, I think we
13  did 45 hours a week.  We were not paid hourly
14  though.
15          Q.    In this interview with Dennis
16  at 565, did you talk about salary or hourly
17  wage?
18          A.    No, he didn't ask that
19  question.
20          Q.    Did you ask that question?
21          A.    No.
22          Q.    Why not?
23          A.    Wasn't a question that he asked
24  and wasn't a question that I even asked.
25          Q.    Did you talk about the hours
```

WHALEY

1
2     that you might be required to work in the
3     job?
4             A.     No.
5             Q.     How did that interview end?
6             A.     He said that he has to speak
7     back to Francis and then he will -- I should
8     get a phone call or I would receive a phone
9     call, excuse me, after he partners up with
10    Francis.
11            Q.     What happened next in this
12    process?
13            A.     The next process Francis called
14    me a couple of weeks later and she set up
15    another interview with Kevin, the district
16    manager of Bed Bath and Beyond in Manhattan.
17            Q.     What part of the year was it
18    that you were doing this interviewing at Bed
19    Bath?
20            A.     I would say that was in June.
21    Yeah, it was mid June.
22            Q.     Was there an interview that was
23    set up with Kevin?
24            A.     Yes, there was.
25            Q.     Where was that interview held?

```
 1                     WHALEY
 2          A.    That was at store 361.
 3          Q.    Where within store 361 if you
 4   recall?
 5          A.    In an office.
 6          Q.    Anybody else present?
 7          A.    No.
 8          Q.    What do you recall saying to
 9   Kevin and Kevin saying to you in that
10   interview?
11          A.    Same questions asked about the
12   culture of the company, policies, operations.
13   He spoke about customer service and he asked
14   about my salary.
15          Q.    Do you recall the words that he
16   used?
17          A.    He said how much -- he said
18   what are you making at Toys R Us.
19          Q.    What did you tell him?
20          A.    I told him the amount I was
21   making which was 65 or 66,000 at that time.
22          Q.    What if anything did he say in
23   response?
24          A.    No response.
25          Q.    Did you ask him at that point
```

```
 1                        WHALEY
 2    how much the job for which you were
 3    interviewing paid?
 4           A.     No.
 5           Q.     Why?
 6           A.     It wasn't a question I decided
 7    to ask.
 8           Q.     Why not?
 9           A.     That's just not what I normally
10    do in an interview unless I feel I need to
11    ask the question I ask it, but I didn't ask.
12           Q.     You didn't know after three
13    interviews whether the job was going to pay
14    you 40,000 or 50,000?
15           A.     No.
16           Q.     And you didn't know how many
17    hours there were that you were going to work?
18           A.     No.
19           Q.     And you didn't know whether you
20    would be eligible for overtime or not?
21           A.     No.
22           Q.     And you didn't know what
23    department there was for which you might be
24    hired?
25           A.     No.
```

```
 1                     WHALEY

 2        Q.    You asked about the culture and

 3   policies in each of these three interviews

 4   that you had?

 5        A.    Yes.

 6        Q.    Explain if you will please why

 7   you didn't ask about salary?

 8        A.    That's just a question I didn't

 9   decide to ask.

10        Q.    How much time would you say you

11   had spent on interviewing up to the time that

12   you were with Kevin including that interview?

13        A.    I don't understand that

14   question.

15        Q.    If you were to take a look back

16   the time it took you to put in your

17   application, have the two telephone calls

18   with Francis, have the meeting with Francis,

19   have the meeting with Kevin and have the next

20   meeting, how much time was involved all

21   together?

22        A.    I understand what you are

23   saying.  I understand about three or four

24   weeks.

25        Q.    How much of your time; was it a
```

**WHALEY**

1

2  couple of hours, was it ten hours?  You

3  personally, how much time had you put into

4  all this?

5      A.    Maybe a couple of hours.

6      Q.    What I don't understand and

7  perhaps it's just me is why you would put a

8  couple of hours of your time in on a job

9  where you didn't know what you were going to

10  be paid. Can you explain that?

11          MS. LIU: Objection.

12      A.    Repeat the question again. I'm

13  sorry.

14      Q.    What I don't understand and I

15  hope you will explain for me is why you would

16  take a couple hours of your time interviewing

17  on a job where you didn't know what you were

18  going to be paid?

19      A.    Again, that just wasn't a

20  question that I asked.

21      Q.    How did the interview end?

22      A.    He said that he will partner up

23  with Francis and they will get back to me at

24  a later time.

25      Q.    Did they get back to you at a

```
1                         WHALEY
2    later time?
3              A.    Yes.
4              Q.    Who got back to you?
5              A.    Francis did.
6              Q.    Was that in person or --
7              A.    No, it was over the phone.
8              Q.    In that telephone call what did
9    she say to you and what did you say to her?
10             A.    She said Andrae, I have an
11   offer for you.  She said it's a department
12   manager position at Bed Bath and Beyond, the
13   18th Street store.  Then after that she told
14   me the salary.
15             Q.    What did she say the salary
16   was?
17             A.    I think at that time I think it
18   was 63,000 at that time.
19             Q.    What did she say about the
20   hours you would work?
21             A.    She said that you have to do 47
22   -- she said it's an hourly position.  You
23   have to do 47.5 hours so she told me that the
24   first 40 hours is your regular hourly rate
25   and then after that whatever you do after
```

1                           WHALEY

2     that it's time-and-a-half overtime or

3     whatever you call it overtime after that so

4     she broke it down.  She said you take -- I'll

5     give an example because I can't remember the

6     dollar amount at the time.  She said let's

7     say it was $30, times that by 40, then you

8     take the $30 and you times it by half of that

9     so then she goes and you take that and then

10    she goes the additional 7 hours, the 7.5

11    hours of overtime gets you into your salary.

12          Q.    What else if anything did you

13    talk about in that call?

14          A.    She talked to me about the

15    benefits.  She talked to me about the

16    opportunities of growth.  That was it.

17          Q.    Did you talk in that call about

18    the hours each day that you would work, what

19    your shift would be?

20          A.    No.

21          Q.    Did you ask?

22          A.    No.

23          Q.    What shift were you then

24    working or what hours were you then working

25    at Toys R Us?

```
1                       WHALEY
2          A.    Shift?
3          Q.    Yeah, when I say shift, I'm
4    thinking did you start at nine in the
5    morning, did you start at three in the
6    afternoon, did you start at 11 at night?
7          A.    At Toys R Us I pretty much
8    worked 6 to 3.
9          Q.    Six p.m.?
10         A.    Excuse me, six a.m. to three
11   p.m.
12         Q.    If I call that shift just for
13   both of us to understand?
14         A.    Okay.
15         Q.    There was no conversation if I
16   understand your testimony about the shift you
17   would work at Bed Bath and Beyond when she
18   and you talked about the offer?
19         A.    No.
20         Q.    You didn't know at that point
21   whether you were being asked to come in at
22   midnight for example?
23         A.    No.
24         Q.    Or being asked to come in at
25   four a.m. for example?
```

```
 1                      WHALEY
 2          A.    No.
 3          Q.    Did you accept the job at that
 4   time?
 5          A.    I did.
 6          Q.    I'm sorry?
 7          A.    I did.
 8          Q.    What happened next after that
 9   phone call?
10          A.    After that phone call about two
11   weeks later I had my first -- she gave me my
12   day one schedule which was the first day of
13   orientation.
14          Q.    Did she give you the schedule
15   for orientation during that call or
16   subsequently?
17          A.    Subsequently.  It was like -- I
18   think it was like a week before I started.
19          Q.    How did she communicate that
20   schedule to you?
21          A.    Over the phone.
22          Q.    In that telephone call was
23   there any conversation about anything other
24   than the schedule?
25          A.    No.
```

WHALEY

1

2      Q.     How long did that call take?

3      A.     Two minutes.

4      Q.     Where was the orientation to

5  be?

6      A.     At 18th Street and Sixth

7  Avenue.

8      Q.     Do I understand correctly that

9  on the day that you were scheduled for

10 orientation you went to the 18th Street

11 store?

12     A.     Yes, I did.

13     Q.     Did you have orientation there?

14     A.     Yes, I did.

15     Q.     What was involved in the

16 orientation?

17     A.     Orientation you meet a lot of

18 people so met a lot of people.  They started

19 probably around eight a.m. so you had to

20 dress casual.  You were in a room with some

21 other department managers, some part-time

22 associates as well.

23     Q.     What were the subjects that

24 were gone over in the orientation?

25     A.     Anything from scheduling,

```
1                        WHALEY
2     policies and procedures, dress code, conduct,
3     culture, safety.  That's about it that I
4     could recall.
5            Q.    Were there new hire paperwork
6     that you had to fill out?
7            A.    Yes, there was new hire
8     paperwork.
9            Q.    When did you fill that out?
10           A.    We filled that out orientation
11    day.
12           Q.    You read all the things you
13    were asked to sign?
14           A.    Yes, new hire paperwork, yes.
15           Q.    Asked whatever questions you
16    had about what you were given to sign?
17           A.    Yes.
18           Q.    How long did the orientation
19    take?
20           A.    Nine hours or so.
21           Q.    All on that day?
22           A.    I'm not understanding your
23    question.
24           Q.    Was it nine hours in one day or
25    did it go from one day to the next?
```

```
1                        WHALEY

2          A.    It went from one day to the

3    next.

4          Q.    How many days in total was the

5    orientation?

6          A.    I don't recall how many days.

7    We did work five days that week.  I don't

8    recall how many days of orientation it was.

9    Might have been two or three days.

10         Q.    Then once you had finished the

11   orientation what happened?  Were you put to

12   work; did you come back the next day to go to

13   work?

14         A.    After day one or once we

15   finished the orientation process?

16         Q.    If I understood your testimony

17   correctly and please tell me if this is right

18   or wrong, you went to the store, you had

19   orientation and that was in the form of

20   classes essentially?

21         A.    Yes.

22         Q.    You were in a room, somebody

23   came in and talked to you about policies and

24   procedures and that sort of thing?

25         A.    Yes.
```

1                    **WHALEY**

2          Q.     There were other people there

3    who were being oriented at the same time?

4          A.     Yes.

5          Q.     That process that I'll call it

6    the classroom process that may have lasted

7    more than one day from what you recall?

8          A.     Correct.

9          Q.     You don't recall whether it was

10   two days or three days or whatever; is that

11   right?

12         A.     Correct.

13         Q.     What I'm asking is you is when

14   those classes finished, when that orientation

15   finished, on that day that it finished, did

16   you then start working in the store?

17         A.     Yes.

18         Q.     What job did you start working

19   at?

20         A.     Department manager.  At that

21   time they had me in the bedding section.

22         Q.     What were the hours you were to

23   work each day?

24         A.     Ten-and-a-half.

25         Q.     From when to when?

```
 1                    WHALEY

 2         A.    It required at that time I

 3    would say I think it was three opening shift

 4    which was from 7 a.m. to 5:30, one mid shift

 5    from ten a.m. to 8:30, one closing shift,

 6    excuse me, from one to 11:30.  One p.m. to

 7    11:30 p.m.

 8         Q.    Do you recall which shift you

 9    started working on?

10         A.    No, not when I originally

11    started in the department, but like I said,

12    it was a 7 a.m. to 5:30. I had three days of

13    opening, one day mid, one day close.

14         Q.    So do I understand correctly

15    that throughout your workweek the time that

16    you started varied from day-to-day?

17              MS. LIU: Objection.

18         A.    I don't understand the question

19    you're asking.

20         Q.    If I heard you correctly, what

21    you said was that you a couple of days came

22    in at seven; is that right?

23         A.    Seven a.m.

24         Q.    A couple of days you came in

25    for the mid shift?
```

```
 1                      WHALEY
 2          A.    Yes.
 3          Q.    And perhaps during the week you
 4   might also do the closing shift?
 5          A.    Correct.
 6          Q.    Was there any pattern to how
 7   many opening, how many mid shifts and how
 8   many closing shifts you had in any given
 9   week?
10          A.    Pattern like I said it was
11   three days opening, one mid, one close and
12   that could change depending on the needs of
13   the business.
14          Q.    When you first started were you
15   just on your own or was there someone there
16   to see what you were doing and help you
17   along?
18          A.    Yeah, there were other
19   department managers.
20          Q.    Did you shadow anyone?
21          A.    A department manager, yeah.
22          Q.    When I use the term shadow,
23   what do you understand me to be saying?
24          A.    Was I being trained by
25   somebody.
```

1                    WHALEY

2          Q.    There was another department

3   manager who was there?

4          A.    Yes.

5          Q.    For how long did that shadowing

6   process go on?

7          A.    The shadowing process goes on a

8   long time.  The training at that time you

9   train for about maybe like two months.

10         Q.    Then what happened?

11         A.    As far as what?

12         Q.    Then what happened; did the

13  training cease and you were sort of on your

14  own?

15         A.    Yes.

16         Q.    Was the first part of your

17  employment the training shadowing, that was

18  all within bedding or no?

19         A.    No.  You have to learn the

20  culture of the business so you are going to

21  do some training at the front end, do some

22  training in the back of the house which is

23  maintenance, you are going to do training

24  everywhere.

25         Q.    How many other department

```
1                        WHALEY
2    managers were there at that -- what's the
3    number of the store?
4            A.    Store 42.
5            Q.    Did you ever work at any other
6    store for Bed Bath?
7            A.    Yes.
8            Q.    Which other store?
9            A.    I don't know the store number.
10           Q.    What was the other store?
11           A.    A store in Long Island.
12           Q.    What were the dates you worked
13   approximately at store 42?
14           A.    The time period or dates?
15           Q.    Yes.
16           A.    From 2011 of July to 2016 of
17   July.
18           Q.    When did you work at the store
19   on Long Island?
20           A.    They needed me to go to Long
21   Island, I can't remember the year correctly.
22   I think it was 2014.
23           Q.    For how long were you at that
24   store in Long Island?
25           A.    About a month.
```

```
 1                      WHALEY
 2         Q.    Any other stores at which you
 3   worked while you were at Bed Bath?
 4         A.    Yes.
 5         Q.    Where?
 6         A.    361 and 565.
 7         Q.    What were the dates
 8   approximately the time frame that you worked
 9   at 361?
10         A.    Let's say 2012 we did a couple
11   of over nights over there and 565 we did a
12   couple of over nights as well.
13         Q.    Also in 2012?
14         A.    Yes.
15         Q.    What does it mean to say over
16   nights?
17         A.    Overnight we assisted in doing
18   inventory for the two stores.
19         Q.    What was the nature of the work
20   you did at the Long Island store?
21         A.    Anything as far as stocking
22   with the associates, maintenance, sweeping,
23   cashiering, ringing customers up.
24         Q.    Were you a department manager
25   at the Long Island store?
```

```
 1                         WHALEY
 2          A.    Yes, I was a department manager
 3   at the Long Island store.
 4          Q.    If I heard you correctly, it
 5   seems like you could say 42 was your home
 6   store?
 7          A.    Correct.
 8          Q.    You had a couple of assignments
 9   at 361 and 365 for a couple of overnights
10   each; is that right?
11          A.    That's right.
12          Q.    And the one month in the Long
13   Island store?
14          A.    Correct.
15          Q.    Coming back to 42, how many
16   other department managers were there who
17   worked at 42 in a normal workweek?
18          A.    Probably over 30 department
19   managers.
20          Q.    In terms of the way the store
21   was organized, were there hourly sales
22   associates who worked with department
23   managers?
24          A.    Yes, there were.
25          Q.    How many hourly sales
```

```
1                      WHALEY
2    associates were there in a normal workweek at
3    store 42?
4            A.    I can't recall that number, but
5    if I would say in the normal workweek we have
6    over 400 associates.
7            Q.    So if I were trying to get a
8    snapshot of store 42 during the time you were
9    there, would it be accurate to say
10   approximately 400 hourly associates, right?
11           A.    Yes.
12           Q.    Approximately 30 department
13   managers?
14           A.    Yes.
15           Q.    Did the department managers
16   report to someone?
17           A.    The department managers?
18           Q.    Yes.
19           A.    Yes, we reported to senior
20   managers, store manager.
21           Q.    The term senior managers, was
22   there a job called assistant store manager as
23   well?
24           A.    Yes, there was a job, excuse
25   me, so yes, let me be a little more detailed
```

```
 1                       WHALEY
 2   with that. Senior manager and assistant store
 3   manager.
 4           Q.    Same job?
 5           A.    Same job.
 6           Q.    How many assistant store
 7   managers or senior managers in a typical week
 8   on the payroll there at 42?
 9           A.    Six to seven.
10           Q.    Was there also a store manager?
11           A.    Yes, there was a store manager.
12           Q.    Just one store manager?
13           A.    One store manager.
14           Q.    Who was the store manager at 42
15   when you first started there?
16           A.    Kristin Thompson.
17           Q.    Was she the store manager
18   throughout the time you were at store 42?
19           A.    Yes, she was.
20           Q.    Who were the senior managers at
21   the time you started at store 42?
22           A.    You had Jerry, he was one
23   senior store manager.  I can't remember
24   everyone's last name.
25           Q.    Okay.
```

1               WHALEY

2          A.    Jerry, senior ASM assistant

3     store manager, Frank ASM, Neil, an ASM. I

4     cannot spell this person's name, never could,

5     Rajid, an ASM, Alex, an ASM, Art, an ASM,

6     Nikki Dillworth, an ASM.  Neary, an ASM.

7          Q.    Did the cast of ASMs or store

8     managers change during the time you were at

9     store 42?

10         A.    Yes.

11         Q.    Was Alex --

12         A.    I'm sorry, repeat that last

13    question.

14         Q.    I was asking whether the cast

15    the group of folks who were assistant store

16    managers or senior managers whether that

17    changed over time at 42?

18         A.    Yes, it did.

19         Q.    Was Alex there most of the time

20    that you were there?

21         A.    Yes, he left the store briefly

22    and he -- he left the store for a while and

23    came back.

24         Q.    You were first when you were at

25    42 in bedding as the department manager?

```
1                        WHALEY
2           A.     Correct.
3           Q.     How many hourly sales
4  associates worked in bedding?
5           A.     I can't recall that number.
6           Q.     For how long approximately did
7  you work as a department manager of bedding?
8           A.     In bedding?
9           Q.     Yes.
10          A.     Seven months.
11          Q.     Then did you move to a
12 different department?
13          A.     Yes, I did.
14          Q.     What department did you move
15 to?
16          A.     I moved to the hard side
17 department.
18          Q.     What does hard side mean?
19          A.     The hard side department
20 consists of kitchen, kitchen gadgets,
21 cookware, electronic blending, summer
22 seasonal product, Christmas, Thanksgiving
23 product.
24          Q.     For how long were you a
25 department manager in the hard side
```

```
 1                    WHALEY
 2   department?
 3         A.    I was a department manager for
 4   the hard side department maybe two months.
 5         Q.    What department did you go to
 6   after that?
 7         A.    After that I was sent to the
 8   warehouse department upstairs.
 9         Q.    For how long were you at the
10   warehouse department?
11         A.    Almost two years.
12         Q.    How many hourly sales or hourly
13   folks were there in the warehouse at the time
14   you were the department manager?
15         A.    About five.
16         Q.    What was the next department at
17   which you worked?
18         A.    The next department would be
19   the front end cashiering.
20         Q.    For how long were you at that
21   department approximately?
22         A.    About four months, four or five
23   months.
24         Q.    How many hourlies were there in
25   the front end?
```

```
 1                    WHALEY
 2         A.    I can't recall that number.
 3  It's a lot of associates.
 4         Q.    More than 20 or so?
 5         A.    Yes.
 6         Q.    What was your next department?
 7         A.    The Harmon's department, health
 8  and beauty.
 9         Q.    How long were you at Harmon
10  department?
11         A.    Almost two years.  Probably
12  like a year and about six months.
13         Q.    How many hourlies were there in
14  that department while you were there?
15         A.    It varied so it started off
16  with like 14, then went down to 10 so
17  anything in the range from 10 to like 14
18  associates.
19         Q.    So just to make sure I got this
20  right, when you were in Harmon during the
21  hours that you were there as the department
22  manager, were there any other department
23  managers for Harmon who were on site?
24         A.    When I first started, yes, on
25  site there was Lynette was department manager
```

```
 1                    WHALEY
 2   with me.
 3         Q.    Did you work the same hours the
 4   two of you?
 5         A.    I think so.  Kenny was a
 6   department manager with me.  After that it
 7   was just me.
 8         Q.    So at some point the group of
 9   folks working the hours that you worked in
10   Harmon was you and ten to 14 hourlies?
11         A.    Yes.
12         Q.    What was your next department?
13         A.    I resigned after that.
14              MR. SULDS: Off the record.
15              (Discussion off the record.)
16              THE VIDEOGRAPHER: The time is
17         12:34 p.m. on July 19, 2017.  We are
18         now off the record.
19              (Recess taken.)
20              THE VIDEOGRAPHER: This marks
21         the beginning of card two in the
22         deposition of Andrae Whaley.  Time is
23         12:39 p.m. on July 19, 2017.  We are
24         now back on the record.  You may
25         proceed.
```

```
1                        WHALEY
2          Q.    You doing okay there, Mr.
3    Whaley?
4          A.    I'm doing fine.
5          Q.    Thinking about the answers that
6    you gave to the questions I asked before we
7    took a break, is there anything you want to
8    add to those answers?
9          A.    Not that I can recall.
10         Q.    Any of the answers you want to
11   change?
12         A.    No.
13         Q.    You having any difficulty
14   following the questions that I'm asking?
15         A.    No.
16         Q.    Do you have any questions for
17   me?
18         A.    Not yet.
19         Q.    There came a point in this
20   lawsuit where on behalf of Bed Bath we asked
21   that you provide us with a bunch of
22   documents; do you recall that?
23         A.    Yes.
24              MR. SULDS: Mark that as 2,
25        please.
```

```
1                      WHALEY
2              (Defendant's Exhibit Whaley 2,
3          Plaintiffs' Objections and Responses
4          to Defendant's First Request For The
5          Production of Documents, marked for
6          Identification.)
7          Q.    Do you have Exhibit 2 in front
8   of you?
9          A.    Yes, I do.
10         Q.    Have you seen that before?
11         A.    Yes, I have.
12         Q.    Have you provided to your
13  lawyer for you lawyer to provide to us all
14  the documents you have which are responsive
15  to that?
16         A.    Yes, I have.
17         Q.    I have two groups of documents
18  that are marked 76 AW through 81 AW and 231
19  AW through 237 AW.  I'm going to show them to
20  you.  I didn't make any other copies.  Would
21  you take a look through those, please, and
22  tell me if there are any documents that you
23  had which are responsive to our document
24  request that are not included in those two
25  groups?
```

WHALEY

1

2      A.    I don't understand the question

3  you are asking.

4      Q.    So there was a request for

5  documents?

6      A.    Correct.

7      Q.    That's Exhibit 2 in front of

8  you and we have received those documents.

9  They are in two groups and if you take a look

10  in handwriting at the bottom of the pages

11  there are numbers?

12      A.    Um-hum.

13      Q.    Those are called Bates numbers,

14  it's how lawyers identify the documents?

15      A.    Okay.

16      Q.    What I'm asking is whether

17  there's anything else in addition to these

18  documents that you have which is responsive

19  to the document request?

20      A.    No.

21      Q.    Do you keep a diary?

22      A.    I'm sorry?

23      Q.    Do you write in a diary about

24  things?

25      A.    No.

```
 1                        WHALEY
 2          Q.    Do you keep notes of any kind
 3     either in writing or in a computer format?
 4          A.    No.
 5          Q.    Do you have any recordings
 6     whether they are electronic or paper and
 7     pencil physical having to do with any part of
 8     your employment at Bed Bath or the claims you
 9     have here other than this group of documents
10     that's in front of you?
11          A.    No.
12          Q.    Let me take those two groups of
13     documents back from you.  Thank you.
14                   MR. SULDS: Mark this as 3,
15          please.
16                   (Defendant's Exhibit Whaley 3,
17          Department Level Manager Compensation,
18          marked for Identification.)
19          Q.    Do you have Exhibit 3 in front
20     of you?
21          A.    Yes.
22          Q.    Is that your signature on it?
23          A.    Yes.
24          Q.    There is a date there 7/18/11.
25     Is that your handwriting?
```

```
1                        WHALEY

2          A.    Yes.

3          Q.    Did you sign this document on

4   or about the date that's indicated there?

