UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
                          :
DANYELL THOMAS, RASHAUN F. FRAZER,
ANDRAE WHALEY, ELENI MIGLIS, CHERYL A.    :  Civil Action No. 16-cv-8160
STRYCHARZ, and DANIELLE BROWN, individually
and on behalf of all other employees similarly situated,  :

      Plaintiffs,                        :

v.                                        :

  BED BATH AND BEYOND, INC.             :

      Defendant.                      x
----------------------------------------------------------------

## BED BATH & BEYOND INC.'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

GREENBERG TRAURIG, LLP
*Attorneys for Defendant*
*Bed Bath and Beyond Inc.*
200 Park Avenue
New York, New York 10166
212.801.9200

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

FACTUAL BACKGROUND .........................................................................................5

ARGUMENT ................................................................................................................8

I.      Legal Standard .................................................................................................8

II.     BBB is Entitled to Summary Judgment on the DM Plaintiffs' Overtime Claims
        Because BBB Properly Applied the Fluctuating WorkWeek Method of Overtime
        Compensation ...................................................................................................9

   A.   The DM Plaintiffs' Hours Fluctuated From Week to Week ............................ 10

   B.   The DM Plaintiffs' Received a Fixed Weekly Salary, Regardless of the Number of  Hours
        They Worked During the Week .................................................................... 15

   C.   The DM Plaintiffs' Fixed Weekly Salary was Sufficient to Provide Compensation at a
        Regular Rate Not Less than the Legal Minimum Wage .................................... 21

   D.   BBB and the DM Plaintiffs Had a Clear, Mutual Understanding that BBB Would Pay  the
        Named Plaintiffs a Fixed Salary Regardless of the Number of   Hours Worked ............ 21

   E.   The DM Plaintiffs Received a Fifty Percent (50%) Overtime Premium in Addition to
        their Fixed Weekly Salary for All Hours Worked in Excess of 40   Hours During the
        Week ....................................................................................................... 22

   F.   There is No Disputed Issue of Fact that BBB Complied with the FWW ........................ 22

III.    BBB is Entitled to Summary Judgment on All Plaintiffs' NYLL Claims because
        BBB Provided Proper Wage Notices and Statements .......................................23

   A.   Time of Hire and Annual Wage Notices (Count III) ...................................... 23

   B.   Wage Statements with each Wage Payment (Count IV) .................................. 26

CONCLUSION ..........................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aiken v. Cnty. of Hampton*,
    172 F.3d 43, (4th Cir. 1998) ...........................................................................................10, 15

*Anderson v. Ikon Office Solutions, Inc.*,
    38 A.D.3d 317 (1st Dep't 2007) ..............................................................................................9

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................................22

*Condo v. Sysco Corp.*,
    1 F.3d 599 (7th Cir. 1993) ...............................................................................................10, 15

*Flood v. New Hanover Cnty.*,
    125 F.3d 249 (4th Cir. 1997) ..................................................................................................14

*Forest Watch v. U.S. Forest Service*,
    410 F.3d 115 (2d Cir. 2005) ...................................................................................................13

*Gold v. N.Y. Life Ins. Co.*,
    730 F.3d 137 (2d Cir. 2013) .....................................................................................................4

*Hernandez v. Jrpac Inc.*,
    No. Civ. A. 14-4176 (PAE), 2016 WL 3248493 (S.D.N.Y. June 9, 2016) ......................23, 25

*Inclan v. New York Hosp. Grp., Inc.*,
    95 F. Supp. 3d 490 (S.D.N.Y. 2015) ...............................................................................23, 24

*Martin v. Malcolm Pirnie, Inc.*,
    949 F.2d 611 (2d Cir. 1991) ...................................................................................................21

*Mitchell v. Abercrombie & Fitch, Co.*,
    428 F. Supp. 2d 725 (S.D. Oh. 2006) ...............................................................................10, 15

*Newsom v. NPC Intern., Inc.*,
    2003 WL 23849758 (W.D. Tenn. Sept. 29, 2003) ..................................................................10

*Pineda v. Frisolino, Inc.*,
    No. Civ. A. 15-3774 (GBD), 2017 WL 3835882 (S.D.N.Y. Aug. 29, 2017) .........................26

*R.G. Group, Inc. v. Horn & Hardart Co.*,
    751 F.2d 69 (2d Cir. 1984) ...................................................................................................8, 9

*Ramos v. Telgian Corp.*,
    176 F. Supp. 3d 181 (E.D.N.Y. 2016) .......................................................... *passim*

*Severino v. 436 West L.L.C.*,
    2015 WL 12559893 (S.D.N.Y. Mar. 19, 2015) .......................................24, 26, 27

*Stein v. Guardsmark, LLC*,
    No Civ. A. 12-4739, 2013 WL 3809463 (S.D.N.Y. July 23, 2013) ............... *passim*

*Teblum v. Eckerd Corp. of Fla, Inc.*,
    2006 WL 288932 (M.D. Fla. Feb. 7, 2006) .......................................................10, 15

*W. World Ins. Co. v. Stack Oil, Inc.*,
    922 F.2d 118 (2d Cir. 1990).....................................................................................22

*Wills v. Radio Shack Corp.*,
    981 F. Supp. 2d 245 (S.D.N.Y. 2013)................................................2, 9, 11, 12

**Statutes**

29 U.S.C. § 251 *et. seq* .........................................................................................5

29 U.S.C. § 2611 *et. seq* ................................................................................. *passim*

N.Y. Labor Law § 195(3) ...............................................................................27

NYLL § 198(3) ...................................................................................................5

**Other Authorities**

29 C.F.R. § 541.602(b)(1)............................................................................17, 18

29 C.F.R. § 541.602(b)(6)....................................................................................18

29 C.F.R. § 541.602(b)(7)....................................................................................20

29 C.F.R. § 778.114 ...............................................................................................9

29 C.F.R. § 778.114(a)....................................................................................10, 12

29 C.F.R. § 778.114(b) .........................................................................................13

29 C.F.R. § 778.114(c)..........................................................................................10

73 Fed. Reg. 43654, 2008 WL 2871453 (Jul. 28, 2008)......................................13

76 Fed. Reg. 18832-01, 18849, 2011 WL 1231289 (Apr. 5, 2011)...........10, 13, 14

Fed. R. Civ. P. 56(a) ..............................................................................................8

Local Rule 56.1 .................................................................................................................5

12 N.Y.C.R.R. § 142–2.2 ...............................................................................................1

## **INTRODUCTION**

Bed Bath and Beyond Inc. ("BBB" or the "Company") respectfully submits this Memorandum of Law in support of its motion for summary judgment. As we demonstrate in detail below, on the undisputed facts and plain law, BBB properly paid Department Managers ("DMs") overtime under the Fluctuating WorkWeek ("FWW") methodology. Accordingly, the overtime claims of Plaintiffs Danyell Thomas, Rashaun Frazer, Andrae Whaley, Cheryl Strycharz, and Danielle Brown (collectively, the "DM Plaintiffs") should be dismissed (Counts I and II).

Additionally, the overtime claims of opt-in Plaintiffs Radica Kutwaru, Guy-Robert Desir, Bryan LaForest, Karla Reynosa, Elizabeth Padilla, Cuthbert Baptiste, Hector Caraballo, Byron Villacres, Andrew Certoma, John Cutajar, Alexis Carree, Anthony Rollock, Erick Ricardo Olivia, Jose Alberto Cassia, Latia Diaz, LeRoy Clarke, Tomika Boyd, Maria Mahan and Louisa Perry—as well as any other individual who opts into this action prior to the Court's ruling on this motion—should also be dismissed.

