UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
                             :

DANYELL THOMAS, RASHAUN F. FRAZER,   :
ANDRAE WHALEY, ELENI MIGLIS, CHERYL A.  :   Civil Action No. 16-cv-8160
STRYCHARZ, and DANIELLE BROWN, individually and :
on behalf of all other employees similarly situated,  :
                             :

    Plaintiffs,                         :

v.                                  :

  BED BATH AND BEYOND, INC.          :

    Defendant.                     x
------------------------------------------------------------------

## BED BATH & BEYOND INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Defendant Bed Bath and Beyond Inc. ("BBB") respectfully submits this statement of undisputed material facts[1] in support of its motion for summary judgment seeking to dismiss the unpaid overtime claims of Plaintiffs Danyell Thomas, Rashaun Frazer, Andrae Whaley, Cheryl Strycharz, and Danielle Brown (collectively, the "DM Plaintiffs") (Counts I and II). BBB also submits undisputed material facts relating to the opt-in Plaintiffs who worked as Department Managers during the relevant time period.[2]

Finally, BBB submits undisputed material facts in support of its motion for summary judgment on all Plaintiffs' claims relating to wage notices and statements under the NYLL. (Counts III and IV).

---

[1] The undisputed facts set forth herein are in addition to the parties' joint statement of undisputed facts, which was filed with the Court on October 6, 2017. (Dkt. 147).
[2] For purposes of this motion, BBB is deeming the "relevant time period" as 6 years prior to the filing of the Complaint in this action pursuant to the New York Labor Law's governing statute of limitations. Accordingly, BBB does not include any facts prior to October 18, 2010.

A.    **Background**

1.      BBB is a retailer in the home furnishing industry and, during the relevant time period here, BBB employed Department Managers ("DMs") in its retail stores. (Joint Statement of Undisputed Facts ("JSF"), ¶¶ 1-3 (Dkt. 147)).

2.      All DMs were classified as non-exempt employees and were paid overtime for all hours worked over 40. Prior to March of 2015, BBB paid its DMs in New York, New Jersey, and Connecticut overtime pursuant to the FWW methodology as set forth in 29 C.F.R. § 778.114. (JSF, ¶¶ 4–5).

3.      BBB and the DM Plaintiffs had a clear mutual understanding that BBB would pay the DM Plaintiffs their fixed weekly salary each week, regardless of the number of hours they worked. (*See* JSF, at Exhibits 5–47; Declaration of Lauren Alvarez ("Alvarez Dec."), ¶ 7).

4.      The DM Plaintiffs' fixed weekly salaries were sufficient to provide compensation at a regular rate not less than the legal minimum wage. (JSF, ¶ 8).

5.      The actual number of hours worked by the DM Plaintiffs fluctuated from week to week. (*See* Alvarez Dec., ¶ 5, Exhibits 25 – 28; 30 – 35; 37 – 40; 42 – 44; 46 – 48; 50 – 52; 54 – 55).

6.      The DM Plaintiffs received their fixed weekly salaries each week, regardless of the number of hours they worked. (*See* Alvarez Dec., ¶ 4, Exhibits 25 – 28; 30 – 35; 37 – 40; 42 – 44; 46 – 48; 50 – 52; 54 – 55).

7.      The DM Plaintiffs received a fifty percent (50%) overtime premium in addition to their fixed weekly salary for all hours worked over 40 during each work week. (*See* Alvarez Dec., ¶ 6, Exhibits 25 – 28; 30 – 35; 37 – 40; 42 – 44; 46 – 48; 50 – 52; 54 – 55); (JSF, ¶ 4).

8.      Upon being hired or promoted to the position of DM, all DMs received and signed documents showing what their base annual salary would be if they worked 40 (or fewer) hours per

week and that the dollar value (per overtime hour) for hours worked over 40 would vary due to BBB's use of the FWW. (JSF, ¶¶ 6 – 7; 9 – 10).

9.      Upon hire, DMs also attended orientation where they were given an example paystub demonstrating the FWW calculation. (Alvarez Dec., ¶ 7, Exhibit 1); (Declaration of Justin F. Keith ("Keith Dec."), at Exhibit 1 (Furlong Dep., 85:18 – 21)).

10.     DMs were paid on a bi-weekly basis and were given pay stubs from BBB each pay period setting forth their pay. (JSF, ¶ 12).

