USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/21/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
: 
DANYELL THOMAS, RASHAUN F. FRAZER,　　　　　:
ANDRAE WHALEY, ELENI MIGLIS, CHERYL A.　　　:
STRYCHARZ, and DANIELLE BROWN, individually　:
and on behalf of all others similarly situated,　　　　:
: 
Plaintiffs,　　　:
: 
-v-　　　　　　　　　　　　:
: 
BED BATH AND BEYOND, INC.,　　　　　　　　　　:
: 
Defendant.　　　:
: 
------------------------------------------------------------------X

16 Civ. 8160 (PAE)

OPINION & ORDER

**PAUL A. ENGELMAYER, District Judge:**

This decision resolves cross-motions for summary judgment filed by plaintiffs, who are employees at the home-goods retailer Bed Bath & Beyond, Inc. ("BBB"), and their employer, BBB, the defendant. Plaintiffs bring claims under the Fair Labor Standards Act ("FLSA") and New York Labor Law. The motions turn on whether BBB paid a subset of employees, its Department Managers ("DMs"), in conformity with the "Fluctuating Work Week" method ("FWW")—a method for calculating overtime compensation which the FLSA permits under certain circumstances and which BBB used until March 2015.

For the reasons that follow, the Court, finding that BBB properly implemented this method of compensation, grants BBB's summary judgment motion on plaintiffs' overtime compensation claims (Counts I and II of the Second Amended Complaint) and denies the DMs' motion.[1]

---

[1] BBB separately seeks summary judgment on claims (Counts III and IV) by DMs and Assistant Store Managers that BBB failed to provide proper wage notices in violation of the NYLL and the

## I.  Background[2]

### A.  Facts

BBB is a home-furnishings retailer with stores in the New York area.  JSF ¶¶ 1, 5.

The DMs in this case include the five named plaintiffs (Rashaun Frazer, *id.* ¶ 16, Danyell Thomas, *id.* ¶ 26, Andrae Whaley, *id.* ¶ 36, Cheryl Strycharz, *id.* ¶ 47, and Danielle Brown, *id.* ¶ 57) and 17 opt-in plaintiffs (Radica Kutwaru, *id.* ¶ 68, Guy-Robert Desir, *id.* ¶ 78, Bryan LaForest, *id.* ¶ 83, Karla Reynosa, *id.* ¶ 91, Elizabeth Padilla, *id.* ¶ 101, Cuthbert Baptiste, *id.* ¶ 111, Hector Caraballo, *id.* ¶ 121, Byron Villacres, *id.* ¶ 132, Andrew Certoma, *id.* ¶ 142, John Cutajar, *id.* ¶ 152, Alexis Carree, *id.* ¶ 159, Anthony Rollock, *id.* ¶ 170, Erick Ricardo Olivia, *id.*

---

Wage Theft Protection Act, 2010 N.Y. Laws ch. 564.  *See* Def. Br. at 4.  Plaintiffs do not oppose BBB's motion to the extent it seeks dismissal of these claims.  Pl. Br. at 2 n.2.  Accordingly, the Court dismisses these counts with prejudice.

[2] The Court's account of the underlying facts of this case is drawn from the parties' submissions on the motions for summary judgment, including the Declarations (and attachments) of Lauren Alvarez, Dkt. 155; Justin F. Keith, Dkt. 156; and James Emmet Murphy, Dkt. 160; as well as the parties' Joint Statement of Undisputed Material Facts, Dkt. 147 (the "JSF"), and respective Rule 56.1 statements and counterstatements.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The parties' counter-statements of facts mark certain statements as "disputed" but, instead of identifying an actual factual inconsistency, often only offer additional context or dispute the relevance of the underlying facts.  Where these counter-statements do not identify a true factual dispute, the Court treats the statement as undisputed.

¶ 178, Jose Alberto Cassia, *id.* ¶ 181, Latia Diaz, *id.* ¶ 184, LeRoy Clarke, *id.* ¶ 187, and Tomika Boyd, *id.* ¶ 190).

Until March 2015, BBB paid DMs in its New York stores overtime according to the FWW method; since then, it has paid DMs overtime at a rate of 1.5 times their regular hourly rate. JSF ¶ 5. Plaintiffs' claims relate solely to the period when BBB used the FWW method.

As to that period, BBB's employees, upon being hired or promoted to the DM position, received several documents explaining their compensation and the operation at BBB of the FWW method for calculating overtime pay. JSF ¶¶ 6–7, 9–13.

First, each DM received a Department Manager Compensation Acknowledgement form. JSF ¶ 9. It explained BBB's compensation methodology. The form stated:

> At the time I was hired, I was told what my anticipated weekly compensation will be and how it will be calculated.
>
> I understand that my weekly compensation consists of two components: (1) a base weekly salary; and (2) an additional amount for all hours above 40 that I work during a week.
>
> I understand that my base weekly salary is compensation for all hours I work in a week. I will get paid this base salary for each week I work, whether or not I work 40 hours in that week, subject to the Company's sick day and leave policies.
>
> I further understand that I will be scheduled for no less than 47 hours per week, but that my actual hours worked will fluctuate depending on the needs of my store.

*Id.*

Second, each DM received documents setting out what the DM's base annual salary would be if he or she worked 40 (or fewer) hours per week. JSF ¶ 6. These documents also set out what the DM's expected total earnings would be for a week in which he or she worked 47 hours (*i.e.*, 7 overtime hours). *Id.* Each DM also received documents explaining that the dollar

value (per overtime hour) for hours worked above 40 hours would vary due to BBB's use of the FWW method. JSF ¶ 7.[3]

Third, all DMs received annual notice and acknowledgment of pay rate forms. Each stated:

> Overtime rate of pay: rate fluctuations based on hours worked in excess of 40*.
>
> *As a Department Manager, your base weekly salary is compensation for all hours you have worked in the week, regardless of the number of hours you work. You will also be paid an additional amount for any hours worked over 40 in one week. Please refer to the attached Department Manager's Bi-Weekly Pay Stub for a detailed explanation.*

*Id.* ¶ 10.