5          A.    Yes.

6          Q.    Did you read the document

7   before you signed it?

8          A.    I don't recall the document.  I

9   don't recall if I read it or not.

10          Q.    Earlier in the deposition you

11   said that you not only read, but asked

12   questions about documents before you signed

13   it?

14          A.    Yes.

15          Q.    So is it fair to say that this

16   is a document that you read and asked

17   questions about before you signed it?

18              MS. LIU: Objection.

19          A.    Like I said, I don't recall if

20   I asked questions about it.  My signature is

21   here so I signed it.

22          Q.    Would you take a look at your

23   Declaration which is Exhibit 1, please.  Take

24   a look, please, at paragraph 9.  Do you have

25   that in front of you?
```

1                          WHALEY

2           A.    Yes, I do.

3           Q.    About four lines down you see

4    you say it's in reference to a meeting with

5    Francis McKinley, "I think this time I was

6    also given a piece of paper with some sort of

7    calculation chart on it"?

8           A.    Yes.

9                 MR. SULDS: Mark this as 4

10          please.

11                (Defendant's Exhibit Whaley 4,

12          Pay Stub, marked for Identification.)

13          Q.    Do you have 4 in front of you?

14          A.    Yes, I do.

15          Q.    Is 4 the piece of paper that

16   you make reference to in paragraph 9 of your

17   Declaration?

18          A.    Yes.

19                MR. SULDS: Would you mark

20          those sequentially 5, 6, 7, 8, 9.

21                (Defendant's Exhibit Whaley 5,

22          Document, marked for Identification.)

23                (Defendant's Exhibit Whaley 6,

24          Document, marked for Identification.)

25                (Defendant's Exhibit Whaley 7,

1                    **WHALEY**

2          Document, marked for Identification.)

3                (Defendant's Exhibit Whaley 8,

4          Document, marked for Identification.)

5                (Defendant's Exhibit Whaley 9,

6          Document, marked for Identification.)

7          Q.    By the way, Mr. Whaley, before

8    I ask you about these documents, let me ask

9    you about at store 42. Were there any human

10   resource folks present?  Was there a human

11   resource office at store 42?

12         A.    Yes.

13         Q.    Was there a human resources

14   office present throughout the time that you

15   were at store 42?

16         A.    Yes.

17         Q.    Did you understand that the

18   human resource office was there if you had

19   any questions about your employment?

20         A.    Yes.

21         Q.    Take a look at what's marked as

22   Exhibit 5, please.  Is that your signature at

23   the bottom?

24         A.    Yes.

25         Q.    Where it says to be completed

```
1                        WHALEY
2   by associate?
3           A.    Yes.
4           Q.    There is a date there 7/18/11,
5   do you see that?
6           A.    Yes.
7           Q.    Is that your handwriting?
8           A.    Yes.
9           Q.    Did you sign this document on
10  or about 7/18/11?
11          A.    Yes.
12          Q.    Take a look at number 6,
13  please.  Is that your signature there under
14  where it says to be completed by associate?
15          A.    Yes.
16          Q.    There is a date there 1/4/12,
17  is that your handwriting?
18          A.    Yes.
19          Q.    Did you sign this document on
20  or about 1/4/12?
21          A.    Yes.
22          Q.    Take a look at 7, please?
23          A.    Yes.
24          Q.    Is that your signature on it?
25          A.    Yes.
```

```
 1                       WHALEY

 2          Q.    There is a date there 1/1/13,

 3   is that your handwriting?

 4          A.    Yes.

 5          Q.    Did you sign this document 7 on

 6   or about 1/1/13?

 7          A.    Yes.

 8          Q.    Take a look at 8, please.

 9          A.    Yes.

10          Q.    Is that your signature on the

11   document under to be completed by associate?

12          A.    Yes.

13          Q.    There is a date there 8/9/13;

14   is that your handwriting?

15          A.    No.

16          Q.    Beg your pardon?

17          A.    You asked me if 8/9/13 is my

18   handwriting.

19          Q.    Yes.

20          A.    No.

21          Q.    Do you know whose handwriting

22   it is?

23          A.    No, I do not.

24          Q.    But that is your signature?

25          A.    Yes.
```

                        WHALEY

1

2          Q.     Okay.   Take a look at 9,

3     please.   Is that your signature in the space

4     that's to be completed by associate?

5          A.     Can I go back if you don't

6     mind?

7          Q.     Sure.

8          A.     8/09/13 is not my signature.

9          Q.     You say that's not your

10    signature?

11         A.     That's not my signature.

12         Q.     What about Exhibit 9; is that

13    your signature?

14         A.     That is my signature.

15         Q.     The date that's there 1/21/14;

16    is that your handwriting?

17         A.     Yes.

18         Q.     Did you sign that document

19    Exhibit 9 on or about that date?

20         A.     Yes.

21         Q.     Let me ask you just to take a

22    look at 9, Exhibit 9 under the third sort of

23    grouping here where it says department

24    manager?

25         A.     Yes.

```
 1                    WHALEY
 2        Q.    Do you see where it says
 3   overtime rate of pay "rate fluctuates based
 4   on hours worked in excess of 40"?
 5        A.    Yes.
 6        Q.    Then there is an asterisk there
 7   and right underneath it there is some writing
 8   in italics.  Will you read that paragraph in
 9   italics that starts as the department
10   manager?
11        A.    Yes, I will read it. As a
12   department manager, your base weekly salary
13   is compensation for all hours you have worked
14   in the week, regardless of the number of
15   hours you work.  You will also be paid an
16   additional amount for any hours worked over
17   40 in one week.  Please refer to the attached
18   department manager's bi-weekly pay stub for a
19   detailed explanation.
20        Q.    You have Exhibit 4 in front of
21   you, don't you?
22        A.    Yes.
23        Q.    That's the department manager's
24   bi-weekly pay stub?
25                 MS. LIU: Objection.
```

```
1                      WHALEY
2         Q.    That's what it's called?
3         A.    Repeat that question one more
4    time.
5         Q.    This Exhibit 4 is called
6    department manager's bi-weekly pay stub,
7    correct?
8         A.    Is it called it, yes.
9         Q.    You were paid every two weeks
10   by Bed Bath; is that correct?
11        A.    That's correct.
12        Q.    You received earning statements
13   for each of those payments, didn't you?
14        A.    Yes.
15        Q.    So if I were to show you, for
16   example, what is 76 AW, your earning
17   statement, that tells you the amount that you
18   earned, correct?
19        A.    It does.
20        Q.    Let me take that back from you
21   for one second if I may, please.
22        A.    Sure.
23        Q.    If I were to show you 77A, that
24   also tells you, I'm going to hand that to
25   you, how much you were paid, doesn't it?
```

1                          WHALEY

2          A.    Yes, it does.

3          Q.    Let me take that back from you.

4    When if ever did you go to HR or anybody else

5    and say I wasn't paid properly?

6          A.    I did go to HR, the date I

7    can't recall and I spoke to Suzanne.  She was

8    the human resource manager at the time.

9          Q.    When you say you went to her,

10   where did you go to her?

11         A.    In her office.

12         Q.    That was an office in store 42?

13         A.    Yes.

14         Q.    That was the regular HR office

15   for store 42?

16         A.    Yes.

17         Q.    There were file cabinets and a

18   computer and other sorts of things like that

19   for an office there?

20         A.    Yes, there are.

21         Q.    What did you say to her and

22   what did she say to you?

23         A.    I asked her could she explain

24   -- could she explain the overtime process.

25   Could she explain why at that time I had a

1                          WHALEY

2    certain amount of hours and my paycheck was

3    maybe like only extra $40 or $20 and I said

4    it just doesn't seem right.  She said she

5    will get back to me on that, but she never

6    got back to me on that.

7          Q.    When was that that you went to

8    Suzanne?

9          A.    That was in the year of maybe

10   2011, late 2011 or could be early 2012.

11         Q.    Did you ever ask anybody else

12   about your pay at any other time?

13         A.    No.

14         Q.    Why not?

15         A.    My hour pay, that's something

16   that is confidential so I'm not going to

17   speak to everyone else but HR who would be

18   able to best give us information on that.

19         Q.    Did you talk to HR more than

20   once about your pay?

21         A.    No, I spoke to HR once about

22   it, she said she would get back to me and she

23   just never got back to me.

24         Q.    Does Bed Bath and Beyond

25   maintain a 1-800 number for complaints by

```
 1                    WHALEY
 2   employees?
 3          A.    I can't recall.  I don't
 4   remember if they do.
 5          Q.    Were there other HR folks that
 6   you knew or had met besides Suzanne?
 7          A.    Yes, at that time I don't
 8   remember her name.  She was in the office
 9   further down in the building.  I can't
10   remember her name.
11          Q.    Did you go and speak to that
12   person?
13          A.    No, I did not.
14          Q.    Did you speak to a store
15   manager or senior manager and say I'm not
16   being paid properly?
17          A.    No.
18          Q.    Did you speak to a district
19   manager and say I'm not being paid properly?
20          A.    No.
21          Q.    Didn't call the general counsel
22   of the company and say I'm not being paid
23   properly, did you?
24          A.    I don't know who the general
25   counsel of the company is.
```

1                        **WHALEY**

2          Q.    You didn't speak to anybody?

3          A.    I didn't speak to anyone else

4   but Suzanne.

5          Q.    What was it when you went into

6   see Suzanne that you thought was not correct

7   about the way you were being paid?

8          A.    I did not understand why am I

9   doing all these hours and it seems like the

10  more hours I do, the less I get paid.  I had

11  an understanding that if we do any extra

12  hours, then we get paid overtime.

13               MR. SULDS: I think if everyone

14          is agreeable now is a good time to

15          take a break for 20 minutes.

16               THE VIDEOGRAPHER: The time is

17          1:02 p.m. on July 19, 2017.  We are

18          now off the record.

19               (Luncheon recess taken at 1:00

20          p.m.)

21

22

23

24

25

```
 1                    WHALEY
 2       A F T E R N O O N   S E S S I O N
 3              (Time Noted: 1:50 p.m.)
 4
 5    A N D R A E   W H A L E Y, resumed and
 6          testified as follows:
 7
 8   CONTINUED EXAMINATION
 9   BY MR. SULDS:
10                  THE VIDEOGRAPHER: Time is 1:50
11          p.m. on July 19, 2017.  We are now
12          back on the record.  You may proceed.
13          Q.    How are you, Mr. Whaley?
14          A.    I'm okay. yourself?
15          Q.    Doing fine, thank you.  Over
16   the break did you have anything alcoholic to
17   drink?
18          A.    No.
19          Q.    Did you take any prescription
20   medications?
21          A.    No.
22          Q.    Take any non prescription
23   medications?
24          A.    No.
25          Q.    As we sit here now, is there
```

```
 1                      WHALEY
 2    any reason you can think of why you can't
 3    answer my questions fully, completely and
 4    truthfully?
 5            A.    No.
 6            Q.    If you think back about the
 7    testimony you have already given, is there
 8    any answer you want to change?
 9            A.    No.
10            Q.    Is there any answer you want to
11    add to?
12            A.    No.
13            Q.    When you were at store 42, you
14    sometimes worked 47-and-a-half hours a week;
15    do I understand that?
16            A.    What do you mean sometimes?
17            Q.    Were there times where you
18    worked more than 50 hours in a week?
19            A.    Yes.
20            Q.    Were there times where you
21    worked more than 55 hours in a week?
22            A.    Yes.
23            Q.    Were there times where you
24    worked more than 60 hours in a week?
25            A.    Yes.
```

```
 1                    WHALEY
 2         Q.    Were there times when you
 3   worked less than 50 hours in a week?
 4         A.    Yes.
 5         Q.    Your work week fluctuated from
 6   week to week; is that correct?
 7              MS. LIU: Objection.
 8         A.    What do you mean fluctuated?
 9         Q.    What does the term fluctuate
10   mean to you?
11         A.    May have changed.
12         Q.    So if that's the definition, is
13   it accurate to say that your hours each week
14   fluctuated?
15         A.    I don't know what you mean by
16   my hours fluctuated.
17         Q.    Let me step back and take it a
18   different way.  You knew, didn't you, that
19   you were not going to work exactly
20   47-and-a-half hours every week?
21              MS. LIU: Objection.
22         A.    No.  The schedule is posted to
23   47.5 hours.  Now on a normal day basis or
24   excuse me, a normal week we always hit above
25   47.5 hours.
```

1              WHALEY

2        Q.     Sometimes for back to school,

3    the hours would be longer than other times,

4    right?

5        A.     Of course.  In any retailer,

6    you go through seasonal transitions.

7    Sometimes the needs of the business, the

8    company asks you to do these hours meaning we

9    work six days, maybe sometimes even seven

10   days so we understood that.  That is told to

11   us.  You know so in our holiday season at Bed

12   Bath and Beyond our holiday season was

13   starting the end of August so we knew that we

14   would work over 50 or 60 hours in a week.

15   Christmas sometimes maybe even at the end of

16   Christmas when you have to do inventory as

17   well, but besides that, the regular schedule

18   was 47.5, but we always did above 47.5 hours.

19       Q.     That was explained to you at

20   the beginning of your employment at Bed Bath

21   that back to school, for example, would be a

22   little busy?

23            MS. LIU: Objection.

24       A.     Yes, we were explained that

25   back to school would be a busy part of this

1                    WHALEY

2  particular store.

3        Q.    And vacations as well, that

4  those would be particularly busy?

5        A.    I don't understand what you

6  mean.

7        Q.    Was that explained to you

8  during orientation or early into your

9  employment?

10        A.    You said that vacations as well

11  would be very busy?

12        Q.    That I'm sorry, holiday time,

13  my mistake, was that explained to you that

14  Christmas or other holidays might be

15  particularly busy?

16        A.    No.  No.  It was explained that

17  during Christmas and holiday season that

18  sometimes the business might pick up, but our

19  back to school season -- so we knew our

20  business would pick up like any other

21  retailer business picks up during the holiday

22  season so we have to do what's required for

23  the business.

24        Q.    Earlier when I asked you

25  whether there was anybody in addition to

1                    WHALEY

2    Suzanne who you knew was at store 42 and had

3    a human resource function you said there was

4    someone down the hall from Suzanne?

5         A.    Yes.

6         Q.    Was that Lauren?

7         A.    No.

8         Q.    This lady who is sitting to my

9    left?

10        A.    No, it was another lady at that

11   time.  I don't remember her name.

12        Q.    Each year it seems if you take

13   a look at Exhibits 5 or 6 or 7 in addition to

14   your signing those documents someone else

15   from Bed Bath and Beyond signed those

16   documents, correct?

17        A.    Yes.

18        Q.    Did you ever ask if any of the

19   people who signed these Exhibits 5, 6, 7, 8

20   and 9, did you ever ask any of those people

21   about your pay?

22        A.    No.  I spoke to -- as I stated,

23   I spoke to Suzanne about it that particular

24   day.

25        Q.    But that was in 2011 if I

1                          WHALEY

2      recall correctly?

3              A.    2011 or 2012.  I can't

4      remember.  It was later on in 2011 or early

5      2012.

6              Q.    So, for example, if you take a

7      look at Exhibit 7, that's signed by someone

8      who looks like maybe M. Brown?

9              A.    Yes.

10             Q.    You didn't say by the way, I'm

11     waiting for an answer from Suzanne about

12     calculation of my pay, did you?

13             A.    No, I did not.

14             Q.     Okay.

15             Q.    One of the things that you

16     learned about in orientation was that Bed

17     Bath and Beyond expected you to be on time

18     for your job; isn't that correct?

19             A.    That is correct.

20             Q.    Fair to say, isn't it, that Bed

21     Bath and Beyond had a policy that told you

22     and associates that on time attendance was

23     part of the job, correct?

24             A.    Yes.

25             Q.    That was important being on

```
1                         WHALEY
2    time because if you were not on time, someone
3    else had to pick up the slack for you, right?
4         A.    That's correct.
5         Q.    It's a fact, isn't it,
6    throughout a large portion of the time you
7    were employed by Bed Bath and Beyond that
8    there were issues concerning your being there
9    on time?
10        A.    That is correct.
11        Q.    And you were spoken to and
12   written up for that; is that right?
13        A.    That is correct.
14              MR. SULDS: If you could mark
15         that as 10, please.
16              (Defendant's Exhibit Whaley
17         10, Associate Disciplinary Notice,
18         marked for Identification.)
19        Q.    Do you recognize Exhibit 10?
20        A.    Yes.
21        Q.    This is a write up you received
22   for repeated lateness, correct?
23        A.    Yes.
24        Q.    Who is August, I don't know the
25   last name.  Was there a senior manager
```

```
 1                    WHALEY
 2   August?
 3        A.    Yes.
 4        Q.    You mentioned Kristin Thompson.
 5   Who is Kristin Thompson?
 6        A.    She's the store manager of
 7   store 42.
 8        Q.    Did there come a point in time
 9   where you had a conversation with Kristin
10   Thompson about your attendance and
11   particularly in reference to a car being
12   stuck in a snow bank?
13        A.    I'm sorry, what was the
14   question?
15        Q.    Was there an incident where you
16   talked to Kristin Thompson about leaving
17   early on a day where you had had a problem
18   with your car being stuck in a snow bank?
19        A.    No, I don't remember that.
20        Q.    You were scheduled to work that
21   day 7 to 5:30, called the store to say that
22   your car was stuck and needed to get it
23   towed?
24        A.    Okay, yeah, but I didn't leave
25   early from work.  I don't think I was at
```

```
 1                         WHALEY
 2   work.
 3           Q.     Is August's last name
 4   Savoretti?
 5           A.     It could be.
 6           Q.     He was an assistant store
 7   manager?
 8           A.     Yes, he was an assistant store
 9   manager.
10           Q.     Did he ever criticize your
11   work?
12           A.     No.  He, you know, he would
13   just tell us what to do as far as how he
14   wanted things or the way he wanted things to
15   be or if we had to pack out or clean up the
16   rug or something like that.
17           Q.     August ever have a conversation
18   with you about you not being on time?
19           A.     Yes.
20           Q.     He told you you had to be on
21   time?
22           A.     Yes, he did.
23           Q.     Told you there would be
24   disciplinary consequences if you were not on
25   time?
```

```
1                        WHALEY

2          A.    Yes, he did.

3                  MR. SULDS: Could you mark that

4          as 11, please.

5                  (Defendant's Exhibit Whaley

6          11, Associate Disciplinary Notice,

7          marked for Identification.)

8          Q.    Mr. Whaley, do you have Exhibit

9    11 in front of you?

10         A.    Yes, I do.

11         Q.    Do you recognize it?

12         A.    Yes.

13         Q.    In the lower right hand corner

14   it says over associate's signature date

15   refuse to sign.  Did you refuse to sign when

16   this was given to you?

17         A.    Yes, I did.

18         Q.    Why?

19         A.    There's a part in the

20   documentation scheduled at 7 to 5:30, came in

21   from 10 to 8:30.

22         Q.    Why did refuse to sign this

23   document?

24         A.    Because the schedule change was

25   approved by one of the senior managers.
```

WHALEY

1

2      Q.    In the facts leading to

3   discipline section says you were previously

4   spoken to about lateness on 11/4/14.  That's

5   accurate, wasn't it?

6      A.    I mean it could be.  I can't

7   recall.

8      Q.    Did Mr. Savoretti ever speak to

9   you about putting signs up on the side caps

10  of the suntan fixture in the store?

11     A.    I don't recall that.  I can't

12  remember that.

13     Q.    Did he ever tell you that

14  signing standards were non negotiable?

15     A.    I can't remember that either.

16     Q.    That was the sort of thing that

17  he would say?

18     A.    I couldn't remember that.

19     Q.    Did Mr. Savoretti ever talk to

20  you about constantly talking to a woman named

21  Kenya?

22     A.    No.

23     Q.    Not walking your department to

24  make sure your staff was engaged in selling?

25     A.    No.

```
1                        WHALEY

2          Q.    You sure?

3          A.    Yeah.  I don't know who Kenya,

4    a woman named Kenya.

5          Q.    Your time for which you would

6    be paid was recorded through a time clock; is

7    that correct?

8          A.    At the beginning, no.  Towards

9    down I think the later part of like the last

10   year or two, yes.

11         Q.    Were you ever disciplined for

12   false time clock swipes or punches?

13         A.    Yes.

14              MR. SULDS: Make this 12,

15         please.

16              (Defendant's Exhibit Whaley

17         12, Associate Disciplinary Notice,

18         marked for Identification.)

19         Q.    Do you recognize Exhibit 12?

20         A.    Yes.

21         Q.    Is that your signature at the

22   bottom of it?

23         A.    Yes.

24         Q.    Was there a specific Harmon

25   team that you were the department manager
```

```
1                         WHALEY
2   for?
3           A.    I'm sorry, repeat the question.
4           Q.    Does the term Harmon team mean
5   something to you?
6           A.    No.
7           Q.    You said earlier in the
8   deposition that you were a department head
9   for Harmon?
10          A.    Yes.
11          Q.    Were there keys for the Harmon
12  area?
13          A.    Yes, there was a lock. I think
14  there was a key for the lock cage.  It would
15  mean the stock room.  We keep high price
16  merchandise in there.
17          Q.    Did August Savoretti when he
18  was an assistant store manager ever criticize
19  you for care of those keys?
20          A.    No.
21          Q.    Was there another Harmon
22  department manager by the name of Kenny?
23          A.    Yes.
24          Q.    Who is Alex Gayl?
25          A.    Alex Gayl is another assistant
```

```
1                        WHALEY
2   store manager of the store.
3           Q.    Did Mr. Gayl ever talk to you
4   about inventory prep?
5           A.    Yes.
6           Q.    He disciplined you for that?
7           A.    Yes, he did.  Hold on.  No, he
8   didn't, no.  No.  We spoke about inventory
9   prep.  The issue was that I think we had to
10  make sure we had a specific order in at a
11  specific time and we mixed up the dates the
12  wrong way, but that was just about it.
13          Q.    He counseled you about that?
14          A.    The inventory, no, he didn't
15  counsel me about the inventory prep, no.
16          Q.    What about over stocks being
17  placed behind wall art.  Did Mr. Gayl ever
18  discipline you for that?
19          A.    Over stocks behind wall art?
20          Q.    Yes.
21          A.    As in a write up for over
22  stocks behind wall art?
23          Q.    Or just a verbal counseling?
24          A.    If we spoke about it, yes, we
25  did speak about that, yes.
```

                            WHALEY

1

2        Q.    What about a sense of urgency?

3        A.    Did we speak about that?

4        Q.    Yes.

5        A.    We did speak about that.

6        Q.    Tell me what that conversation

7   was, please?

8        A.    He said that you have to make

9   sure that you finish your -- you have to have

10  a sense of urgency when you start and

11  complete a task within the department.

12       Q.    He told you that you needed to

13  follow up better on the execution of tasks;

14  is that right?

15       A.    Yes.

16       Q.    You needed to plan tasks

17  better; is that correct?

18       A.    Yes.

19       Q.    That you needed to reach out in

20  advance if you needed help, correct?

21       A.    Yes.

22       Q.    And to know tasks that the

23  tasks had to be completed on a schedule; is

24  that correct?

25       A.    Yes.