The DM Plaintiffs assert that BBB improperly paid them overtime utilizing the FWW methodology, and therefore, Plaintiffs say, BBB failed properly to pay them overtime in violation of the Fair Labor Standards Act[1] ("FLSA") and the New York Labor Law[2] (the "NYLL"). The DM Plaintiffs admit that BBB paid them for all hours that they worked—including FWW overtime payments. However, they contend that BBB did not meet two of five prongs of the test for proper application of the FWW methodology. That assertion fails.

The undisputed evidence in this record shows that BBB fully and lawfully complied with the FWW pay method. DM Plaintiffs were properly paid for all time that they worked in excess

---

[1] 29 U.S.C. § 251, *et. seq.*
[2] 12 N.Y.C.R.R. § 142–2.2.

of forty hours per week under the well-established FWW methodology. The uncontested record evidence is that: (1) the DM Plaintiffs' hours fluctuated from week to week; (2) that DM Plaintiffs received a fixed weekly salary regardless of the number of hours they worked during the week; (3) their fixed weekly salary provided compensation above the applicable minimum wage; (4) BBB and the DM Plaintiffs had a clear, mutual understanding that BBB would pay the DM Plaintiffs a fixed weekly salary regardless of the number of hours they worked; and (5) the DM Plaintiffs received, in addition to their fixed weekly salaries, a fifty percent (50%) or "halftime" overtime premium for all hours worked in excess of 40 hours during the week. In short, BBB met every FWW requirement.[3]

In their pre-motion conference letter, Plaintiffs state that the only issues they dispute here concern the fluctuation and the fixed weekly salary prongs (elements 1 and 2). (Dkt. 141). The first is a legal argument directly at odds with established law in this District. The second is a misdirection refuted by the undisputed record evidence.

First, as to fluctuation, Plaintiffs' argument is directly contradicted by the law in this District and by numerous other District Courts and Courts of Appeals. Plaintiffs say the FLSA requires fluctuation between weeks with over 40 hours of work and weeks under 40. That is incorrect. Under this District's cases, an employee whose hours fluctuate week to week may lawfully be paid under the FWW regardless whether their hours fluctuate above and below 40 a week. *Stein v. Guardsmark, LLC*, No Civ. A. 12-4739, 2013 WL 3809463 (S.D.N.Y. July 23, 2013).

In *Stein*, Judge Oetken rejected precisely the same argument made by Plaintiffs here— "that, in order for the FWW to be properly implemented, an employee's work hours must regularly fluctuate above and below 40 hours per week." (Dkt. 141). Analyzing this issue, the

---

[3] *See e.g., Wills v. Radio Shack Corp.*, 981 F. Supp. 2d 245, 255 (S.D.N.Y. 2013).

*Stein* Court found no authority to support such a requirement, holding instead that hours must simply "vary, from workweek to workweek." *Id.*, at *4. *See also*, *Ramos v. Telgian Corp.*, 176 F. Supp. 3d 181, 195 (E.D.N.Y. 2016)[4] holding in accord after carefully reviewing and detailing the pertinent regulations; when asked to hear an appeal on the fluctuation issue, the Second Circuit declined to do so.[5]

Under *Stein*, *Telgian*, and the plain language of the FWW regulation, BBB is entitled to summary judgment. There is no dispute of fact; the documents showing the actual number of hours worked by each DM are clear on their face and the DM Plaintiffs themselves testified that DM hours fluctuated week to week. (Declaration of Justin F. Keith ("Keith Dec."), at Exhibit 3 (Thomas Dep., 63:10 – 64:5); Exhibit 2 (Frazer Dep., 53:7 – 9); Exhibit 4 (Whaley Dep., 75:17 – 76:4); and Exhibit 6 (Brown Dep., 52:24)). There is no contrary evidence.

Second, as to the fixed weekly salary requirement, the DM Plaintiffs raise a red herring. In their pre-motion conference letter, they point to 12 earnings statements out of the 1,128 produced by the parties[6]—about 1% of all statements—and say that on those a DM Plaintiff or opt-in Plaintiff was not paid their fixed weekly salary. (Dkt. 141). Aside from the fact that those 12[7] earnings statements involve only 4 of the 24 DM and opt-in Plaintiffs here, for each of the weeks at issue there is, as set forth in the accompanying Declaration of Lauren Alvarez ("Alvarez Dec.") and demonstrated further below, a lawful reason for the amount paid. (Alvarez Dec., ¶¶ 13; 16 – 19; 21 – 24, Exhibits 20 – 24). The undisputed material facts plainly show that BBB paid the DM and opt-in Plaintiffs a fixed weekly salary for all hours worked.

---

[4] *Motion to certify appeal granted*, 2016 WL 1959746 (E.D.N.Y. May 3, 2016), *reconsideration denied*, 2016 WL 8711360 (E.D.N.Y. June 3, 2016), and *motion to certify appeal denied*, 2016 WL 8711360 (E.D.N.Y. June 3, 2016), and *on reconsideration in part*, 2017 WL 354200 (E.D.N.Y. Jan. 24, 2017).
[5] *See* USCA Mandate, *Ramos v. Telgian Corp.*, 14 CV 03422 (PKC-LC) (Dkt. No. 70) (Sept. 13, 2016).
[6] Plaintiffs produced 291 earnings statements and BBB produced 837 earnings statements.
[7] Of those 12 earnings statements, one is for DM Plaintiff Rashaun Frazer; one is for DM Plaintiff Danyell Thomas; 2 are for opt-in Plaintiff Radica Kutwaru; and 8 are for opt-in Plaintiff Karla Reynosa. (Declaration of Lauren Alvarez, ¶ 12, Exhibits 6 – 17).

Aside from the FWW claims DM Plaintiffs raise, BBB is also entitled to summary judgment on all Plaintiffs' claims, for both DMs and Assistant Store Managers ("ASMs"), that it failed to provide proper wage notices and statements in violation of the NYLL and Wage Theft Prevention Act ("WTPA").

First, of the 6[8] named Plaintiffs in this action, 4 of them began working for BBB prior to the WTPA taking effect on April 9, 2011.[9] Therefore, any claim that BBB failed to provide proper wage notices at their time of hire fails as a matter of law because the Second Circuit has made clear that the WTPA does not apply retroactively. *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 143–44 (2d Cir. 2013). Second, the record is clear that the remaining 2 Plaintiffs[10] received and executed proper wage notices at their time of hire, and that all 6 Plaintiffs received annual notice of their wages from 2011 onward as required under New York law. (Parties' Joint Statement of Undisputed Facts ("JSF"), ¶¶ 20, 30, 40, 51, 61, at Exhibits 6, 8, 10, 12, 14). Finally, all Plaintiffs received pay stubs for each pay period setting forth a breakdown of their wages and there can be no dispute that the wage statements utilized by BBB during the relevant time period complied with the WTPA and NYLL. (JSF, ¶¶ 12, 14, at Exhibits 1 and 3); (Alvarez Dec., ¶¶ 9 – 10, Exhibits 3 – 5).

Accordingly, this Court should dismiss the named Plaintiffs' NYLL claims relating to wage notices and statements (Counts III and IV), with prejudice. Additionally, the opt-in Plaintiffs' NYLL claims relating to wage notices and statements should also be dismissed because BBB has demonstrated that it complied with the NYLL and WTPA.

---

[8] Plaintiff Eleni Miglis is the additional Plaintiff not already encompassed in the FWW claims, as she was an Assistant Store Manager at all relevant times.

[9] The 4 Plaintiffs hired prior to April 9, 2011 are: Danyell Thomas, Eleni Miglis, Cheryl Strycharz and Danielle (BBB's Statement of Undisputed Material Facts ("SMF"), ¶¶ 26; 52; 61; 89).

[10] The 2 Plaintiffs hired after April 9, 2011 are: Rashaun Frazer and Andrae Whaley. (SMF, ¶¶ 15; 41).