11.     DMs were also given an employee handbook, which explicitly informs the DMs that it is their responsibility to review their pay stub, the hours they worked, the pay they received, and any deductions taken. The handbook instructs the DMs that, if they notice an error in their paycheck, to tell their supervisor immediately. (Alvarez Dec., ¶ 8, Exhibit 2).

12.     During the relevant time period, BBB had two versions of the pay stubs received by the DM Plaintiffs (one referencing "additional pay" and the other containing a "Fluctuating Overtime Breakdown"). Both versions contained (i) the dates of work covered by that payment of wages; (ii) the name of the employee; (iii) the name of the Company; (iv) the Company's address and phone number; (v) the employee's rate of pay; (vi) the employee's gross wages; (vii) deductions; and (viii) net wages. (Alvarez Dec., ¶ 9, Exhibits 3; 4).

13.     BBB also employs Assistant Store Managers ("ASMs") in its retail stores. ASMs are classified as exempt and do not receive overtime for hours worked over 40. ASMs also receive(d) pay stubs from BBB each pay period. (JSF, ¶ 14).

14.     The pay stubs received by ASMs contained (i) the dates of work covered by that payment of wages; (ii) the name of the employee; (iii) the name of the Company; (iv) the Company's address and phone number; (v) the employee's rate of pay; (vi) the employee's gross wages; (vii) deductions; and (viii) net wages. (Alvarez Dec., ¶ 10, Exhibit 5).

**B.**     **Plaintiff Rashaun Frazer**

15.     Rashaun Frazer worked as a DM for BBB in New York from October 31, 2011 to January 17, 2015. (Alvarez Dec., ¶ 29, Exhibit 29).

16.     Upon being hired and annually thereafter, Rashaun Frazer received and signed written Notice and Acknowledgement of pay rate forms that contained: (i) his rate of pay and the basis thereof; (ii) the regular pay day designated by BBB; (iii) BBB's name; (iv) the physical address of BBB's main office; and (v) BBB's telephone number. (*See* JSF, at Exhibit 6).

17.     In his first year as a DM, from on or about October 31, 2011 to on or about October 28, 2012, Rashaun Frazer's fixed weekly salary was $996.40. (JSF, at Exhibit 6). During this time period, Rashaun Frazer received his fixed weekly salary each bi-weekly pay period, regardless of the number of hours he worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 25, Exhibit 25).

18.     The number of hours Rashaun Frazer worked in his first year as a DM fluctuated from week to week and ranged anywhere from 47.5 or 48.25 hours to 55.25 or 57.25 hours, and anywhere in between. (*See id.*).

19.     In his second year as a DM, from on or about October 29, 2012, to on or about December 8, 2013, Rashaun Frazer's fixed weekly salary was $1,013.94. (JSF, at Exhibit 6). During this time period, Rashaun Frazer received his fixed weekly salary each bi-weekly pay period, regardless of the number of hours he worked, except for the pay period ending November 10, 2013, when Rashaun Frazer was on a leave of absence. Rashaun Frazer also received a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶¶ 16; 26, Exhibits 20; 26).

20.     The number of hours Rashaun Frazer worked in his second year as a DM fluctuated from week to week and ranged anywhere from 47.5 or 48 hours to 51.5 or 52.25 hours, and anywhere in between. (*See* Alvarez Dec., ¶ 26, Exhibit 26).

21.     In his third year as a DM, from on or about December 9, 2013, to on or about November 8, 2014, Rashaun Frazer's fixed weekly salary was $1,034.05. (JSF, at Exhibit 6). During this time period, Rashaun Frazer received his fixed weekly salary each bi-weekly pay period, regardless of the number of hours he worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 27, Exhibit 27).

22.     The number of hours Rashaun Frazer worked in his third year as a DM fluctuated from week to week and ranged anywhere from 47.5 or 48 hours to 50 or 50.25 hours, and anywhere in between. (*See id*.).

23.     In his final months as a DM, from on or about November 9, 2014 to on or about January 17, 2015, Rashaun Frazer's fixed weekly salary was $1,054.89. During this time period, Rashaun Frazer received his fixed weekly salary each bi-weekly pay period, regardless of the number of hours he worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 28, Exhibit 28).

24.     The number of hours Rashaun Frazer worked in his final months as a DM fluctuated from week to week and ranged anywhere from 45.98 or 46.96 hours to 50.16 hours, and anywhere in between. (*See id*.).