Fourth, plaintiffs received pay stubs from BBB each pay period setting forth their pay. *Id.* ¶ 12.

BBB's compensation practices for DMs as to overtime are helpfully illustrated by examples drawn from the pay records of named plaintiff Rashaun Frazer. As of January 21, 2014, Frazer's base weekly salary was $1,034.22—he was paid that sum regardless whether he worked overtime. *See* JSF ¶ 20; *id.*, Ex. 6. Frazer's weekly hours, however, like those of the other DMs, varied. JSF ¶ 23. His pay stubs reflected how the additional pay—on top of the base pay of $1,034.22—was tabulated for weeks in which Frazer worked more than 40 hours. *See* JSF, Ex. 6; Alvarez Decl., Ex. 1. For example, for a week in which Frazer worked 47 hours, BBB, to calculate his additional compensation for overtime, would divide his base compensation figure ($1,034.22) by the total number of hours he worked that week (47). *See generally* Alvarez Decl., Ex. 1. This would yield the hourly rate that BBB would pay Frazer for his overtime hours

---

[3] The parties agree that, for all weeks, all DMs were paid at rates that met or exceeded the applicable minimum wage laws. JSF ¶ 8.

for that week ($21.79 per hour). Thus, for the 7 hours of overtime Frazer worked, he would be paid $152.53 (*i.e.*, $21.79/hour x 7 hours). *See id.* In a week in which Frazer worked more overtime hours, this formula would result in Frazer's being paid a higher absolute overtime wage but a smaller rate per overtime hour. So, for example, had Frazer worked 54 hours in particular week, BBB would calculate his overtime hourly rate by dividing his weekly compensation ($1,034.22) by the total number of hours worked in the week (54). This would yield an overtime hourly rate of $18.97; and for his 14 hours of overtime work, Frazer would be paid $265.58 (*i.e.*, $18.97/hour x 14 hours). *See id.*

The DMs were scheduled to work 47.5 hours per week. BBB's Response to Pl. 56.1 ¶¶ 1. The parties agree that, in almost every week at issue, the plaintiff DMs in fact either worked 40 or more hours, or, when annual or sick leave time taken that week was added to their actual hours worked, were credited with having worked 40 or more hours. *See id.* ¶¶ 2, 6.

However, as discussed below, on several occasions, three plaintiff DMs—Reynosa, Frazer, and Thomas—worked fewer than 40 hours in a given week, as a result of having taken unpaid leave. *See infra* § II.A.2. For these weeks, Reynosa, Frazer, and Thomas did *not* receive their base salary, but instead, a lesser figure. *See id.* Plaintiffs' argument that BBB misapplied the FWW method relies heavily on these DMs' receipt for those several weeks of lower-than-usual base pay. Based on this alleged misapplication of FWW, plaintiffs argue that BBB is precluded from using that method to calculate the overtime pay of these employees and the other plaintiff DMs. Plaintiffs contend instead that BBB is obliged to calculate overtime pay by using the more generous "time and a half" method that the FLSA prescribes for workers paid a regular hourly rate.

## B. Procedural History

On October 18, 2016, plaintiffs filed this action, bringing claims on behalf of DMs and AMs under the FLSA and NYLL. Dkt. 1.

On November 18, 2016, plaintiffs filed an amended complaint. Dkt. 11. On December 16, 2016, BBB answered the amended complaint. Dkt. 14. On June 16, 2017, after plaintiffs had moved for collective certification under the FLSA, *see* Dkt. 28, the Court granted plaintiffs leave to file a second amended complaint and denied as moot the motion for conditional class certification, *see* Dkt. 79.

On June 28, 2017, plaintiffs filed their second amended complaint, the operative pleading before the Court. Dkt. 90 (the "SAC"). On July 12, 2017, plaintiffs moved again to certify a collective action under the FLSA. *See* Dkts. 105–07. On August 9, 2017, that motion became fully briefed. *See* Dkts. 112 (Def. Op. Br.), 134 (Pl. Reply Br.). On August 25, 2017, however, plaintiffs informed the Court that they intended to move for summary judgment on the DMs' FWW claim and to move for class certification of their NYLL claims under Rule 23. *See* Dkt. 141. On September 13, 2017, at a pre-motion conference, the Court set a briefing schedule for the cross-motions for partial summary judgment; held in abeyance, pending resolution of the summary judgment motions, plaintiffs' motion for collective certification under the FLSA; and directed that plaintiffs defer filing any motion for class certification under Rule 23 until after the summary judgment motions were resolved. *See* Dkt. 144.

On October 27, 2017, BBB filed its motion for partial summary judgment and supporting documents, including its Rule 56.1 Statement. Dkts. 152–56. On November 21, 2017, plaintiffs filed their brief in opposition and in support of their cross-motion for partial summary judgment. Dkts. 159–61. On December 15, 2017, BBB filed its brief in opposition to the plaintiffs' motion and in further support of its own, Dkt. 166, and, on January 5, 2018, a revised brief in opposition,

Dkt. 171, and a counterstatement of facts in response to plaintiffs' 56.1 statement, Dkt. 172.[4]  On

January 19, 2018, plaintiffs filed their brief in reply.  Dkt. 175.

## II.  Applicable Legal Standards

### A.  Standards for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show [] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a

question of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the

opposing party must establish a genuine issue of fact by "citing to particular parts of materials in

the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.

2009).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a

verdict for the non-moving party.  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d

Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.