```
 1                      WHALEY
 2        Q.    What about availability of
 3   associates?  What does that mean to you that
 4   phrase availability of associates?
 5        A.    Say that one more time, I'm
 6   sorry.
 7        Q.    Did Mr. Gayl ever speak to you
 8   asking you about providing him and August
 9   about the availability of associates so that
10   scheduling needs could be assessed?
11        A.    Yes, he did.
12        Q.    Did he criticize you for not
13   providing those availabilities?
14        A.    Yes, he did and the feedback
15   given to him was that he had received
16   availabilities, but he never utilized it.
17        Q.    That was among his duties and
18   responsibilities, wasn't it, to criticize you
19   if you didn't perform the way he thought you
20   needed to?
21             MS. LIU: Objection.
22        A.    Repeat the question.
23        Q.    Did you understand that Mr.
24   Gayl had that responsibility to criticize
25   your work if he thought that it was necessary
```

```
 1                    WHALEY
 2   to criticize it?
 3        A.    Yes.  Any one of your bosses
 4   can criticize your work.
 5        Q.    August was your boss?
 6        A.    Yep.
 7        Q.    Mr. Gayl was your boss?
 8        A.    Yes.
 9        Q.    What does it mean to lighten up
10   an order?
11        A.    To lighten up an order would
12   mean that you have to scale back on a number
13   of items that you are bringing into the
14   department.
15        Q.    And did Mr. Gayl ever direct
16   you to lighten up orders?
17        A.    Yes, he did.
18        Q.    As your boss, that was one of
19   his duties and responsibilities?
20              MS. LIU: Objection.
21              MR. SULDS: What's the
22        objection?
23              MS. LIU: What's the foundation
24        of that question?  You are rephrasing
25        or testifying saying was that your
```

1                      **WHALEY**

2          understanding.

3          Q.    Did you understand it to be

4    within the scope of Mr. Gayl's authority to

5    criticize you for failing to lighten up an

6    order?

7          A.    I don't understand the question

8    you are asking.  I'm sorry.

9          Q.    Let's start again.  Lightening

10   up an order means reducing it, correct?

11         A.    Yes.

12         Q.    Mr. Gayl talked to you about

13   that, correct?

14         A.    Yes.

15         Q.    He criticized you for that, did

16   he not, that you did not follow up directions

17   and lighten up orders?

18         A.    Yes.

19         Q.    Did you understand that that

20   was within his authority to criticize you for

21   not lightening up orders?

22              MS. LIU: Objection.

23         A.    Like I said, he's an ASM so

24   he's above me so he made all the decisions.

25         Q.    Did there come a point in time

```
 1                      WHALEY
 2   when Mr. Gayl coached you on lack of planning
 3   for HBC inventory?
 4          A.     What do you mean coached me;
 5   like spoke to me?
 6          Q.     Yes.
 7          A.     Yes, he spoke to me about that.
 8          Q.     Did he criticize you for
 9   failing to execute on a plan?
10                 MS. LIU: Objection.
11          A.     What do you mean criticize?
12          Q.     Did he tell you you failed to
13   execute on a plan and that you had to do
14   better?
15          A.     Yes.
16          Q.     Did Mr. Gayl walk your
17   department from time to time?
18          A.     Yes.
19          Q.     Did he tell you that you had
20   multiple boxes of mixed merchandise in the
21   stock room, boxes of fixtures mixed with
22   boxes of merchandise, damaged merchandise
23   overflowing?
24          A.     I don't recall the conversation
25   that we had when it came to in particular
```

1                          WHALEY

2    boxes, but we spoke about things pertaining

3    to the department.

4          Q.    Did Mr. Gayl tell you that you

5    needed to delegate cleaning up those various

6    issues by delegating to the overnight team?

7          A.    No.

8          Q.    Did Mr. Gayl counsel you in

9    connection with stock room maintenance and

10   preparedness for an inventory?

11                MS. LIU: Objection.

12         A.    What do you mean counsel me?

13         Q.    Did he call to your attention

14   that you were not prepared for the inventory

15   and tell you you had to be?

16         A.    Yes.

17         Q.    Did Mr. Gayl tell you to set up

18   a hair accessory feature within your

19   department?

20         A.    I don't recall.

21         Q.    Did Mr. Gayl talk to you on a

22   number of occasions about the need to have a

23   one to two week supply in your department?

24         A.    Yes.

25         Q.    Did he criticize you for

                          WHALEY

1  failing to execute a sign walk?

2          A.    I don't recall.

3          Q.    What is a sign walk?

4          A.    A sign walk would mean that you

5  have to make sure that everything that has a

6  label or everything that needs a sign or

7  price has to have a sign or price.

8          Q.    In 2016 your department had a

9  very significant loss in sales, didn't it?

10         A.    Yes, it did.

11         Q.    Did Mr. Gayl go over that with

12 you and tell you that that could not be

13 tolerated?

14         A.    No.

15         Q.    What did he tell you?

16         A.    We always talked about sales

17 because the entire store was down in sales so

18 we just talked about trying to make sure that

19 we get the sales up in general.

20         Q.    Would it be accurate to say

21 that on March 24th of 2016 Mr. Gayl reviewed

22 with you the unprecedented loss of sales in

23 the department which brought the year to date

24 results to a negative number?

```
 1                      WHALEY
 2              MS. LIU: Objection.
 3         Q.    And that the over stock should
 4  no longer be utilized behind wall art?
 5         A.    I don't remember the date that
 6  we spoke about that.  I don't recall a
 7  conversation or date about that.  Like I
 8  said, it's a retail business so we speak
 9  about those things.
10         Q.    Specifically with reference to
11  over stock not being behind wall art, do you
12  recall that Mr. Gayl told you that that could
13  not go on?
14         A.    Yes.
15         Q.    Do you recall that subsequently
16  it was learned that you had continued to have
17  over stock behind wall art in your
18  department?
19         A.    Yes.
20         Q.    As a result of that and certain
21  other matters you were placed on a
22  performance improvement plan, weren't you?
23         A.    Yes, I was.
24         Q.    Was there a person within the
25  management of store 42 to whom you were
```

```
1                        WHALEY
2    supposed to relate, you know, talk about the
3    performance improvement plan?
4              A.    Yes, Alex.  It was Alex.
5                    MR. SULDS: Can you mark this
6         as 13.
7                    (Defendant's Exhibit Whaley
8         13, Performance Improvement Plan,
9         marked for Identification.)
10             Q.    Do you recognize Exhibit 13?
11             A.    Yes.
12             Q.    If you take a look at the third
13   page is that your signature on it?
14             A.    Yes.
15             Q.    You signed this and there is
16   some dates there looks like May 6, 2016?
17             A.    I don't recall the day I
18   signed, but my signature is there so I did
19   sign it, but I don't recall.
20             Q.    You read it before you signed
21   it, didn't you?
22             A.    Yes, I did.
23             Q.    Ask any questions you felt were
24   necessary to ask about it?
25             A.    I believe so.
```

```
 1                        WHALEY
 2         Q.    You worked through the
 3   performance improvement plan and were
 4   subsequently taken off the plan, correct?
 5         A.    Yes, I was.
 6         Q.    And then at some point after
 7   that you left Bed Bath and Beyond, correct?
 8         A.    Yes.
 9         Q.    I'm going to ask you to refer
10   back to your declaration which is Exhibit 1.
11   Should be there in front of you.
12         A.    Just give me one second, I'm
13   sorry.  Yes, I have it.
14         Q.    I'm going to ask you to look at
15   paragraph 18.  You say in that paragraph all
16   DMs', that's department managers, correct?
17         A.    That is department managers,
18   yes.
19         Q.    Responsibilities are similar
20   from store to store.  You didn't work at any
21   stores in New Jersey, did you, any Bed Bath
22   and Beyond stores in New Jersey?
23         A.    No.
24         Q.    And you didn't work at any Bed
25   Bath and Beyond stores in Connecticut, did
```

```
 1                    WHALEY
 2   you?
 3          A.    No.
 4          Q.    You didn't work at any Bed Bath
 5   and Beyond stores in Westchester, correct?
 6          A.    No.
 7          Q.    The only stores that you worked
 8   at were the ones that you told us about 42,
 9   the Long Island store and the two Manhattan
10   stores where you did over nights, right?
11          A.    Yes.
12          Q.    When you did over nights at
13   those two Manhattan stores, were the stores
14   open and functioning?
15          A.    No.
16          Q.    So when you were at the Long
17   Island store, was that during normal opening
18   hours for the store?
19          A.    Yes.
20          Q.    So your experience as to the
21   operation of the stores is limited to store
22   42 and the Long Island store; is that
23   correct?
24          A.    Say that again.
25          Q.    Do you have any experience of
```

```
 1                      WHALEY
 2   what DM responsibilities are other than from
 3   your work at store 42 or the store on Long
 4   Island?
 5           A.    What question are you asking
 6   exactly?
 7           Q.    Paragraph 18 of your Affidavit
 8   says all DMs' responsibilities are similar
 9   from store to store.  That's based on your
10   personal knowledge that statement, isn't it?
11           A.    Yes.
12           Q.    And your personal knowledge
13   about what DM responsibilities are covers
14   store 42, right?
15           A.    Yes.
16           Q.    And it may cover the store on
17   Long Island where you worked, correct?
18           A.    Yes.
19           Q.    But you don't have personal
20   knowledge of any other store and the
21   responsibilities that DMs had there, do you?
22           A.    I only go by what I see.  I do
23   shop at other stores.
24           Q.    What other stores do you shop
25   at?
```

1                          WHALEY

2          A.     The Bronx store, the Jersey

3     store in Paramus so there's other stores and

4     when I am visiting there you see managers

5     ringing, you see managers doing maintenance

6     work as well, you see managers stocking.

7          Q.     So you shopped at a store in

8     the Bronx?

9          A.     Yes, I have.

10         Q.     And a store in Paramus?

11         A.     Yes, I have.

12         Q.     Any place else?

13         A.     Not that I know of.

14         Q.     Take a look at paragraph 22

15    which reads throughout my employment with

16    BBB, I believe that I had to work the full

17    scheduled shift hours unless I had available

18    paid absence hours to be paid my full salary?

19         A.     Um-hum.

20         Q.     What's the basis of that

21    belief?

22         A.     That if I didn't work the

23    hours, that my salary would be deducted.

24         Q.     Did that happen?

25         A.     Yeah.

```
 1                        WHALEY

 2          Q.     When?

 3          A.     I was out 2012 I was out for a

 4    while.  I had developed a health issue on my

 5    face and I believe I wound up having to use

 6    some vacation time to cover my hours.

 7          Q.     That's the basis of this

 8    statement?

 9          A.     No, the basis -- what question

10    were you asking?

11          Q.     The basis of the statement in

12    paragraph 22, what's the source of your

13    belief that you had to work the full

14    scheduled hours unless you had available paid

15    absence hours?

16          A.     Right so now like I said I was

17    out and if I didn't use those hours, my

18    vacation hours, then I wouldn't be paid.

19          Q.     In paragraph 23 you say

20    throughout my employment with BBB, I believe

21    that if I exhausted all my paid leave, but I

22    needed to take extra days off, BBB would

23    deduct my salary.  Did that ever happen to

24    you?

25          A.     Yes, when I was out -- well, I
```

1                        WHALEY

2    never really exhausted my paid leave because

3    I did have vacation time so that never

4    happened for me.

5            Q.    Let's look at paragraph 23.

6    I'm reading the second, sorry, paragraph 24,

7    you say in the second sentence that on or

8    about October 2014, BBB gave you a write up

9    under excessive absence for took one day sick

10   leave beyond 40 hour sick leave hours.  Do

11   you have a copy of that?

12           A.    No, I wouldn't have a copy of

13   that documentation.

14           Q.    Why not?

15           A.    We don't get to keep our copies

16   of documentation.

17           Q.    You are sure this was in

18   October of 2014?

19           A.    You know, things happened so

20   far back, I can't recall. It could have been

21   September or it could have been October.

22           Q.    If I were to represent to you

23   that I have given you as exhibits all the

24   write ups that BBB has in its possession in

25   connection with you, could you identify for

1                        WHALEY

2    me in those exhibits any of them that writes

3    you up for taking one day sick leave beyond

4    40 hours sick leave hours?

5                MS. LIU: Objection.

6         A.    The exhibits that are in front

7    of me do not have that, but as I stated it

8    could have been September or October, it was

9    in 2014 and that actually happened.

10                    MR. SULDS: Let's go off the

11             record for a minute or two.

12                    THE VIDEOGRAPHER: Time is 2:32

13             p.m. on July 19, 2017.  We are now off

14             the record.

15                    (Recess taken.)

16                    THE VIDEOGRAPHER: Time is 2:37

17             p.m. and we are now back on the

18             record.  You may proceed.

19         Q.    Mr. Whaley, do you have a

20    computer of your own?

21         A.    Yes.

22         Q.    Do you have a smart phone?

23         A.    Yes, I do.

24         Q.    Do you have your own personal

25    e-mail accounts?

```
 1                         WHALEY
 2          A.    Yes.
 3          Q.    In trying to respond to our
 4   request for documents, did you search through
 5   your computer to see if there was anything
 6   that would be responsive?
 7          A.    I'm not understanding the
 8   question you are asking.
 9          Q.    You have a computer?
10          A.    Yes, I do.
11          Q.    That computer has files on it?
12          A.    Yes.
13          Q.    It has e-mail on it?
14          A.    Yes.
15          Q.    Did you look through the files
16   on that computer to see if you had anything
17   there that would be responsive to Exhibit 2,
18   the document production request?
19          A.    I don't have any files on that.
20          Q.    I beg your pardon?
21          A.    I don't have files.
22          Q.    I asked you a different
23   question.  It was meant to be efficient and
24   not rude.
25          A.    It's okay.
```

1                           WHALEY

2           Q.    My question was whether you

3     looked at your computer to see if you had any

4     documents or information stored there that

5     would be called for by Exhibit 2?

6           A.    I didn't need to look because I

7     don't have anything on my computer.

8           Q.    Does that mean you did not

9     look?

10          A.    I did not look.

11          Q.    What about on your smart phone,

12    did you look on your smart phone through

13    e-mail or other documents that might be

14    stored on your smart phone to see if you had

15    anything that was responsive to Exhibit 2?

16          A.    I did not look.  I don't have

17    any type of files or documents on my phone.

18          Q.    So if six months or a year from

19    now someone were to ask you a question about

20    your claims in this case and you were to

21    testify differently from the way you

22    testified here today, do I understand that

23    you wouldn't have any documents or any other

24    information anywhere except that which you

25    have already given us that would refresh your

```
 1                    WHALEY
 2   recollection about your employment at BBB and
 3   these claims?
 4          A.    Yeah, yes.
 5          Q.    What did you do to prepare to
 6   come here today to be a witness?
 7          A.    I really didn't do any
 8   preparing.
 9          Q.    Did you look at any documents?
10          A.    Just whatever documents I have.
11   I think I had some of these documents that
12   you have here, Exhibit 2, some of my
13   responses.  That's just about it.
14          Q.    Were you provided with
15   documents to review by anyone?
16              MS. LIU: Objection.
17          A.    I don't understand the question
18   you're asking.
19          Q.    You said that you may have
20   looked at some documents.  Where did those
21   documents come from?
22                MS. LIU: Objection and direct
23          him not to answer. It's privileged
24          information.
25          Q.    I think that the privilege
```

1                          WHALEY

2     doesn't cover the fact that you may have

3     provided documents for the witness to review,

4     but let me see if I can do it this way

5     without getting into a fight about that.

6     When you say that you reviewed documents,

7     were those your own documents?

8          A.    I'm not understanding the

9     question you're asking.

10         Q.    I asked you if you recall what

11    you did to prepare to come here today and

12    then I asked you as a follow up whether you

13    looked at any documents and you told me that

14    you looked at some documents, Exhibit 2 I

15    think you may have mentioned, right and I'm

16    asking whether the documents that you looked

17    at were documents that you had in your

18    possession at that time?

19         A.    Yes, I had documents in my

20    possession.

21         Q.    Did you look at any documents

22    other than the documents that you had in your

23    possession at that time?

24         A.    No.

25         Q.    Did you speak to anyone else

1                        **WHALEY**

2    who's involved in this lawsuit before you

3    came here today?

4            A.    No.

5            Q.    Did you talk to any of the

6    other plaintiffs or opt in plaintiffs in this

7    lawsuit about the depositions they have

8    given?

9            A.    No.

10           Q.    Would you take a look at

11   paragraph 7 of your Declaration, please.

12           A.    Yes, I'm looking at it.

13           Q.    In that paragraph you say no

14   one from BBB ever either verbally or via

15   written document informed me that my salary

16   is to cover whatever hours I may work in a

17   workweek and that BBB would pay the salary

18   even if I work less hours than the full

19   number of hours scheduled.  That's an

20   accurate reading of what you wrote there?

21           A.    Yes.

22           Q.    But that's not a true

23   statement, is it?

24                 MS. LIU: Objection.

25           A.    I don't understand what you

1                        WHALEY

2   mean.

3           Q.    Do you understand what truth

4   is?

5           A.    I understand what truth is.

6           Q.    That statement in paragraph 7

7   is not accurate, is it?

8                   MS. LIU: Objection.

9           A.    I don't understand what you

10  mean.

11          Q.    Take a look at Exhibit 5.

12  Exhibit 5 is one of these.

13          A.    I'm sorry.  Yes.

14          Q.    Under the asterisk, the

15  statement that I asked you to read earlier,

16  the first sentence is as a department manager

17  your base weekly salary is compensation for

18  all hours you have worked in the week

19  regardless of the number of hours you work so

20  BBB did tell you that your salary was to

21  cover whatever hours you may work in the

22  week, didn't it?

23                  MS. LIU: Objection.

24          A.    No, because I don't recall BBB

25  telling me that.

                          WHALEY

1

2        Q.    You signed Exhibit 5, right?

3        A.    Yes, I did.

4        Q.    And you signed Exhibit 6,

5   correct?

6        A.    Yes, I did.

7        Q.    And Exhibit 6 has exactly the

8   same language after the asterisk as Exhibit

9   5, doesn't it?

10       A.    Just give me one second.

11       Q.    Please.

12       A.    Yes, it does.

13       Q.    Exhibit 7 you signed as well,

14  didn't you and take a look at Exhibit 9 as

15  well?

16       A.    Yes, I'm looking at them.

17       Q.    Each of these documents has

18  exactly the same sentence, don't they, as a

19  department manager your base weekly salary is

20  compensation for all hours you have worked in

21  the week regardless of hours you work of the

22  number of hours you work, correct?

23       A.    It says that.

24       Q.    BBB via a written document told

25  you not once but at least four times that you

```
 1                        WHALEY
 2   would be paid for all hours you worked.  Take
 3   a look at Exhibit 3, please.
 4        A.    I have it.
 5        Q.    In the second paragraph of
 6   Exhibit 3 and that's a document you signed
 7   also, right?
 8        A.    I did.
 9        Q.    In the second paragraph it says
10   I understand that my weekly compensation
11   consists of two components, (1) a base weekly
12   salary for all hours worked and (2) an
13   additional amount for all hours over 40 that
14   I work during a week.  The fact is that what
15   you wrote in paragraph 7 of your Declaration
16   is simply wrong; isn't that right?
17                  MS. LIU: Objection.
18        A.    No.
19                  MR. SULDS: I don't have
20            anything further for the witness at
21            this time.
22                  MS. LIU: I'm going to have a
23            few redirect.
24   EXAMINATION BY
25   MS. LIU:
```

```
 1                     WHALEY
 2        Q.    Mr. Whaley, did I pronounce
 3   your name right?
 4        A.    Whaley.
 5        Q.    I'm just going to have a few
 6   follow up questions.  Can you tell us again
 7   how do you come to apply a position at Bed
 8   Bath?
 9              MR. SULDS: Objection.
10        A.    Yes, a friend of mine Jose told
11   me about the job at Bed Bath and Beyond.  He
12   told me I had to go to the customer service
13   area in the store and fill out an
14   application.
15        Q.    Is the application form that
16   you filled out, do you recall if the
17   application form yourself indicate what
18   position that you would be applying for?
19              MR. SULDS: Objection.
20        A.    No.
21        Q.    Did it indicate how much
22   compensation you would be compensated for the
23   position?
24              MR. SULDS: Objection.
25        A.    No.
```

1                          **WHALEY**

2              Q.    Did it mention anything about

3     your work hours that you would anticipate to

4     work for that position?

5                    MR. SULDS: Objection.

6         A.    No.

7              Q.    How many interviews that you

8     went through before you got hired by Bed Bath

9     and Beyond?

10                   MR. SULDS: Objection.

11        A.    I went through three.

12             Q.    At the first interview, who did

13    you interview with the first time?

14                   MR. SULDS: Objection.

15        A.    Francis McKinley.

16             Q.    Did Ms. McKinley mention

17    anything about your compensation at your

18    interview?

19                   MR. SULDS: Objection.

20        A.    No.

21             Q.    Did she mention anything about

22    your work hours at the interview?

23                   MR. SULDS: Objection.

24        A.    No.

25             Q.    Did she mention what position

```
 1                    WHALEY
 2  you were applying for?
 3               MR. SULDS: Objection.
 4        A.    No.
 5        Q.    Who did you interview with for
 6  the second interview?
 7               MR. SULDS: Objection.
 8        A.    Store manager Dennis at 565.
 9        Q.    Did Dennis tell you how many
10  hours you anticipate to work in what
11  position?
12               MR. SULDS: Objection.
13        A.    No.
14        Q.    Did he discuss the compensation
15  that Bed Bath will offer you?
16               MR. SULDS: Objection.
17        A.    No.
18        Q.    Did you guys talk about
19  anything about compensation and work hours at
20  the second interview?
21               MR. SULDS: Objection.
22        A.    No.
23        Q.    Third interview, who did you
24  interview with?
25               MR. SULDS: Objection.
```

```
 1                       WHALEY
 2        A.    Kevin, the district manager.
 3        Q.    Did Kevin the district manager,
 4   did he mention about how many hours you
 5   should anticipate to work for the position?
 6              MR. SULDS: Objection.
 7        A.    No.
 8        Q.    How about compensation, did he
 9   discuss anything about compensation with you?
10        A.    No.
11              MR. SULDS: Objection.
12        Q.    Who made you the job offer?
13              MR. SULDS: Objection.
14        A.    Francis McKinley.
15        Q.    Was that after the third
16   interview?
17              MR. SULDS: Objection.
18        A.    That was after the third
19   interview, yes.
20        Q.    When Ms. McKinley made you the
21   job offer, did she tell you how much you
22   would be paid?
23              MR. SULDS: Objection.
24        A.    She gave me a salary.
25        Q.    How much was that salary?
```

```
1                        WHALEY
2               MR. SULDS: Objection.
3        A.    I believe it was 63,000 at the
4   time.
5        Q.    So through the application and
6   through the three interviews no one mentioned
7   to you about your compensation; is that
8   right?
9               MR. SULDS: Objection.
10       A.    No.
11       Q.    No one from Bed Bath mentioned
12  about how many hours you should anticipate to
13  work; is that right?
14              MR. SULDS: Objection.
15       A.    Correct.
16       Q.    Did you understand why no one
17  mention any of those things to you?
18              MR. SULDS: Objection.
19       A.    No.
20       Q.    After your conversation with
21  Ms. McKinley where -- scratch that.  Ms.
22  McKinley who was the one who made you the job
23  offer, right?
24              MR. SULDS: Objection.
25       A.    Yes, she was.
```

```
 1                      WHALEY

 2        Q.    At the time that you accept the

 3   job offer, what was your understanding about

 4   your pay and work hours?

 5                 MR. SULDS: Objection.

 6        A.    We have to do 47.5 hours.

 7   Anything after the 40 hours we would be paid

 8   overtime.

 9        Q.    How much was overtime would be?

10                 MR. SULDS: Objection.

11        A.    1.5.  I don't have the dollar

12   amount because I can't recall the rate that

13   she gave me.

14        Q.    That was communicated to you?

15                 MR. SULDS: Objection.

16        A.    Yes.

17        Q.    That was your understanding

18   about your pay?

19        A.    Yes.

20                 MR. SULDS: Objection.

21        Q.    Based on that understanding you

22   accept the job offer?