## FACTUAL BACKGROUND[11]

During their time as DMs, the DM Plaintiffs were all classified as non-exempt employees and were paid overtime for all hours worked over 40 during the relevant six year time period under the NYLL and three year period under the FLSA.[12] 29 U.S.C. § 255; NYLL § 198(3). Prior to March 2015, BBB paid the DM Plaintiffs overtime pursuant to the FLSA's FWW methodology. There is no allegation that DMs were paid improperly after March 2015. (JSF, ¶¶ 3–5).

At the time each of the DM Plaintiffs were hired as (or promoted to) the position of DM, each was explicitly told how his or her pay would be calculated and was informed of BBB's use of the FWW. (BBB's Statement of Undisputed Material Facts ("SMF"), ¶¶ 8 – 9). Each DM Plaintiff in this case was told what his or her base annual salary would be for working 40 (or fewer) hours per week, and what their expected total earnings would be if they worked 47 hours per week, including overtime. *Id.* The DM Plaintiffs were also told that the dollar value (per overtime hour) for hours worked above 40 hours would vary due to BBB's use of the FWW. *Id.*

Plaintiffs recognize this. They do not contest that a clear mutual understanding about the FWW was reached. (Dkt. 141). Indeed, the DM and opt-in Plaintiffs here all received and signed a Department Level Manager Compensation acknowledgement ("DM Compensation Acknowledgement"), that states:

> At the time I was hired, I was told what my anticipated weekly compensation will be and how it will be calculated.

---

[11] The relevant facts and circumstances underlying this motion have been set forth at length in the parties' joint stipulation of material facts and BBB's statement of material facts (submitted pursuant to Local Rule 56.1) as well as all of the exhibits and papers annexed thereto. For the sake of brevity, these facts will not be repeated at length here with respect to each individual DM Plaintiff.

[12] The classification of DMs is not at issue in this case and BBB disputes that any alleged willful violation of the FLSA occurred such that the statute of limitations should be two years; however, for purposes of this motion only, BBB assumes that the relevant time period is three years.

I understand that my weekly compensation consists of two components: (1) a base weekly salary; and (2) an additional amount for all hours over 40 that I work during a week.

I understand that my base weekly salary is compensation for all hours I work in a week. I will be paid this base salary for each week I work, whether or not I work 40 hours in that week, subject to the Company's sick day and leave policies.

I further understand that I will be scheduled for no less than 47 hours per week, but that my actual hours worked will fluctuate depending on the needs of my store. (JSF, ¶¶ 18, 28, 38, 49, 59, 71, 81, 86, 93, 103, 113, 124, 134, 145, 155, 162, 172, 179, 182, 185, 188, 191, at Exhibits 5, 7, 9, 11, 13, 15, 17, 19, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44, and 46)[13].

In accordance with the WTPA, the DM and opt-in Plaintiffs reviewed and signed Notice and Acknowledgement of Pay Rate forms ("Annual Pay Acknowledgment") at their time of hire (if hired in 2011 or later) and annually thereafter. These Acknowledgements unequivocally state:

Overtime rate of pay: rate fluctuates based on hours worked in excess of 40*.

*As a Department Manager, your base weekly salary is compensation for all hours you have worked in the week, regardless of the number of hours you work. You will also be paid an additional amount for any hours worked over 40 in one week. Please refer to the attached Department Manager's Bi-Weekly Pay Stub for a detailed explanation.

(JSF, ¶¶ 20, 30, 40, 51, 61, 73, 82, 95, 105, 115, 126, 136, 147, 156, 164, 174, 180, 183, 186, 189, 192, at Exhibits 6, 8, 10, 12, 14, 16, 18, 21, 23, 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, 45 and 47 (emphasis originals)). Each DM and opt-in Plaintiff who was deposed admitted that they had received and signed these documents. (JSF, ¶¶ 21, 31, 41, 52, 62, 74, 96, 106, 116, 127, 137, 148, 166, 175).

The DM Plaintiffs also received pay stubs each pay period showing that their pay consisted of, among other things their base weekly salary as well as overtime paid. These pay stubs were compliant with the requirements relating to wage statements under the NYLL and

---

[13] Along with the DM Compensation Acknowledgement, the DM Plaintiffs here were all given an example pay stub, explaining exactly how the FWW worked, with clear examples. (SMF, ¶ 9). The example pay stubs showed that the DM Plaintiffs would receive their weekly salary, regardless of the number of hours worked. *Id.*

WTPA. The DM Plaintiffs testified in their depositions and have conceded here that they received pay stubs each pay period. (JSF, ¶ 12). It is uncontradicted that no DM Plaintiff filed any claim or challenge to his/her FWW weekly calculation of pay for any week any of them worked.[14]

The DM Plaintiffs who were deposed testified that they understood they were being paid overtime pursuant to the FWW, or "Chinese overtime" as they sometimes referred to it. (JSF, ¶ 33). Although some DM Plaintiffs had conversations with their colleagues about the FWW, the DM Plaintiffs did not complain to management or Human Resources about their overtime pay. All of the DM Plaintiffs acknowledged receiving the Company's employee handbook which contains an express reference to BBB's open door policy for raising questions or complaints relating to one's employment with the Company. (JSF, ¶ 11). The DM Plaintiffs also testified that they knew they could complain about their pay, but they did not do so. (Keith Dec., at Exhibit 3 (Thomas Dep., 35:22 – 25; 44:14 – 45:15; 51:12 – 53:9; 87:21 – 24; 88:10 – 17); Exhibit 2 (Frazer Dep., 48:15 – 18; 52:16 – 19; 54:21 – 23; 61:17 – 20; 69:7 – 9; 91:13 – 15); Exhibit 4 (Whaley Dep., 71:11 – 72:25; 79:18 – 24); Exhibit 6 (Strycharz Dep., 33:20 – 25); and Exhibit 6 (Brown Dep., 19:11– 20:12)).

The uncontradicted record evidence is clear that the amount of hours worked week to week by the DM Plaintiffs fluctuated. The DM Plaintiffs testified that their hours fluctuated depending on a host of variables. (Keith Dec., at Exhibit 3 (Thomas Dep., 63:10 – 64:5) (where Danyell Thomas testified that she worked longer hours during holiday and back to school seasons); Exhibit 2 (Frazer Dep., 53:7 – 9) (where Rashaun Frazer agreed that "sometimes [he'd]

---

[14] The DM Plaintiffs were also required to attend orientation training where they were, again, informed of BBB's pay practices, that they would be paid under the FWW methodology, and that they would receive both a fixed weekly salary for all hours worked and overtime pay for hours worked over 40. (Alvarez Dec., ¶ 7); (Keith Dec., at Exhibit 2 (Furlong Dep., 85:18 – 21)).

have more hours and sometimes [he'd] have less"); Exhibit 5 (Whaley Dep., 75:17 – 76:4) (where Andrae Whaley testified that there were times he worked more than 50 hours in a week, 55 hours in a week, 60 hours in a week, and less than 50 hours in a week); and Exhibit 7 (Brown Dep., 52:24) (where Danielle Brown testified that her actual hours worked varied each week)).

## ARGUMENT

### I.    Legal Standard

The standard for summary judgment is well-known and applies to FLSA actions which—despite the factual complexity that can sometimes accompany large-scale collective actions with multiple plaintiffs—are equally amenable as other types of actions to early disposition. *Stein v. Guardsmark, LLC*, No Civ. A. 12-4739, 2013 WL 3809463 (S.D.N.Y. July 23, 2013) (granting summary judgment for defendant in a FLSA case). Summary judgment is appropriate where the evidence demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it will affect the outcome of the suit under governing law." *Stein*, 2013 WL 3809463, at *1 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "For there to be a 'genuine' issue about the [material] fact, the evidence must be such 'that a reasonable jury could return a verdict for the nonmoving party.'" *Id*.