25.     Throughout his entire time as a DM during the relevant period, Rashaun Frazer was paid: 1) a fixed weekly salary each week for all hours worked, except for the one pay period where he was on an unpaid leave of absence in 2013 as set forth in ¶ 20 above; and 2) overtime calculated pursuant to the FWW for each hour worked over 40 in a workweek.

**C.     Plaintiff Danyell Thomas**

26.     Danyell Thomas worked as a DM for BBB in New York from December 7, 2009 to May 11, 2015. (Alvarez Dec., ¶ 36, Exhibit 36).

27.     Beginning January 6, 2012 and annually thereafter, Danyell Thomas received and signed written Notice and Acknowledgement of pay rate forms that contained: (i) her rate of pay and the basis thereof; (ii) the regular pay day designated by BBB; (iii) BBB's name; (iv) the physical address of BBB's main office; and (v) BBB's telephone number. (*See* JSF, at Exhibit 8).

28.     From on or about October 18, 2010 to on or about December 12, 2010, Danyell Thomas's fixed weekly salary was $961.51. During this time period, Danyell Thomas received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 30, Exhibit 30).

29.     The number of hours Danyell Thomas worked from October 18, 2010 to December 12, 2010 fluctuated from week to week and ranged anywhere from 47.5 hours to 52.25 hours, and anywhere in between. (*See id.*).

30.     From on or about December 13, 2010 to on or about December 11, 2011, Danyell Thomas's fixed weekly salary was $975.92. During this time period, Danyell Thomas received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 31, Exhibit 31).

31.     The number of hours Danyell Thomas worked from December 13, 2010 to December 11, 2011 fluctuated from week to week and ranged anywhere from 47.5 or 48.25 hours to 52.5 or 55 hours, and anywhere in between. (*See id.*).

32.     From on or about December 12, 2011 to on or about December 9, 2012, Danyell Thomas's fixed weekly salary was $1,000.40. (JSF, at Exhibit 8). During this time period, Danyell Thomas received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 32, Exhibit 32).

33.    The number of hours Danyell Thomas worked from December 12, 2011 to December 9, 2012 fluctuated from week to week and ranged anywhere from 47.5 hours to 48.75 hours. (*See id.*).

34.    From on or about December 10, 2012 to on or about December 8, 2013, Danyell Thomas's fixed weekly salary was $1,000.36. (JSF, at Exhibit 8). During this time period, Danyell Thomas received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 33, Exhibit 33).

35.    The number of hours Danyell Thomas worked from December 10, 2012 to December 8, 2013 fluctuated from week to week and ranged anywhere from 47.5 hours to 49 hours. (*See id.*).

36.    From on or about December 9, 2013 to on or about December 20, 2014, Danyell Thomas's fixed weekly salary was $1,045.69. (JSF, at Exhibit 8). During this time period, Danyell Thomas received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, except for the pay period ending January 5, 2014, in which a payroll error occurred and for which Danyell Thomas will be reimbursed. Danyell Thomas also received a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶¶ 13; 21; 34, Exhibit 34).

37.    The number of hours Danyell Thomas worked from December 9, 2013 to December 20, 2014 fluctuated from week to week and ranged anywhere from 45.73 hours to 49.25 hours. (*See* Alvarez Dec., ¶ 34, Exhibit 34).

38.    From on or about December 20, 2014 to March of 2015 when BBB stopped using the FWW, Danyell Thomas's fixed weekly salary was $1,066.78. During this time period, Danyell Thomas received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours

she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 35, Exhibit 35).

39.     The number of hours Danyell Thomas worked from December 20, 2014 through February of 2015 fluctuated from week to week. (*See id*.).

40.     Throughout her entire time as a DM during the relevant period, Danyell Thomas was paid: 1) a fixed weekly salary each week for all hours worked, except for the one pay period where a payroll error occurred and for which she has been reimbursed; and 2) overtime calculated pursuant to the FWW for each hour worked over 40 in a workweek.

**D.    Plaintiff Andrae Whaley**

41.     Andrae Whaley worked as a DM for BBB in New York from July 18, 2011 to July 23, 2016. (Alvarez Dec., ¶ 41, Exhibit 41).

42.     Upon being hired and annually thereafter, Rashaun Frazer received and signed written Notice and Acknowledgement of pay rate forms that contained: (i) his rate of pay and the basis thereof; (ii) the regular pay day designated by BBB; (iii) BBB's name; (iv) the physical address of BBB's main office; and (v) BBB's telephone number. (*See* JSF, at Exhibit 10).