2010) (internal quotation marks and citation omitted).  "Only disputes over facts that might

affect the outcome of the suit under the governing law" will preclude a grant of summary

judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether

there are genuine issues of material fact, the Court is "required to resolve all ambiguities and

draw all permissible factual inferences in favor of the party against whom summary judgment is

---

[4] On December 18, 2017, plaintiffs sought leave to file their 56.1 Statement, which they had
failed to file with their opening brief.  *See* Dkt. 168.  On December 20, 2017, the Court granted
this relief, while allowing BBB to re-file its opposition brief upon review of plaintiffs' 56.1
Statement.  Dkt. 169.  Plaintiffs filed their 56.1 Statement that day.  Dkt. 170.

sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Cariou v. Prince*, 784 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)); *see also, e.g., AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 187 F. Supp. 3d 428, 435 (S.D.N.Y. 2016).

**B.    Standards Governing the Fluctuating Work Week Method**

The FLSA sets a maximum number of hours employees may work per week without additional, overtime compensation. *See* 29 U.S.C. § 207. For every hour a non-exempt employee works above 40 in a given week, the FLSA requires employers to pay "a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). "This higher rate for overtime is intended to apply financial pressure on employers to spread employment and to compensate employees for the burden of a workweek exceeding forty hours." *Russell v. Wells Fargo & Co.*, 672 F. Supp. 2d 1008, 1010 (N.D. Cal. 2009); *see Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942).

For employees who are paid an hourly wage rate, the calculation of overtime pay is straightforward: The regular rate is the hourly rate. Thus, a non-exempt employee who earns a regular rate of $10 per hour but who works 50 hours in a given week must be paid a total of $550—$10 per hour for the first 40 hours and $15 per hour for the remaining 10 hours.

When an employee is paid a fixed weekly salary for hours that fluctuate each week, however, calculating overtime becomes more challenging. For such employees, employers are

permitted to use the FWW method to comply with the FLSA's overtime requirement. *See O'Brien v. Town of Agawam*, 350 F.3d 279, 287 (1st Cir. 2003) ("The [FWW] method is one of two approved methods in the FLSA regulations for calculating the 'regular rate at which an [employee] is employed' for overtime purposes" and is "intended to cover cases in which a salaried employee whose hours of work fluctuate from week to week . . . receive[s] a fixed amount as straight-time pay for whatever hours" worked in a week, "whether few or many." (internal quotations omitted)). When the FWW method applies, "the minimum overtime rate required by the FLSA is only half-time (*i.e.*, 50% of the regular rate), rather than time-and-a-half (150%)." *Id.* at 286–87; *see generally Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 253–55 (S.D.N.Y. 2013).

This Court has previously addressed the FWW method at length in *Wills*, which raised an issue, not present here, of the impact of paying performance bonuses on an employer's right to use the FWW. As this Court there explained, *see Willis*, 981 F. Supp. 2d at 254, the FWW method derives from the Supreme Court's decision in *Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572 (1942), decided four years after passage of the FLSA. There, an employee sued under § 207 of the FLSA for overtime back pay. His employer had paid him a flat weekly rate, regardless of the number of hours he worked, but had not paid him anything extra for weeks in which he had worked more than 40 hours. The Supreme Court first considered whether the employee's flat weekly wage could be used as the basis for calculating overtime pay under the FLSA. Section 207 requires that overtime pay be based upon the employee's "regular rate," but does not specify how that rate is to be calculated. The Court held that an employer could, under the FLSA, calculate an employee's regular rate by dividing a fixed weekly salary by fluctuating hours, and then use that rate as the basis for calculating overtime pay. *See id.* at 580 ("No

9

problem is presented in assimilating the computation of overtime for employees under contract for a fixed weekly wage for regular contract hours which are the actual hours worked, to similar computations for employees on hourly rates. Where the employment contract is for a weekly wage with variable or fluctuating hours the same method of computation produces the regular rate for each week."). As the Court recognized, this method meant that "the longer the hours the less the rate and the pay per hour"; however, it stated, "[t]his is not an argument . . . against this method of determining the regular rate of employment for the week in question." *Id.*

The Court ultimately held that the employer in *Missel* had violated the FLSA by not paying its employee for the overtime hours he had worked. But as this Court and many others have recognized, the lasting significance of the *Missel* decision is its approval under the FLSA of paying an employee a flat weekly salary for fluctuating hours so long as a premium is also paid of at least "fifty per cent additional for the hours actually worked over the statutory maximum[.]" *Id.* at 581; *see also Russell*, 672 F. Supp. 2d at 1011; *Stein v. Guardsmark, LLC*, No. 12 Civ. 4739 (JPO), 2013 WL 3809463, at *2 (S.D.N.Y. Jul. 23, 2013); *Wills*, 981 F. Supp. 2d. at 254–55.

In 1968, the United States Department of Labor ("DOL") issued an interpretative rule, 29 C.F.R. § 778.114, which clarified how and when employers could use the "half-time" method discussed in *Missel* to calculate overtime pay. The rule permits an employer to pay a fixed weekly salary "for the hours worked each workweek, whatever their number," so long as it provides extra pay "for all overtime hours worked at a rate not less than one-half [the] regular rate of pay." 29 C.F.R. § 778.114(a). This regular rate "will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week." *Id.* Paying the employee one-half of

the "regular rate" for all hours worked above 40 for the week "satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement." *Id.* "In other words, because the fixed salary compensates the employee for all the hours worked that week—whether more or less than 40—paying an additional 50% of the "regular rate" for every hour above 40 complies with the FLSA's requirement that employers pay time-and-a-half for overtime hours." *Wills*, 981 F. Supp. 2d. at 255. The FWW is thus a method for complying with the FLSA's overtime requirements, not an exception thereto.

Under § 778.114, employers may use the FWW method only if all of the following five conditions are met:

> (1) the employee's hours fluctuate from week to week;
>
> (2) the employee receives a fixed weekly salary which remains the same regardless of the number of hours the employee works during the week (excluding overtime premiums);
>
> (3) the fixed amount is sufficient to provide compensation at a regular rate not less than the legal minimum wage;
>
> (4) the employer and employee have a clear mutual understanding that the employer will pay the employee a fixed salary regardless of the number of hours worked; and
>
> (5) the employee receives a fifty percent (50%) overtime premium in addition to the fixed weekly salary for all hours worked in excess of 40 during the week.