23                 MR. SULDS: Objection.

24        A.    Yes, I did.

25        Q.    Earlier you testified you went
```

```
 1                        WHALEY
 2   through orientation before you start working;
 3   is that correct?
 4                 MR. SULDS: Objection.
 5        A.    That's correct.
 6        Q.    Did you sign anything during
 7   orientation?
 8                 MR. SULDS: Objection.
 9        A.    Yes, we signed new hire
10   paperwork.
11        Q.    Do you recall exactly what
12   consist of the new hire paperwork?
13                 MR. SULDS: Objection.
14        A.    I don't recall exactly what
15   consisted of it.  It was a while ago.
16        Q.    Let's look at Exhibit 3.
17        A.    Yes, I have it.
18        Q.    Do you recall signing that
19   document at orientation?
20                 MR. SULDS: Objection.
21        A.    I recall signing the document.
22   I mean it has a date of July 18th of 2011,
23   but I can't recall if it was part of the
24   orientation or not.
25        Q.    Exhibit 4 earlier you testified
```

```
 1                         WHALEY
 2   this was a calculation chart that you were
 3   referring to in your declaration paragraph 9;
 4   is that correct?
 5                  MR. SULDS: Objection.
 6        A.    Yes.
 7        Q.    Paragraph 9 you said let me
 8   direct your attention to Exhibit 1,
 9   Declaration, paragraph 9?
10        A.    Yes.
11        Q.    It says starting in the
12   paragraph a few months later after I start
13   working and then you go down all the way to
14   the fourth line, I think this time I was also
15   given a piece of paper with some sort of
16   calculation chart on it and earlier you
17   testify this is a chart you referred to
18   Exhibit 4; is that correct?
19                  MR. SULDS: Objection.
20        A.    Correct.
21        Q.    Prior to the instance you
22   referred to in paragraph 9, did you ever see
23   Exhibit 4 before?
24                  MR. SULDS: Objection.
25        A.    No.
```

```
 1                        WHALEY
 2          Q.    After that incident that you
 3   refer to in paragraph 9, did you ever see
 4   this Exhibit 4 ever again?
 5                   MR. SULDS: Objection.
 6          A.    No.
 7          Q.    Let's see Exhibits 5, 6, 7, 8
 8   and 9.
 9          A.    Yes, I have them.
10          Q.    Exhibit 4, let's look at that
11   document for a minute, it's titled as
12   department manager's bi-weekly pay stub; is
13   that correct?
14                   MR. SULDS: Objection.
15          A.    That's correct.
16          Q.    If you go to Exhibit 5 through
17   Exhibit 9, right, it refers you to the
18   section department manager and that paragraph
19   you read earlier, you refer to please refer
20   to the attached department manager's
21   bi-weekly pay stub for a detailed
22   explanation.  Do you recall that you ever
23   received that?
24                   MR. SULDS: Objection.
25          A.    No.
```

1                        **WHALEY**

2          Q.    Let's go back to Exhibit 3.

3    Sorry I'm jumping around.

4          A.    It's okay, I got it here.

5          Q.    Exhibit 3 has four paragraphs;

6    is that correct?

7          A.    It does.

8          Q.    How about the -- can you read

9    the third paragraph for us?

10                   MR. SULDS: Objection.

11         A.    Sure.  I understand that my

12   base salary is compensation for all hours I

13   work in a week.  I will be paid this base

14   salary for each week I work whether or not I

15   work 40 hours in that week subject to the

16   company's sick day and leave policies.

17         Q.    Did anyone explain to you what

18   does that mean that subject to the company's

19   sick day and leave policies?

20                   MR. SULDS: Objection.

21         A.    No.

22         Q.    Do you have any understanding

23   about that line?

24                   MR. SULDS: Objection.

25         A.    No.

1                       WHALEY

2           Q.     Okay.   Throughout your time at

3    42, store 42 as department manager, the

4    number of hours you worked each week, did it

5    vary?

6                    MR. SULDS: Objection.

7           A.     Yes.

8           Q.     How did it vary from week to

9    week?

10                   MR. SULDS: Objection.

11          A.     Our schedule is written as

12   47.5, but weekly we would probably do about

13   50, 51, somewhere down the line but no less

14   than like 50, 51, 52.

15          Q.     Was it always around that

16   range?

17                   MR. SULDS: Objection.

18          A.     Yes, except for back to school

19   time period.

20          Q.     How long does that back to

21   school season last?

22                   MR. SULDS: Objection.

23          A.     A week.

24          Q.     So what was the hours that you

25   generally would work during that period?

```
 1                         WHALEY

 2                 MR. SULDS: Objection.

 3        A.     During which period?

 4        Q.     Back to school?

 5                 MR. SULDS: Objection.

 6        A.     Back to school week is probably

 7   about two weeks, sorry about that, it's about

 8   two weeks, but during those periods you can

 9   work from the minimum would probably be 47.5,

10   but the average would probably be about 55

11   hours because you are working six days.

12        Q.     Let's look at Exhibit 8.

13        A.     Yes.

14        Q.     Earlier you testified about the

15   signature on this document.  Is the signature

16   yours, associate signature, did you sign

17   that?

18                 MR. SULDS: Objection.

19        A.     No.

20        Q.     How about the date, did you

21   date that?

22                 MR. SULDS: Objection.

23        A.     No.

24        Q.     Do you have any guesses who

25   might have put it in there?
```

```
1                      WHALEY

2               MR. SULDS: Objection.

3        A.    I do not.

4               MR. SULDS: Can we go off the

5        record for a second.

6               (Discussion off the record.)

7        Q.    Earlier you testified --

8   scratch that.  During your time as department

9   manager in store 42, did you work with any

10  assistant managers there?

11              MR. SULDS: Objection.

12       A.    Yes.

13       Q.    How many of them do you recall

14  you worked with?

15              MR. SULDS: Objection.

16       A.    All of them.  Seven.

17       Q.    About seven?

18       A.    Yes.

19       Q.    Earlier you testified Mr. Gayl

20  and Mr. August, I can't pronounce his last

21  name.

22              MR. SULDS: Objection.

23       Q.    You identified them as your

24  boss?

25              MR. SULDS: Objection.
```

```
1                        WHALEY

2         A.    Yes.

3         Q.    Do you think the store managers

4    are a boss?

5                   MR. SULDS: Objection.

6         A.    Yes.

7         Q.    Do you think the district

8    managers are your boss as well?

9                   MR. SULDS: Objection.

10        A.    Yes.

11        Q.    Why do you specifically think

12   Mr. Gayl and Mr. August were your boss?

13                  MR. SULDS: Objection.

14        A.    Yes.

15        Q.    Why do you think they are your

16   boss?

17                  MR. SULDS: Objection.

18        A.    Because they are telling me --

19   they are working with me, but they are

20   telling me, you know, directions of what they

21   want done and, you know, we have to follow

22   those directions.

23        Q.    Do you think -- who do you

24   think they get the directions from?

25                  MR. SULDS: Objection.
```

```
 1                      WHALEY
 2          A.    Probably get the directions
 3     from the store manager Kristin and the
 4     district managers as well.
 5          Q.    Earlier you also testified
 6     quite a few of the conversations that you had
 7     allegedly had with Mr. Gayl?
 8          A.    Yes.
 9          Q.    Such as talking about
10     inventory?
11          A.    Yes.
12               MR. SULDS: Objection.
13          Q.    About associate availability?
14          A.    Yes.
15               MR. SULDS: Objection.
16          Q.    About a sense of urgency about
17     supply, about sign work, about sales will
18     drop sometimes and about over stock behind
19     wall art; is that correct?
20               MR. SULDS: Objection.
21          A.    That's correct.
22          Q.    Do you know if Bed Bath has
23     kept records of the conversations you had
24     with Mr. Gayl?
25               MR. SULDS: Objection.
```

|    |                                                    |
|----|----------------------------------------------------|
| 1  | **WHALEY**                                         |
| 2  | A.     I don't know.                               |
| 3  | Q.     Do you personally keep a record             |
| 4  | of those conversations?                            |
| 5  | MR. SULDS: Objection.                              |
| 6  | A.     No, I do not.                               |
| 7  | Q.     Let's look at Exhibit 11.  On               |
| 8  | the bottom there are two lines for manager's       |
| 9  | name.  Do you recognize who's the one who          |
| 10 | sign on the left?                                  |
| 11 | MR. SULDS: Objection.                              |
| 12 | A.     To the left it's Lauren                     |
| 13 | Alvarez, excuse me, Ms. Lauren Alvarez.            |
| 14 | Q.     And who signed next to her?                 |
| 15 | MR. SULDS: Objection.                              |
| 16 | A.     To the right would be August.              |
| 17 | I can't pronounce the last name.                   |
| 18 | Q.     That's a challenge.  Do you                 |
| 19 | recall what Mr. August's role was in terms of      |
| 20 | the disciplinary notice?                           |
| 21 | MR. SULDS: Objection.                              |
| 22 | A.     He's my boss.  He's an                      |
| 23 | assistant store manager.                           |
| 24 | Q.     Did he participate in issuing               |
| 25 | this disciplinary notice?                          |

```
 1                      WHALEY
 2              MR. SULDS: Objection.
 3       A.    Yes, he did.
 4       Q.    How did he participate?
 5              MR. SULDS: Objection.
 6       A.    To my understanding he was the
 7  one that wrote the disciplinary action.
 8       Q.    Did you know that he has to
 9  seek someone else's permission before he gave
10  you?
11              MR. SULDS: Objection.
12       A.    Of course he has to speak to
13  his bosses about it.
14       Q.    Who do you think is his boss?
15              MR. SULDS: Objection.
16       A.    Store manager.
17       Q.    On a daily basis, how did you
18  work with the ASMs?
19              MR. SULDS: Objection.
20       A.    They would help put up product
21  as well.  They would do the same things we
22  did.  Put up products sometimes, sometimes
23  ring.  Sometimes back stock as well, sweep
24  carpets, help with customers, print signs
25  out.
```

```
 1                         WHALEY
 2        Q.    How often did they do those
 3   things with you?
 4                  MR. SULDS: Objection.
 5        A.    They work with you daily.
 6                  MS. LIU: I have no further
 7        questions.
 8                  MR. SULDS: We're done.
 9                  THE VIDEOGRAPHER: This
10        concludes today's deposition of Andrae
11        Whaley. The time is 3:05 p.m. on July
12        19, 2017.  This is the end of card
13        three.  We are now off the record.
14                  (Time noted: 3:05 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              A C K N O W L E D G M E N T

 2

 3   STATE OF           )

 4                      :ss

 5   COUNTY OF          )

 6

 7         I, ANDRAE WHALEY, hereby certify that

 8   I have read the transcript of my testimony

 9   taken under oath in my deposition; that the

10   transcript is a true, complete and correct

11   record of my testimony, and that the answers

12   on the record as given by me are true and

13   correct.

14

15

16              _____

17                     ANDRAE WHALEY

18

19

20   Signed and subscribed to before me,

21   this     day of          , 2017.

22

23

24   _____

25   Notary Public, State of _____
```

1          C E R T I F I C A T E

2

3  STATE OF NEW YORK      )

4                        ) ss.:

5  COUNTY OF NEW YORK     )

6

7          I, SHARI COHEN, a Notary Public

8  within and for the State of New York, do

9  hereby certify:

10          That ANDRAE WHALEY, the witness

11  whose deposition is hereinbefore set forth,

12  was duly sworn by me and that such deposition

13  is a true record of the testimony given by

14  such witness.

15          I further certify that I am not

16  related to any of the parties to this action

17  by blood or marriage; and that I am in no way

18  interested in the outcome of this matter.

19          IN WITNESS WHEREOF, I have hereunto

20  set my hand this 24th day of July, 2017.

21

22

23

24  _____

25  SHARI COHEN

```
1                    ***ERRATA***

2         ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Streat, Fifth Floor
3               New York, New York  10022
                     212-750-6434
4

5   NAME OF CASE: THOMAS vs. BED BATH AND BEYOND
    DATE OF DEPOSITION: July 19, 2017
6   NAME OF WITNESS: ANDRAE WHALEY

7   PAGE  LINE      FROM          TO          REASON

8   ____|_____|_____|_____|_____

9   ____|_____|_____|_____|_____

10  ____|_____|_____|_____|_____

11  ____|_____|_____|_____|_____

12  ____|_____|_____|_____|_____

13  ____|_____|_____|_____|_____

14  ____|_____|_____|_____|_____

15  ____|_____|_____|_____|_____

16  ____|_____|_____|_____|_____

17  ____|_____|_____|_____|_____

18  ____|_____|_____|_____|_____

19  ____|_____|_____|_____|_____

20  ____|_____|_____|_____|_____

21                     _____

22  Subscribed and sworn before me

23  this____day of_____, 20__.