Placing this burden on the movant, however, does not entitle the non-movant to rest on conclusory allegations because "the opposing party must provide 'concrete particulars' showing that a trial is needed, and '[i]t is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to that motion.'" *R.G. Group, Inc. v. Horn & Hardart Co*., 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp*., 585 F.2d 31, 33 (2d Cir. 1978)). Where "the court is 'convinced as a matter of law that the suit can

have only one possible outcome', summary judgment must be granted." *Id.* (quoting *Reliance Insurance Co. v. Barron's*, 442 F. Supp. 1341, 1343–44 (S.D.N.Y. 1977)).

## II. BBB is Entitled to Summary Judgment on the DM Plaintiffs' Overtime Claims Because BBB Properly Applied the Fluctuating WorkWeek Method of Overtime Compensation

As this Court observed in *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 255 (S.D.N.Y. 2013), "…employers may use the FWW method if the following five conditions are met:

(1) the employee's hours fluctuate from week to week;

(2) the employee receives a fixed weekly salary which remains the same regardless of the number of hours the employee works during the week (excluding overtime premiums);

(3) the fixed amount is sufficient to provide compensation at a regular rate not less than the legal minimum wage;

(4) the employer and employee have a clear mutual understanding that the employer will pay the employee a fixed salary regardless of the number of hours worked; and

(5) the employee receives a fifty percent (50%) overtime premium in addition to the fixed weekly salary for all hours worked in excess of 40 during the week."

(citations omitted); 29 C.F.R. § 778.114.[15]

The Department of Labor's ("DOL") FWW regulation "provides that an employer may use the fluctuating workweek method for computing halftime overtime compensation if an employee works fluctuating hours from week to week and receives, pursuant to an understanding with the employer, a fixed salary as straight-time compensation '(apart from overtime premiums)' *for whatever hours the employee is called upon to work in a workweek, whether few*

---

[15] The standards for lawfully paying overtime under the NYLL "both incorporate and track the FLSA." *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 252–53 (S.D.N.Y. 2013). Thus, the NYLL recognizes the FWW method of paying overtime, and the Court should use the same analysis to resolve the DM Plaintiffs' NYLL overtime claim as their FLSA overtime claim. *Id.* (rejecting plaintiff's argument that the FWW method of paying overtime is not recognized by the NYLL, and dismissing plaintiff's FLSA and NYLL claims); *Anderson v. Ikon Office Solutions, Inc.*, 38 A.D.3d 317, 317 (1st Dep't 2007) (evaluating plaintiff's NYLL overtime claim by analyzing whether "defendant had established compliance with the federal 'fluctuating workweek' standard").

*or many*." 76 Fed. Reg. 18832-01, 18849, 2011 WL 1231289 (Apr. 5, 2011) (emphasis added); *see also*, 29 C.F.R. § 778.114(c). All of the FWW factors are satisfied here.

### A.    *The DM Plaintiffs' Hours Fluctuated From Week to Week*

In order to satisfy the FWW's first requirement, the DM Plaintiffs' hours must simply "vary, from workweek to workweek." *Stein*, 2013 WL 3809463, at *4 (quoting *Flood v. New Hanover Cnty.*, 125 F.3d 249, 253 (4th Cir. 1997)). There is no "requirement of utter unpredictability.'" *Id*., at *4 (quoting *Flood*, 125 F.3d at 253). As Courts in this District have held, hours fluctuating from 50 to 55 week to week satisfy this requirement. *Id*.

Contrary to Plaintiffs' contention, there is no requirement that hours fluctuate above and below 40 hours workweek to workweek in order for the FWW to be applied properly. *See Stein*, 2013 WL 3809463; *Telgian*, 176 F. Supp. 3d at 195; *see also, Mitchell v. Abercrombie & Fitch, Co.*, 428 F. Supp. 2d 725, 735 (S.D. Oh. 2006) ("neither existing authority nor the language of 29 C.F.R. § 778.114(a) supports Plaintiffs' argument that an employee's hours mu[st] fluctuate above and below 40 for the fluctuating workweek method of computing overtime to apply."); *Condo v. Sysco Corp.*, 1 F.3d 599, 603 (7th Cir. 1993) (although work did not fall below 40 hours per week, plaintiff worked varying amounts of overtime hours and number of hours worked therefore "fluctuated"); *Aiken v. Cnty. of Hampton*, 172 F.3d 43, 1998 WL 957458, at *3 (4th Cir. 1998) (finding "unavailing" plaintiff's claim that fluctuation requires "working fewer than 40 … hours in a given week"); *Teblum v. Eckerd Corp. of Fla, Inc*., 2006 WL 288932, at *5 (M.D. Fla. Feb. 7, 2006) (finding no dispute of fact that employer satisfied fluctuation prong of FWW where plaintiff's "hours generally fluctuated only above forty hours per week"); *Newsom v. NPC Intern., Inc*., 2003 WL 23849758, at *4 (W.D. Tenn. Sept. 29, 2003) ("the Court finds

that an employee's hours need not vary both above and below forty hours per week in order for an employer to utilize the fluctuating work week method of calculating overtime").

In *Telgian*, the plaintiffs argued that "their hours did not fluctuate as contemplated by the FWW scheme, because they did not fluctuate both above and below 40 hours in a week." *Telgian*, 176 F. Supp. 3d at 195. In rejecting this argument, the Court carefully traced through the regulations in detail and found that "requiring an employee's work hours to fluctuate both above and below 40 hours in a week to come within the rule[ ] ***finds no support in its implementing regulation***[.]" *Id*. (emphasis added). The Court said this is so because "the FWW scheme requires that the employee's fixed salary 'compensate the employee at straight time rates for *whatever* hours are worked in the workweek[.]" *Id*. at 196 (emphasis in original) (quoting 29 C.F.R. § 778.114(a)); *see also*, *Stein*, 2013 WL 3809463, at *4 (concluding that fluctuation requirement was met where plaintiff's hours fluctuated between 50–55+ hours per week); *RadioShack Corp*., 981 F. Supp. 2d at 261 (emphasizing the DOL's view that a fixed weekly salary is "straight time pay for *whatever hours are worked each workweek, regardless of their number*." (emphasis in original)).

The *Telgian* Court acknowledged that while the reference in the regulation to the number of hours worked whether "'few or many' reasonably may be interpreted as referring to work hours both below and above a standard workweek, *i.e.*, 40 hours, that reference clearly does not impose, or even suggest, a *requirement* that an employee's hours must vary in both directions in order to come within the FWW rule." *Telgian*, 176 F. Supp. 3d at 195 (emphasis in original). The Court went on to explain:

> This interpretation is confirmed by the next sentence, which discusses a fixed salary that pays for 'hours worked each workweek, *whatever their number*, rather than for working 40 hours or some other fixed weekly work period.' Again, the regulation does not specify that the weekly work-hour deviation must be in both

11

directions; the phrase 'whatever the number' plainly contemplates that an employee's work hours could be either more or less than the 40-hour or other fixed workweek, or both.

…

The mere fact that the FWW scheme benefits employers and permits a lower recovery—albeit one that still falls within the time-and-a-half overtime requirements of the FLSA—than is available to employees not subject to the FWW rule does not justify reading into the regulation a requirement that otherwise does not exist.

*Id.*, at 195–96 (emphasis in original).

Consistent with the teachings of *Telgian*, as this Court recognized in a comparable setting, if the DOL wanted to impose specific requirements for use of the FWW (such as a requirement that hours fluctuate above and below 40), "***it is hard to imagine that the DOL would not, somehow, have said so***." *RadioShack Corp.*, 981 F. Supp. 2d at 262 (emphasis added) (analyzing whether performance-based bonuses violated the fixed weekly salary requirement and noting that "[t]he lack of any reference, direct or indirect, to performance-based bonuses in the DOL's Final Ruling is, in the Court's view, the proverbial dog that did not bark.").

As the *Telgian* analysis makes clear, the plain meaning of the DOL Regulations calls for rejection of Plaintiffs' contention.