43.     In his first year as a DM, from on or about July 18, 2011 to on or about August 19, 2012, Andrae Whaley's fixed weekly salary was $1,101.40. (JSF, at Exhibit 10). During this time period, Andrae Whaley received his fixed weekly salary each bi-weekly pay period, regardless of the number of hours he worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 37, Exhibit 37).

44.     The number of hours Andrae Whaley worked in his first year as a DM fluctuated from week to week and ranged anywhere from 47.5 or 47.75 hours to 56.75 or 58.25 hours, and anywhere in between. (*See id*.).

45.     In his second year as a DM, from on or about August 20, 2012 to on or about July 21, 2013, Andrae Whaley's fixed weekly salary was $1,131.68. (JSF, at Exhibit 10). During this time period, Andrae Whaley received his fixed weekly salary each bi-weekly pay period, regardless of the number of hours he worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 38, Exhibit 38).

46.     The number of hours Andrae Whaley worked in his second year as a DM fluctuated from week to week and ranged anywhere from 47.5 or 48 hours to 55.75 or 66 hours, and anywhere in between. (*See id*.).

47.     In his third year as a DM, from on or about July 22, 2013 to on or about August 2, 2014, Andrae Whaley's fixed weekly salary was $1,156.58. (JSF, at Exhibit 10). During this time period, Andrae Whaley received his fixed weekly salary each bi-weekly pay period, regardless of the number of hours he worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 39, Exhibit 39).

48.     The number of hours Andrae Whaley worked in his third year as a DM fluctuated from week to week and ranged anywhere from 47.75 or 48 hours to 51.75 or 62.06 hours, and anywhere in between. (*See id*.).

49.     From on or about August 3, 2014 to March of 2015 when BBB stopped using the FWW, Andrae Whaley's fixed weekly salary was $1,182.02. During this time period, Andrae Whaley received his fixed weekly salary each bi-weekly pay period, regardless of the number of hours he worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 40, Exhibit 40).

50.     The number of hours Andrae Whaley worked from August 3, 2014 through the end of February 2015 fluctuated week to week and ranged anywhere from 46.05 or 47.5 hours to 50 hours, and anywhere in between. (*See id*.).

51.     Throughout his entire time as a DM during the relevant period, Andrae Whaley was paid: 1) a fixed weekly salary each week for all hours worked; and 2) overtime calculated pursuant to the FWW for each hour worked over 40 in a workweek.

**E.     Plaintiff Cheryl Strycharz**

52.     Cheryl Strycharz worked as a DM for BBB in New York from January 7, 2008 to July 20, 2012. (Alvarez Dec., ¶ 45, Exhibit 45).

53.     On January 9, 2012, Cheryl Strycharz received and signed a written Notice and Acknowledgement of pay rate form that contained: (i) her rate of pay and the basis thereof; (ii) the regular pay day designated by BBB; (iii) BBB's name; (iv) the physical address of BBB's main office; and (v) BBB's telephone number. (*See* JSF, at Exhibit 12).

54.     From on or about October 18, 2010 to on or about June 26, 2011, Cheryl Strycharz's fixed weekly salary was $1,218.34. During this time period, Cheryl Strycharz received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 42, Exhibit 42).

55.     The number of hours Cheryl Strycharz worked from October 18, 2010 to June 26, 2011 fluctuated week to week and ranged from 47.5 hours to 47.66 hours. (*See id*.).

56.     From on or about June 27, 2011 to on or about June 24, 2012, Cheryl Strycharz's fixed weekly salary was $1,242.8. (JSF, at Exhibit 12). During this time period, Cheryl Strycharz received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 43, Exhibit 43).

57.     The number of hours Cheryl Strycharz worked from June 27, 2011 to June 24, 2012 fluctuated week to week and ranged from 47.5 hours to 51.25 hours. (*See id*.).

58.     From on or about June 25, 2012 to on or about July 20, 2012, when Cheryl Strycharz was terminated from BBB, Cheryl Strycharz's fixed weekly salary was $1,270.02. During this time period, Cheryl Strycharz received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 44, Exhibit 44).

59.     The number of hours Cheryl Strycharz worked in her final few weeks at BBB fluctuated. (*See id.*).

60.     Throughout her entire time as a DM during the relevant period, Cheryl Strycharz was paid: 1) a fixed weekly salary each week for all hours worked; and 2) overtime calculated pursuant to the FWW for each hour worked over 40 in a workweek.