*See Stein*, 2013 WL 3809463, at *3; *accord Wills*, 981 F. Supp. 2d at 255; *Ayers v. SGS Control Servs., Inc.*, No. 03 Civ. 9078 (RMB), 2007 WL 3171342, at *2 (S.D.N.Y. Oct. 9, 2007).

## III.    Analysis

Here, the parties agree that BBB's compensation plan satisfied requirements (3) and (5) of the FWW. BBB's compliance with the first, second, and fourth requirements, however, is in dispute, to wit, whether the DMs received a fixed weekly salary that remained the same,

regardless of the number of hours they worked; whether the DMs' hours fluctuated from week to week; and whether the DMs and BBB had a clear mutual understanding that the DMs would be paid a fixed weekly salary.[5] As to each, summary judgment is warranted for BBB.

## A.    Fixed Weekly Salary

For the FWW to properly apply, an employee must be paid a "a fixed weekly salary which remains the same regardless of the number of hours the employee works during the week (excluding overtime premiums)." *E.g.*, *Wills*, 981 F. Supp. 2d at 255. The DMs advance two theories as to why their salaries were not fixed.

First, they note that BBB gave workers flexible paid-vacation days for the time they worked on holidays or other off days. This, they argue, was an hours-based bonus that should disqualify BBB from being able to use the FWW method. Second, they argue that, on several occasions, BBB "docked" the pay of DMs who, because they availed themselves of unpaid leave or otherwise did not work for all or part of a given week, worked fewer than 40 hours in a given week. Neither theory withstands scrutiny.

### 1.    Bonuses

"'[H]ours-based' bonuses [are] inconsistent with the DOL's regulation regarding the FWW method." *Wills*, 981 F. Supp. 2d at 257. As this Court has recognized, "paying an employee hours-based, or time-based, bonuses and premiums—such as extra pay for holiday,

---

[5] The parties agree that the DOL's regulations implementing the FWW, 29 C.F.R. § 778.114, govern the Court's resolution of BBB's compliance with the FLSA in this case. As this Court has previously explained, "Section 778.114 was issued by the DOL as an interpretive bulletin. It was not subject to formal notice and comment rulemaking proceedings, and was therefore itself not entitled to deference. But because § 778.114 represents the Secretary of Labor's implementation of the Supreme Court's holding in *Missel*, courts have afforded it a measure of deference." *Wills*, 981 F. Supp. 2d at 263 (internal citations and quotations omitted). Accordingly, the Court treats those regulations as binding here.

weekend, or night work—offend[s] § 778.114's requirement of a 'fixed weekly salary.'" *Id.* at 255–56. On that point, federal courts are in near-unanimous agreement. *Id.*; *see, e.g.*, *Ayers*, 2007 WL 3171342, at *2 (increased pay for sea-duty, working days off, and working holidays violates the FWW method's fixed salary requirement); *Brantley v. Inspectorate America Corp.*, 821 F. Supp. 2d 879, 890 (S.D. Tex. 2011) (same, as to off-shore, holiday, and day-off premiums); *Brumley v. Camin Cargo Control, Inc.*, No. 08 Civ. 1798 (JLL), 2010 WL 1644066 (D.N.J. Apr. 22, 2010) (same, as to enhanced lump-sum holiday and day-off pay); *Adeva v. Intertek USA*, No. 09 Civ. 1096 (SRC), 2010 WL 97991 (D.N.J. Jan. 11, 2010) (same, as to enhanced off-shore, holiday, and day-off pay); *Dooley v. Liberty Mut. Ins. Co.*, 369 F. Supp. 2d 81 (D. Mass. 2005) (same, as to premium pay for Saturday work); *O'Brien*, 350 F.3d at 288–89 (same, as to $10 night-shift differential and extra pay for working more than eight hours or during off-duty time). As this Court and those others have recognized, "when an employer pays its employees additional money for hours worked during weekends, holidays, or nights, the employees who work such premium hours will earn more than those who work normal, non-premium hours." *Wills*, 981 F. Supp. 2d at 256.

The DMs argue that BBB ran afoul of this principle by giving additional time off to DMs who worked on holidays (or on their scheduled days off). Pl. Br. at 20. The Department of Labor, in a regulation unrelated to the FWW method, treats paid time off as compensation. *See* 29 C.F.R. § 541.604 (discussing the additional compensation an employer may provide to an exempt employee); *see also* NYLL §§ 190(1), 198-c. And that makes sense: an employee's pay, whether for hours worked or for compensable time off, is clearly compensation. Thus, if BBB had rewarded those DMs who worked longer hours with extra compensable vacation days or

hours, BBB could be said to have paid bonuses for extra hours worked, disentitling it to use of the FWW. *See Wills*, 981 F. Supp. 2d at 256.

The DMs, however, do not argue that BBB engaged in this practice here, and the factual record would not support such a claim. Instead, the DMs seize on a different, undisputed fact: that BBB allowed DMs who worked on a holiday (*e.g.*, Labor Day)—when other DMs enjoyed paid time off—to take an alternative paid day off later (*i.e.*, to "bank" the holiday for future use). *See* Def. Resp. to Pl. 56.1 ¶ 5; *see also* Pl. Br. at 20; Pl. Reply Br. at 6–8. But allowing a worker who is obliged to work on a paid holiday, or on a scheduled day off, an alternative paid day off is not inconsistent with the FWW's fixed-weekly-salary requirement. It does not lead to such an employee's receipt of any *additional* compensation for hours worked—*i.e.*, an hours-based bonus. Rather, it guards against inequitable treatment of such an employee, by assuring that each employee is given the same number of paid days off, and that an employee who is obliged to work on a holiday or scheduled day off does not forfeit a paid day off. Plaintiffs have not identified any case law or DOL regulation supporting the claim that the FWW is breached by this practice.