24  _____   _____

25  (Notary Public)    My Commission Expires:
```

## $

**$20 (1)**
71:3
**$30 (2)**
38:7,8
**$40 (1)**
71:3

## A

**ability (1)**
12:16
**able (5)**
9:24;10:15;11:5,
14;71:18
**above (3)**
76:24;77:18;92:24
**absence (3)**
101:18;102:15;
103:9
**accept (3)**
40:3;118:2,22
**accessory (1)**
94:18
**accounts (1)**
104:25
**accurate (6)**
51:9;76:13;85:5;
95:21;109:20;110:7
**action (1)**
129:7
**actual (2)**
14:16;22:13
**actually (2)**
28:4;104:9
**add (2)**
58:8;75:11
**addition (3)**
60:17;78:25;79:13
**additional (3)**
38:10;68:16;
112:13
**address (1)**
29:3
**administer (1)**
5:14
**advance (1)**
89:20
**Affidavit (1)**
100:7
**afternoon (1)**
39:6
**again (7)**
30:17;36:12,19;
92:9;99:24;113:6;
121:4
**against (3)**
15:25;18:5,9
**agency (1)**
8:5
**ago (1)**

## 119:15

**agreeable (1)**
73:14
**AGREED (3)**
5:3,7,11
**ahead (2)**
16:6;19:16
**al (1)**
6:7
**alcoholic (2)**
12:6;74:16
**Alex (7)**
53:5,11,19;87:24,
25;97:4,4
**allegedly (1)**
127:7
**allowed (1)**
20:25
**Almost (2)**
55:11;56:11
**along (1)**
46:17
**Alvarez (2)**
128:13,13
**always (4)**
76:24;77:18;95:17;
123:15
**among (1)**
90:17
**amount (7)**
33:20;38:6;68:16;
69:17;71:2;112:13;
118:12
**Andrae (6)**
6:6;37:10;57:22;
130:10;131:7,17
**anticipate (4)**
114:3;115:10;
116:5;117:12
**application (13)**
22:9,12,22,24;
23:11,15,18;24:20;
35:17;113:14,15,17;
117:5
**apply (1)**
113:7
**applying (2)**
113:18;115:2
**approved (1)**
84:25
**approximately (9)**
16:12;30:19;31:3;
48:13;49:8;51:10,12;
54:6;55:21
**April (1)**
16:20
**area (3)**
23:16;87:12;
113:13
**Armstrong (1)**
6:16
**around (3)**
41:19;122:3;

## 123:15

**Art (8)**
53:5;88:17,19,22;
96:4,11,17;127:19
**ASM (9)**
53:2,3,3,5,5,6,6;
92:23
**ASMs (2)**
53:7;129:18
**assessed (1)**
90:10
**assignments (1)**
50:8
**assistant (14)**
15:16;17:8,10;
51:22;52:2,6;53:2,
15;83:6,8;87:18,25;
125:10;128:23
**assisted (1)**
49:17
**associate (9)**
65:2,14;66:11;
67:4;81:17;84:6;
86:17;124:16;127:13
**Associates (14)**
6:22;41:22;49:22;
50:22;51:2,6,10;
54:4;56:3,18;80:22;
90:3,4,9
**associate's (1)**
84:14
**asterisk (3)**
68:6;110:14;111:8
**attached (2)**
68:17;121:20
**attendance (2)**
80:22;82:10
**attention (2)**
94:13;120:8
**attorney/client (1)**
21:3
**attorneys (1)**
5:4
**August (10)**
77:13;81:24;82:2;
83:17;87:17;90:8;
91:5;125:20;126:12;
128:16
**August's (2)**
83:3;128:19
**authority (2)**
92:4,20
**authorized (1)**
5:13
**availabilities (2)**
90:13,16
**availability (4)**
90:2,4,9;127:13
**available (2)**
101:17;102:14
**Avenue (4)**
6:11;13:9,11;41:7
**average (1)**

## 124:10

**AW (5)**
59:18,18,19,19;
69:16

## B

**BA (1)**
18:20
**back (39)**
19:20;24:13,24;
30:23;32:7;35:15;
36:23,25;37:4;43:12;
47:22;50:15;53:23;
57:24;61:13;67:5;
69:20;70:3;71:5,6,22,
23;74:12;75:6;76:17;
77:2,21,25;78:19;
91:12;98:10;103:20;
104:17;122:2;
123:18,20;124:4,6;
129:23
**background (3)**
18:12;25:16;30:15
**bank (2)**
82:12,18
**base (6)**
68:12;110:17;
111:19;112:11;
122:12,13
**based (3)**
68:3;100:9;118:21
**basically (1)**
24:16
**basis (6)**
76:23;101:20;
102:7,9,11;129:17
**Bates (1)**
60:13
**Bath (42)**
6:7;9:2;14:11,14,
21,22,25;15:3;21:24;
24:5,6;25:18;28:5;
29:13;30:16,24;
32:16,19;37:12;
39:17;48:6;49:3;
71:24;77:12;79:15;
80:17,21;81:7;98:7,
22,25;99:5;103:10;
104:3;113:11;114:9
**Beyond's (1)**
14:21
**bi-weekly (5)**
68:18,24;69:6;
121:12,21
**blending (1)**
54:21
**boss (10)**
91:5,7,18;125:24;
126:4,8,12,16;
128:22;129:14
**bosses (2)**
91:3;129:13
**both (2)**
8:19;39:13
**bottom (4)**
60:10;64:23;86:22;
128:8
**boxes (4)**
93:20,21,22;94:2

## 24:5,6;25:18;28:5;

29:13;30:16,24;
32:16,18;37:12;
39:17;48:6;49:3;
58:20;61:8;69:10;
71:24;77:11,20;
79:15;80:16,20;81:7;
98:7,21,24;99:4;
113:7,11;114:8;
115:15;117:11;
127:22
**bedding (6)**
44:21;47:18;53:25;
54:4,7,8
**Beg (2)**
66:16;105:20
**beginning (3)**
57:21;77:20;86:8
**behalf (2)**
6:24;58:20
**behind (7)**
88:17,19,22;96:4,
11,17;127:18
**belief (2)**
101:21;102:13
**benefits (1)**
38:15
**besides (2)**
72:6;77:17
**best (3)**
14:17;25:14;71:18
**better (4)**
8:22;89:13,17;
93:14
**Beyond (28)**
6:8;9:2;14:12,14,
22;15:4;21:25;24:6;
25:18;28:6;30:16;
32:16;37:12;39:17;
71:24;77:12;79:15;
80:17,21;81:7;98:7,
22,25;99:5;103:10;
104:3;113:11;114:9
**beauty (1)**
56:8
**Bed (42)**
6:7;9:2;14:11,14,
20,22,25;15:3;21:24;

**BBB (11)**
101:16;102:20,22;
103:8,24;107:2;
109:14,17;110:20,24;
111:24

break (3)
58:7;73:15;74:16
briefly (1)
53:21
bring (2)
18:5,8
bringing (2)
9:4;91:13
broke (1)
38:4
Bronx (2)
101:2,8
brought (3)
15:24;26:6;95:24
Brown (1)
80:8
building (1)
72:9
bunch (1)
58:21
business (8)
46:13;47:20;77:7;
78:18,20,21,23;96:8
busy (5)
77:22,25;78:4,11,
15

**C**

cabinets (1)
70:17
cage (1)
87:14
calculation (4)
63:7;80:12;120:2,
16
call (18)
8:13,20;24:25;
32:8,9;37:8;38:3,13,
17;39:12;40:9,10,15,
22;41:2;44:5;72:21;
94:13
called (15)
7:5;9:9;23:24;
24:13,22,24;28:18;
32:13;51:22;60:13;
69:2,5,8;82:21;106:5
calls (1)
35:17
came (11)
21:8;24;25:7;
43:23;45:21,24;
53:23;58:19;84:20;
93:25;109:3
can (21)
8:21,22;9:17;
11:16,20;14:17;16:6;
19:16;21:7;25:15;
36:10;58:9;67:5;
75:2;91:4;97:5;
108:4;113:6;122:8;
124:8;125:4
caps (1)

85:9
car (3)
82:11,18,22
card (3)
6:2;57:21;130:12
care (1)
87:19
carpets (1)
129:24
case (2)
19:25;106:20
cashiering (2)
49:23;55:19
cast (2)
53:7,14
casual (1)
41:20
cease (1)
47:13
certain (2)
71:2;96:20
certify (1)
131:7
challenge (1)
128:18
chance (4)
9:8,10;10:25;11:6
change (5)
46:12;53:8;58:11;
75:8;84:24
changed (1)
9:23;53:17;76:11
charge (1)
15:17
chart (4)
63:7;120:2,16,17
Christmas (5)
54:22;77:15,16;
78:14,17
Circuit (12)
16:10,12,14,17,22;
17:6,7,11,19;18:2,6,9
City (12)
16:10,12,15,17,22;
17:6,7,11,19;18:2,6,9
claims (3)
61:8;106:20;107:3
classes (2)
43:20;44:14
classroom (1)
44:6
clean (1)
83:15
cleaning (1)
94:5
clear (1)
8:18
clock (2)
86:6,12
close (2)
45:13;46:11
closed (1)
16:18

closing (3)
45:5;46:4,8
coached (2)
93:2,4
code (1)
42:2
Cohen (1)
6:14
College (1)
18:13
Coming (1)
50:15
communicate (1)
40:19
communicated (1)
118:14
company (5)
27:12;33:12;72:22,
25;77:8
company's (2)
122:16,18
compensated (1)
113:22
Compensation (13)
61:17;68:13;
110:17;111:20;
112:10;113:22;
114:17;115:14,19;
116:8,9;117:7;
122:12
complain (2)
16:3;17:25
complaints (1)
71:25
complete (4)
9:17;10:23;89:11;
131:10
completed (5)
64:25;65:14;66:11;
67:4;89:23
completely (1)
75:3
components (1)
112:11
computer (9)
61:3;70:18;104:20;
105:5,9,11,16;106:3,
7
concerning (1)
81:8
concludes (1)
130:10
condition (2)
12:10,15
conduct (1)
42:2
confidential (1)
71:16
Connecticut (1)
98:25
connection (2)
94:9;103:25
consequences (1)

83:24
consist (1)
119:12
consisted (1)
119:15
consists (2)
54:20;112:11
constantly (1)
85:20
contacted (1)
22:10
CONTINUED (2)
74:8;96:16
conversation (11)
23:25;24:8,9;
39:15;40:23;82:9;
83:17;89:6;93:24;
96:7;117:20
conversations (4)
21:2;127:6,23;
128:4
cookware (1)
54:21
copies (2)
59:20;103:15
copy (2)
103:11,12
corner (1)
84:13
correctly (8)
7:14;41:8;43:17;
45:14,20;48:21;50:4;
80:2
Counsel (6)
6:18;72:21,25;
88:15;94:8,12
counseled (1)
88:13
counseling (1)
88:23
COUNTY (1)
131:5
couple (13)
23:23;24:23;32:14;
36:2,5,8,16;45:21,24;
49:10,12;50:8,9
course (2)
77:5;129:12
Court (7)
5:16;6:13,14,17;
7:3;8:5;10:13
cover (5)
100:16;102:6;
108:2;109:16;110:21
covered (1)
21:2
covers (1)
100:13
created (1)
21:8
criticize (12)
83:10;87:18;90:12,
18,24;91:2,4;92:5,20;

93:8,11;94:25
criticized (1)
92:15
culture (7)
25:18;27:11;30:16;
33:12;35:2;42:3;
47:20
currently (1)
12:18
Customer (3)
23:16;33:13;
113:12
customers (2)
49:23;129:24

**D**

daily (2)
129:17;130:5
damaged (1)
93:22
Danyell (1)
6:6
date (17)
14:16;61:24;62:4;
65:4,16;66:2,13;
67:15,19;70:6;84:14;
95:24;96:5,7;119:22;
124:20,21
dates (6)
14:13;48:12,14;
49:7;88:11;97:16
day (39)
23:2,9;26:10,13,14,
25;27:2,17;28:14,16,
16;30:5,6;38:18;
40:12,12;41:9;42:11,
21,24,25;43:2,12,14;
44:7,15,23;45:13,13;
76:23;79:24;82:17,
21;97:17;103:9;
104:3;122:16,19;
131:21
days (17)
23:23;24:23;43:4,
6,7,8,9;44:10,10;
45:12,21,24;46:11;
77:9,10;102:22;
124:11
day-to-day (1)
45:16
decide (1)
35:9
decided (1)
34:6
decisions (1)
92:24
declaration (9)
19:25;20:6;62:23;
63:17;98:10;109:11;
112:15;120:3,9
deduct (1)
102:23

**deducted (1)**
101:23
**defendant (2)**
6:25;9:2
**Defendant's (14)**
20:5;59:2,4;61:16;
63:11,21,23,25;64:3,
5;81:16;84:5;86:16;
97:7
**definition (1)**
76:12
**degree (2)**
18:24;19:4
**delegate (1)**
94:5
**delegating (1)**
94:6
**Dennis (4)**
29:19;31:15;115:8,
9
**department (80)**
22:8;23:12;25:23,
25;28:3,4,6,9;34:23;
37:11;41:21;44:20;
45:11;46:19,21;47:2,
25;49:24;50:2,16,18,
22;51:12,15,17;
53:25;54:7,12,14,17,
19,25;55:2,3,4,5,8,10,
14,16,18,21;56:6,7,
10,14,21,22,25;57:6,
12;61:17;67:23;68:9,
12,18,23;69:6;85:23;
86:25;87:8,22;89:11;
91:14;93:17;94:3,19,
23;95:9,24;96:18;
98:16,17;110:16;
111:19;121:12,18,20;
123:3;125:8
**depending (1)**
46:12
**deposition (15)**
5:6,12;6:5,9;7:22;
8:14,16;9:16;11:14;
19:15;57:22;62:10;
87:8;130:10;131:9
**depositions (1)**
109:7
**describe (2)**
23:8;25:14
**detailed (3)**
51:25;68:19;
121:21
**developed (1)**
102:4
**diary (2)**
60:21,23
**different (4)**
9:21;54:12;76:18;
105:22
**differently (1)**
106:21
**difficult (2)**

7:18;12:10
**difficulty (1)**
58:13
**Dillworth (1)**
53:6
**direct (3)**
91:15;107:22;
120:8
**directions (5)**
92:16;126:20,22,
24;127:2
**Disciplinary (7)**
81:17;83:24;84:6;
86:17;128:20,25;
129:7
**discipline (1)**
85:3;88:18
**disciplined (2)**
86:11;88:6
**discovery (2)**
8:21,25
**discuss (3)**
26:4;115:14;116:9
**discussion (3)**
25:20;57:15;125:6
**district (8)**
17:9,18;32:15;
72:18;116:2,3;126:7;
127:4
**DM (2)**
100:2,13
**DMs (1)**
100:21
**DMs' (2)**
98:16;100:8
**document (36)**
19:9;20:8,10,14,16,
19,21;21:8,12,13,15;
59:23;60:19;62:3,6,8,
16;63:22,24;64:2,4,6;
65:9,19;66:5,11;
67:18;84:23;105:18;
109:15;111:24;
112:6;119:19,21;
121:11;124:15
**documentation (3)**
84:20;103:13,16
**documents (39)**
9:11;19:5;58:22;
59:5,14,17,22;60:5,8,
14,18;61:9,13;62:12;
64:8;79:14,16;105:4;
106:4,13,17,23;
107:9,10,11,15,20,
21;108:3,6,7,13,14,
16,17,19,21,22;
111:17
**dollar (2)**
38:6;118:11
**done (3)**
12:3;126:21;130:8
**down (12)**
9:6;10:15;16:19;

38:4;56:16;63:3;
72:9;79:4;86:9;
95:18;120:13;123:13
**dress (2)**
41:20;42:2
**drink (2)**
12:7;74:17
**drop (1)**
127:18
**duly (1)**
7:6
**during (16)**
27:8;40:15;46:3;
51:8;53:8;56:20;
78:8,17,21;99:17;
112:14;119:6;
123:25;124:3,8;
125:8
**duties (3)**
27:21;90:17;91:19

**E**

**Earlier (12)**
62:10;78:24;87:7;
110:15;118:25;
119:25;120:16;
121:19;124:14;
125:7,19;127:5
**early (5)**
71:10;78:8;80:4;
82:17,25
**earned (1)**
69:18
**earning (4)**
30:20;31:4;69:12,
16
**Education (2)**
18:23;19:4
**educational (1)**
18:11
**effect (1)**
5:15
**efficient (1)**
105:23
**eight (2)**
12:24;41:19
**Eighth (2)**
13:9,11
**either (5)**
12:11;28:16;61:3;
85:15;109:14
**electronic (2)**
54:21;61:6
**eligible (1)**
34:20
**Ellen (2)**
6:14,16
**else (13)**
26:12;30:7;33:6;
38:12;60:17;70:4;
71:11,17;73:3;79:14;
81:3;101:12;108:25

**else's (1)**
129:9
**e-mail (3)**
104:25;105:13;
106:13
**employ (1)**
14:21
**employed (7)**
12:19;13:5,12,13;
21:24;30:24;81:7
**employees (1)**
72:2
**employment (9)**
14:14;47:17;61:8;
64:19;77:20;78:9;
101:15;102:20;107:2
**end (8)**
32:5;36:21;47:21;
55:19,25;77:13,15;
130:12
**engage (1)**
8:20
**engaged (1)**
85:24
**entire (1)**
95:18
**entitled (1)**
9:23
**essentially (1)**
43:20
**et (1)**
6:7
**even (4)**
31:24;77:9,15;
109:18
**everyone (3)**
28:5;71:17;73:13
**everyone's (1)**
52:24
**everywhere (1)**
47:24
**exact (1)**
27:3
**exactly (6)**
76:19;100:6;111:7,
18;119:11,14
**EXAMINATION (3)**
7:10;74:8;112:24
**examined (1)**
7:7
**example (7)**
10:23;38:5;39:22,
25;69:16;77:21;80:6
**Excellent (3)**
7:17;10:21;11:9
**except (3)**
5:8;106:24;123:18
**excess (1)**
68:4
**excessive (1)**
103:9
**Excuse (7)**
25:3;32:9;39:10;

45:6;51:24;76:24;
128:13
**execute (3)**
93:9,13;95:2
**execution (1)**
89:13
**exhausted (2)**
102:21;103:2
**Exhibit (58)**
20:5,9;59:2,7;60:7;
61:16,19;62:23;
63:11,21,23,25;64:3,
5,22;67:12,19,22;
68:20;69:5;80:7;
81:16,19;84:5,8;
86:16,19;97:7,10;
98:10;105:17;106:5,
15;107:12;108:14;
110:11,12;111:2,4,7,
8,13,14;112:3,6;
119:16,25;120:8,18,
23;121:4,10,16,17;
122:2,5;124:12;
128:7
**Exhibits (6)**
79:13,19;103:23;
104:2,6;121:7
**expected (1)**
80:17
**experience (3)**
24:11;99:20,25
**explain (9)**
11:4,7;35:6;36:10,
15;70:23,24,25;
122:17
**explained (5)**
77:19,24;78:7,13,
16
**explanation (3)**
10:24;68:19;
121:22
**extra (3)**
71:3;73:11;102:22

**F**

**face (1)**
102:5
**fact (3)**
81:5;108:2;112:14
**facts (2)**
8:21;85:2
**failed (1)**
93:12
**failing (3)**
92:5;93:9;95:2
**fair (3)**
19:3;62:15;80:20
**false (1)**
86:12
**far (3)**
47:11;49:21;83:13;
103:20

**DANYELL THOMAS, ET AL. VS.**
**BED BATH AND BEYOND, INC.**

**ANDRAE WHALEY**
**July 19, 2017**

**feature (1)**
94:18
**feedback (1)**
90:14
**feel (1)**
34:10
**felt (1)**
97:23
**few (4)**
112:23;113:5;
120:12;127:6
**field (1)**
18:22
**fight (1)**
108:5
**file (1)**
70:17
**files (5)**
105:11,15,19,21;
106:17
**filing (1)**
5:5
**fill (5)**
23:2,5;42:6,9;
113:13
**filled (7)**
22:9,24;23:7,11;
24:20;42:10;113:16
**filling (1)**
23:18
**fine (2)**
58:4;74:15
**finish (1)**
89:9
**finished (6)**
23:18;43:10,15;
44:14,15,15
**first (14)**
7:15;16:14;37:24;
40:11,12;46:14;
47:16;52:15;53:24;
56:24;59:4;110:16;
114:12,13
**five (3)**
43:7;55:15,22
**fixture (1)**
85:10
**fixtures (1)**
93:21
**fluctuate (1)**
76:9
**fluctuated (4)**
76:5,8,14,16
**fluctuates (1)**
68:3
**folks (6)**
9:4;53:15;55:13;
57:9;64:10;72:5
**follow (5)**
89:13;92:16;
108:12;113:6;126:21
**following (1)**
58:14

**follows (2)**
7:8;74:6
**force (1)**
5:14
**Forever (6)**
13:14,17,20,23;
14:9,23
**form (4)**
5:8;43:19;113:15,
17
**format (1)**
61:3
**foundation (1)**
91:23
**four (8)**
13:18;35:23;39:25;
55:22,22;63:3;
111:25;122:5
**fourth (1)**
120:14
**frame (1)**
49:8
**Francis (17)**
22:10;23:24;24:2,
21;25:11;26:11;
30:15;32:7,10,13;
35:18,18;36:23;37:5;
63:5;114:15;116:14
**Frank (1)**
53:3
**friend (3)**
22:2,4;113:10
**front (14)**
20:9;47:21;55:19,
25;59:7;60:7;61:10,
19;62:25;63:13;
68:20;84:9;98:11;
104:6
**full (4)**
101:16,18;102:13;
109:18
**fullest (2)**
9:16;10:22
**fully (1)**
75:3
**function (1)**
79:3
**functioning (1)**
99:14
**FURTHER (5)**
5:7,11;72:9;
112:20;130:6

**G**

**gadgets (1)**
54:20
**gave (7)**
24:20;40:11;58:6;
103:8;116:24;
118:13;129:9
**Gayl (22)**
87:24,25;88:3,17;

90:7,24;91:7,15;
92:12;93:2,16;94:4,8,
17,21;95:12,22;
96:12;125:19;
126:12;127:7,24
**Gayl's (1)**
92:4
**general (3)**
72:21,24;95:20
**generally (1)**
123:25
**gets (3)**
9:2,10;38:11
**given (11)**
42:16;46:8;63:6;
75:7;84:16;90:15;
103:23;106:25;
109:8;120:15;131:12
**goes (3)**
38:9,10;47:7
**good (1)**
73:14
**graduate (1)**
19:3
**graduated (1)**
18:17
**graduation (1)**
18:13
**Grauer (2)**
6:14,17
**Greenberg (2)**
6:10,25
**grounds (1)**
19:11
**group (3)**
53:15;57:8;61:9
**grouping (1)**
67:23
**groups (4)**
59:17,25;60:9;
61:12
**growth (1)**
38:16
**guesses (1)**
124:24
**guys (1)**
115:18

**H**

**hair (1)**
94:18
**half (1)**
38:8
**hall (1)**
79:4
**hand (2)**
69:24;84:13
**handwriting (9)**
60:10;61:25;65:7,
17;66:3,14,18,21;
67:16
**Hang (1)**

6:22
**happen (3)**
28:21;101:24;
102:23
**happened (13)**
23:8,21;24:12,24;
28:12;32:11;40:8;
43:11;47:10,12;
103:4,19;104:9
**happens (1)**
8:25
**hard (5)**
54:16,18,19,25;
55:4
**Harmon (9)**
56:9,20,23;57:10;
86:24;87:4,9,11,21
**Harmon's (1)**
56:7
**HBC (1)**
93:3
**head (2)**
10:14;87:8
**health (2)**
56:7;102:4
**hear (1)**
12:11
**heard (4)**
8:14;28:3;45:20;
50:4
**held (2)**
6:9;32:25
**help (4)**
46:16;89:20;
129:20,24
**HEREBY (2)**
5:3;131:7
**herein (1)**
5:5
**high (1)**
87:15
**hire (5)**
42:5,7,14;119:9,12
**hired (3)**
27:18;34:24;114:8
**history (1)**
18:25
**hit (1)**
76:24
**Hold (2)**
22:11;88:7
**holiday (5)**
77:11,12;78:12,17,
21
**holidays (1)**
78:14
**home (1)**
50:5
**hope (1)**
36:15
**hour (2)**
71:15;103:10
**hourlies (3)**

55:24;56:13;57:10
**hourly (10)**
31:13,16;37:22,24;
50:21,25;51:10;54:3;
55:12,12
**hours (93)**
11:25;12:4,7;14:6;
15:18,22;17:12,15,
20,23;27:14;31:11,
13,25;34:17;36:2,2,5,
8,16;37:20,23,24;
38:10,11,18,24;
42:20,24;44:22;
56:21;57:3,9;68:4,13,
15,16;71:2;73:9,10,
12;75:14,18,21,24;
76:3,13,16,20,23,25;
77:3,8,14,18;99:18;
101:17,18,23;102:6,
14,15,17,18;103:10;
104:4,4;109:16,18,
19;110:18,19,21;
111:20,21,22;112:2,
12,13;114:3,22;
115:10,19;116:4;
117:12;118:4,6,7;
122:12,15;123:4,24;
124:11
**house (1)**
47:22
**HR (7)**
70:4,6,14;71:17,19,
21;72:5
**human (6)**
64:9,10,13,18;
70:8;79:3

**I**

**Identification (13)**
20:7;59:6;61:18;
63:12,22,24;64:2,4,6;
81:18;84:7;86:18;
97:9
**identified (1)**
125:23
**identify (2)**
60:14;103:25
**important (4)**
9:15;10:4,21;80:25
**improvement (2)**
96:22;97:3,8;98:3
**Inc (1)**
6:8
**incident (2)**
82:15;121:2
**included (1)**
59:24
**including (1)**
35:12
**indicate (2)**
113:17,21
**indicated (1)**

DANYELL THOMAS, ET AL. VS.
BED BATH AND BEYOND, INC.

ANDRAE WHALEY
July 19, 2017

62:4

**information (5)**
26:19;71:18;106:4,
24;107:24

**informed (1)**
109:15

**instance (1)**
120:21

**interchange (1)**
29:12

**interested (1)**
21:5

**interfere (1)**
12:15

**interim (1)**
29:13

**interrogatories (1)**
9:10

**interview (32)**
24:15;25:3,4;
26:17,21;27:8;28:19,
22;29:7,18;30:2,9;
31:15;32:5,15,22,25;
33:10;34:10;35:12;
36:21;114:12,13,18,
22;115:5,6,20,23,24;
116:16,19

**interviewed (4)**
24:16;27:19,23;
28:10

**interviewing (6)**
28:13;30:23;32:18;
34:3;35:11;36:16

**interviews (4)**
34:13;35:3;114:7;
117:6

**into (8)**
8:23;28:5;36:3;
38:11;73:5;78:8;
91:13;108:5

**introduce (1)**
6:18

**inventory (10)**
49:18;77:16;88:4,
8,14,15;93:3;94:10,
14;127:10

**involved (3)**
35:20;41:15;109:2

**Island (14)**
18:14;48:11,19,21,
24;49:20,25;50:3,13;
99:9,17,22;100:4,17

**issue (2)**
88:9;102:4

**issues (2)**
81:8;94:6

**issuing (1)**
128:24

**italics (1)**
68:8,9

**items (1)**
91:13

## J

**Jerry (2)**
52:22;53:2

**Jersey (3)**
98:21,22;101:2

**job (30)**
12:25;13:20;15:11;
17:5;22:3;25:21,23;
26:2,3;27:22;29:21;
32:3;34:2,13;36:8,
17;40:3;44:18;51:22,
24;52:4,5;80:18,23;
113:11;116:12,21;
117:22;118:3,22

**Jonathan (1)**
7:1

**Jose (2)**
22:5;113:10

**judge (2)**
9:23;11:6

**July (13)**
6:4;14:15,18,18;
48:16,17;57:17,23;
73:17;74:11;104:13;
119:22;130:11

**jumping (1)**
122:3

**June (2)**
32:20,21

**jury (2)**
9:24;11:6

## K

**keep (5)**
60:21;61:2;87:15;
103:15;128:3

**Keli (1)**
6:21

**Kenny (2)**
57:5;87:22

**Kenya (3)**
85:21;86:3,4

**kept (1)**
127:23

**Kevin (8)**
32:15,23;33:9,9;
35:12,19;116:2,3

**key (1)**
87:14

**keys (2)**
87:11,19

**kind (4)**
7:24;8:5;15:14;
61:2

**kitchen (2)**
54:20,20

**knew (5)**
72:6;76:18;77:13;
78:19;79:2

**knowledge (3)**

**Kristin (6)**
52:16;82:4,5,9,16;
127:3

## L

**label (1)**
95:7

**lack (1)**
93:2

**lady (2)**
79:8,10

**language (1)**
111:8

**large (1)**
81:6

**last (16)**
7:18;11:25;12:4,7;
20:13;22:6;27:4;
29:20;52:24;53:12;
81:25;83:3;86:9;
123:21;125:20;
128:17

**lasted (1)**
44:6

**late (1)**
71:10

**lateness (2)**
81:22;85:4

**later (14)**
9:20;11:3;17:9;
23:23;24:23;28:18;
29:10;32:14;36:24;
37:2;40:11;80:4;
86:9;120:12

**Lauren (3)**
79:6;128:12,13

**lawsuit (7)**
8:19,23;9:4,13,21;
15:24;18:5;58:20;
109:2,7

**lawsuits (1)**
18:8

**lawyer (6)**
20:22;21:2,6,6;
59:13,13

**lawyers (2)**
8:13;60:14

**lead (1)**
28:7

**Leading (2)**
19:13;85:2

**learn (1)**
47:19

**learned (2)**
80:16;96:16

**least (2)**
27:18;111:25

**leave (10)**
14:20;82:24;
102:21;103:2,10,10;
104:3,4;122:16,19

**leaving (1)**
82:16

**left (10)**
14:22;23:13;26:16;
30:21;53:21,22;79:9;
98:7;128:10,12

**legal (1)**
6:15

**less (4)**
73:10;76:3;109:18;
123:13

**Level (1)**
61:17

**lighten (5)**
91:9,11,16;92:5,17

**Lightening (2)**
92:9,21

**limited (1)**
99:21

**line (3)**
120:14;122:23;
123:13

**lines (2)**
63:3;128:8

**little (2)**
51:25;77:22

**Liu (36)**
6:21,21;13:25;
16:5;17:2,16;18:3;
19:6,10,13;20:20,23;
36:11;45:17;62:18;
68:25;76:7,21;77:23;
90:21;91:20,23;
92:22;93:10;94:11;
96:2;104:5;107:16,
22;109:24;110:8,23;
112:17,22,25;130:6

**located (2)**
6:11;13:8

**lock (2)**
87:13,14

**long (31)**
12:21;13:16;15:6;
16:16;18:13;27:4;
30:9;41:2;42:18;
47:5,8;48:11,19,20,
23,24;49:20,25;50:3,
12;54:6,24;55:9,20;
56:9;99:9,16,22;
100:3,17;123:20

**longer (2)**
77:3;96:4

**look (35)**
9:23;20:12;35:15;
59:21;60:9;62:22,24;
64:21;65:12,22;66:8;
67:2,22;79:13;80:7;
97:12;98:14;101:14;
103:5;105:15;106:6,
9,10,12,16;107:9;
108:21;109:10;
110:11;111:14;
112:3;119:16;

**leaving (1)**
82:16

**leaving** ...

**121:10;124:12;128:7**

**looked (5)**
106:3;107:20;
108:13,14,16

**looking (2)**
109:12;111:16

**looks (3)**
20:13;80:8;97:16

**loss (2)**
95:10,23

**lot (3)**
41:17,18;56:3

**lower (1)**
84:13

**Luncheon (1)**
73:19

**Lynette (1)**
56:25

## M

**maintain (1)**
71:25

**maintenance (4)**
47:23;49:22;94:9;
101:5

**making (4)**
31:5,7;33:18,21

**management (1)**
96:25

**manager (77)**
13:3,22,23;14:3;
15:12,15,17;17:6,8,9,
11,19;22:8;24:11;
25:17,23;26:2,20;
28:3,4,6,20;29:22;
32:16;37:12;44:20;
46:21;47:3;49:24;
50:2;51:20,22;52:2,3,
10,11,12,13,14,17,23;
53:3,25;54:7,25;55:3,
14;56:22,25;57:6;
61:17;67:24;68:10,
12;70:8;72:15,15,19;
81:25;82:6;83:7,9;
86:25;87:18,22;88:2;
110:16;111:19;
115:8;116:2,3;
121:18;123:3;125:9;
127:3;128:23;129:16

**managers (29)**
23:12;41:21;46:19;
48:2;50:16,19,23;
51:13,15,17,20,21;
52:7,7,20;53:8,16,16;
56:23;84:25;98:16,
17;101:4,5,6;125:10;
126:3,8;127:4

**manager's (8)**
16:21,25;68:18,23;
69:6;121:12,20;
128:8

**Manhattan (3)**

32:16;99:9,13
**many (20)**
    34:16;43:4,6,8;
    46:7,7,8;47:25;50:15,
    25;52:6;54:3;55:12,
    24;56:13;114:7;
    115:9;116:4;117:12;
    125:13
**March (1)**
    95:22
**Mark (7)**
    58:24;61:14;63:9,
    19;81:14;84:3;97:5
**marked (15)**
    20:6;59:5,18;
    61:18;63:12,22,24;
    64:2,4,6,21;81:18;
    84:7;86:18;97:9
**marks (1)**
    57:20