The DOL regulations provide in relevant part that "Where there is a clear mutual understanding of the parties that the fixed weekly salary is compensation (apart from overtime premiums) **for the hours worked each workweek, *whatever their number*, rather than for working 40 hours or some other fixed weekly work period**, such a salary arrangement is permitted by the Act. 29 C.F.R. § 778.114(a) (emphasis added).

The plain meaning of the regulation is clear—such pay arrangements are lawful where employees' hours fluctuate "whatever their number." "Whatever their number" does not mean

there is a requirement of fluctuation between weeks of over 40 hours worked and weeks with fewer than 40 hours.

In *Forest Watch v. U.S. Forest Service*, 410 F.3d 115, 117 (2d Cir. 2005) the Second Circuit wrote that "[t]he plain meaning of language in a regulation governs unless that meaning would lead to absurd results." (internal quotation marks and citations omitted). *Telgian* demonstrates that no absurd result follows from applying the regulation as written. The DOL has already spoken on this issue—no fluctuation below 40 hours is required by the regulation. That plain meaning should impel rejection of Plaintiffs' argument.

The absence of any evidence that the DOL intended to require fluctuation below 40 hours is reinforced by the FWW regulation's illustrative examples of how to calculate half-time pay. Since its inception, the DOL's example has referenced a hypothetical series of workweeks consisting of 40, 44, 50, and 48 hours—i.e., *none* below 40. *See* 29 C.F.R. § 778.114(b)(2010); (1981); (1980); (1969); (1968); and (1966). In 2008, the DOL issued a Notice of Proposed Rulemaking (73 Fed. Reg. 43654, 2008 WL 2871453 (Jul. 28, 2008)), which would have (among other proposed changes to the FLSA's regulations) expressly permitted the payment of additional compensation to employees paid under the FWW. The DOL ultimately changed course and did not change the FWW regulation, except to update the example in the regulations from an outdated hypothetical weekly salary of $250 to $600 per week so that **the rates of pay would be no less than the then-current minimum wage.**[16]

---

[16] During notice and comment rulemaking, it was pointed out that the increase in salary from $250 to $600 resulted in inexact hourly rates (i.e. $600 / 44 hours = $13.63636363). To address this arithmetic issue, the DOL changed the reference from 44 hours to 37.5 hours, which resulted in an exact hourly rate of $16. *See* 76 Fed. Reg. at 18849, (noting that a commentator "recommended changing one of the weekly hour totals from 44 to 37.5 so that there would be an exact regular rate calculation in each instance, thereby eliminating the need to use 'approximately.' We agree with this analysis and have incorporated his suggested revision into the final rule."). *Id.*; *see also, Telgian*, 176 F.3d at 195 (explaining that language in the regulations "clearly does not impose, or even suggest, a *requirement* that an employee's hours" fluctuate below 40. (emphasis in original)).

The fact that the DOL, after more than two years of rulemaking, declined to make anything but ministerial updates to the FWW regulation underscores that engrafting a requirement that hours fluctuate both above and below 40 was not contemplated by the regulator. Indeed, in issuing the Final Rule, the DOL specifically pointed to the Fourth Circuit's decision in *Flood v. New Hanover County*, 125 F.3d 249, 253 (4th Cir. 1997), which holds that the FWW was properly utilized where the employees' hours did not fall below 40 but rather fluctuated between 48.3, 56.3, 64.45, or 72.45 hours. 76 Fed. Reg. at 18849.

Plaintiffs' contrary assertion fails for all these reasons.

It is undisputed that the DM Plaintiffs' hours fluctuated. While the DM Plaintiffs may have been *scheduled* for a similar number of hours each week, their earnings statements demonstrate that the *actual number of hours they worked* varied day to day and week to week. (SMF, ¶ 5); *see Flood*, 125 F.3d at 252 (explaining the DOL's view that an individual paid under the FWW can have a fixed weekly schedule so long as the actual number hours worked fluctuate). The DM Plaintiffs themselves admitted during their depositions that the actual number of hours they worked each day or each week varied. *Id*.

For example, Rashaun Frazer testified that some weeks he would work more hours and some weeks he would work less. (Keith Dec., at Exhibit 2 (Frazer Dep., 53:3 – 9)). Andrae Whaley testified that there were weeks he worked more than 50 hours, weeks he worked more than 55 hours, weeks he worked more than 60 hours, and weeks he worked less than 50 hours. (Keith Dec., at Exhibit 4 (Whaley Dep., 75:17 – 76:4)). The opt-in Plaintiffs' testimony, by way of additional examples, is consistent. When asked whether her hours as a DM varied, opt-in Plaintiff Radica Kutwaru responded "yes." (Keith Dec., at Exhibit 7 (Kutwaru Dep., 21:7 – 8)). Opt-in Plaintiff Elizabeth Padilla was asked during her deposition whether the number of hours

she actually worked as a DM conformed to the number of hours she was scheduled to work each week, and Plaintiff Padilla testified in response that "[t]he hours fluctuated, it varies, the times… Sometimes I would be there later for my shift… It could be from 47 to 50 [hours in a week]." (Keith Dec., at Exhibit 16 (Padilla Dep., 78:25 – 79:16)).

And, the DM Plaintiffs' earnings statements show clear fluctuation week to week. For example, Plaintiff Thomas worked 48.75 hours in one regular week and 50.5 hours in another regular week. (SMF, ¶¶ 29; 31; 33; 35; 37; 39). Plaintiff Frazer worked 39.75 hours in one regular week and 55.25 hours in another regular week. (SMF, ¶¶ 18; 20; 22; 24). Plaintiff Whaley worked 52 hours in one regular week and 66 hours in another regular week. (SMF, ¶¶ 44; 46; 48; 50). The remaining opt-in Plaintiffs' earnings statements all show similar fluctuation and there is not a single DM Plaintiff or opt-in here who worked the same number of hours every week during their time as a DM. (Alvarez Dec., ¶ 5, Exhibits 25 – 28; 30 – 35; 37 – 40; 42 – 44; 46 – 48; 50 – 52; 54 – 55).

Based on the record evidence and the DM Plaintiffs' own testimony, there is no disputed issue of material fact that BBB has satisfied the fluctuation prong under *Telgian*, *Stein*, *Mitchell*, *Condo*, *Aiken*, *Teblum*, and *Newsom*, *supra*.

### B.  The DM Plaintiffs' Received a Fixed Weekly Salary, Regardless of the Number of Hours They Worked During the Week

Under the FWW's second requirement, the DM Plaintiffs were compensated with a fixed weekly salary that remained the same regardless of the number of hours they worked (excluding overtime which was paid in addition). (SMF, ¶ 6; Alvarez Dec., ¶ 4, Exhibits 25 – 28; 30 – 35; 37 – 40; 42 – 44; 46 – 48; 50 – 52; 54 – 55). The DM Compensation Acknowledgment forms and Annual Pay Acknowledgement forms state unequivocally that each DM "will be paid th[eir] base salary for each week [they] work, whether or not [they] work 40 hours in that week, subject

15

to the Company's sick day and leave policies." (JSF, ¶ 9). The DM Plaintiffs' earnings statements demonstrate that when the DM Plaintiffs did work less than 40 hours per week, they were paid their full weekly salary. (Alvarez Dec., ¶ 4, Exhibits 25 – 28; 30 – 35; 37 – 40; 42 – 44; 46 – 48; 50 – 52; 54 – 55).

Based on their letter submission, the DM Plaintiffs likely will assert that certain DM's salaries were not fixed, but rather were subject to "docking" when they worked fewer than 40 hours in a week. (Dkt. 141). However, the earnings statements referenced by the DM Plaintiffs on this issue in their pre-motion conference letter do not give rise to a disputed issue of material fact because for each of those weeks, the DM or opt-in Plaintiff was not entitled to receive a full weekly salary amount under the FWW methodology for lawful reasons.