**F.      Plaintiff Danielle Brown**

61.     Danielle Brown worked as a DM for BBB in New York from November 27, 2006 to July 5, 2012. (Alvarez Dec., ¶ 49, Exhibit 49).

62.     On January 2, 2012, Danielle Brown received and signed a written Notice and Acknowledgement of pay rate form that contained: (i) her rate of pay and the basis thereof; (ii) the regular pay day designated by BBB; (iii) BBB's name; (iv) the physical address of BBB's main office; and (v) BBB's telephone number. (*See* JSF, at Exhibit 14).

63.     From on or about October 18, 2010 to on or about November 28, 2010, Danielle Brown's fixed weekly salary was $882.16. During this time period, Danielle Brown received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 46, Exhibit 46).

64.     The number of hours Danielle Brown worked from October 18, 2010 to November 28, 2010 fluctuated week to week and ranged from 50.5 hours to 54.49 hours. (*See id.*).

65.     From on or about November 29, 2010 to on or about November 27, 2011, Danielle Brown's fixed weekly salary was $895.35. During this time period, Danielle Brown received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 47, Exhibit 47).

66.     The number of hours Danielle Brown worked from November 29, 2010 to November 27, 2011 fluctuated week to week and ranged anywhere from 48.5 or 49.25 hours to 61.5 hours, and anywhere in between. (*See id.*).

67.     From on or about November 28, 2011 to July 5, 2012 when Danielle Brown voluntarily resigned from BBB, Danielle Brown's fixed weekly salary was $915.20. (JSF, at Exhibit 14). During this time period, Danielle Brown received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 48, Exhibit 48).

68.     The number of hours Danielle Brown worked from November 28, 2011 to July 5, 2012 fluctuated week to week and ranged anywhere from 49.25 hours to 52.5 hours, and anywhere in between. (*See id.*).

69.     Throughout her entire time as a DM during the relevant period, Danielle Brown was paid: 1) a fixed weekly salary each week for all hours worked; and 2) overtime calculated pursuant to the FWW for each hour worked over 40 in a workweek.

**G.      Opt-in Plaintiff Radica Kutwaru**

70.     Radica Kutwaru worked as a DM for BBB from April 9, 2012 to October 5, 2015, when she was promoted to the position of Assistant Store Manager. (Alvarez Dec., ¶ 53, Exhibit 53).

71.     From April 9, 2012 to July 7, 2013, Radica Kutwaru worked as a DM in Store 42 in Manhattan New York. (*See id.*).

72.     From July 8, 2013 to July 28, 2013, Radica Kutwaru worked as a DM in Store 103 in Georgia. (*See id*.).

73.     On July 29, 2013, Radica Kutwaru transferred back to Store 42 in Manhattan, New York and worked there as a DM until October 5, 2015. (*See id*.).

74.     Upon being hired and annually thereafter, Radica Kutwaru received and signed written Notice and Acknowledgement of pay rate forms that contained: (i) her rate of pay and the basis thereof; (ii) the regular pay day designated by BBB; (iii) BBB's name; (iv) the physical address of BBB's main office; and (v) BBB's telephone number. (*See* JSF, at Exhibit 16).

75.     In her first year as a DM, from on or about April 9, 2012 to on or about April 14, 2013, Radica Kutwaru's fixed weekly salary was $966.49. (JSF, at Exhibit 16). During this time period, Radica Kutwaru received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, except for the pay period ending June 24, 2012, when Radica Kutwaru was on a leave of absence. Radica Kutwaru also received a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶¶ 17; 50, Exhibits 21; 50).

76.     The number of hours Radica Kutwaru worked in her first year as a DM fluctuated from week to week and ranged anywhere from 47.5 hours to 60.25 hours, and anywhere in between. (*See* Alvarez Dec., ¶ 50, Exhibit 50).

77.     In her second year as a DM, from on or about April 15, 2013 to on or about April 27, 2014, Radica Kutwaru's fixed weekly salary was $990.65. (JSF, at Exhibit 16). During this time period, Radica Kutwaru received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, except for the pay period ending August 4, 2013, when Radica Kutwaru was on a leave of absence. Radica Kutwaru also received a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶¶ 18; 51, Exhibit 51).

78.     The number of hours Radica Kutwaru worked in her second year as a DM fluctuated from week to week and ranged anywhere from 47.5 hours to 63.25 hours, and anywhere in between. (*See* Alvarez Dec., ¶ 51, Exhibit 51).