### 2.    "Docked" Base Pay

Plaintiffs next assert that several DMs had their pay "docked" in a manner they claim is inconsistent with the FWW method's requirement of fixed base pay. Specifically, in pursuing summary judgment, plaintiffs identified 12 weeks in which, they argue, a DM's weekly pay was below his or her base pay rate, Pl. Br. at 16; *see* Murphy Decl. ¶¶ 7–8, although plaintiffs have

subsequently confined their claim of non-conformity with FWW to only six of these weeks, *see* Pl. Reply. Br. at 2.

### a. The 12 Weeks at Issue

The 12 weeks at issue can be sorted into several categories.

***Weeks with no hours worked (6 weeks)***: First, there are six weeks in which the DM at issue worked no hours at all. These are:

- The first week of the pay period ending 6/24/12 for DM Kutwaru, *see* Alvarez Decl., Ex. 7;
- The first week of the pay period ending 8/4/13 for DM Kutwaru, *see id.*, Ex. 8;
- The first week of the pay period ending 8/4/13 for DM Reynosa, *see id.*, Ex. 10;
- The second week of the pay period ending 9/1/13 for DM Reynosa, *see id.*, Ex. 11;[6]
- The first week of the pay period ending 11/10/13 for DM Frazer, *see id.*, Ex. 6; and
- The second week of the pay period ending 7/22/12 for DM Brown.[7]

Plaintiffs "do not dispute that no payment was required under the FLSA" for these weeks. Pl. Reply Br. at 2. The Court therefore need not—and does not—consider whether nonpayment for those weeks was permissible under the FLSA.

The remaining six weeks in which plaintiffs claim a DM's pay was "docked" include one week worked by DM Thomas, one week worked by DM Frazer, and four weeks worked by DM Reynosa. *See* Murphy Declaration ¶ 8; Alvarez Declaration ¶¶ 12–13; Pl. Reply Br. at 16–17.

---

[6] The parties disagree whether this week—the second week of Reynosa's pay period ending September 1, 2013—counts as a week in which no work was performed. Plaintiffs claim that work was performed. *See* Pl. Reply Br. at 16. But Reynosa's earnings statement for this period identifies the entire second week as "vacation." Alvarez Declaration, Ex. 11. *See id.* Plaintiffs do not point to contrary evidence.

[7] The Court assumes *arguendo* that Brown was not paid for this period, as the parties each proceed on this premise. The summary judgment record, however, does not contain affirmative proof of non-payment. *See* Alvarez Declaration, Ex. 48 (including earnings statements for Brown up to the period ending July 8, 2012, but no later); Murphy Declaration (attaching no earnings statements for Brown at all).

***DM Thomas (1 week)***:  In the first week of the pay period ending January 5, 2014—that is, the week ending December 29, 2013—Thomas received less than her full weekly base salary. *See* Alvarez Decl., Ex. 12.  BBB concedes that Thomas was errantly underpaid by $50 for that week, and represents that it is "issuing a check to rectify the error."  BBB Br. at 19.

***DM Frazer (1 week)***:  In the second week of the pay period ending November 10, 2013, Frazer received less than his full weekly base salary. *See* Alvarez Decl., Ex. 6.  BBB explains that Frazer, who had been out on unpaid leave for the previous week, *see id.*, remained on unpaid FMLA leave on the Monday of that week, and that this resulted in correspondingly reduced weekly pay for Frazer for that week, BBB Reply Br. at 18; *see* Alvarez Decl., Ex. 6.  The record does not reflect a contrary explanation for Frazer's receipt of reduced pay for that week.

***DM Reynosa (4 weeks)***:  With respect to two weeks in which Reynosa received less than a full week's pay, BBB explains, this was because of payroll errors that were promptly rectified. *See* BBB Reply. Br. at 17–18.  Specifically, as to week two of the pay period ending May 25, 2014, Reynosa—after temporarily being made whole by a cash advance that she later repaid—was made whole by a check that compensated her for the underpayment; when Reynosa again was underpaid the next pay period, she was again recompensed by check. *See* Alvarez Decl. ¶¶ 22–23; *id.* Exs. 14–17.  On the undisputed record, the existence of individual paychecks for these two periods in sums less than Reynosa's base salary reflects the use of compensatory checks to make Reynosa whole for payroll errors.

As to Reynosa's other two weeks at issue:  For the first week of the pay period ending February 14, 2015, *i.e.*, the week ending February 7, 2014, Reynosa received less than her full weekly salary. *See id.* Ex. 13.  The parties agree, however, that Reynosa's final day of employment with BBB was February 5, 2014. JSF ¶ 100.  Finally, for the first week of the pay

period ending July 7, 2013, *i.e.*, the week ending June 30, 2013, Reynosa was paid for 28.75 hours. Alvarez Decl., Ex. 9. It is undisputed that Reynosa took unpaid vacation during this week, as she and BBB had agreed she could do at the time she was hired. *See* Pl. Br. at 17; BBB Reply Br. at 18; Alvarez Decl. ¶ 19 & Exs. 9, 22.

### b. Discussion

Plaintiffs argue that the fact that DMs Thomas, Frazer, and Reynosa were paid less than their base salary during the six weeks at issue amounts to a "docking" of base pay inconsistent with the FWW's requirement of a fixed weekly salary. They argue that the reasons for any shortfall in base pay, even an inadvertent payroll error, are irrelevant. *See* Pl. Br. at 16; Pl. Reply Br. at 2. Because these six weeks present distinct issues, the Court addresses them separately.