**matter (2)**
    6:6;27:16
**matters (1)**
    96:21
**Maxx (8)**
    12:20,22,23;13:2,4,
    13;14:3,7
**may (14)**
    5:12;44:6;57:24;
    69:21;74:12;76:11;
    97:16;100:16;
    104:18;107:19;
    108:2,15;109:16;
    110:21
**maybe (9)**
    31:5;36:5;47:9;
    55:4;71:3,9;77:9,15;
    80:8
**McKinley (14)**
    22:10;23:24;24:2,
    21;25:11;26:11;
    29:14;63:5;114:15,
    16;116:14,20;117:21,
    22
**mean (23)**
    17:4;49:15;54:18;
    75:16;76:8,10,15;
    78:6;85:6;87:4,15;
    90:3;91:9,12;93:4,
    11;94:12;95:5;106:8;
    110:2,10;119:22;
    122:18
**meaning (1)**
    77:8
**means (1)**
    92:10
**meant (1)**
    105:23
**medical (2)**
    12:9,14
**medication (2)**
    11:25;12:4
**medications (2)**

74:20,23
**meet (1)**
    41:17
**meeting (4)**
    35:18,19,20;63:4
**mention (6)**
    114:2,16,21,25;
    116:4;117:17
**mentioned (4)**
    82:4;108:15;117:6,
    11
**merchandise (4)**
    87:16;93:20,22,22
**met (4)**
    24:14;29:23;41:18;
    72:6
**mid (6)**
    32:21;45:4,13,25;
    46:7,11
**midnight (1)**
    39:22
**might (9)**
    9:11;32:2;34:23;
    43:9;46:4;78:14,18;
    106:13;124:25
**mind (1)**
    67:6
**mine (1)**
    113:10
**minimum (1)**
    124:9
**minute (2)**
    104:11;121:11
**minutes (4)**
    27:6;30:12;41:3;
    73:15
**mistake (1)**
    78:13
**mistaken (2)**
    24:4;31:6
**mixed (3)**
    88:11;93:20,21
**month (2)**
    48:25;50:12
**months (12)**
    12:24;13:19;15:9,
    10;47:9;54:10;55:4,
    22,23;56:12;106:18;
    120:12
**more (11)**
    19:18;44:7;51:25;
    56:4;69:3;71:19;
    73:10;75:18,21,24;
    90:5
**morning (1)**
    39:5
**most (3)**
    9:17;10:22;53:19
**motion (1)**
    10:12
**move (2)**
    54:11,14
**moved (1)**

54:16
**much (16)**
    25:19;26:3;30:19;
    31:3;33:17;34:2;
    35:10,20,25;36:3;
    39:7;69:25;113:21;
    116:21,25;118:9
**multiple (1)**
    93:20

# N

**name (17)**
    7:18;22:5,6;29:19,
    20;52:24;53:4;72:8,
    10;79:11;81:25;83:3;
    87:22;113:3;125:21;
    128:9,17
**named (2)**
    85:20;86:4
**Nathaniel (1)**
    6:16
**nature (1)**
    49:19
**Neary (1)**
    53:6
**necessary (2)**
    90:25;97:24
**need (5)**
    10:9,9;34:10;
    94:22;106:6
**needed (9)**
    48:20;82:22;89:12,
    16,19,20;90:20;94:5;
    102:22
**needs (4)**
    46:12;77:7;90:10;
    95:7
**negative (1)**
    95:25
**negotiable (1)**
    85:14
**Neil (1)**
    53:3
**New (9)**
    6:11,12;42:5,7,14;
    98:21,22;119:9,12
**next (17)**
    23:21;24:12;28:12,
    15,16;32:11,13;
    35:19;40:8;42:25;
    43:3,12;55:16,18;
    56:6;57:12;128:14
**night (2)**
    27:17;39:6
**nights (5)**
    49:11,12,16;99:10,
    12
**Nikki (1)**
    53:6
**nine (3)**
    39:4;42:20,24
**nod (1)**

10:14
**non (3)**
    12:3;74:22;85:14
**normal (6)**
    50:17;51:2,5;
    76:23,24;99:17
**normally (1)**
    34:9
**Notary (2)**
    7:7;131:25
**Noted (2)**
    74:3;130:14
**notes (1)**
    61:2
**Notice (5)**
    81:17;84:6;86:17;
    128:20,25
**number (18)**
    22:19;29:2,4;48:3,
    9;51:4;54:5;56:2;
    65:12;68:14;71:25;
    91:12;94:22;95:25;
    109:19;110:19;
    111:22;123:4
**numbers (2)**
    60:11,13

# O

**oath (5)**
    5:14;8:2;9:5;
    21:19;131:9
**Objection (105)**
    13:25;16:5;17:2,
    16;18:3;19:6,10,12;
    20:20,23;36:11;
    45:17;62:18;68:25;
    76:7,21;77:23;90:21;
    91:20,22;92:22;
    93:10;94:11;96:2;
    104:5;107:16,22;
    109:24;110:8,23;
    112:17;113:9,19,24;
    114:5,10,14,19,23;
    115:3,7,12,16,21,25;
    116:6,11,13,17,23;
    117:2,9,14,18,24;
    118:5,10,15,20,23;
    119:4,8,13,20;120:5,
    19,24;121:5,14,24;
    122:10,20,24;123:6,
    10,17,22;124:2,5,18,
    22;125:2,11,15,22,
    25;126:5,9,13,17,25;
    127:12,15,20,25;
    128:5,11,15,21;
    129:2,5,11,15,19;
    130:4
**objections (2)**
    5:8;59:3
**obtained (1)**
    22:22
**occasions (1)**

94:22
**October (4)**
    103:8,18,21;104:8
**off (12)**
    56:15;57:14,15,18;
    73:18;98:4;102:22;
    104:10,13;125:4,6;
    130:13
**offer (8)**
    37:11;39:18;
    115:15;116:12,21;
    117:23;118:3,22
**office (12)**
    26:23,24;30:3;
    33:5;64:11,14,18;
    70:11,12,14,19;72:8
**officer (1)**
    5:13
**offices (1)**
    6:10
**often (1)**
    130:2
**once (7)**
    8:22;23:18;43:10,
    14;71:20,21;111:25
**one (47)**
    6:3;7:15;10:8;
    11:12;19:18;20:24;
    22:11;23:12;40:12;
    42:24,25;43:2,14;
    44:7;45:4,5,6,6,13,
    13;46:11,11;50:12;
    52:12,13,22;68:17;
    69:3,21;80:15;84:25;
    90:5;91:3,18;94:23;
    98:12;103:9;104:3;
    109:14;110:12;
    111:10;117:6,11,16,
    22;128:9;129:7
**ones (1)**
    99:8
**only (4)**
    62:11;71:3;99:7;
    100:22
**oOo- (1)**
    5:18
**open (1)**
    99:14
**opening (6)**
    6:5;45:3,13;46:7,
    11;99:17
**operation (1)**
    99:21
**operational (1)**
    27:13
**operations (5)**
    15:17;17:9,19;
    30:17;33:12
**opportunities (1)**
    38:16
**opportunity (3)**
    8:20;9:3;14:23
**opt (1)**

109:6

**order (5)**
88:10;91:10,11;
92:6,10

**orders (3)**
91:16;92:17,21

**organized (1)**
50:21

**orientation (22)**
40:13,15;41:4,10,
13,16,17,24;42:10,
18;43:5,8,11,15,19;
44:14;78:8;80:16;
119:2,7,19,24

**oriented (1)**
44:3

**originally (1)**
45:10

**out (21)**
8:21;22:9,24;23:2,
5,7,11,19;24:20;42:6,
9,10;83:15;89:19;
102:3,3,17,25;
113:13,16;129:25

**over (35)**
14:6;15:18,22;
17:12,15,20,23;
23:25;24:17;31:10;
37:7;40:21;41:24;
49:11,11,12,15;
50:18;51:6;53:17;
68:16;74:15;77:14;
84:14;88:16,19,21;
95:12;96:3,11,17;
99:10,12;112:13;
127:18

**overflowing (1)**
93:23

**Overnight (2)**
49:17;94:6

**overnights (1)**
50:9

**overtime (16)**
8:12;13:24;14:4;
15:21;17:14,22;31:7;
34:20;38:2,3,11;
68:3;70:24;73:12;
118:8,9

**own (6)**
28:7;46:15;47:14;
104:20,24;108:7

**P**

**pack (1)**
83:15

**page (3)**
20:13,13;97:13

**pages (1)**
60:10

**paid (27)**
14:4;18:2;31:13;
34:3;36:10,18;68:15;

69:9,25;70:5;72:16,
19,22;73:7,10,12;
86:6;101:18,18;
102:14,18,21;103:2;
112:2;116:22;118:7;
122:13

**paper (4)**
61:6;63:6,15;
120:15

**paperwork (5)**
42:5,8,14;119:10,
12

**paragraph (25)**
62:24;63:16;68:8;
98:15,15;100:7;
101:14;102:12,19;
103:5,6;109:11,13;
110:6;112:5,9,15;
120:3,7,9,12,22;
121:3,18;122:9

**paragraphs (1)**
122:5

**Paramus (2)**
101:3,10

**pardon (2)**
66:16;105:20

**Park (1)**
6:11

**part (9)**
18:24;32:17;47:16;
61:7;77:25;80:23;
84:19;86:9;119:23

**participate (2)**
128:24;129:4

**particular (6)**
13:4;25:9;28:8;
78:2;79:23;93:25

**particularly (3)**
78:4,15;82:11

**parties (2)**
5:5;8:22

**partner (1)**
36:22

**partners (1)**
32:9

**part-time (1)**
41:21

**pass (1)**
26:18

**pattern (2)**
46:6,10

**pay (19)**
8:12;16:4;26:3;
34:13;63:12;68:3,18,
24;69:6;71:12,15,20;
79:21;80:12;109:17;
118:4,18;121:12,21

**paycheck (1)**
71:2

**payment (1)**
17:23

**payments (1)**
69:13

**payroll (1)**
52:8

**penalty (2)**
21:17,21

**pencil (1)**
61:7

**people (6)**
7:16;41:18,18;
44:2;79:19,20

**perform (1)**
90:19

**performance (4)**
96:22;97:3,8;98:3

**perhaps (2)**
36:7;46:3

**period (5)**
30:11;48:14;
123:19,25;124:3

**periods (1)**
124:8

**perjury (2)**
21:17,21

**permission (1)**
129:9

**person (4)**
29:17;37:6;72:12;
96:24

**personal (4)**
100:10,12,19;
104:24

**personally (2)**
36:3;128:3

**person's (1)**
53:4

**pertaining (1)**
94:2

**phone (15)**
23:25;24:17,22,25;
32:8,8;37:7;40:9,10,
21;104:22;106:11,12,
14,17

**phrase (1)**
90:4

**physical (1)**
61:7

**physically (1)**
26:22

**pick (3)**
78:18,20;81:3

**picks (1)**
78:21

**picture (1)**
10:12

**pictures (1)**
10:11

**piece (3)**
63:6,15;120:15

**place (2)**
26:22;101:12

**placed (2)**
88:17;96:21

**plaintiffs (3)**
6:23;109:6,6

**Plaintiffs' (1)**
59:3

**plan (8)**
89:16;93:9,13;
96:22;97:3,8;98:3,4

**planning (1)**
93:2

**please (31)**
6:18;7:3;10:16,17;
19:18,20;21:23;
25:14;35:6;43:17;
58:25;59:21;61:15;
62:23,24;63:10;
64:22;65:13,22;66:8;
67:3;68:17;69:21;
81:15;84:4;86:15;
89:7;109:11;111:11;
112:3;121:19

**pm (14)**
39:9,11;45:6,7;
57:17,23;73:17,20;
74:3,11;104:13,17;
130:11,14

**point (11)**
16:22;17:12;25:21,
22;33:25;39:20;57:8;
58:19;82:8;92:25;
98:6

**policies (6)**
33:12;35:3;42:2;
43:23;122:16,19

**policy (1)**
80:21

**portion (1)**
81:6

**position (9)**
37:12,22;113:7,18,
23;114:4,25;115:11;
116:5

**positions (1)**
8:24

**possession (5)**
9:12;103:24;
108:18,20,23

**posted (1)**
76:22

**prep (3)**
88:4,9,15

**prepare (2)**
107:5;108:11

**prepared (1)**
94:14

**preparedness (1)**
94:10

**preparing (1)**
107:8

**prescription (4)**
11:24;12:4;74:19,
22

**present (4)**
30:7;33:6;64:10,14

**pretty (2)**
25:19;39:7

**previously (1)**
85:3

**price (3)**
87:15;95:8,8

**print (1)**
129:24

**Prior (4)**
13:12,14;16:8;
120:21

**privilege (2)**
21:3;107:25

**privileged (1)**
107:23

**Probably (10)**
27:5;28:17;41:19;
50:18;56:11;123:12;
124:6,9,10;127:2

**problem (1)**
82:17

**procedures (4)**
27:13;30:18;42:2;
43:24

**proceed (3)**
57:25;74:12;
104:18

**proceeding (1)**
7:24

**process (12)**
8:25;23:22;25:15;
28:13;32:12,13;
43:15;44:5,6;47:6,7;
70:24

**produce (1)**
9:11

**product (3)**
54:22,23;129:20

**Production (2)**
59:5;105:18

**products (1)**
129:22

**pronounce (5)**
7:14,18;113:2;
125:20;128:17

**properly (5)**
18:2;70:5;72:16,
19,23

**provide (2)**
58:21;59:13

**provided (3)**
59:12;107:14;
108:3

**providing (2)**
90:8,13

**Public (2)**
7:7;131:25

**punches (1)**
86:12

**purpose (3)**
8:8,11;9:5

**purposes (1)**
21:11

**put (7)**
35:16;36:3,7;

43:11;124:25;
129:20,22
**putting (1)**
85:9

## Q

**quick (1)**
24:9
**quite (1)**
127:6

## R

**Rajid (1)**
53:5
**range (2)**
56:17;123:16
**rate (4)**
37:24;68:3,3;
118:12
**reach (1)**
89:19
**read (19)**
19:4,9,19,21;
20:16;21:11,13;
42:12;62:6,9,11,16;
68:8,11;97:20;
110:15;121:19;
122:8;131:8
**reading (2)**
103:6;109:20
**reads (1)**
101:15
**Real (1)**
24:9
**really (3)**
8:18;103:2;107:7
**reason (3)**
11:16,20;75:2
**recall (49)**
14:17;22:6;23:20;
25:15;29:20,21;33:4,
8,15;42:4;43:6,8;
44:7,9;45:8;51:4;
54:5;56:2;58:9,22;
62:8,9,19;70:7;72:3;
80:2;85:7,11;93:24;
94:20;95:3;96:6,12,
15;97:17,19;103:20;
108:10;110:24;
113:16;118:12;
119:11,14,18,21,23;
121:22;125:13;
128:19
**receive (5)**
13:24;15:21;17:14,
22;32:8
**received (5)**
60:8;69:12;81:21;
90:15;121:23
**Recess (3)**
57:19;73:19;

104:15
**recognize (6)**
20:10;81:19;84:11;
86:19;97:10;128:9
**recollection (1)**
107:2
**record (17)**
6:3;19:21;57:14,
15,18,24;73:18;
74:12;104:11,14,18;
125:5,6;128:3;
130:13;131:11,12
**recorded (1)**
86:6
**recordings (1)**
61:5
**records (1)**
127:23
**recruiter (1)**
24:4
**redirect (1)**
112:23
**reducing (1)**
92:10
**refer (5)**
68:17;98:9;121:3,
19,19
**reference (4)**
63:4,16;82:11;
96:10
**referred (2)**
120:17,22
**referring (1)**
120:3
**refers (1)**
121:17
**refresh (1)**
106:25
**refuse (1)**
84:15,15,22
**Regarding (1)**
7:23
**regardless (3)**
68:14;110:19;
111:21
**regular (3)**
37:24;70:14;77:17
**regulatory (1)**
8:5
**relate (1)**
97:2
**relevant (1)**
9:12
**remember (19)**
16:14;18:16;19:24;
24:7;29:3;30:4;38:5;
48:21;52:23;72:4,8,
10;79:11;80:4;82:19;
85:12,15,18;96:5
**Repeat (6)**
19:17;36:12;53:12;
69:3;87:3;90:22
**repeated (1)**

81:22
**rephrase (1)**
10:8
**rephrasing (1)**
91:24
**report (1)**
51:16
**reported (1)**
51:19
**reporter (3)**
6:13;7:3;10:13
**Reporting (2)**
6:15,17
**represent (2)**
6:20;103:22
**representing (1)**
6:22
**Request (6)**
59:4,24;60:4,19;
105:4,18
**required (3)**
32:2;45:2;78:22
**reserved (1)**
5:9
**resign (1)**
14:24
**resigned (1)**
57:13
**resource (5)**
64:10,11,18;70:8;
79:3
**resources (1)**
64:13
**respective (1)**
5:4
**respond (1)**
105:3
**response (2)**
33:23,24
**Responses (2)**
59:3;107:13
**responsibilities (8)**
27:22;90:18;91:19;
98:19;100:2,8,13,21
**responsibility (1)**
90:24
**responsive (6)**
59:14,23;60:18;
105:6,17;106:15
**result (1)**
96:20
**results (1)**
95:25
**resumed (1)**
74:5
**retail (1)**
96:8
**retailer (2)**
77:5;78:21
**review (2)**
107:15;108:3
**reviewed (2)**
95:22;108:6

right (32)
7:13,19;10:8;
21:11;24:19;43:17;
44:11;45:22;50:10,
11;51:10;56:20;68:7;
71:4;77:4;81:3,12;
84:13;89:14;99:10;
100:14;102:16;
108:15;111:2;112:7,
16;113:3;117:8,13,
23;121:17;128:16
**ring (1)**
129:23
**ringing (2)**
49:23;101:5
**role (3)**
16:21,25;128:19
**room (6)**
7:25;41:20;43:22;
87:15;93:21;94:9
**rude (1)**
105:24
**rug (1)**
83:16

## S

**safety (1)**
42:3
**salary (20)**
31:16;33:14;35:7;
37:14,15;38:11;
68:12;101:18,23;
102:23;109:15,17;
110:17,20;111:19;
112:12;116:24,25;
122:12,14
**sales (10)**
50:21,25;54:3;
55:12;95:10,17,18,
20,23;127:17
**same (16)**
5:14;24:16;26:13,
14;28:14;30:11,14,
17;33:11;44:3;52:4,
5;57:3;111:8,18;
129:21
**sat (1)**
7:25
**Savoretti (4)**
83:4;85:8,19;87:17
**saw (1)**
29:14
**saying (5)**
33:8,9;35:23;
46:23;91:25
**scale (1)**
91:12
**schedule (9)**
40:12,14,20,24;
76:22;77:17;84:24;
89:23;123:11
**scheduled (6)**

41:9;82:20;84:20;
101:17;102:14;
109:19
**scheduling (2)**
41:25;90:10
**school (8)**
77:2,21,25;78:19;
123:18,21;124:4,6
**scope (1)**
92:4
**scratch (2)**
117:21;125:8
**sealing (1)**
5:5
**search (1)**
105:4
**season (6)**
77:11,12;78:17,19,
22;123:21
**seasonal (2)**
54:22;77:6
**second (12)**
22:11;24:25;69:21;
98:12;103:6,7;
111:10;112:5,9;
115:6,20;125:5
**section (3)**
44:21;85:3;121:18
**seek (2)**
14:23;129:9
**seeking (1)**
25:21
**seem (1)**
71:4
**seems (3)**
50:5;73:9;79:12
**selling (1)**
85:24
**senior (11)**
51:19,21;52:2,7,20,
23;53:2,16;72:15;
81:25;84:25
**sense (3)**
89:2,10;127:16
**sent (1)**
55:7
**sentence (3)**
103:7;110:16;
111:18
**September (2)**
103:21;104:8
**sequentially (1)**
63:20
**service (3)**
23:16;33:13;
113:12
**set (6)**
24:14;28:19,21;
32:14,23;94:17
**seven (7)**
45:22,23;52:9;
54:10;77:9;125:16,
17

**shadow (2)**
46:20,22
**shadowing (3)**
47:5,7,17
**shall (1)**
5:9
**Shari (1)**
6:13
**shift (15)**
27:17,17;38:19,23;
39:2,3,12,16;45:3,4,
5,8,25;46:4;101:17
**shifts (2)**
46:7,8
**shop (2)**
100:23,24
**shopped (1)**
101:7
**Short (1)**
24:23
**show (3)**
59:19;69:15,23
**sick (6)**
103:9,10;104:3,4;
122:16,19
**side (8)**
28:20,24;54:16,18,
19,25;55:4;85:9
**sides (1)**
8:19
**sign (25)**
19:5,8,9,22;20:13;
42:13,16;62:3;65:9,
19;66:5;67:18;84:15,
15,22;95:2,4,5,7,8;
97:19;119:6;124:16;
127:17;128:10
**signature (20)**
61:22;62:20;64:22;
65:13,24;66:10,24;
67:3,8,10,11,13,14;
84:14;86:21;97:13,
18;124:15,15,16
**signed (22)**
5:13,15,20:17;
21:14,15;62:7,12,17,
21;79:15,19;80:7;
97:15,18,20;111:2,4,
13;112:6;119:9;
128:14;131:20
**significant (1)**
95:10
**signing (6)**
19:24;21:17;79:14;
85:14;119:18,21
**signs (2)**
85:9;129:24
**similar (2)**
98:19;100:8
**simply (1)**
112:16
**sit (2)**
11:16;74:25

**site (2)**
56:23,25
**sitting (1)**
79:8
**Six (7)**
39:9,10;52:9;
56:12;77:9;106:18;
124:11
**Sixth (1)**
41:6
**slack (1)**
81:3
**smart (4)**
104:22;106:11,12,
14
**snapshot (1)**
51:8
**snow (2)**
82:12,18
**somebody (3)**
24:21;43:22;46:25
**someone (9)**
25:9;46:15;51:16;
79:4,14;80:7;81:2;
106:19;129:9
**sometimes (11)**
75:14,16;77:2,7,9,
15;78:18;127:18;
129:22,22,23
**somewhere (1)**
123:13
**Sorry (17)**
18:7,17;19:17;
36:13;40:6;53:12;
60:22;78:12;82:13;
87:3;90:6;92:8;
98:13;103:6;110:13;
122:3;124:7
**sort (6)**
43:24;47:13;63:6;
67:22;85:16;120:15
**sorts (1)**
70:18
**source (1)**
102:12
**space (2)**
29:25;67:3
**speak (16)**
26:11;32:6;71:17;
72:11,14,18;73:2,3;
85:8;88:25;89:3,5;
90:7;96:8;108:25;
129:12
**specific (4)**
15:14;86:24;88:10,
11
**Specifically (2)**
96:10;126:11
**spell (1)**
53:4
**spent (1)**
35:11
**spoke (18)**

20:22;24:15,17;
25:16;26:11,19;
30:14;33:13;70:7;
71:21;79:22,23;88:8,
24;93:5,7;94:2;96:6
**spoken (2)**
81:11;85:4
**ss (1)**
131:4
**staff (1)**
85:24
**standards (2)**
27:12;85:14
**start (11)**
11:10;30:22;39:4,
5,6;44:16,18;89:10;
92:9;119:2;120:12
**started (11)**
16:14;40:18;41:18;
45:9,11,16;46:14;
52:15,21;56:15,24
**starting (2)**
77:13;120:11
**starts (2)**
28:6;68:9
**state (3)**
6:19;131:3,25
**stated (3)**
25:17;79:22;104:7
**statement (7)**
69:17;100:10;
102:8,11;109:23;
110:6,15
**statements (1)**
69:12
**stayed (1)**
16:18
**step (2)**
28:15;76:17
**STIPULATED (3)**
5:3,7,11
**stock (8)**
87:15;93:21;94:9;
96:3,11,17;127:18;
129:23
**stocking (2)**
49:21;101:6
**stocks (3)**
88:16,19,22
**store (115)**
13:5,7,8;15:16;
17:8,11;22:13,14,16,
18,20,21;23:3,6,7,11,
15;24:19,21;26:22;
28:20,25;29:2,4,15,
22;33:2,3;37:13;
41:11;43:18;44:16;
48:3,4,6,8,9,10,11,13,
18,24;49:20,25;50:3,
6,13,20;51:3,8,20,22;
52:2,6,10,11,12,13,
14,17,18,21,23;53:3,
7,9,15,21,22;64:9,11,

15;70:12,15;72:14;
75:13;78:2;79:2;
82:6,7,21;83:6,8;
85:10;87:18;88:2,2;
95:18;96:25;98:20,
20;99:9,17,18,21,22;
100:3,3,9,9,14,16,20;
101:2,3,7,10;113:13;
115:8;123:3;125:9;
126:3;127:3;128:23;
129:16
**stored (2)**
106:4,14
**stores (14)**
49:2,18;98:21,22,
25;99:5,7,10,13,13,
21;100:23,24;101:3
**Street (7)**
13:9;22:17,22;
25:7;37:13;41:6,10
**strengths (1)**
8:23
**Stub (6)**
63:12;68:18,24;
69:6;121:12,21
**stuck (1)**
82:12,18,22
**subject (2)**
122:15,18
**subjects (1)**
41:23
**submitted (1)**
23:11
**subscribed (1)**
131:20
**subsequently (4)**
40:16,17;96:15;
98:4
**suffer (1)**
12:9
**sufficient (1)**
21:10
**SULDS (97)**
6:24;7:1,11;19:11,
14,19;20:3;57:14;
58:24;61:14;63:9,19;
73:13;74:9;81:14;
84:3;86:14;91:21;
97:5;104:10;112:19;
113:9,19,24;114:5,
10,14,19,23;115:3,7,
12,16,21,25;116:6,
11,13,17,23;117:2,9,
14,18,24;118:5,10,
15,20,23;119:4,8,13,
20;120:5,19,24;
121:5,14,24;122:10,
20,24;123:6,10,17,
22;124:2,5,18,22;
125:2,4,11,15,22,25;
126:5,9,13,17,25;
127:12,15,20,25;
128:5,11,15,21;

129:2,5,11,15,19;
130:4,8
**S-U-L-D-S (1)**
7:1
**summer (1)**
54:21
**suntan (1)**
85:10
**supply (2)**
94:23;127:17
**supposed (4)**
25:5,8,10;97:2
**sure (15)**
7:19;11:13;21:9;
24:18;56:19;67:7;
69:22;85:24;86:2;
88:10;89:9;95:6,19;
103:17;122:11
**Suzanne (9)**
70:7;71:8;72:6;
73:4,6;79:2,4,23;
80:11
**swear (1)**
7:3
**sweep (1)**
129:23
**sweeping (1)**
49:22
**swipes (1)**
86:12
**swore (1)**
21:20
**sworn (3)**
5:12,15;7:6

**T**

**talk (12)**
30:13;31:16,25;
38:13,17;71:19;
85:19;88:3;94:21;
97:2;109:5;115:18
**talked (9)**
24:22;38:14,15;
39:18;43:23;82:16;
92:12;95:17,19
**talking (2)**
85:20;127:9
**task (1)**
89:11
**tasks (4)**
89:13,16,22,23
**team (4)**
28:7;86:25;87:4;
94:6
**telephone (3)**
35:17;37:8;40:22
**telling (3)**
110:25;126:18,20
**tells (2)**
69:17,24
**ten (5)**
15:9,10;36:2;45:5;

57:10
**Ten-and-a-half (1)**
44:24
**tenure (1)**
16:22
**term (6)**
8:14;28:4;46:22;
51:21;76:9;87:4
**terms (2)**
50:20;128:19
**testified (10)**
7:8;8:4;74:6;
106:22;118:25;
119:25;124:14;
125:7,19;127:5
**testify (1)**
9:21;106:21;
120:17
**testifying (1)**
91:25
**testimony (8)**
8:2;9:6,24;39:16;
43:16;75:7;131:8,11
**Thanksgiving (1)**
54:22
**thinking (2)**
39:4;58:5
**third (6)**
67:22;97:12;
115:23;116:15,18;
122:9
**Thomas (1)**
6:7
**Thompson (5)**
52:16;82:4,5,10,16
**though (1)**
31:14
**thought (3)**
73:6;90:19,25
**three (13)**
34:12;35:3,23;
39:5,10;43:9;44:10;
45:3,12;46:11;
114:11;117:6;130:13
**throughout (7)**
45:15;52:18;64:14;
81:6;101:15;102:20;
123:2
**time-and-a-half (1)**
38:2
**times (8)**
38:7,8;75:17,20,
23;76:2;77:3;111:25
**titled (1)**
121:11
**TJ (8)**
12:20,22,23,25;
13:4,12;14:3,7
**today (8)**
8:8;9:22;10:4;
21:20;106:22;107:6;
108:11;109:3
**today's (1)**

130:10
**together (1)**
35:21
**told (19)**
22:3;25:17,25;
27:25;28:5;33:20;
37:13,23;77:10;
80:21;83:20,23;
89:12;96:12;99:8;
108:13;111:24;
113:10,12
**tolerated (1)**
95:14
**took (3)**
35:16;58:7;103:9
**total (1)**
43:4
**Towards (1)**
86:8
**towed (1)**
82:23
**Toys (14)**
15:5,7,11,12,19,25;
16:4,8;30:20,24;
31:12;33:18;38:25;
39:7
**train (1)**
47:9
**trained (1)**
46:24
**training (6)**
47:8,13,17,21,22,
23
**transcript (2)**
131:8,10
**transitions (1)**
77:6
**Traurig (2)**
6:10,25
**trial (1)**
5:10
**true (3)**
109:22;131:10,12
**truth (3)**
21:20;110:3,5
**truthful (1)**
9:17
**truthfully (4)**
11:15,22;12:16;
75:4
**try (1)**
11:12
**trying (3)**
51:7;95:19;105:3
**two (27)**
30:13;35:17;40:10;
41:3;43:9;44:10;
47:9;49:18;55:4,11;
56:11;57:4,21;59:17,
24;60:9;61:12;69:9;
86:10;94:23;99:9,13;
104:11;112:11;
124:7,8;128:8

type (2)
27:12;106:17
typical (1)
52:7

**U**

**Um-hum (2)**
60:12;101:19
**under (10)**
8:2;9:4;21:17,20;
65:13;66:11;67:22;
103:9;110:14;131:9
**underneath (1)**
68:7
**understood (2)**
43:16;77:10
**University (1)**
18:14
**unless (3)**
34:10;101:17;
102:14
**unprecedented (1)**
95:23
**up (40)**
23:24;24:14;26:6;
28:19,22;32:9,14,23;
35:11;36:22;49:23;
78:18,20,21;81:3,12,
21;83:15;85:9;88:11,
21;89:13;91:9,11,16;
92:5,10,16,17,21;
94:5,17;95:20;102:5;
103:8;104:3;108:12;
113:6;129:20,22
**ups (1)**
103:24
**upstairs (1)**
55:8
**urgency (3)**
89:2,10;127:16
**use (3)**
46:22;102:5,17
**used (1)**
33:16
**utilized (2)**
90:16;96:4

**V**

**vacation (3)**
102:6,18;103:3
**vacations (2)**
78:3,10
**varied (2)**
45:16;56:15
**various (1)**
94:5
**vary (2)**
123:5,8
**verbal (1)**
88:23
**verbalize (1)**

10:10
**verbally (1)**
109:14
**versus (1)**
6:7
**via (2)**
109:14;111:24
**video (1)**
10:12
**VIDEOGRAPHER (11)**
6:2,15;7:2;10:11;
57:16,20;73:16;
74:10;104:12,16;
130:9
**visiting (1)**
101:4
**voluntarily (1)**
14:24

**W**

**wage (1)**
31:17
**waiting (1)**
80:11
**waived (1)**
5:6
**walk (4)**
93:16;95:2,4,5
**walking (1)**
85:23
**wall (7)**
88:17,19,22;96:4,
11,17;127:19
**warehouse (3)**
55:8,10,13
**way (12)**
9:21;50:20;64:7;
73:7;76:18;80:10;
83:14;88:12;90:19;
106:21;108:4;120:13
**weaknesses (1)**
8:24
**week (41)**
14:7;15:19;17:12,
20;28:18;29:9,11;
31:11,13;40:18;43:7;
46:3,9;52:7;68:14,
17;75:14,18,21,24;
76:3,5,6,6,13,20,24;
77:14;94:23;110:18,
22;111:21;112:14;
122:13,14,15;123:4,
8,9,23;124:6
**weekly (6)**
68:12;110:17;
111:19;112:10,11;
123:12
**weeks (6)**
32:14;35:24;40:11;
69:9;124:7,8
**weren't (1)**
96:22

west (1)
28:20,24
**Westchester (1)**
99:5
**Whaley (150)**
6:6;7:12;8:1;9:1;
10:1;11:1;12:1;13:1;
14:1;15:1;16:1;17:1;
18:1;19:1;20:1,4,5;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1,22;58:1,3;59:1,
2;60:1;61:1,16;62:1;