The uncontradicted testimony of BBB's regional recruiter and district human resources manager, Michael Furlong, is that DMs accrued paid time off and vacation days each year, had an unlimited amount of paid sick time, and if an individual was going to be out for more than one week's period of time, he or she could take a leave of absence under the FMLA. (Keith Dec., at Exhibit 1 (Furlong Dep., 74:3 – 75:22)). Mr. Furlong also testified that whether the FMLA leave was paid or unpaid would depend on whether the DM had exhausted all of his/her accrued paid time off, but in no event did BBB make deductions from the pay of DMs. (Keith Dec., at Exhibit 1 (Furlong Dep., 139:2 – 12)).

BBB's policy in this regard is consistent with what the law requires. *See* 29 U.S.C. §§ 2612(c); (d)(2). In analyzing whether an individual is paid a fixed weekly salary as required by the FWW, the *Stein* Court explained that the "DOL regulations that define what it means to be paid on a 'salary basis' are instructive on this point[.]" *Stein*, 2013 WL 3809463, at *5. An employee is considered to be paid on a salary basis where he/she receives a predetermined

16

amount of pay on a weekly basis, the amount of which "is not subject to reduction ***because of variations in the quality or quantity of work performed***…" *Id.* (quoting 29 C.F.R. § 541.602) (emphasis added). A leave policy such as BBB's does not reduce salary because of variations in quality or quantity and is therefore consistent with salary basis payment. (*Id.*).

Here, consistent with BBB's leave policy, DM Plaintiff Rashaun Frazer did not receive his full weekly salary of approximately $1,013.94 for the pay period ending November 10, 2013, because he took a 2-week leave of absence under the Family Medical Leave Act ("FMLA") for the birth of his son. (Alvarez Dec., ¶ 16, Exhibits 6; 19; 20). The leave documents signed by Mr. Frazer clearly show that he had 7 paid leave days, all of which were used in the prior pay period ending October 27, 2013, where Mr. Frazer received his full pay. 29 U.S.C. §§ 2612(d)(2) (noting that "an employer may require the employee[ ] to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee … for any part of the 12-week period of such leave").

Opt-in Plaintiff Karla Reynosa did not receive her full weekly salary for pay periods ending July 7, 2013, August 4, 2013, and September 1, 2013, because she took a personal leave of absence for vacations. 29 C.F.R. § 541.602(b)(1) ("Deductions from pay may be made when a[ ] [salaried] employee is absent from work for one or more full days for personal reasons, other than sickness or disability.") Ms. Reynosa discussed her vacation plans with BBB upon being hired in May of 2013, and was told that she had 5 vacation days in light of her hiring date. Ms. Reynosa voluntarily chose to take the remainder of her pre-planned vacation as unpaid personal leave. (Alvarez Dec, ¶ 19, Exhibits 9; 10; 11; 22).

Similarly, opt-in Plaintiff Radica Kutwaru did not receive her full weekly salary of approximately $966.49 for the pay period ending June 24, 2012, because she took a 2-week leave

of absence under the FMLA due to an injury she sustained. (Alvarez Dec., ¶ 17, Exhibits 7; 19; 21); 29 U.S.C. §§ 2612(c) (noting that leave under the FMLA "may consist of unpaid leave"). Ms. Kutwaru did not receive her full weekly salary of approximately $990.65 for the pay period ending August 4, 2013, because she took another leave of absence; after transferring to work in a Georgia BBB store for approximately 20 days, she decided to move back to New York for personal reasons and took an unpaid leave to do so. (Alvarez Dec., ¶ 18, Exhibit 8); 29 C.F.R. § 541.602(b)(1).

Opt-in Plaintiff Karla Reynosa did not receive her full weekly salary of approximately $1,199.16 for the pay period ending May 25, 2014, due to a payroll error, which was corrected in the next pay period ending June 8, 2014, when Ms. Reynosa was paid the difference. (Alvarez Dec., ¶ 22, Exhibits 14; 15). Karla Reynosa did not receive her full weekly salary of approximately $1,199.16 for the pay period ending June 8, 2014, due to a payroll error, which was corrected in the pay period ending July 5, 2014. (Alvarez Dec., ¶ 22, Exhibits 16; 17). In both instances where an error occurred, Karla Reynosa was given cash from the register shortly thereafter in order to make her whole until the payroll errors were corrected in the system. (Alvarez Dec., ¶ 23, Exhibits 23; 24).

Karla Reynosa did not receive a full week's pay for the pay period ending February 14, 2015, because her last day of employment with the Company was on February 5, 2015 and therefore she did not work for the full week. (Alvarez Dec., ¶ 24, Exhibit 13); 29 C.F.R. § 541.602(b)(6) ("An employer is not required to pay the full salary in the initial or terminal week of employment."); (U.S. Department of Labor Field Operations Handbook § 32b04b(c)) ("an employee employed on a fixed salary basis … may be paid a pro rata share of his/her salary in

18

the initial or terminal week of his/her employment when he/she is not in payroll status for the entire week.").

The Company has identified one isolated incident where a payroll error appears to have occurred out of the 5.5 years Danyell Thomas was employed (pay period ending January 5, 2014), which resulted in the underpayment of approximately $50. BBB is in the process of issuing a check to rectify this error. (Alvarez Dec., ¶ 21, Exhibit 12).

Thus, there is no disputed issue of material fact that BBB satisfied the fixed weekly salary prong.[17] Indeed, the uncontested record evidence shows BBB intended to pay DMs on a salary basis and did not have *an actual practice* of making improper deductions. *Stein,* 2013 WL 3809463 at *6 (noting that the DOL clarified "that the effect of improper deductions depends upon whether the facts demonstrate that the employer *intended* to pay employees on a salary basis" as demonstrated by the words 'actual practice' of making improper deductions rather than the proposed 'pattern and practice' language) (emphasis added). That DM Plaintiffs point to but 1% of the earnings statements as being allegedly problematic is telling. *Id*. at *6 (explaining that "courts have looked skeptically on single-incident docking of pay as proof that an employer did not intend to pay an employee on a salary basis."). This is particularly true where Mr. Furlong testified unequivocally that BBB did not make any deductions from the pay of DMs. (Keith Dec., at Exhibit 1 (Furlong Dep., at 139:12)).

Indeed, Plaintiffs' argument here should be precluded by their concession that they do not challenge that BBB and the DM Plaintiffs had a clear mutual understanding that BBB would pay

---

[17] The DOL has set forth non-exhaustive relevant factors to consider when determining whether an employer intended to pay an employee on a salary basis, including "the number of improper deductions … [and] whether the employer has a clearly communicated policy permitting or prohibiting improper deductions." *Id*. (quoting 29 C.F.R. § 541.602).

the DM Plaintiffs a fixed salary regardless of the number of hours worked[18] and the uncontradicted fact that no DM who allegedly had his or her pay "docked" challenged that as a violation of the understanding. Had any DM thought he or she should have been paid more or differently, that could have been challenged because "docking" was not part of the understanding. But there were no such challenges.

Each of the DM Plaintiffs here acknowledged receiving the Company's handbook, which explicitly informs the DMs that it is their "responsibility to review [their] pay stub, specifically the hours [they] worked, the pay [they] receive and any deductions taken. If [they] notice an error in [their] paycheck, tell your supervisor immediately so that the matter may be researched." (SMF, ¶ 11); (Alvarez Dec., ¶ 8, Exhibit 2).

There simply is no principled basis to say Plaintiffs should receive pay for not working while on leave, or that the clear mutual understanding contemplates any such treatment. Of course people on unpaid leaves were not paid. 29 C.F.R. § 541.602(b)(7) ("An employer is not required to pay the full salary for weeks in which an exempt employee takes unpaid leave under the Family and Medical Leave Act. Rather, when an exempt employee takes unpaid leave under the Family and Medical Leave Act, an employer may pay a proportionate part of the full salary for the time actually worked.").