79.     In her third year as a DM, from on or about April 28, 2014, to March of 2015 when BBB stopped using the FWW, Radica Kutwaru's fixed weekly salary was $1,020.37 (JSF, at Exhibit 16). During this time period, Radica Kutwaru received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, and a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶ 52, Exhibit 52).

80.     The number of hours Radica Kutwaru worked in her third year as a DM fluctuated from week to week and ranged anywhere from 47.5 hours to 51.75 hours, and anywhere in between. (*See id.*).

81.     Throughout her entire time as a DM during the relevant period, Radica Kutwaru was paid: 1) a fixed weekly salary each week for all hours worked; and 2) overtime calculated pursuant to the FWW for each hour worked over 40 in a workweek.

**H.     Opt-in Plaintiff Karla Reynosa**

82.     Karla Reynosa worked as a DM for BBB in New York from May 20, 2013 to February 5, 2015. (Alvarez Dec., ¶ 56, Exhibit 56).

83.     Upon being hired and annually thereafter, Karla Reynosa received and signed written Notice and Acknowledgement of pay rate forms that contained: (i) her rate of pay and the basis thereof; (ii) the regular pay day designated by BBB; (iii) BBB's name; (iv) the physical address of BBB's main office; and (v) BBB's telephone number. (*See* JSF, at Exhibit 21).

84.     In her first year as a DM, from on or about May 20, 2013 to on or about May 11, 2014, Karla Reynosa's fixed weekly salary was $1,199.16. (JSF, at Exhibit 21). During this time period, Karla Reynosa received her fixed weekly salary each bi-weekly pay period, regardless of the

number of hours she worked, except for pay periods ending July 7, 2013, August 4, 2013, and September 1, 2013, where she was on a personal leave of absence due to previous vacation plans she discussed with BBB upon being hired. Karla Reynosa also received a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶¶ 19; 54, Exhibits 22; 54).

85.     The number of hours Karla Reynosa worked in her first year as a DM fluctuated from week to week and ranged anywhere from 47.5 hours to 52.5 hours, and anywhere in between. (*See* Alvarez Dec., ¶ 54, Exhibit 54).

86.     In her second year as a DM, from on or about May 12, 2014 to on or about February 5, 2015 when Karla Reynosa was terminated, Karla Reynosa's fixed weekly salary was $1,199.16. (JSF, at Exhibit 21). During this time period, Karla Reynosa received her fixed weekly salary each bi-weekly pay period, regardless of the number of hours she worked, except for the pay periods ending May 25, 2014 and June 8, 2014, for which there were payroll errors that were corrected the following pay periods ending June 8, 2014 and July 5, 2014, as well as the pay period ending February 14, 2015, in light of Karla Reynosa's termination in the middle of that pay period. Karla Reynosa also received a fifty percent (50%) overtime premium for all hours worked over 40. (Alvarez Dec., ¶¶ 22 – 24; 55, Exhibits 23; 24; 55).

87.     The number of hours Karla Reynosa worked in her second and final year as a DM fluctuated from week to week and ranged anywhere from 47.5 hours to 50.57 hours, and anywhere in between. (*See* Alvarez Dec., ¶ 55, Exhibit 55).

88.     Throughout her entire time as a DM during the relevant period, Karla Reynosa was paid: 1) a fixed weekly salary each week for all hours worked; and 2) overtime calculated pursuant to the FWW for each hour worked over 40 in a workweek.

I.    **Plaintiff Eleni Miglis**

89.    Eleni Miglis worked as an ASM for BBB in New York from July 13, 2009 to March 19, 2015. (*See* Alvarez Dec., ¶ 58, Exhibit 58).

90.    Beginning February 22, 2012, and annually thereafter while Eleni Miglis was an Assistant Store Manager, Eleni Miglis received and signed written Notice and Acknowledgement of pay rate forms that contained: (i) her rate of pay and the basis thereof; (ii) the regular pay day designated by BBB; (iii) BBB's name; (iv) the physical address of BBB's main office; and (v) BBB's telephone number. (*See* Alvarez Dec., ¶ 57, Exhibit 57).

Respectfully submitted,


BED BATH AND BEYOND INC.

By its attorneys,

/s/ Jonathan L. Sulds_____
Jonathan L. Sulds
Justin F. Keith
Greenberg Traurig LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, NY 10166
(212) 801-9200
suldsj@gtlaw.com
keithj@gtlaw.com