To begin with, the "docking" of Thomas's salary for one week is of no legal significance. It is undisputed that Thomas was underpaid by $50 due to a single payroll error, since rectified. Plaintiffs do not argue—and the record would not permit them to argue—that this underpayment reflects a policy or practice of any kind, including of "docking" base salary. And plaintiffs have not supplied any authority to the effect that an inadvertent payroll glitch or lapse disqualifies an employer from using the FWW. For the same reasons, the two weeks in which BBB initially underpaid Reynosa but promptly made her whole do not jeopardize its use of the FWW method.

To the extent plaintiffs rely on Reynosa's pay during the week ending February 7, 2014, that claim is also easily put to rest. For that week, as noted, Reynosa received less than her full weekly base salary; she was paid *pro rata* for her work through February 5, 2014, her last day of employment. JSF ¶ 100. But DOL regulations governing the FWW method condone BBB paying her for less than a full week. They provide that an employee may "be paid a pro rata share of [her] salary in the initial or terminal week of [her] employment when [she] is not in

payroll status for the entire week." U.S. Department of Labor Field Operations Handbook

§ 32b04b(c), *available at* https://www.dol.gov/whd/FOH/index.htm.

The remaining two weeks at issue require more extended discussion. These are BBB's

(1) reduction of Reynosa's base pay for the week ending June 30, 2013, to reflect that she took

some time off that week on an unpaid vacation that she had negotiated with BWW at the start of

her employment; and (2) reduction of Frazer's base pay for the week ending November 10, 2013,

to reflect that he took a day's unpaid leave. With respect to both weeks, plaintiffs rely on DOL

opinion letters, which, they argue, provide that to comply with the FWW, an employer may not

permit an employee to take unpaid leave time. Specifically, in 1991, the DOL advised that an

employer "may substitute paid leave for employee absences provided the total compensation in

any week when the absences occur equals the employee's guaranteed fixed salary" but that,

"[w]here there is no paid leave to substitute for employee absences, the employer may not make

deductions from the employee's guaranteed fixed salary under the fluctuating workweek method

of compensation." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on Fair Labor

Standards Act (FLSA) (August 20, 1991), 1991 WL 11648489, at *1. And, in 2006, the DOL

advised that the FWW regulation "does not authorize" an employer that otherwise provides paid

sick leave to "take full day deductions from the salary of an employee paid on the fluctuating

workweek method after the employee has exhausted the employee's sick leave bank, or before

he or she has earned enough sick leave to cover the absence." U.S. Dep't of Labor, Wage &

Hour Div., Opinion Letter on Fair Labor Standards Act (FLSA) (May 12, 2006), 2006 WL

1488849, at *1. Based on these DOL letters,[8] plaintiffs argue that the FWW method required

---

[8] *See also, e.g.*, U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on Fair Labor Standards Act (FLSA) (May 28, 1999), 1999 WL 1002415, at *2 (explaining that, "[f]or an employee paid according to the fluctuating workweek method, who is utilizing intermittent or reduced schedule

that BBB pay its employees their fixed weekly salary, even with respect to days or weeks in which they took unpaid leave, and that BBB's failure to do so requires that all plaintiff DMs be retroactively paid "time and a half" pay for their overtime hours. Pl. Br. at 13–16; Pl. Reply Br. at 2. Defendants counter that the DOL regulations speak to corporate *policies*, not isolated incidents, and that BBB's limited failure to comply with DOL regulations does not evince an intention by BBB to compensate its employees on a basis other than FWW. *See* BBB Reply Br. at 19–20.

Of the two weeks at issue—Reynosa's and Frazer's—in which BBB paid a DM less than his or her base weekly salary, Frazer's presents the more substantial issue. BBB's negotiated agreement with Reynosa, reached at the outset of her employment, to accommodate and permit her to take three previously scheduled vacations (one of which occurred during the week of June 30), without pay, during her first summer at BBB, *see* Alvarez Decl. ¶ 19; *id.* Ex. 22, is fairly squared with the FWW. The DOL's opinion letters simply do not speak to the idiosyncratic circumstance of an employee who takes a position paid under the FWW and negotiates a one-time leave arrangement to cover previously scheduled holidays. And there is no policy reason under the FLSA why an employer's agreement to accommodate a prospective employee in this fashion should block it from using the FWW as a matter of course going forward, whether for that employee or others. Revealingly, too, plaintiffs have withdrawn their claim that the FWW method was breached by BBB's non-payment to Reynosa of her base salary during two later weeks the same summer (in late July and late August, *see supra* & Alvarez Exs. 10–11) when,

---

FMLA leave, the employer may during the period of the leave compensate the employee on an hourly basis and pay only for the hours worked, including time and one-half the employee's regular rate for overtime hours. If the employer does not elect to convert the employee's compensation to an hourly basis, no deduction may be made for FMLA leave absences.").

pursuant to the same negotiated arrangement with BBB, Reynosa took unpaid vacation. But there is no clear basis for distinguishing between those vacation weeks and the partial vacation week of June 30, 2013: If to comply with the FWW an employer must pay an employee her base pay for negotiated unpaid leave, the same should presumably apply to a day's unpaid leave and a week's unpaid leave.

In contrast, Frazer's pay for the week ending November 10, 2013, in which he worked 39.75 hours but took Monday off on unpaid leave, presents a difficult question of compliance with the FWW. Read literally, the language of the 1991 and 2006 DOL opinion letters are difficult to square with BBB's denial to Frazer of his full pay for that week based on one day's unpaid leave. A federal district court for the District of Columbia, in the most thoroughgoing treatment of the DOL's opinion letters, has construed these to require an employer to pay the employee his or her full base salary under such circumstances:

> The Department's opinion, which the Court finds persuasive, is unambiguous on this point: employers who use the FWW method of compensation must compensate their employees in full, notwithstanding absences for personal reasons, even if the employee has not accrued sufficient leave time to cover the absence. . . . The only recognized exception is for disciplinary actions where the employee's misconduct resulted in missed work.

*Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 60–61 (D.D.C. 2006). To be sure, there are sound policy reasons that could have led the DOL to the opposite result. Applied literally, the DOL's policy might discourage employers from granting extended unpaid time off from work (above and beyond the employee's allocated leave) to attend to personal circumstances, lest doing so jeopardize the employer's right to pay overtime under the FWW method. But that policy judgment is for the DOL, not this Court.

Even assuming, however, that BBB's withholding of some Frazer's base pay for the week of November 10, 2013 was inconsistent with the FWW, on the summary judgment record,

that was the lone occasion in which the evidence supports that BBB failed to pay him a fixed

weekly salary. As Judge Oetken has explained, the fact that a lapse was anomalous as opposed

to more systematic is relevant to whether the employee is disentitled to use the FWW method.

As he emphasized in *Stein,* 2013 WL 3809463 at \*5, the DOL's "regulations that define what it

means to be paid on a 'salary basis' are instructive." They define an employee paid on a "salary

basis" as one who:

> receives each pay period on a weekly, or less frequent basis, a predetermined
> amount constituting all or part of the employee's compensation, which amount is
> not subject to reduction because of variations in the quality or quantity of the work
> performed . . .

*See* 29 C.F.R. § 541.602 (quoted in *Stein,* 2013 WL 3809463, at \*5). As Judge Oetken also

noted, "DOL regulations further provide that '[a]n employer who makes improper deductions

from salary shall lose [the right to invoke certain FLSA exemptions] *if the facts demonstrate that*

*the employer did not intend to pay employees on a salary basis.*'" *Id.* (quoting 29 C.F.R.

§ 541.603(a)) (emphasis added). Whether an employer did or did not intend to pay employees

on a salary basis is evidenced by a number of factors, including, significantly, the number and

duration of the employer's lapses:

> [T]he number of improper deductions, particularly as compared to the number of
> employee infractions warranting discipline; the time period during which the
> employer made improper deductions; the number and geographic location of
> employees whose salary was improperly reduced; the number and geographic
> location of managers responsible for taking the improper deductions; and whether
> the employer has a clearly communicated policy permitting or prohibiting improper
> deductions.

29 C.F.R. § 541.603(a). As Judge Oetken noted: "[C]ourts have looked skeptically on single-

incident docking of pay as proof that an employer did not intend to pay an employee on a salary

basis," *see Stein*, 2013 WL 3809463 at \*6, such that a single incident of docking of pay is also

insufficient to evidence that an employer failed to pay a fixed weekly salary under the FWW, *see*

*id.* at *6–7; *cf. Yourman v. Giuliani*, 229 F.3d 124, 130 (2d Cir. 2000) ("[I]n determining what constitutes an 'actual practice' of pay deductions, we bear in mind the object of the inquiry: whether the employer's practices reflect an 'objective intention' to pay its employees on a salaried basis.").

Applying the DOL's multi-factor test here, summary judgment must be granted for BBB. The record reflects only six weeks—out of more than 1,000—in which a DM was paid less than his or her full weekly base salary. And of those six weeks, only one week (Frazer's) is indicative of a failure to pay a fixed weekly salary to DMs, and only one other week (Reynosa's, under the arrangement she negotiated attendant to joining BBB) is arguably so. Whether measured by raw number or duration, the infraction(s) here, as a matter of law, are far too few and isolated to establish that either Frazer or Reynosa, let alone their fellow DMs, were not paid a fixed weekly salary. *See Stein*, 2013 WL 3809463, at *7. And the record as to such infractions is now closed, with discovery in this case complete and with BBB having moved in 2015 to a new method for overtime compensation. Accordingly, to the extent plaintiffs' claim is based on BBB's alleged noncompliance with this element of the FWW method, plaintiffs' attack fails as a matter of law.

B.     **Fluctuating Hours**

The parties agree that whether the DMs' hours "fluctuated" within the meaning of the FLSA is a question of law as to which the relevant facts are undisputed. Rather, the parties dispute whether an employee's schedule can be said to "fluctuate" if the employee's weekly hours, in practice, never or rarely fell below a 40-hour workweek, but did vary above that threshold. The DMs argue that only if their hours regularly fell below 40 hours per week can the FWW requirement of fluctuation be met. BBB counters that employees' schedules "fluctuated"

22

within the meaning of the FLSA because their workweeks varied, although these hours almost always were at or over 40 hours.

The governing regulation states, in pertinent part, that an employee whose "hours of work ... fluctuate from week to week" may be paid a fixed salary "pursuant to an understanding with his employer that he will received such fixed amount as straight time pay for *whatever hours he is called upon to work in a workweek, whether few or many*." 29 C.F.R. § 778.114 (emphasis added). The regulation further refers to the "hours worked each workweek" as "whatever their number," *id*, as opposed to, say, "40 hours or some other fixed weekly work period." It adds that payment of a fixed salary "in such a situation is intended to compensate the employee at straight time rates for *whatever* hours are worked in the workweek." *Id.* (emphasis added).

This language, by its terms, requires merely that an employee's hours vary, not that the hours vary above and below 40 hours per week, or that a certain percentage of employee-weeks entail hours below 40. As a district court in this Circuit has explained,

> Though the reference to "few or many" reasonably may be interpreted as referring to work hours both below and above a standard workweek, *i.e.*, 40 hours, that reference clearly does not impose, or even suggest, a *requirement* that an employee's hours must vary in both directions in order to come within the FWW rule. This interpretation is confirmed by the next sentence, which discusses a fixed salary that pays for "hours worked each workweek, *whatever their number*, rather than for working 40 hours or some other fixed weekly work period." Again, the regulation does not specify that the weekly work-hour deviations must be in both directions; the phrase "whatever the number" plainly contemplates that an employee's work hours could be either more or less than the 40-hour or other fixed workweek, or both.