63:1,3,5,7;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1,
13;75:1;76:1;77:1;
78:1;79:1;80:1;81:1,
16;82:1;83:1;84:1,5,
8;85:1;86:1,16;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1;95:1;
96:1;97:1,7;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1,
19;105:1;106:1;
107:1;108:1;109:1;
110:1;111:1;112:1;
113:1,2,4;114:1;
115:1;116:1;117:1;
118:1;119:1;120:1;
121:1;122:1;123:1;
124:1;125:1;126:1;
127:1;128:1;129:1;
130:1,11;131:7,17
**What's (9)**
18:11;19:11;48:2;
64:21;78:22;91:21,
23;101:20;102:12
**who's (3)**
11:13;109:2;128:9
**whose (1)**
66:21
**within (12)**
5:6,12;12:7;23:14;
29:25;33:3;47:18;
89:11;92:4,20;94:18;
96:24
**without (1)**
108:5
**witness (6)**
7:4,6;11:13;107:6;
108:3;112:20
**woman (2)**
85:20;86:4

DANYELL THOMAS, ET AL. VS.
BED BATH AND BEYOND, INC.

ANDRAE WHALEY
July 19, 2017

**words (1)**
33:15
**work (66)**
14:6,10;15:4,6,18;
16:9,16;17:11,20;
32:2;34:17;37:20;
38:18;39:17;43:7,12,
13;44:23;48:5,18;
49:19;54:7;57:3;
68:15;76:5,19;77:9,
14;82:20,25;83:2,11;
90:25;91:4;98:20,24;
99:4;100:3;101:6,16,
22;102:13;109:16,
18;110:19,21;111:21,
22;112:14;114:3,4,
22;115:10,19;116:5;
117:13;118:4;
122:13,14,15;123:25;
124:9;125:9;127:17;
129:18;130:5
**worked (35)**
14:9,11;15:3,5;
16:10;17:10,18;22:3;
24:10;39:8;48:12;
49:3,8;50:17,22;
54:4;55:17;57:9;
68:4,13,16;75:14,18,
21,24;76:3;98:2;
99:7;100:17;110:18;
111:20;112:2,12;
123:4;125:14
**working (12)**
16:8;31:10;38:24,
24;44:16,18;45:9;
57:9;119:2;120:13;
124:11;126:19
**workweek (5)**
45:15;50:17;51:2,
5;109:17
**wound (1)**
102:5
**write (7)**
20:19,21;60:23;
81:21;88:21;103:8,
24
**writes (1)**
104:2
**writing (3)**
9:9;61:3;68:7
**written (4)**
81:12;109:15;
111:24;123:11
**wrong (3)**
43:18;88:12;
112:16
**wrote (3)**
109:20;112:15;
129:7

## Y

**year (15)**

15:8,9,10;16:14,
19;18:15,17;32:17;
48:21;56:12;71:9;
79:12;86:10;95:24;
106:18
**years (3)**
16:11;55:11;56:11
**Yep (1)**
91:6
**York (2)**
6:11,12

## 1

**1 (7)**
20:4,5,9;62:23;
98:10;112:11;120:8
**1.5 (1)**
118:11
**1/1/13 (2)**
66:2,6
**1/21/14 (1)**
67:15
**1/4/12 (2)**
65:16,20
**1:00 (1)**
73:19
**1:02 (1)**
73:17
**1:50 (2)**
74:3,10
**10 (6)**
56:16,17;81:15,17,
19;84:21
**10166 (1)**
6:12
**11 (5)**
39:6;84:4,6,9;
128:7
**11/4/14 (1)**
85:4
**11:30 (2)**
45:6,7
**11:37 (1)**
6:4
**12 (3)**
86:14,17,19
**12:34 (1)**
57:17
**12:39 (1)**
57:23
**13 (3)**
97:6,8,10
**14 (3)**
56:16,17;57:10
**18 (2)**
98:15;100:7
**1-800 (1)**
71:25
**18th (7)**
22:17,21;25:7;
37:13;41:6,10;
119:22

**19 (7)**
6:4;57:17,23;
73:17;74:11;104:13;
130:12

## 2

**2 (10)**
58:24;59:2,7;60:7;
105:17;106:5,15;
107:12;108:14;
112:12
**2:32 (1)**
104:12
**2:37 (1)**
104:16
**20 (3)**
30:11;56:4;73:15
**200 (1)**
6:11
**2000 (1)**
18:16
**2002 (1)**
16:13
**2009 (2)**
16:19;18:18
**2011 (8)**
14:18;48:16;71:10,
10;79:25;80:3,4;
119:22
**2012 (6)**
49:10,13;71:10;
80:3,5;102:3
**2014 (4)**
48:22;103:8,18;
104:9
**2016 (5)**
14:19;48:16;95:9,
22;97:16
**2017 (8)**
6:4;57:17,23;
73:17;74:11;104:13;
130:12;131:21
**21 (6)**
13:14,17,21,23;
14:10,23
**22 (2)**
101:14;102:12
**23 (2)**
102:19;103:5
**231 (1)**
59:18
**237 (1)**
59:19
**24 (4)**
11:25;12:4,7;103:6
**24th (1)**
95:22
**25 (2)**
27:5;30:12

## 3

**3 (9)**
39:8;61:14,16,19;
112:3,6;119:16;
122:2,5
**3:05 (2)**
130:11,14
**30 (3)**
27:5;50:18;51:12
**361 (5)**
33:2,3;49:6,9;50:9
**365 (1)**
50:9

## 4

**4 (11)**
63:9,11,13,15;
68:20;69:5;119:25;
120:18,23;121:4,10
**40 (17)**
14:6;15:18,22;
17:12,15,20,23;
31:10;37:24;38:7;
68:4,17;103:10;
104:4;112:13;118:7;
122:15
**40,000 (1)**
34:14
**400 (2)**
51:6,10
**42 (35)**
22:20,21;23:3;
24:19;29:15;48:4,13;
50:5,15,17;51:3,8;
52:8,14,18,21;53:9,
17,25;64:9,11,15;
70:12,15;75:13;79:2;
82:7;96:25;99:8,22;
100:3,14;123:3,3;
125:9
**45 (1)**
31:13
**47 (1)**
37:21
**47.5 (8)**
37:23;76:23,25;
77:18,18;118:6;
123:12;124:9
**47-and-a-half (2)**
75:14;76:20

## 5

**5 (11)**
63:20,21;64:22;
79:13,19;110:11,12;
111:2,9;121:7,16
**5:30 (4)**
45:4,12;82:21;
84:20
**50 (5)**
75:18;76:3;77:14;
123:13,14

**50,000 (1)**
34:14
**51 (2)**
123:13,14
**52 (1)**
123:14
**55 (2)**
75:21;124:10
**565 (10)**
29:5,6,15,18,23,25;
31:16;49:6,11;115:8
**57th (2)**
13:8,10,11

## 6

**6 (10)**
39:8;63:20,23;
65:12;79:13,19;
97:16;111:4,7;121:7
**60 (2)**
75:24;77:14
**63,000 (2)**
37:18;117:3
**65 (1)**
33:21
**65,000 (1)**
31:6
**66,000 (2)**
31:6;33:21

## 7

**7 (18)**
20:13;38:10;45:4,
12;63:20,25;65:22;
66:5;79:13,19;80:7;
82:21;84:20;109:11;
110:6;111:13;
112:15;121:7
**7.5 (1)**
38:10
**7/18/11 (3)**
61:24;65:4,10
**76 (2)**
59:18;69:16
**77A (1)**
69:23

## 8

**8 (6)**
63:20;64:3;66:8;
79:19;121:7;124:12
**8/09/13 (1)**
67:8
**8/9/13 (2)**
66:13,17
**8:30 (2)**
45:5;84:21
**81 (1)**
59:18

**9**

**9 (18)**
   62:24;63:16,20;
   64:5;67:2,12,19,22,
   22;79:20;111:14;
   120:3,7,9,22;121:3,8,
   17

# EXHIBIT 2

CO.   FILE   DEPT.   CLOCK   NUMBER
1NU   043547  NY0042         0903662285   1

**Earnings Statement**



051-0038

BED BATH & BEYOND INC.
PO BOX 3759
UNION, NJ 07083-3759
ATTN: PAYROLL DEPT

| Period Beginning: | 10/12/2014 |
| Period Ending: | 10/25/2014 |
| Pay Date: | 10/30/2014 |

Taxable Marital Status:   Single
Exemptions/Allowances:
  Federal:    3
  NY:       3
  New York Cit:  3

RADICA KUTWARU
3605 HOLLAND AVE
BRONX NY 10467

Social Security Number: XXX-XX-XXXX

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | | | 2,040.74 | 44,361.28 |
| Fluctuating O T | | | 185.29 | 3,896.28 |
| Week 1 Regula | | 47.98 | | |
| Week 2 Regula | | 49.80 | | |
| Retro Pay | | | | 64.35 |
| **Gross Pay** | | | **$2,226.03** | 48,321.91 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -228.18 | 3,653.60 |
| | Social Security Tax | -138.01 | 2,903.46 |
| | Medicare Tax | -32.28 | 679.04 |
| | NY State Income Tax | -96.85 | 1,905.77 |
| | New York Cit Income Tax | -60.41 | 1,192.91 |
| | NY SUI/SDI Tax | -1.20 | 26.40 |
| | **Other** | | |
| | 401K | -133.56* | 2,899.31 |
| | **Net Pay** | **$1,535.54** | |
| | **Net Check** | **$1,535.54** | |

\* Excluded from federal taxable wages.

Your federal taxable wages this period are
$2,092.47

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Total Hours | 97.78 | |

**Important Notes**
YOUR COMPANY'S PHONE NUMBER IS 908-688-0888

NOTE: Due to rounding in the calculations below, the figures
below may vary slightly from the actual dollars paid.

**FLUCTUATING OVERTIME BREAKDOWN (FL-OT)**

| Week | Hours | Rate | Tota |
|---|---|---|---|
| WK 1 HRS @ FL-OT | 7.98 | 10.6333 | 84. |
| WK 2 HRS @ FL-OT | 9.80 | 10.2446 | 100. |

p00133 RK

# **<u>EXHIBIT 3</u>**

1NU 104996 NY0361      0000106943
125-0295

# Earnings Statement

**ADP**

BED BATH & BEYOND INC.
PO BOX 3759
UNION, NJ 07083-3759
ATTN: PAYROLL DEPT

| | |
|---|---|
| Period Beginning: | 02/17/2014 |
| Period Ending: | 03/02/2014 |
| Pay Date: | 03/06/2014 |

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 0
NY: 0
New York Cit: 0

Social Security Number: XXX-XX-XXXX

ELIZABETH PADILLA
131 LORRAINE STREET
APT.2D
BROOKLYN, NY 11231

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | | | 1,789.80 | 5,794.43 |
| Fluctuating O T | | | 141.30 | 433.76 |
| Week 1 Regula | | 47.50 | | |
| Week 2 Regula | | 47.50 | | |
| **Gross Pay** | | | **$1,931.10** | 6,228.19 |

Your federal taxable wages this period are
$1,747.80

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Total Hours | 95.00 | |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -255.95 | 798.67 |
| | Social Security Tax | -116.75 | 374.83 |
| | Medicare Tax | -27.30 | 87.66 |
| | NY State Income Tax | -82.06 | 250.14 |
| | New York Cit Income Tax | -51.46 | 158.07 |
| | NY SUI/SDI Tax | -1.20 | 4.80 |
| | **Other** | | |
| | Checking | -1,076.00 | |
| | Dental | -9.86* | |
| | Medical | -63.26* | |
| | 401K | -135.18* | 435.97 |
| | 401K Loan | -137.08 | |
| | **Adjustment** | | |
| | Annual Phys Cr | +12.50* | |
| | Prev Screen Cr | +12.50* | |
| | **Net Pay** | **$0.00** | |

\* Excluded from federal taxable wages

**Important Notes**

YOUR COMPANY'S PHONE NUMBER IS 908-688-0888

NOTE: Due to rounding in the calculations below, the figures
below may vary slightly from the actual dollars paid.

**FLUCTUATING OVERTIME BREAKDOWN (FL-OT)**

| Week | Hours | Rate | Total |
|---|---|---|---|
| WK 1 HRS @ FL-OT | 7.50 | 9.4199 | 70.6 |
| WK 2 HRS @ FL-OT | 7.50 | 9.4199 | 70.6 |

POOO32 EP

# **<u>EXHIBIT 4</u>**

**MASHEL LAW, L.L.C.**
**500 Campus Drive, Suite 303**
**Morganville, New Jersey 07751**
**(P): (732) 536-6161**
**(F): (732) 536-6165**
**(E): smashel@mashellaw.com**
**Attorneys for Plaintiffs Brent Carter,**
**Robert Haynes and Kenneth Cuoco**

By:   **STEPHAN T. MASHEL, ESQUIRE**
       **N.J. ID. No.: 031851986**

| | |
|---|---|
| **BRENT CARTER, ROBERT HAYNES,** and **KENNETH CUOCO**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**BED BATH & BEYOND, Inc.**, a New York Corporation<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION MIDDLESEX COUNTY<br><br>DOCKET NO: MID-L-6178-16<br><br>**Civil Action**<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT** |

## INTRODUCTION

1.       This is a class action brought by Plaintiffs, Brent Carter ("Plaintiffs" or "Carter"), Robert Haynes ("Plaintiffs" or "Haynes") and Kenneth Cuoco ("Plaintiffs" or "Cuoco"), on behalf of themselves and all similarly situated current and former employees who worked in stores located in New Jersey operated by Defendant Bed Bath & Beyond, Inc. ("BBB") to recover for Defendant's failure to pay overtime wages in violation of The New Jersey Wage and Hour Law N.J.S.A., 34:11-56.1 to -56.12 ("NJWHL").

2.     Plaintiffs, and those similarly situated, were subjected to Defendant BBB's policy and practice of failing to pay overtime at a rate of one and one-half times their regular rate for hours worked in excess of forty (40) hours during a workweek.

3.     The proposed Class consists of all persons employed by Defendant BBB in New Jersey who worked as either a Department Manager ("DM") and/or as a Customer Service Representative ("CSR") and/or as an Assistant Store Manager ("ASM") at any time two years prior to the filing of this action throughout the entry of judgment who worked over 40 hours per week and were not paid overtime pay at a rate of one and one half times their regular rate for hours worked in excess of 40 hours during a workweek (hereinafter the proposed "Class").

4.     Specifically, Plaintiffs complain that rather than Defendant BBB paying Plaintiffs and all other members of the proposed Class overtime pay at a rate of one and one-half times their regular rate for hours worked in excess of forty (40) hours during a workweek as is required by the NJWHL, BBB instead unlawfully paid the proposed Class members overtime pay based on a calculation which divided an employee's base weekly salary by all hours worked in the week divided by 2 multiplied by all hours worked over 40 in the week. Put differently, BBB used the following "Fluctuating OT" formula to improperly calculate the proposed Class members overtime pay:

$$\frac{\text{Base weekly salary}}{\text{All hours worked}} \div 2 \quad \times \quad \text{all hours worked over 40 in the week} \quad = \quad \text{additional pay}$$

5.     Defendant BBB unlawfully applied the Fluctuating OT formula to avoid paying the DMs, CSRs and ASMs overtime compensation required under the NJWHL, to wit, overtime pay at a rate of one and one half times their regular rate for hours worked in excess of forty (40) hours during a work week.

6.      To remedy their damages, Plaintiffs bring this action as a state class action pursuant to New Jersey Rule of Court R̲. 4:32-1 (Rule 32).

7.      Plaintiffs contend that Defendant BBB's improper classification resulted in the failure to properly compensate its DMs, CSRs and ASMs overtime pay as required under the NJWHL.

8.      Plaintiffs seeks a declaration that their rights, and the rights of other Class members, were violated, an award of unpaid wages, an award of liquidated and compensatory damages, and an award of attorneys' fees and costs to make them whole for damages suffered.

## PARTIES

9.      Plaintiff, Brent Carter, is an individual who resides in Union County, New Jersey. Plaintiff worked for the Defendant BBB as a Customer Service Representative and DM.

10.     Plaintiff, Robert Haynes, is an individual who resides in Middlesex County, New Jersey.   Plaintiff worked for the Defendant BBB in New Jersey as a ASM.

11.     Plaintiff, Kenneth Cuoco, is an individual who resides in Sussex County, New Jersey. Plaintiff worked for the Defendant BBB in New Jersey as a DM.

12.     Defendant, BBB, is a New York corporation with its principal executive offices located at 650 Liberty Avenue, Union, New Jersey 07083.

13.     The following is believed to accurately describe Defendant BBB:

Bed Bath & Beyond Inc., incorporated on October 5, 1971, is a retailer, which operates under the names Bed Bath & Beyond (BBB), Christmas Tree Shops, Christmas Tree Shops and That! or and That! (collectively, CTS), Harmon or Harmon Face Values (collectively, Harmon), buybuy BABY (Baby) and World Market, Cost Plus World Market or Cost Plus (collectively, Cost Plus World Market). The Company operates in two segments: North American Retail and Institutional Sales.

The Company's customers can purchase products from the Company either in-store, online, with a mobile device or through a contact center. The Company also operates Linen Holdings, a provider of a range of textile products, amenities and other goods to institutional customers in the hospitality, cruise line, healthcare and other industries. Additionally, the Company is a partner in a joint venture, which operates approximately seven retail stores in Mexico under the name Bed Bath & Beyond.

The Company sells a range of domestics merchandise and home furnishings. Domestics merchandise includes categories, such as bed linens and related items, bath items and kitchen textiles. Home furnishings include categories, such as kitchen and tabletop items, fine tabletop, basic housewares, general home furnishings, consumables and juvenile products.

The Company operates approximately 1,530 stores plus its various Websites, other interactive platforms and distribution facilities. The Company's over 1,530 stores operate in approximately 50 states, the District of Columbia, Puerto Rico and Canada, including over 1,020 BBB stores, approximately 280 Cost Plus World Market stores, over 100 Baby stores, approximately 80 CTS stores and over 50 Harmon stores. The Company's stores range in size from approximately 5,000 to 100,000 square feet. The Company has distribution facilities, which ship merchandise to stores and customers, totaling approximately 6.1 million square feet consisting of over three owned and approximately 10 leased facilities. The Company has approximately 813,000 square feet within over 20 leased and owned facilities for procurement and corporate office functions. In addition, the Company has over seven locations, totaling approximately 14,000 square feet, which are utilized primarily for institutional sales related functions.[1]

## **ALLEGATIONS AS TO BRENT CARTER**

14.     Defendant employs several different types of workers, including but not limited to Department Managers, Customer Service Representatives, Assistant Store Managers, Store Managers, and other corporate employees.

15.     In or about December 2010 Plaintiff Carter was hired by Defendant BBB and was assigned to work in their Totowa, New Jersey store as a DM and worked there as a DM until in or about July 2011.

---

[1] http://www.reuters.com/finance/stocks/companyProfile?symbol=BBBY.O

16.     Thereafter, Plaintiff Carter worked as a DM in BBB's Watchung, New Jersey store from July 2011 through in or about July 2014.

17.     Thereafter, Plaintiff Carter worked as a DM in BBB's Totowa, New Jersey store from July 2011 through in or about July 2014.

18.     Thereafter, Plaintiff Carter worked as a DM and/or CSR in BBB's Bridgewater, New Jersey store from July 2014 through April 2015.

19.     The job duties of a DM and CSR are substantially similar and include, but are not limited to unloading freight, stocking product, stocking merchandise, assisting customers, cashier services, clean, organize and fixing stock room, gift packaging, getting together orders for online pick up, packing, sorting and shipping damaged goods, going outside to shipping trailers and getting items to replenish the store with, mopping and sweeping the store floor, cleaning the bathroom, organizing the sales floor and ordering merchandise.

20.     Plaintiff Carter's primary duties as a DM and/or CSR did not include: hiring, firing, managing or disciplining other employees.

21.     Plaintiff Carter's duties as a DM and/or CSR did not differ substantially from the duties of normal hourly paid store employees, who also perform many of the responsibilities previously described.

22.     Plaintiff Carter did not exercise a meaningful degree of independent discretion with respect to the exercise of his duties as a DM and/or CSR.

23.     Consistent with Defendant's policy and pattern or practice, Plaintiff Carter regularly worked in excess of 40 hours per work week without being paid a legally required overtime rate of 1.5 times his regular rate of compensation for the hours he worked in excess of 40 hours per work week.

24.     Defendant knew that the improper payment of overtime pay would financially injury

Plaintiff Carter and similarly situated employees and violate New Jersey state law.

25.     Throughout his employment with Defendant BBB as a DM and CSR, Plaintiff Carter regularly worked in excess of 40 hours per week.

26.     As a DM and/or CSR in Bridgewater, New Jersey from July 2014 until April 2015, Plaintiff was paid a base salary approximating $65,000 per year.

27.     As a DM and./or CSR, Defendant failed to pay Plaintiff Carter overtime pay at a rate of one and one-half times their regular rate for hours worked in excess of 40 hours during a workweek as required under New Jersey state law.

## ALLEGATIONS AS TO ROBERT HAYNES

28.     Plaintiff Haynes was hired by Defendant BBB in August 2013 as a DM and assigned to work in its Brick, New Jersey store there until August 2014.

29.     Thereafter, Plaintiff Haynes worked for Defendant BBB as a DM in its Brick, New Jersey store from in or about August 2014 through in or January 2014.

30.     Thereafter, Plaintiff Haynes worked for Defendant BBB as a DM in its Hamilton, New Jersey store from in or about January 2014 through in or about May 2014.

31.     Thereafter, Plaintiff Haynes worked for Defendant BBB as a DM in its Bridgewater, New Jersey store from in or about May 2014 through in or about July 2014.

32.     Thereafter, Plaintiff Haynes worked for Defendant BBB as a DM in its Watchung, New Jersey store from in or about July 2014 through in or about August 2014.

33.     Thereafter, Plaintiff Haynes worked for Defendant BBB as a ASM in its Watchung, in August 2014 for approximately three (3) weeks.

34.     Thereafter, Plaintiff Haynes worked for Defendant BBB as an ASM in its Bridgewater, New Jersey store from August 2014 through March 2016.

35.     The tasks that Plaintiff Haynes performed as an ASM were substantially the same as the responsibilities of a DM or CSR with the addition that as an ASM Plaintiff Haynes had was able to approve merchandise orders, order supplies and open and close stores.

36.     Despite the fact that his responsibilities as an ASM were substantially the same as a DM or CSR, Plaintiff Haynes was classified by BBB as an employee exempt from receiving overtime pay, and therefore, did not receive overtime compensation for the hours he worked in excess of 40.

37.     Plaintiff Haynes' primary duties as ASM did not include: hiring, firing, managing or disciplining other employees.

38.     Plaintiff Haynes' duties as ASM did not differ substantially from the duties of normal hourly paid store employees, who also perform many of the responsibilities previously described.

39.     Plaintiff Haynes did not exercise a meaningful degree of independent discretion with respect to the exercise of his duties.

40.     Consistent with Defendants policy and pattern of practice, Plaintiff Haynes regularly worked in excess of 40 hours per work week without being paid a premium overtime rate of 1.5 times of the respective regular rate of compensation for the hours he worked in excess of 40 per work week.

41.     Defendant knew that the improper payment of overtime pay would financially injure Plaintiff Haynes and similarly situated employees and violated state and federal laws.

42.     Throughout his employment with Defendant BBB as a DM, Plaintiff regularly worked in excess of 40 hours per week.

43.     At the time Plaintiff Haynes worked as an ASM in BBB's Bridgewater, New Jersey store, he regularly worked in excess of forty (40) hours in a week.

44.     At the time Plaintiff Haynes worked as an ASM in BBB's Bridgewater, New Jersey store, he was paid a base salary approximating $69,700 per year.

45.     As an ASM, Defendant failed to pay Plaintiff Haynes overtime pay at a rate of one and one-half times their regular rate for hours worked in excess of 40 hours during a workweek, as required under New Jersey state law.

## ALLEGATIONS AS TO KENNETH CUOCO

46.     Plaintiff Cuoco was hired by Defendant BBB in or about July 2011 as a DM and assigned to work in its Springfield, New Jersey store. Cuoco worked in the Springfield store from July 2011 until in or about January 2012.

47.     Thereafter, Plaintiff Cuoco worked for Defendant BBB as a DM in its Newton, New Jersey store from in or about January 2012 through in or about March 2013.

48.     Thereafter, Plaintiff Cuoco worked for Defendant BBB as a DM in its Butler, New Jersey store from in or about March 2013 through in or about September 2013.