Further, BBB utilized multiple levels of safeguards to ensure that all DMs were paid their full weekly salary. First, after reviewing each individual DM's time logs, a senior manager would manually enter the hours worked by each DM during the relevant pay period into the payroll system to ensure overtime payment for any and all hours worked over 40. (Alvarez Dec., ¶ 20). Where a DM worked fewer than 40 hours in a given week but was not on leave or some

---

[18] Plaintiffs also point out in their pre-motion conference letter that there is no dispute BBB has satisfied the clear mutual understanding prong. (Dkt. 141) (noting that, for purposes of summary judgment, "Plaintiffs do not dispute that Defendant[ ] satisfy[ies] elements (3), (4), and (5).")

other lawful unpaid status, the senior manager would enter 40 hours into the system regardless of how many hours were actually worked by the DM. Second, after payroll processed each DM's paycheck, a District Human Resources manager would receive a report showing DMs hours and have the opportunity to review and correct any payroll errors. (Alvarez Dec., ¶ 20).

To the extent there was ever human error at one of the two safeguards in place by BBB, it still would be insufficient to show that the DM Plaintiffs did not receive a fixed weekly salary because the regulations are not intended to apply to "'one-time or inadvertent deductions, [but] to a settled policy of subjecting the pay of employees to reductions.'" *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 616 (2d Cir. 1991) (quoting *Knecht v .City of Redwood City*, 683 F. Supp. 1307, 1311 (N.D. Cal. 1987).

Accordingly, there is no disputed issue of fact that the DM Plaintiffs' received fixed weekly salaries in satisfaction of the FWW's element 2.

### C.      The DM Plaintiffs' Fixed Weekly Salary was Sufficient to Provide Compensation at a Regular Rate Not Less than the Legal Minimum Wage

Under the FWW's third requirement, and as Plaintiffs concede, the DM Plaintiffs' fixed weekly salaries were sufficient to provide compensation at a regular rate not less than the legal minimum wage. (JSF, ¶ 8). Accordingly, there is no disputed issue of fact that BBB has satisfied this prong and that it paid its DMs well above the then-applicable minimum wage.

### D.      BBB and the DM Plaintiffs Had a Clear, Mutual Understanding that BBB Would Pay the Named Plaintiffs a Fixed Salary Regardless of the Number of Hours Worked

Plaintiffs do not dispute there was a clear mutual understanding that BBB would pay a fixed weekly salary. (Dkt. 141). As evidenced by the DM Compensation forms and the Annual Pay Acknowledgement forms that the DM Plaintiffs each reviewed and signed numerous times,

BBB and the DM Plaintiffs indisputably had a clear, mutual understanding that BBB would pay them a fixed salary regardless of the number of hours worked.

Accordingly, there is no disputed issue of fact that BBB has satisfied the clear mutual understanding prong to utilize the FWW.

### E. The DM Plaintiffs Received a Fifty Percent (50%) Overtime Premium in Addition to their Fixed Weekly Salary for All Hours Worked in Excess of 40 Hours During the Week

Under the fifth FWW requirement, the DM Plaintiffs received compensation for all hours that they worked for BBB. (JSF, ¶ 4). They also received a fifty percent (50%) overtime premium for all hours worked in excess of 40 in a week during their employment with BBB. (SMF, ¶ 7). No one disputes the arithmetic here—the DM Plaintiffs acknowledged in their pre-motion conference letter that, for purposes of this motion, there is no dispute that BBB has satisfied this prong. (Dkt. 141). Accordingly, there is no disputed issue of fact that BBB paid the DM Plaintiffs a fifty percent (50%) overtime premium for all hours worked in excess of 40 hours in a week.

### F. There is No Disputed Issue of Fact that BBB Complied with the FWW

As shown, BBB complied with each of the elements of the FWW. The DM Plaintiffs cannot identify with reasonable particularity any "concrete evidence from which a reasonable [fact-finder]" could find to the contrary. *Anderson*, 477 U.S. at 256; *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). Instead, it is anticipated that the DM Plaintiffs will mount a legal challenge relating to the fluctuation element that is contradicted by the law of this District, and a factual challenge on the fixed weekly salaries of a handful of DMs in a limited number of weeks, each of which are easily explained by BBB's leave of absence policy that complies with the law and in any event are statistically insignificant to defeat summary

judgment. For these reasons, BBB is entitled to summary judgment on the DM Plaintiffs' FLSA and NYLL claims for unpaid overtime.[19]

### III.     BBB is Entitled to Summary Judgment on All Plaintiffs' NYLL Claims because BBB Provided Proper Wage Notices and Statements

BBB is entitled to summary judgment on all Plaintiffs' NYLL claims because there is no disputed issue of fact that BBB provided proper wage notices at the time of hire and annually thereafter (Count III), as well as proper wage statements with every payment of wages (Count IV).

#### A.     Time of Hire and Annual Wage Notices (Count III)

"'Since April 9, 2011, the NYLL has required that, at the time of hiring, [and annually through December 28, 2014,] employers provide their employees a written notice with the following information: (1) the rate or rates of pay and basis thereof; (2) allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; (3) the regular pay day designated by the employer; (4) the employer's name; (5) any 'doing business as' names used by the employer; (6) the physical address of the employer's main office or principal place of business, and a mailing address if different; (7) the employer's telephone number; and (8) such other information as the commissioner deems material and necessary.'" *Hernandez v. Jrpac Inc.*, No. Civ. A. 14-4176 (PAE), 2016 WL 3248493, at *29 (S.D.N.Y. June 9, 2016) (brackets in original) (quoting *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 474 (S.D.N.Y 2015)). This requirement finds support in the WTPA, "which is the name of an amendment to the NYLL, effective April 9, 2011." *Inclan v. New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 500 (S.D.N.Y. 2015).

---

[19] Assuming, *arguendo*, that the Court disagrees, BBB is, at a minimum, entitled to summary judgment on the FLSA FWW claims for the DM Plaintiffs who worked as DMs outside the FLSA limitations period and whose FWW claims in this regard are therefore time-barred.

First, there can be no disputed issue of fact that BBB is entitled to summary judgment on

Plaintiffs Danyell Thomas, Eleni Miglis, Cheryl Strycharz, and Danielle Brown's claim that they

were not provided proper wage notices at their time of hire, as each of these Plaintiffs

indisputably were hired before April 9, 2011. (SMF, ¶¶ 26; 52; 61; 89).

The Second Circuit has made clear "that the WTPA does not apply retroactively." *Inclan*,

95 F. Supp. 3d at 501 ("For those plaintiffs who were hired before the WTPA took effect on

April 9, 2011, the failure of the [employer] to provide … notice at the time of hiring cannot

support a claim under the WTPA[.]" (citing *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 143–44 (2d

Cir. 2013)); *see also Severino v. 436 West L.L.C.*, 2015 WL 12559893, at *9 (S.D.N.Y. Mar. 19,

2015) ("An employee who began working before April 2011 would not have been required to

receive annual notice of his wages within ten business days of his or her first day of

employment.").

Second, remaining Plaintiffs Rashaun Frazer and Andrae Whaley (both of whom were

hired as DMs) acknowledge receiving and signing written notices at their time of hire. (JSF, ¶¶

20; 40, at Exhibits 6; 10). These notices, on their face, comply with the NYLL and WTPA.