*Ramos v. Telgian Corp.*, 176 F. Supp. 3d 181, 195 (E.D.N.Y. 2016).

To be sure, there are sound policy reasons that could have led the DOL to impose a requirement along the lines that plaintiffs urge. As the Seventh Circuit has reasoned, "[t]he possibility of a higher hourly rate in one week justifies a reduction in overtime compensation if,

in future weeks, hours rise above 40." *Heder v. City of Two Rivers, Wisconsin*, 295 F.3d 777, 779 (7th Cir. 2002). Or, as a district court in this Circuit has observed: "For a fluctuating work week arrangement to make sense to both parties, employees should offset their relative loss from a grueling work week far above forty hours with the benefit of full pay for weeks that clock-in at less than forty hours. Otherwise, employees have not bargained for anything but decreasing marginal pay as they work longer and longer hours at work." *Hasan v. GPM Investments, LLC*, 896 F. Supp. 2d 145, 150 (D. Conn. 2012); *see also Costello v. Home Depot USA, Inc.*, 944 F. Supp. 2d 199, 208 (D. Conn. 2013). On the other hand, there is no assurance that, under a different system for overtime compensation, employees would be paid more: An employer who is required to pay employees 150% of a fixed hourly wage for overtime hours might—subject to applicable minimum wage laws—compensate by paying employees a lower hourly rate.

In the end, BBB was entitled to design its FWW system within the bounds authorized by DOL's regulations, and the governing regulations do not require an employment arrangement in which weekly hours necessarily fluctuate above and below 40. The regulations require simply that weekly hours fluctuate. *See Telgian*, 176 F. Supp. 3d at 195; *Stein*, 2013 WL 3809463, at *4.[9] There is no dispute that the DMs' hours varied. Accordingly, on this element, too, of the FWW method, plaintiffs fail to establish BBB's noncompliance and BBB has demonstrated its adherence to the FWW.

C.     **Mutual Understanding**

Finally, plaintiffs claim noncompliance by BBB with the "mutual understanding" element of the FWW method. This element requires that the employee and employer both

---

[9] As in *Telgian*, the Court also notes that the DMs' hours *did* fluctuate below 40 hours per week, "however infrequently and however related to personal vacation or a company-recognized holiday." 176 F. Supp. 3d at 195 n.21.

understood that the employee would be paid a fixed salary regardless of the number of hours worked. Notably, it is not required that an "employee . . . actually understand the full details of how her employer's FWW program operated." *Stein*, 2013 WL 3809463, at * 8. Plaintiffs here deny they shared the requisite understanding with BBB. The assembled record, however—most notably the written notices given to the DMs in connection with their employment—makes clear that the DMs were apprised of the essential facts of BBB's overtime compensation system. Any misapprehension could be, at most, as to details.

The DOL's regulation "sets forth in clear terms what the parties must clearly and mutually understand: 'that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period.'" *Id.* (quoting *Bailey v. Cnty. Of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996)). However, "[t]his rule does not require an understanding of how the FWW method works or that overtime will be paid according to this method." *Id.*

Here, the various forms and notices reviewed above amply educated DMs as to how their compensation would be calculated, including that a fixed weekly salary would be paid regardless of hours worked, and that overtime would be paid for hours worked above 40. These forms further notified the DMs that their overtime pay, measured per hour, would fluctuate depending on the number of hours worked in a given week, such that the more overtime hours worked, the lower the per-hour overtime rate would be. JSF ¶ 9. The DMs were further given documents illustrating these points. The documents explained to each DM his or her base annual salary and expected earnings for a 47-hour workweek. JSF ¶ 6.

In light of these written notices, plaintiffs' submissions on summary judgment focus instead on the deposition testimony of various plaintiff DMs. But this testimony at most can be

invoked to support that, subjectively, certain DMs did not understand aspects of the compensation scheme. *See, e.g.*, Pl. Response to Def. 56.1 at ¶ 3. It does not, however, permit a finding that the DM plaintiffs lacked an understanding that their "employer [would] pay the employee[s] a fixed salary regardless of the number of hours worked." *Ayers*, 2007 WL 3171342, at *2. Quite the contrary, as the DM plaintiffs each have acknowledged, they received Department Manager Compensation Acknowledgement forms, which stated, in relevant part, "I understand that my base weekly salary is compensation for all hours I work in a week. I will be paid this base salary for each week I work, whether or not I work 40 hours in that week, subject to the Company's sick day and leave policies." JSF ¶ 9.

There is, therefore, no genuine dispute that the DMs knew they would be paid a fixed base salary regardless of their hours worked. *Accord* Dep't of Labor, Wage & Hour Div., Opinion Letter on FLSA (Jan. 14, 2009), https://www.dol.gov/whd/opinion/flsa.htm#2009; *Stein*, 2013 WL 3809463, at *8. This element of the FWW method, too, must be resolved in BBB's favor.

## CONCLUSION

For the foregoing reasons, the Court grants BBB's motion for summary judgment, Dkt. 153, and denies plaintiffs' motion, Dkt. 159. The Court also denies as moot the motion for certification pending at Dkt. 105; this decision is without prejudice to the filing of a renewed

motion as to plaintiffs' remaining claims.  The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 105, 153 and 159.[10]

By Monday, February 26, 2018, the parties are hereby directed to submit a joint letter advising the Court of the parties' views as to next steps in this case, including as to the remaining claims (*e.g.*, those of the Assistant Managers).


SO ORDERED.

Paul A. Engelmayer
_____
Paul A. Engelmayer
United States District Judge


Dated: February 21, 2018
       New York, New York

---

[10] BBB requested oral argument on its motion.  Dkt. 167, 174.  Because the Court did not find argument necessary, the Court denies that motion.  Therefore, in addition to closing the substantive motions for summary judgment, the Clerk of Court is respectfully directed to close the motions pending at Dkts. 167 and 174.