49.     Thereafter, Plaintiff Cuoco worked for Defendant BBB as a DM in its Bridgewater, New Jersey store from in or about June 2014 through in or about June 2015.

50.     Thereafter, Plaintiff Cuoco worked for Defendant BBB as a DM in its Watchung, New Jersey store from in or about June 2015 through in or about June 2016.

51.     Plaintiff Cuoco's primary duties as a DM did not include: hiring, firing, managing or disciplining other employees.

52.     Plaintiff Cuoco's duties as a DM did not differ substantially from the duties of normal hourly paid store employees, who also perform many of the responsibilities previously described.

53.     Plaintiff Cuoco did not exercise a meaningful degree of independent discretion with respect to the exercise of his duties as a DM.

54.     Consistent with Defendants' policy and pattern or practice, Plaintiff Cuoco regularly worked in excess of 40 hours per work week without being paid a legally required overtime rate of 1.5

times his regular rate of compensation for the hours he worked in excess of 40 per work week.

55.     Defendant knew that the improper payment of overtime pay would financially injure Plaintiff Cuoco and similarly situated employees and violate New Jersey state law.

56.     Throughout his employment with Defendant BBB as a DM and CSR, Plaintiff regularly worked in excess of 40 hours per week.

57.     As a DM in the Springfield, Newton, Butler, Bridgewater and Watchung stores, Plaintiff Cuoco was paid a base salary approximating $63,000 per year.

58.     As a DM, Defendant failed to pay Plaintiff Cuoco overtime pay at a rate of one and one-half times their regular rate for hours worked in excess of 40 hours during a workweek as required under New Jersey state law.

## CLASS ACTION ALLEGATIONS

59.     Plaintiffs bring this claim as a class action pursuant to Rule 32 of the New Jersey Rules of Court on behalf of a class, consisting of:

> All persons who work or worked in New Jersey as Department Managers, Customer Service Representatives and/or Assistant Store Managers for Defendant BBB at any time prior to two years prior to the filing of this action through the entry of judgment of this action (the "New Jersey Rule 23 Class") who worked over 40 hours per week and were not paid overtime pay at a rate of one and one-half times their regular rate of hours worked in excess of 40 hours during a work week.

60.     The persons in the New Jersey Rule 23 Class are so numerous that joinder of all members is impracticable. The exact number of the New Jersey Rule 23 Class members is unknown to Plaintiff at this time but there is believed to be over a hundred such persons. The identity of the New Jersey Rule 23 Class members is known to the Defendants and is contained in the employment records that the Defendants are required to create and maintain as a matter of state and federal law.

61.    Plaintiffs' claims are typical of the claims of the other members of the New Jersey Rule 23 Class as plaintiff and all other members of the New Jersey Rule 23 Class sustained damages arising out of defendants' conduct in violation of the New Jersey State laws complained of herein. The New Jersey Rule 23 Class members work, or have worked, for the Defendants in New Jersey as department managers and were improperly classified as exempt employees and not paid overtime wages by the Defendants. They have sustained similar types of damages as a result of Defendants' failure to comply with the NJWHL and supporting regulations of the New Jersey Department of Labor and Workplace Development contained in the New Jersey Administrative Code (NJAC).

62.    Plaintiffs will fairly and adequately protect the interests of the members of the New Jersey Rule 23 Class and has retained counsel competent and experienced in complex class action litigation.

63.    Plaintiffs have no interests that are contrary to or in conflict with those of the other members of the New Jersey Rule 23 Class.

64.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

65.    Common questions of law and fact exist as to all members of the New Jersey Rule 23 Class and predominate over any questions affecting solely individual members. Among the questions of law and fact common to the New Jersey Rule 23 Class are:

a.    Whether the NJWHL and the supporting regulations were violated by Defendants' acts as alleged herein;

b.    Whether Defendant failed to pay overtime wages to Plaintiffs and other New Jersey Rule 23 Class members for time worked in excess of 40 hours in a workweek as required

by   NJWHL,   <u>N.J.S.A.</u>,   34:11-56a4   and   <u>N.J.A.C.</u>, 12:56-6.1-6.7

c.   Whether the Defendants improperly classified Plaintiffs and other New Jersey Rule 23 Class members as employees exempt from the overtime pay requirements of the NJWHL and the NJAC; and

d.   Whether Plaintiffs and the New Jersey Rule 23 Class have sustained damages and, if so, the proper measure of such damages

66.     Defendants have acted or have refused to act on grounds generally applicable to the New Jersey Rule 23 Class, thereby making appropriate relief with respect to the New Jersey Rule 23 Class as a whole.

67.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Since damages suffered by individual New Jersey Rule 23 Class members may be relatively small, the expense and burden of individual litigation makes it virtually impossible for Plaintiffs and New Jersey Rule 23 Class members to individually seek redress for the wrongful conduct alleged.   Individual class members lack the financial resources to conduct a thorough examination of defendants' compensation practices to prosecute vigorously a lawsuit against the defendants to recover such damages.   Class litigation is superior because it will obviate the need for unduly duplicative litigation.

## COUNT ONE

## VIOLATION OF THE NEW JERSEY WAGE AND HOUR LAW
## <u>FAILURE TO PAY OVERTIME WAGES</u>

68.     Plaintiffs re-allege and incorporate all previous paragraphs as if set forth at length herein.

69.     Pursuant to the NJWHL, <u>N.J.S.A.</u>, 34:11-56.1, *et seq.*, Plaintiffs and all putative Class members are entitled to compensation at their regular rate for all hours actually worked.

70.     <u>N.J.S.A.</u>, 34:11-56a4 provides in relevant part: "Every employer shall pay to each of his employees' wages at a rate of not less than …for 40 hours of working time in any week and **1 1/2 times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week, except this overtime rate shall not include any individual employed in a bona fide executive, administrative, or professional capacity…"**(emphasis added).

71.     Defendant BBB misclassified the Plaintiffs and all similarly situated employees as exempt when in fact they were non-exempt. Neither Plaintiffs nor the putative Class members qualify for exemptions under NJWHL. Thus, they are not exempt.

72.     By misclassifying the Plaintiffs and similarly situated employees as exempt from overtime, Defendant BBB unlawfully failed to pay Plaintiffs and the putative Class members for hours worked over forty (40) hours in a week for that respective period at a rate of 1 1/2 times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week.

73.     Through the use of its Fluctuating OT formula Defendant BBB unlawfully failed to pay Plaintiffs and the putative Class members for hours worked over forty (40) hours in a week for that respective period at a rate of 1 1/2 times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week.

74.     Defendant BBB's unlawful conduct has been widespread, repeated, and willful. Defendant knew or should have known that its policies and practices were unlawful and unfair.

75.     As a result of Defendant's violations of the NJWHL, Plaintiffs and others similarly situated have suffered damages by being denied pay for all of their hours worked, by being denied overtime wages in accordance with the NJWHL in amounts to be determined at trial, and are entitled to recovery of such amounts, prejudgment and post judgment interest, reasonably attorneys' fees and costs pursuant to the NJWHL.

**COUNT TWO**

**VIOLATION OF THE NEW JERSEY WAGE AND HOUR LAW**
**FAILURE TO PAY MINIMUM WAGES**

1.     Plaintiffs re-allege and incorporate all previous paragraphs as if set forth at length herein.

2.     N.J.S.A., 34:11-56a states: "It is declared to be the public policy of this State to establish a minimum wage level for workers in order to safeguard their health, efficiency, and general well-being and to protect them as well as their employers from the effects of serious and unfair competition resulting from wage levels detrimental to their health, efficiency and well-being."

3.     Effective January 1, 2014, the minimum wage rate in New Jersey was $8.25 per hour.

4.     Effective January 1, 2015, the minimum wage rate in New Jersey was $8.38 per hour.

5.     For 2016, the minimum wage rate in New Jersey remained at $8.38 per hour.

6.      Through the use of its Fluctuating OT formula Defendant BBB unlawfully failed to pay Plaintiffs and the putative Class members minimum wages for hours worked over forty (40) hours in a week

7.      Defendant BBB's unlawful conduct has been widespread, repeated, and willful. Defendant knew or should have known that its policies and practices were unlawful and unfair.

8.      As a result of Defendant's violations of the NJWHL, Plaintiffs and others similarly situated have suffered damages by being denied pay for all of their hours worked, by being denied overtime wages in accordance with the NJWHL in amounts to be determined at trial, and are entitled to recovery of such amounts, prejudgment and post judgment interest, reasonably attorneys' fees and costs pursuant to the NJWHL.

**COUNT THREE**

**UNJUST ENRICHMENT**

1.      Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

2.      By misclassifying the Plaintiffs and similarly situated employees as exempt from overtime, Defendant BBB unlawfully failed to pay Plaintiffs and the putative Class members for hours worked over forty (40) hours in a week for that respective period at a rate of 1 1/2 times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week.

3.      Through the use of its Fluctuating OT formula Defendant BBB unlawfully failed to pay Plaintiffs and the putative Class members for hours worked over forty (40) hours in a week for that respective period at a rate of 1 1/2 times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week.

4.     Through the use of its Fluctuating OT formula Defendant BBB unlawfully failed to pay Plaintiffs and the putative Class members minimum wages for hours worked over forty (40) hours in a week

5.     By failing to pay Plaintiffs and the putative Class members for hours worked over forty (40) hours in a week for that respective period at a rate of 1 1/2 times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week, BBB has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class.

6.     By failing to pay Plaintiffs and the putative Class members minimum wages for hours worked over forty (40) hours in a week, BBB has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class.

7.     It would be inequitable for BBB to be permitted to retain the unpaid wages it avoided paying to Plaintiff and the Class from its wrongful misclassification of Plaintiffs and the Class as exempt from overtime and/or through the use of its Fluctuating OT formula, overtime wages at a rate of 1 1/2 times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week. Therefore, BBB should be compelled to disgorge to the Plaintiff and the Class all amounts it retained and received as a result of its wrongful and inequitable practices.

8.     It would be inequitable for BBB to be permitted to retain the unpaid wages it avoided paying to Plaintiff and the Class minimum wages for hours worked over forty (40) hours in a week. Therefore, BBB should be compelled to disgorge to the Plaintiff and the Class all amounts it retained and received as a result of its wrongful and inequitable practices.

## COUNT FOUR

## VIOLATION OF THE NEW JERSEY WAGE PAYMENT LAW

1.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

2.     The New Jersey Wage Payment Law (WPL) requires an employer to pay its employees all wages due under the New Jersey Wage and Hour Law (NJWHL)at least twice during a calendar month. <u>N.J.S.A.</u> 34:11-4.2.

3.     The WPL further states the following

It shall be unlawful for any employer to enter into or make any agreement with any employee for the payment of wages of any such employee otherwise than as provided in this act, except to pay wages at shorter intervals than as herein provided, or to pay wages in advance. Every agreement made in violation of this section shall be deemed to be null and void, and the penalties in this act provided may be enforced notwithstanding such agreement; and each and every employee with whom any agreement in violation of this section shall be made by any such employer, or the agent or agents thereof, shall have a right of civil action against any such employer for the full amount of his wages in any court of competent jurisdiction in this State.

<u>N.J.S.A.</u> 34:11-4.7.

4.     BBB claims to have had an agreement or understanding, express or implied, whereby it was mutually understood that BBB would pay employees under a Fluctuating Workweek formula a fixed salary regardless of the number of hours worked, and they would receive a fifty percent (50%) overtime premium in addition to the fixed weekly salary for all hours worked in excess of 40 during a workweek.

4.     By using its Fluctuating OT or FWW formula, Defendant BBB has violated the WPL by failing to pay Plaintiffs and the putative Class members for hours worked over forty (40) hours in a week for that respective period at a rate of 1 1/2 times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week.

5.     As a result of BBB unlawful actions, the Plaintiffs and the putative Class members have been damaged.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs Brent Carter, Robert Haynes and Kenneth Cuoco hereby demand judgment be entered against Bed Bath & Beyond, Inc., under all of the Counts of the Complaint as follows:

a.     Certifying this case as a class action in accordance with New Jersey Rule of Court R. 4:23-1 (Rule 23) with respect to the WPL, NJWHL claims set forth above;

b.     Declaring that Defendant Bed Bath & Beyond, Inc. violated its obligations under the WPL and NJWHL and its attendant regulations as set forth above;

c.     Certifying this matter to proceed as a class action;

d.     Granting judgment in favor of Plaintiffs and against Defendant Bed Bath & Beyond, Inc. and awarding the lost overtime compensation calculated at the rate of one and one-half (1.5) of Plaintiffs' regular rate multiplied by all hours that Plaintiffs worked in excess of forty (40) hours per week for the past three years;

e.      Judgment for Plaintiffs and the New Jersey Rule 23 Class members for all statutory, compensatory, liquidated and consequential damages, or any other damages authorized by law or equity, sustained as a result of defendant's unlawful conduct, as well as prejudgment and post judgment interest;

f.      An award to Plaintiffs and the New Jersey Rule 23 Class for their reasonable attorneys' fees, costs, including expert fees, and expenses authorized by law;

g.      Awarding reasonably attorney fees and costs incurred by Plaintiff's in filing this action; and

h.      Such further relief as this court deems appropriate.

Date:   March 07, 2017                          MASHEL LAW, L.L.C.
                                                Attorneys for Plaintiffs
                                                Brent Carter, Robert Haynes
                                                and Kenneth Cuoco


                                        By:     _____
                                                STEPHAN T. MASHEL, ESQUIRE

                            **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues triable in this action.

## DESIGNATED TRIAL ATTORNEY

Stephan T. Mashel, Esquire is hereby designated as Plaintiff's trial attorney.

## CERTIFICATION

I hereby certify to the best of my personal knowledge that the matter in controversy is not the subject of any other action pending in any Court or of a pending arbitration proceeding, nor is any other action or arbitration contemplated, nor any other parties to be joined EXCEPT for the joinder of the true persons in interest whose names are identified herein as Defendants John Does 1-10 and XYZ Corporations 1-10.

Date:   March 07, 2017

MASHEL LAW, L.L.C.
Attorneys for Plaintiffs
Brent Carter, Robert Haynes
and Kenneth Cuoco

By: _____
STEPHAN T. MASHEL, ESQUIRE

## NOTICE PROHIBITING SPOLIATION OF EVIDENCE

PLEASE TAKE NOTICE, a defendant's failure to prevent spoliation of evidence can result in severe sanctions being imposed by the Court. Furthermore, Defendants' obligations to preserve documents and things for discovery in this case arise in law and equity independent of any Order of court or notice from our office. Defendants are hereby placed on notice not to destroy, conceal or alter any paper or electronic files and other data generated by and/or stored on computers and storage media (e.g., hard drives, hard disks, floppy disks, backup tapes, email accounts), or any other electronic data maintained by the named Defendants, such as surveillance or voice mail, that may be construed in any manner as potentially discoverable information in this litigation.

## AS TO THE PRESERVATION OF
## VIDEOS, SURVEILLANCE MATERIALS,
## OUT-TAKES, PHOTOGRAPHS, ETC.:

In accordance with the above request for the avoidance of spoliation of any evidence please be further guided by the following specific request for preservation.

(a)     All photographs, slides, videotapes, or audiotapes, transcripts, or memoranda thereof, and/or motion pictures, surveillance photographs/motion pictures, out-takes, tape recording, movies, visual, optical and/or audio and/or magnetic reproductions of descriptions of Plaintiffs purporting to depict Plaintiffs, Plaintiffs' activities, actions, speech, etc.

(b)     All photographs of the scene of the underlying occurrence.

(c)     The time records, records of amount of footage of film or videotape used; the type of equipment used to take, develop, and convert such film or videotape; the make and model of all equipment, lenses and range settings employed by Defendant(s) and/or Defendant('s)(s') photographers, investigators, and/or other used or associated in conjunction with the surveillance, tape recordings, etc., of Plaintiff and all memoranda pertaining thereto.

**NOTE:**If the Defendant(s) fails to preserve and/or otherwise disclose such surveillance materials (using the words generically), then Plaintiffs may:

(1)     Move at the trial to exclude all such surveillance and its by-products; and/or

(2)     Move to exclude/suppress all of Plaintiffs' deposition testimony relating to the improperly suppressed/undisclosed pre-deposition surveillance materials and its progeny; and/or

(3)     Seek other appropriate and equitable relief by reason of Defendant('s)(s') non-compliance.

Date:  March 07, 2017                          MASHEL LAW, L.L.C.
                                               Attorneys for Plaintiffs
                                               Brent Carter, Robert Haynes
                                               and Kenneth Cuoco


                                    By:  _____
                                         STEPHAN T. MASHEL, ESQUIRE


Page **21** of 21

**MASHEL LAW, L.L.C.**
**500 Campus Drive, Suite 303**
**Morganville, New Jersey 07751**
**(P): (732) 536-6161**
**(F): (732) 536-6165**
**(E): smashel@mashellaw.com**
**Attorneys for Plaintiffs Brent Carter,**
**Robert Haynes and Kenneth Cuoco**

FILED

MAR 0 3 2017

ARTHUR BERGMAN, J.S.C.

By:   **STEPHAN T. MASHEL, ESQUIRE**
      **N.J. ID No.: 031851986**

| | |
|---|---|
| **BRENT CARTER, ROBERT HAYNES,** and **KENNETH CUOCO**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**BED BATH & BEYOND, Inc.,** a New York Corporation<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>MIDDLESEX COUNTY<br><br>DOCKET NO: MID-L-6178-16<br><br><u>**Civil Action**</u>     # 897<br><br>**ORDER** |

  **THIS MOTION** having come before the Court by Robert H. Bernstein, Esquire, of

the law offices of Greenberg Traurig, LLP, attorneys for Defendant Bed Bath & Beyond,

Inc., seeking a grant of Defendant's Motion to Dismiss Plaintiff's Second Amended

Class Action Complaint pursuant to <u>R.</u> 4:6-2(e), and the Court having considered the

papers presented, the argument of counsel, if any, and for good cause shown:

  **IT IS on this**  3rd  **day of** March  , 2017,

  **ORDERED** that Defendant's Motion to Dismiss Plaintiff's Second Amended

Class Action Complaint without prejudice is hereby **DENIED**;

**AND IT IS FURTHER ORDERED** that Defendant's Motion to Stay this action pending the resolution of the action pending in the Southern District of New York, entitled <u>Daniel Thomas, Rashaun F. Frazer, Andrae Whaley and Eleni Miglis, individually and on behalf of all other employees similarly situated v. Bed Bath and Beyond, Inc.</u>, Civ. A. No. 16-cv-8160-PAE is hereby **DENIED**;

**AND IT IS FURTHER ORDERED** that Plaintiffs Brent Carter, Robert Haynes and Kenneth Cuco are hereby granted leave pursuant to <u>R.</u> 4:9-1 to file with the Court a Third Amended Class Action Complaint and shall do so within _____10_____ days of the date hereof;

**AND IT IS FINALLY ORDERED** that a copy of this Order shall be served upon all counsel of record within ___7___ days of entry thereof.

_____

J.S.C.

ARTHUR BERGMAN, J.S.C.