Specifically, the notices include:

> (1) Plaintiffs' base weekly salary amount for all hours worked, as well as an explanation of their overtime pay under the FWW that expressly states "Overtime rate of pay: <u>rate fluctuates based on hours worked in excess of 40*</u> *As a Department Manager, your base weekly salary is compensation for all hours you have worked in the week, regardless of the number of hours you work. You will also be paid an additional amount for any hours worked over 40 in one week. Please refer to the attached Department Manager's Bi-Weekly Pay Stub for a detailed explanation.* (emphasis in original);
>
> (2) A section entitled "**PAYDAY, ALL ASSOCIATES**" with express language that "Friday is the usual payday. You will receive your paycheck every two weeks. The check you receive is for all worked hours and paid non-worked hours (e.g., vacation) for the previous two-week pay period." (emphasis in original);

24

(3) The name of the Company, in large, bolded, centered font at the top of each notice;

(4) The physical address of the Company's corporate office; and

(5) The Company's phone number.[20] (*Id.*)

Finally, there is no dispute of fact that each of the Plaintiffs who were hired after the WTPA was enacted were provided notices containing this information within 10 business days of his or her first day of employment as required by the law. (*Id.*); *Hernandez*, 2016 WL 3248439, at *29. Rashaun Frazer was hired on October 31, 2011 and he signed and dated the notice on this same day (JMF, ¶ 20, at Exhibit 6). Andrae Whaley was hired on July 18, 2011 and he signed and dated the notice on this same day (JMF, ¶ 40, at Exhibit 10).

By way of further examples, opt-in Plaintiff Radica Kutwaru was hired on April 9, 2012 and she signed and dated the notice on this same day (JMF, ¶ 73, at Exhibit 16). Guy-Robert Desir was hired on June 4, 2012 and he signed and dated the notice on this same day (JMF, ¶ 82, at Exhibit 18). Karla Reynosa was hired on May 20, 2013 and she signed and dated the notice on this same day (JMF, ¶ 95, at Exhibit 21). Byron Villacres was hired on October 3, 2011 and he signed and dated the notice on this same day (JMF, ¶ 136, at Exhibit 29). Anthony Rollock was hired on December 11, 2011 and he signed and dated the notice the very next day on December 12, 2011 (JMF, ¶ 174, at Exhibit 37). Jose Alberto Cassia was hired on February 8, 2013 and he signed and dated the notice 10 days thereafter on February 18, 2013 (JMF, ¶ 183, at Exhibit 41). LeRoy Clarke was hired on July 5, 2011 and he signed and dated the notice on this same day (JMF, ¶ 189, at Exhibit 45).

Accordingly, there is no disputed issue of fact that BBB complied with the NYLL and WTPA in providing proper wage notices at the time of hire to the Plaintiffs hired after April 9,

---

[20] The remaining elements under the WTPA, requiring that the notice set forth minimum wage deductions, if any, and 'doing business as' names used by the employer, if any, do not apply here.

2011, and that these notices contained the information required by the statute. Plaintiffs' claims to the contrary fail as a matter of law.

Moreover, while it is unclear whether the WTPA's requirement for annual notice of wages applies to individuals who were hired before April 9, 2011, *see Severino*, 2015 WL 12559893, at *9 (explaining that the Southern District has not answered "in a uniform manner … whether an employee who was already employed when the WTPA took effect on April 9, 2011, may properly bring a claim … for failure to provide annual notice of his wages"), BBB nevertheless provided all Plaintiffs with annual notices upon the WTPA taking effect in 2011 through 2015 regardless of their hire date.[21] (JSF, ¶¶ 20, 30, 40, 51, 61, at Exhibits 6, 8, 10, 12, 14); (Alvarez Dec., ¶ 57, Exhibit 57).

In sum, regardless of which interpretation of the WTPA applies here (either requiring no annual notice for employees hired before April 9, 2011 or requiring annual notice for all employees), BBB acted lawfully and has met its burden for the grant of summary judgment. As set forth above, the notices received by Plaintiffs contained all necessary information under the NYLL and WTPA. There is also no dispute that each of the Plaintiffs here received and signed the notices annually regardless of when they were hired, which is more than the law requires. Accordingly, BBB is entitled to summary judgment on Count III of Plaintiffs' Complaint.

### B.    *Wage Statements with each Wage Payment (Count IV)*

The NYLL and WTPA "requires employers to provide each employee 'with a statement with every payment of wages' including 'the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked.'" *Pineda v. Frisolino, Inc.*, No. Civ. A. 15-3774 (GBD), 2017 WL 3835882, at *12

---

[21] "[T]he requirement to provide annual notice of wages has since been repealed[,]" effective February 27, 2015. *Severino*, 2015 WL 12559893, at *8 and *10 n. 19 (citing 2014 N.Y. Sess. Laws ch. 537, § 1 (McKinney)).

(S.D.N.Y. Aug. 29, 2017) (citing N.Y. Labor Law § 195(3)); *see also Severino*, 2015 WL 12559893, at *10 (explaining that wage statements must also include "the employee's name; the employer's name, address, and phone number; the rate of pay; and the net and gross wages…"). "Most existing cases holding employers liable for failing to satisfy the requirements of § 195(3) have done so where the employer has furnished no wage statements at all." *Severino*, 2015 WL 12559893, at *9 (collecting cases).

Here, the record evidence is clear—and Plaintiffs do not dispute—that each Plaintiff received bi-weekly pay stubs with their paychecks throughout their employment with BBB. (JSF, ¶¶ 12, 14). Further, all pay stubs (for both DMs and ASMs) are clear on their face in that they contained all necessary information required by the NYLL and WTPA, namely: (1) the dates of work covered by that payment of wages; (2) the name of the employee; (3) the name of the Company; (4) the Company's address and phone number; (5) the employee's rate of pay; (6) the employee's gross wages; (7) deductions; and (8) net wages. (JSF, ¶¶ 12, 14, at Exhibits 1; 3); (Alvarez Dec., ¶¶ 9 – 10, Exhibits 3 – 5); N.Y. Labor Law, § 195(3).

As revealed by the pay stubs themselves, all versions of the pay stubs utilized by the Company after April 9, 2011 complied with the requirements of the NYLL and WTPA.[22] Each version contained a detailed breakdown of the DM Plaintiffs' wages including both their regular rate of pay and overtime pay, as well as all other information required by law. Accordingly, BBB is entitled to summary judgment on Plaintiffs' claim regarding proper wage statements and/or pay stubs (Count IV).

---

[22] Further, to the extent Plaintiffs base their claim of improper wage statements on the employees gross wage amounts being improper in light of BBB's use of the FWW, those claims fail because, as set forth above, the pay provided to the Plaintiffs was correct.

## **CONCLUSION**

For the foregoing reasons, BBB respectfully requests that the Court grant its motion for summary judgment in its entirety.

Dated: October 27, 2017

Respectfully submitted,

BED BATH & BEYOND INC.

/s/ Jonathan L. Sulds

Justin F. Keith (*pro hac vice*)
Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA 02110
Telephone: 617.310.6230
Fax: 617.897.0930
keithj@gtlaw.com

Jonathan L. Sulds
Greenberg Traurig, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, NY 10166
Telephone: 212.801.9200
Fax: 212.801.6400
suldsj@gtlaw.com

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x
                                :

DANYELL THOMAS, RASHAUN F. FRAZER,
ANDRAE WHALEY, ELENI MIGLIS, CHERYL A.
STRYCHARZ, and DANIELLE BROWN, individually
and on behalf of all other employees similarly situated

Civil Action No. 16-cv-8160

    Plaintiffs

v.

  BED BATH AND BEYOND, INC.

    Defendant.
----------------------------------------------------------------

## CERTIFICATE OF SERVICE

      I hereby certify that on October 27, 2017 a true copy of the above document was served upon the attorney of record for each other party by ECF filing.

Dated: October 27, 2017

New York, New York

                                  */s/ Jonathan L. Sulds*
                                  Jonathan L. Sulds
                                  Greenberg Traurig, LLP
                                  MetLife Building
                                  200 Park Avenue, 34th Floor
                                  New York, NY 10166
                                  Telephone: 212.801.9200
                                  Fax: 212.801.6400
                                  suldsj@gtlaw.com

*NY 246847276v11*