Ibt9thoc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3     DANYELL THOMAS, ET AL.,

4                    Plaintiffs,

5            v.                          16 CV 8160 (PAE)

6     BED BATH AND BEYOND, INC.,

7                    Defendant.

8    ------------------------------x
                                         New York, N.Y.
9                                        November 29, 2018
                                         10:34 a.m.
10
     Before:
11
                        HON. PAUL A. ENGELMAYER
12
                                              District Judge
13
                            APPEARANCES
14
     HANG & ASSOCIATES
15       Attorney for Plaintiffs
     BY:  KELI LIU
16
     GREENBERG TRAURIG
17       Attorneys for Defendant
     BY:  JONATHAN L. SULDS
18       JUSTIN F. KEITH

19

20

21

22

23

24

25

Ibt9thoc

1          (Case called)

2          MS. LIU:  Good morning.  This is Keli Liu for the

3     plaintiffs.

4          THE COURT:  Good morning, Ms. Liu.

5          MR. SULDS:  On behalf of the defendants, Greenberg

6     Traurig, Jonathan Sulds and.

7          MR. KEITH:  Justin Keith.

8          THE COURT:  Off the record for a moment.

9          (Discussion off the record)

10          THE COURT:  So with that, on the record, this is a

11     pretrial conference and we have a formidable, but manageable,

12     agenda today.

13          To begin with, I have rulings on the motions in limine

14     which I intend, in a moment, to read aloud.  And after that I

15     want to take up a variety of granular issues relating to the

16     upcoming trial, including understanding a little better about

17     judge versus jury issues and some of the allocation of

18     responsibility.

19          I want to get a more specific understanding of the

20     length of the trial and who will be testifying, particularly

21     given orders that limited the number of defense witnesses and

22     particularly given some of the motion in limine rulings which

23     may have implications.

24          I want to understand a little better the nature of the

25     exhibits to which the parties do not agree with respect to

Ibt9thoc

1    admissibility.  I was confused as to some of what you intended.

2              And then, ultimately, I want to set a trial date, set

3    a date for final conference for the week before, and want to

4    also discuss the process for hopefully achieving a settlement

5    here that would moot the trial.

6              So that's my agenda.  If there are other things you'll

7    want to put on the table, I will give you a floor to do that

8    towards the end of the conference.

9              With that let's begin with the motions in limine.

10             In advance of trial, each party has moved in limine on

11   a variety of matters.  Both parties have submitted helpful

12   briefs, for which the Court thanks counsel.

13             I'm about to put on the record the bases for the

14   Court's rulings on the motions in limine.  There will not be a

15   written decision, instead, the Court will issue only a brief

16   bottomline order setting out the fact of the disposition of the

17   motions.  So, if the reasons for the Court's rulings are

18   important to you, you'll need to order today's transcript.

19             The Court will begin with the legal standards

20   governing motions in limine briefly.  "The purpose of an in

21   limine motion is to aid the trial process by enabling the Court

22   to rule in advance of trial on the relevance of certain

23   forecasted evidence, as to issues that are definitely set for

24   trial, without lengthy argument at, or interruption of, the

25   trial.  Evidence should not be excluded on a motion in limine

Ibt9thoc

unless such evidence is clearly inadmissible on all potential grounds."  Hart v. RCI Hospital Holdings, Inc., 90 F.Supp. 3d 250, 257-58 (S.D.N.Y. 2015).  A court's ruling on such a motion is "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in a party's proffer."  Luce v. United States, 469 U.S. 38, 41 (1984).

Several issues raised by these motions in limine turn on the application of Federal Rule of Evidence 403.  That rule provides that a district court may exclude "relevant evidence" defined elsewhere as material evidence having "any tendency to make a fact more or less probable than it would be without the evidence," Federal Rule of Evidence 401 -- if its probative value is substantially outweighed by a danger of one or more of the following:  "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," citing Rule of Evidence 407.

The Court first addresses plaintiffs' motions before turning to defendant's motions.

The Court first resolves plaintiffs' first three motions in limine.  Because the three implicate related issues, the Court addresses them together.

In their first motion, plaintiffs ask the Court to exclude evidence, testimony, and/or arguments regarding any plaintiff's separation from employment at Bed Bath and Beyond,

Ibt9thoc

which I will refer to as Bed Bath.  Plaintiffs argue, first,
that this evidence is irrelevant under Rules 401 and 402;
second, that even if this evidence is slightly relevant, it is
misleading and likely to cause unfair prejudice to plaintiffs,
requiring exclusion under the Rule 403 balancing inquiry; and,
third, that it is impermissible character evidence, prohibited
by Rule 404(b)(1).

            In their second motion, plaintiffs ask the Court to
exclude evidence of any plaintiff's unsatisfactory job
performance as irrelevant under Rules 401 and 402, and likely
to mislead the jury and cause undue prejudice to plaintiffs, so
as to warrant exclusion under Rule 403.

            In their third motion, plaintiffs ask the Court to
exclude evidence regarding the workplace disciplinary record of
any plaintiff.  They do so for the same reasons:  That such
evidence is irrelevant under Rules 401 and 402, and that its
probative value is substantially outweighed by the likelihood
of misleading the jury and causing undue prejudice to the
plaintiffs under Rule 403.

            Bed Bath counters that all three categories of
evidence are relevant under Rules 401 and 402.  Bed Bath argues
that such evidence, by shedding light on a plaintiff's job
performance, also sheds light on the plaintiff's job
responsibilities, and therefore has a proper place in the
jury's consideration of whether the plaintiff's role as an

Ibt9thoc

1    Assistant Store Manager at Bed Bath made him or her an exempt

2    employee under the FLSA and New York Labor Law.  Bed Bath

3    contends that the evidence of terminations, performance

4    deficiencies, and disciplinary infractions on the part of the

5    plaintiffs is not prejudicial at all.  Therefore, under Rule

6    403, its probative value outweighs any minimal prejudicial

7    effect.  As to the issue of a job termination, Bed Bath argues

8    that even if such an event may reflect negatively on the

9    terminated plaintiff's character, it is still admissible under

10   Rule 404 because it bears on a relevant issue, job duties, and

11   indeed is highly relevant to that issue.  Finally, Bed Bath

12   argues that all three motions in limine are premature, and that

13   evidentiary issues of this nature should be decided one by one,

14   at trial, on the basis of the specific item of evidence at

15   issue.

16          The Court evaluates all three motions in limine

17   together, as has Bed Bath, because they all implicate similar

18   concerns.

19          Subject to an important caveat that I will address in

20   a few moments, the Court is going to grant each of the

21   plaintiffs' three motions to exclude all evidence in each of

22   the three categories of evidence in question.  The Court thus

23   excludes as a general matter all evidence of any plaintiff's

24   separation, unsatisfactory job performance, and disciplinary

25   records.

Ibt9thoc

1          The Court does so pursuant to Rule 403.  On the

2    probative value side of the equation, the fact that a plaintiff

3    employee was terminated, disciplined, or written-up for poor

4    performance has, in general, limited probative value as to the

5    key question here, which involves the nature of the plaintiff's

6    job responsibilities.  To be sure, the Court certainly

7    understands that, in a particular or one-off situation, the

8    communications attendant to a termination or disciplinary

9    write-up or negative performance review might hypothetically be

10   revealing as to the employee's actual job responsibilities.

11   For example, a write-up of an employee for poor performance

12   supervising his or her 20 direct reports potentially might

13   reveal the nature of the supervisory duties of that employee.

14   And, continuing with the hypothetical, it's possible that no

15   evidence other than the disciplinary write-up would reveal

16   those supervisory job responsibilities.  In those hypothetical

17   circumstances, there could be meaningful probative value to a

18   communication relating to a write-up of an employee attendant

19   to his or her termination, discipline, or adverse performance

20   review.  But Bed Bath has not given the Court any reason to

21   assume that these hypothesized circumstances are commonplace,

22   if they even existed at all.  On the contrary, it strikes the

23   Court as improbable that, particularly in an established and

24   sizeable concern such as Bed Bath, documents, memos, or other

25   quotidian materials do not exist to set out job duties.

Ibt9thoc

```
1    Indeed, it may be the case that a portion of a performance
2    review sets out the duties without needing to go on to talk
3    about whether or not the individual employee lived up to those
4    to duties.  The Court therefore finds, in the main, that the
5    testimony or documents relating to these categories of adverse
6    employment events have very limited incremental probative value
7    as to the nature of the employee's job duties.  And I would
8    note that Bed Bath does not argue that the termination,
9    discipline, or performance write-ups, adverse performance
10   write-ups of employees are probative for other reasons, for
11   instance, as bearing on employees' credibility.  The Court
12   shares Bed Bath's implicit assessment that adverse employment
13   actions do not, in the main, bear materially on an employee's
14   credibility as a testifying witness, even if one could
15   hypothesize a circumstance in which they did.
16           On the countervailing side of the Rule 403 equation,
17   there are substantial and obvious reasons why admitting
18   evidence of negative performance evaluations, adverse
19   disciplinary actions, or terminations have the capacity to
20   unfairly prejudice a plaintiff.  To be sure, the date when an
21   plaintiff's employment ceased, and any gaps in the employee's
22   active service, are presumably germane, at a minimum, to
23   damages.  The Court does not exclude evidence of the date of an
24   employee's service as an Assistant Store Manager.  But exposing
25   to the jury reasons for any of these adverse employment events
```

Ibt9thoc

has the potential to tarnish an employee with irrelevant yet

denigrating facts.  An employee may have been terminated,

disciplined, or poorly reviewed on account of tardiness, theft,

workplace harassment, substance abuse, incompetence, rudeness,

or a host of imageable other shortcomings or misdeeds.  These

are completely irrelevant to the issues at hand.  The matter of

job responsibilities on which the issue of an FLSA or New York

labor law exemption turns is an objective one.  Bed Bath's

proposal to allow such negative details to be put before the

jury has the obvious potential to prejudice the plaintiff, who

would be seen as a bad actor or undeserving of monetary

recovering regardless of his or her -- and it has obvious

potential to distract and confuse the jury from the discrete

objective issues at hand.  Further, a claim of improper conduct

by a plaintiff would presumably or rather evidence -- receipt

of evidence of improper conduct by a plaintiff offered by Bed

Bath would presumably entitle that plaintiff to rebut with his

or her side of the story.  Bed Bath's approach to these issues

thus squarely implicates all of the countervailing

considerations under ruled 340; specifically, the risks that

probative value could be substantially outweighed by about the

potential for unfair prejudice, for confusion, and for delay.

The Court therefore finds, with no difficulty, that the Rule

403 balance requires, as a general matter, the exclusion of the

adverse evidence at issue.

Ibt9thoc

1          The Court therefore grants the plaintiffs' first three
2     motions in limine.  There is, however, as I said beings an
3     important caveat.  Bed Bath has not proffered any specific
4     instance of terminations, poor job writeups or disciplinary
5     actions which it contends actually bear upon the issue at hand:
6     Whether an Assistant Store Manager's responsibilities make him
7     or her exempt under the FLSA or New York labor law.  That may
8     be telling.  There may be no such evidence whatsoever
9     concretely that is meaningfully probative of the issues in this
10    case.  But, con severe able, in an individual circumstance, the
11    communications attendant to an adverse employment action taken
12    against a plaintiff may significantly bear on the employee's
13    job responsibilities as an Assistant Store Manager an,
14    conceivably, they may do so in a way that other more quotidian
15    records do not.  I've already offered the possibility a that
16    the way in which a performance review is written upsets out in
17    one place the responsibilities and in another place the
18    evaluation of how the employee did.  There is ever I've
19    possibility that a redacted performance review that sets out
20    the responsibilities but does not include the negative
21    evaluation of the plaintiff may well be admissible.  Bed Bath
22    may well have an argument, in individual listed circumstances,
23    for admission under Rule 403 of evidence tending to reveal the
24    adverse employment action.  The Court's ruling today therefore
25    does not preclude Bed Bath from seeking leave of the Court, on

Ibt9thoc

1    an incident or employee or document specific base, to offer

2    such evidence.  For avoidance of doubt, however, the Court

3    expects such an application to be made outside the presence of

4    the jury, in writing, and in advance of the testimony of the

5    employee in question, so that the Court can give such

6    application due care.  Bed Bath may not initiate questioning of

7    a witness about such an adverse employment action without

8    express leave of the Court.  This ruling, therefore, gives Bed

9    Bath the opportunity, in an individual situation, to argue that

10   the Rule 403 balance as to a particular add document or

11   particular adverse action favors its admission, but if Bed Bath

12   seeks is to do so, it must do so with adequate notice so as to

13   give the plaintiffs a chance to assess that alleger and

14   respond, and to give the Court a fair opportunity to reflect

15   and rule.

16          This ends the ruling on that motion.  I will just add

17   that later on one of the things I'm going to be asking you to

18   do is to revise your joint pretrial order to conform to the

19   significantly narrowed scope of the witnesses in the case

20   pursuant to my earlier order and I expect as part of that you

21   will conform the physical proof in the case, for example, the

22   exhibits, performance reviews, so as to be consistent with this

23   ruling.  And I would encourage the parties, as part of that, to

24   identify the redactions you intend in such documents so as to

25   allow Bed Bath to get the legitimate mileage it can out of

Ibt9thoc

1    documents in the employee's file without bringing to bear

2    needless adverse information.

3              Moving on.  The Court has already resolved plaintiffs'

4    fourth motion in limine, involving Bed Bath's many undisclosed

5    witnesses.  And I see that Bed Bath has adapted its proof

6    accordingly.  Later, when we turn to address the trial plan, I

7    will be eager to understand the extent to which the significant

8    reduction in the number of Bed Bath's trial witnesses reduces

9    the parties' estimates of the length of trial.

10             That completes my discussion of plaintiffs' motions.

11   The Court now the turns to Bed Bath's motions.

12             Bed Bath first asks the Court to exclude evidence of,

13   and any reference to, its size and financial condition.  It

14   argues that its size is irrelevant under Rules 401 and 402, and

15   likely to inflame and prejudice the jurors, so as under Rule

16   403 to substantially outweigh any limited probative value.

17   Plaintiffs counter that defendant's size and financial

18   condition are directly relevant to the motives of defendant's

19   executives in labeling plaintiffs as Assistant Store Managers

20   while assigning them to perform primarily nonexempt tasks to

21   save money.  Plaintiffs also argue that the impact of

22   defendant's public image and stock price are relevant to

23   defendant's corporate witnesses's credibility and bias.

24             The Court agrees with Bed Bath and grants its motion

25   in limine.  The overall sides, revenues, and profitability of a

Ibt9thoc

large corporation have no probative value whatsoever as to the

responsibilities of the particular subset of employees denoted

as assistant store managers.  Such information, if put before

the jury by plaintiffs, would serve the patently inappropriate

purposes of inviting the jury either to disfavor Bed Bath as a

large corporate behemoth, or to make the jury more comfortable

finding for the plaintiffs on the ground that any

redistribution here, any recovery here, would represent a

minuscule portion of Bed Bath's revenue.  The jury, however, is

not tasked with being the greater populist or being Robin Hood.

It is tasked with making a granular determination as to

particular employees' job duties, so as to determine whether an

FLSA or New York Labor Law exemption applies, and if it does

not, what the hours worked were of such employees.

          To the extent that plaintiffs imagine that Bed Bath's

profitability or size bears on its motivations to misclassify

plaintiffs, that argument also is meritless.  Any business,

whether large or small, my may misclassify a worker, whether

inadvertently or with the deliberate goal of denying workers

their due in order to profit-maximize.  But one cannot infer

willfulness from corporate size.  Now if plaintiffs had adduced

let's say a memo from corporate headquarters directing that

Assistant Store Managers be misclassified that would be a

different issue.  Such a hypothetical would be strong evidence

of willfulness.  But that memo could exist in a small, medium

Ibt9thoc

size or large employer.  Without more, corporate size simply

does not speak to willfulness.  Small, medium and large

businesses each sometimes obey the law and sometimes each break

it.  Size is no proxy for motive to break the law.

        Under both Rule 401 and 403, the Court therefore

precludes any references to corporate size, stock price,

revenues, profitability, and the like.

        And the ruling, of course, extends to counsel's

arguments, including opening statement.  I am quite concerned

that plaintiffs' counsel somehow imagined that this was

conceivably a proper area for commentary or examination.  To be

crystal clear:  There is to be no commentary by counsel,

including even hints about Bed Bath's size or profitability or

revenues etc., in jury addresses, whatsoever.  Just as defense

counsel are not to dirty up plaintiffs with irrelevant

workplace misconduct, plaintiffs' counsel are not to dirty up

defendant with irrelevant references to corporate size and

financial condition.

        This ruling leaves plaintiffs fully at liberty to

develop their responsibilities as Assistant Store Managers.  It

may be that the size of a particular store and the number of

workers there is germane to that issue -- a worker who has

supervisory responsibilities may need to develop the scope of

the workforce that plaintiff supervised.  I do not know.  But

that is no charter to develop broader evidence of Bed Bath's

Ibt9thoc

corporate size or payroll as a whole.

          Bed Bath next and finally asks the Court to exclude
evidence of, and any reference to, other lawsuits involving it
as irrelevant under Rules 401 and 402; as excludable under Rule
403, on the ground that any probative value of such other
lawsuits is substantially outweighed by, among other factors,
the risk of unfair prejudice; as involving receipt of improper
character evidence under Rule 404; and as inadmissible hearsay
under Rules 801 and 802.  Plaintiffs have not filed an
opposition.

          The Court grants Bed Bath's unopposed motion.  The
fact that other parties have filed suits that are pending
against Bed Bath is irrelevant to the merits of the suit filed
here by these particular plaintiffs.  Whether other workers in
other stores claim misclassification or whether workers in
other stores are quite satisfied with their classifications by
Bed Bath says nothing about whether the plaintiffs here were
wrongly denied overtime by a misclassification.  The fact that
two or more other pending lawsuits involving the same or
similar misclassification claims involving other plaintiffs in
perhaps other stores does not make the claims here more or less
likely meritorious.  Yet, references to such other unresolved
suits would likely be mistaken by the jury as signifying
likelihood of liability in such cases, unfairly prejudicing
defendant.  The Court accordingly precludes, under both Rules

Ibt9thoc

1    401 and 403, any reference to other lawsuits.

2              That concludes the Court's rulings on the motions in

3    limine.

4              All right.  Having taken care of that material, let's

5    turn now to the joint pretrial order and I'll ask everyone to

6    please pull those out.

7              We're going to take a three-minute recess.  I left

8    mine upstairs.

9              Thank you.

10             (Recess)

11             The next issue I want to take up with you involves the

12   allocation of responsibilities as between the judge and jury.

13   I just want to make sure I understand where you're all going

14   here.  The jury will make the misclassification determination.

15   You all agree that the judge will make -- the Court will make,

16   if there is liability found, the ultimate damages

17   determination.

18             You appear to conclude that the jury will determine

19   the work hours that are worked by any employee.

20             Let's put for a moment aside willfulness and good

21   faith.  Let's just stop where we're at.  What do you envision

22   the verdict form then looking like with respect to the jury?

23             Put aside willfulness and good faith.  Just as to the

24   quantitative.  For a given plaintiff, let's suppose there's a

25   misclassification found, let's say for Ms. Miglis, plaintiff,

Ibt9thoc

1    what do you envision the jury finding as to Ms. Miglis that

2    would enable the Court's calculation of damages?

3            MS. LIU:  I would imagine at least there are points

4    specifically finding how much compensable work hours has been

5    performed that will lead to the hours and the specific duties

6    that she actually performed.

7            THE COURT:  Well let me see if I understand it.

8            Is your view a unitary one, which is to say if she was

9    nonexempt, then by definition all of her hours count towards

10   the overtime calculation; or is your view something more

11   nuanced, which is only her work doing nonexempt tasks counts?

12           I thought it was the former.

13           MS. LIU:  It's the former.  Maybe I misunderstood your

14   question.

15           So I see it as two steps.  First the jury is going to

16   determine what did she actually do.  That goes to whether she

17   was actually misclassified.  And then the hours kicks in, the

18   hours becomes matters, because if we decide the first question,

19   she was not misclassified, then the hours really doesn't

20   matter.

21           THE COURT:  Well then you lose the lawsuit.  There is

22   no liability.

23           But assuming that you have won, that's the premise of

24   this line of questioning.  For Ms. Miglis are you envisioning

25   that the jury would then be tasked with finding for each

Ibt9thoc

1    calendar year in which she testified that she worked what her

2    aggregate overtime hours were?

3              Are you imagining a more fine-tuned analysis that

4    might be at the level of the day, week, or month?

5              I'm trying to understand -- I understand that I'm

6    ultimately to do the math here as to damages but that you

7    envision the jury making the fact finding as to number of

8    overtime hours.

9              I'm trying to get a more granular sense of what

10   question would be put to them.

11             MS. LIU:  I would say it's the first version where

12   they would make a more simplified aggregate finding as to how

13   many hours she testified worked --

14             THE COURT:  In a given year or over the course --

15             MS. LIU:  I would say --

16             THE COURT:  It probably has to be on a given year

17   because the salaries may be different each year, right?

18             MS. LIU:  Yes.  But that's going to go down to --

19   because she is going to testify on a weekly basis.  She's not

20   going to be able to testify or at least she's not going to add

21   the math up.  She's going to say this week I worked XYZ number

22   of hours, so they can go and find that.

23             THE COURT:  Let me backup.  In a lot of FLSA cases

24   usually involving small restaurants or nail salons or something

25   nobody keeps records of hours and so unavoidably we have to use

Ibt9thoc

1    proxies like best memory to get there.

2              This is a different type of company.  Are there

3    records reflecting the hours of your client?

4              MS. LIU:  There are, I believe, log-in, log-out

5    computerized records.  But I believe it's not entirely accurate

6    because as assistant manager, the defendants are in the

7    position to correct me if I'm wrong, they were not really

8    required to accurately track it but they did have some kind of

9    computerized log-in log-out, sometimes they would put in, which

10   we intend to introduce as evidence that was produced by

11   defendants.  But I don't believe that the records are complete

12   for all the relevant years.

13             THE COURT:  Is it your view that the computerized

14   log-in and log-out records are a floor but that the employees

15   worked more, or is it your view that they are useful but on any

16   given day the employee might have worked more or less than

17   reflected in the computerized hours?

18             MS. LIU:  Would say it's a general reflection of the

19   floor of the hours because she could have worked a bit longer

20   after she logged out but that would reflect --

21             THE COURT:  But perhaps she just decided to talk about

22   the Super Bowl for two hours with a colleague during the

23   workday and do no work.

24             Why would you assume that the log-in log-out

25   necessarily captures -- why is it a floor as opposed to just

Ibt9thoc

1   sort of a general premise?

2              MS. LIU:  I'm not making the determination.  I'm

3   simply offering it's more likely that the testimony will be

4   that I worked extra beyond the logged out hours, not watching

5   football but doing actual work.  But because she was classified

6   as a manager she was not really required to actually track

7   hours so that in itself reflect -- it's a baseline, I would

8   say.

9              THE COURT:  In any event, though, regardless of what

10  weight the jury attaches to that species of evidence, you're

11  envisioning now that the verdict form as to any individual

12  plaintiff, we'll stick with Ms. Miglis, would ask the jury, if

13  liability were found, to make a finding as to the overtime

14  hours per year?

15             MS. LIU:  Yes.

16             THE COURT:  Defense, on that limited issue, put aside

17  willfulness, good faith, just as to hours tabulation, assuming

18  that you lose on liability, what do you envision the jury being

19  asked that will facilitate my damages calculation?

20             MR. KEITH:  Yes, your Honor.

21             So we think that the evidence will show that there is

22  variation in volume of hours worked that is tied to

23  seasonality, things like back to school, winter holidays and

24  the like.  So we think that a reporting on the verdict form of

25  aggregate hours in a year is not going to be sufficiently

Ibt9thoc

1    granular to conform to what we believe the evidence will show.

2            THE COURT:  Why is that?  In other words -- just move

3    the mic a little closer.

4            In other words, while I understand that a jury in

5    working through the hours might have to say during December we

6    assume greater overtime than during August but that doesn't

7    require the jury to -- there is no reason to require the jury

8    to show it's work and to give a separate finding per month or

9    per holiday season.  That would simply matter if your advocacy

10   and your tote board or your summary witness or however you're

11   going to explain it to the jury as to why over all the course

12   of the year giving bigger estimates for December and smaller

13   for August you come up with X.

14           I'm trying to figure out why the verdict form, for

15   example, would need to fine tune it quite that much.

16           MR. KEITH:  So the reason I think, your Honor, for

17   fine tuning is, if we are at the stage of the case where the

18   jury has found liability as to one or more of the individuals,

19   candidly we want them thinking critically about what the

20   evidence has shown and what's been presented to them.  And I

21   think there's a concern that if it's just an aggregate, give a

22   number of hours on average for the entire year, that that takes

23   away that prompt to think critically; whereas, if you have to

24   lock at the verdict form and go month by month, it may have

25   been a few weeks by that point from the time testimony went in

22

Ibt9thoc

1    about the seasonality and number of hours in January versus

2    March and the like, and then having the jurors go through the

3    mental exercise, which I don't think is going to be a

4    significant burden.  It's simply saying:  OK.  I heard

5    testimony that December is a busy month.  I'm going to

6    attribute this many hours to December.  I've heard testimony

7    that things are slow in May.  I'm going to attribute fewer

8    hours to May, rather than simply trying to lump it all.

9            THE COURT:  I can clearly sort this out later on but

10   either way both of you are envisioning either at a more

11   generalized or more specific level that there will be an entry

12   per plaintiff, either per year or on a more fine-tuned level,

13   with the number of hours.

14           Is there anything else you envision the jury needing

15   to report on the verdict form to facilitate the Court's entry

16   of damages?

17           Do we need to have the jury find the rate of pay or is

18   that something that will be sufficiently undisputed in the

19   evidence that you'll both be fine with my plugging in that

20   number for math purposes?

21           MR. KEITH:  I think the annual compensation is not

22   going to be disputed.  I think that's something the parties can

23   stipulate to.

24           I think the issue of the math and the calculations are

25   all issues that you, as the judge, will decide and what

Ibt9thoc

1    methodology is used to do the arithmetic.  I don't think the

2    jury needs to report anything more than hours.

3              THE COURT:  So do you both agree that the only data

4    point we need the jury for, assuming liability for any

5    plaintiff, is hours.

6              MS. LIU:  Yes.

7              THE COURT:  May I just ask you, defense counsel, just,

8    although there is no need for me to address it now, I'm

9    intrigued.  What's your view about this log-in log-out

10   document?

11             MR. KEITH:  I believe the document that plaintiffs are

12   referring to is an electronic schedule that's generated through

13   a piece of scheduling software that the company used at least

14   for some period of time at issue in this case.  The Assistant

15   Store Managers, as exempt employees, do not log-in and log-out.

16   They don't punch a time clock.  They don't write down when they

17   come in and when they leave.

18             What is in the record and what was produced during

19   discovery is a computer-generated schedule that says for

20   Ms. Miglis, for example, on Monday you're going to be scheduled

21   to work an opening shift so that means you come in at 7 a.m.

22   and that means you leave at 2 p.m., for example.  These are

23   just hypotheticals I'm making up for illustrative purposes.

24             The schedule is simply an expectation and there will

25   be times when someone will work to the schedule, will work

Ibt9thoc

```
 1   fewer hours and there could be times when someone would work --
 2            THE COURT:  What you're telling me is there's
 3   actually -- contrary to the impression I had a moment ago,
 4   there's not any action that an employee takes on any given day
 5   to create the inputting of data as to that person's hours?
 6            MR. KEITH:  That's correct.
 7            THE COURT:  So all we have here is an expectation, and
 8   there will be testimony in whatever direction I get it, as to
 9   whether it's fair to infer that people stuck to the schedule or
10   were early or late as to the start or end date -- end time or,
11   for that matter, taking breaks in between that are
12   non-compensable.
13            MR. KEITH:  Yes, your Honor.
14            THE COURT:  Plaintiff, I hadn't understood that.  Are
15   you contending that there is some action that an employee takes
16   to log-in or log-out?  You referred to it as log-in log-out.
17            MS. LIU:  I apologize to this Court if I
18   mischaracterized the evidence.
19            What I meant is not that she was logging at 5:05 and
20   then that will generate the time.  The time was already in the
21   computer.  But she will see the computer, the employee has --
22   the manager has their own access to the computer.
23            THE COURT:  Sorry.  But is anything being entered each
24   day by anybody as to a particular employee?
25            MS. LIU:  No.
```

Ibt9thoc

1          THE COURT:  So we have a schedule and it's for the

2     fact finder to figure out how faithful actions in the real

3     world were to the scheduled expectation.  Is that about right?

4          MR. KEITH:  Yes, your Honor.

5          MS. LIU:  Yes, your Honor.

6          THE COURT:  So what remains to be seen is how we

7     design a verdict form, but I think it's helpful that we've

8     agreed that the findings for any individual employee then are

9     liability and then as to damages at an hour as well.

10          We then get to the issue of willfulness and good

11     faith.  As I understand it, you all agree that the jury

12     resolves the issue of willfulness under both statutes and good

13     faith under the New York Labor Law but the judge resolves the

14     issue of good faith under the Fair Labor Standards Act.

15          To begin with, that seemed to be clear from your joint

16     pretrial order.  Is that correct?

17          MS. LIU:  That is the plaintiffs' position.

18          MR. KEITH:  Yes, your Honor.

19          THE COURT:  Again, for another day we can resolve this

20     but I'm trying to figure out how this all works.

21          I take it the judge's good faith determination of the

22     FLSA is based on the same pool of evidence or data that the

23     jury will be making its determination.  It's not that you

24     envision some posttrial supplementation of evidence that would

25     enable me to make a good faith determination under the FLSA.  I

Ibt9thoc

1   am to rely on the same evidence given to the jury.

2            Is that correct?

3            MS. LIU:  Yes, your Honor.

4            MR. KEITH:  That's correct, your Honor.

5            THE COURT:  And somebody help me what difference it

6   makes.  I realize I may need to make a formal entry as to this

7   point.  But in the real world is there, assuming that the

8   defense has -- that the plaintiff has prevailed across the

9   board, let us say, and found for the plaintiff on any of these

10  inquiries.  Does the plaintiff get anymore money by my making

11  the parallel lack of good faith, if that's the right way to put

12  it, finding under the FLSA or is the recovery the same as long

13  as the plaintiff so prevails under the New York labor law?

14           I'm trying to figure in the real word what difference

15  this makes.

16           MS. LIU:  New York labor law has longer years.  It has

17  six years.  It covers the three years under FLSA.  So that

18  covers the backpay basically.

19           But what ties to the good faith is also the liquidated

20  damage.  So that will give us the double.

21           THE COURT:  Right.  But I think there's case law that

22  has recently been sharpened -- I've certainly written on it --

23  involving the unavailability of overlapping liquidated damages

24  under the two statutes.

25           MS. LIU:  Yes.

Ibt9thoc

1          THE COURT:  What I'm trying to figure out is, assuming

2     you prevail under the New York Labor Law that has the longer

3     statute of limitations, in practice what difference does it

4     make how the Court would find as to the Fair Labor Standards

5     Act good faith as long as I'm not disturbing the jury's finding

6     on the New York labor law equivalent?

7          MS. LIU:  I would say the stacking, the case you are

8     talking about, is about how both the liquidated damage under

9     the FLSA and the -- so it will be triple.  But what we're

10    saying if we only talk about good faith, so we only win

11    liquidated damage under New York Labor Law.  So that's double

12    under New York Labor Law with six years.  So in practical

13    matter whatever comes out of FLSA doesn't really change.

14         THE COURT:  That's where I was going.  In other words,

15    if one starts with the premise that you don't get to have

16    overlapping liquidated damages but one bite only at that apple,

17    if you had maxed out on your New York Labor Law recovery, the

18    FLSA adds nothing incremental.

19         MS. LIU:  Yes.

20         THE COURT:  Defense, while I'll know you resist the

21    factual assumptions under which the hypo was built, giving

22    yourself over to them for a moment, do you agree with that?

23         MR. KEITH:  I think, your Honor, the only instance in

24    which it might make a difference, and I think we'd have to look

25    at the eight individuals to see if any of these time periods

Ibt9thoc

1    come into play, is prior to, I believe it was April 2011, the

2    liquidated damages rate under the New York Labor Law was

3    25 percent.  And then post-amendment to the statute there is a

4    liquidated damages provision that's coextensive.  So if there's

5    any window in there --

6            THE COURT:  I see.  That's where it may matter.

7            But, in any event, that's an entry that I would be

8    making based on the same pool of evidence.  Thank you.  That's

9    helpful.  I was trying to figure out why anything turned on it

10   and now I understand why it might.

11           The jury's verdict form will presumably include

12   willfulness and good faith determinations to the extent

13   liability has been found.

14           I assume but don't know that the willfulness or good

15   faith determination would be unitary at least per employee,

16   i.e., it wouldn't depend on the time period.  Perhaps there's

17   some employee where the nature of the responsibilities changes

18   enough over time that the willfulness or good faith analysis is

19   different, but I'm going to assume, unless I'm told otherwise,

20   that for each employee it's a singular determination.

21           Any reason to think differently about that?

22           MR. KEITH:  Not at this point, your Honor.

23           THE COURT:  Plaintiff.

24           MS. LIU:  No, your Honor.

25           THE COURT:  I suppose closer to the trial we'll need

Ibt9thoc

1    to figure out whether there's any basis for a willfulness or

2    good faith determination that is employee-specific as opposed

3    to across the board.

4            In other words, the other way to think about the task

5    given to the jury is for -- to the extent you have found Bed

6    Bath and Beyond liable for misclassification, was that

7    misclassification willful?  Was it made other than in good

8    faith?

9            However, the question is put -- there's a question of

10   whether there's a need to make them answer that question per

11   employee or whether it's an all-in, same determination for

12   everybody.

13           Is there any reason to think that that is an employee

14   or plaintiff-specific issue in this case?

15           MR. KEITH:  I don't believe so, your Honor.  I think,

16   though, to your point about the jury verdict form, I don't

17   think that there's any reason not to the include the question

18   of willfulness and good faith on each individual.

19           THE COURT:  Will the evidence as to willfulness and

20   good faith differ by individual?

21           In other words, how many -- we've got, what, eight

22   employees?

23           MR. KEITH:  Eight.

24           THE COURT:  How many stores do they span?

25           MR. KEITH:  It spans approximately a dozen to fifteen

30

Ibt9thoc

1      stores.  People move around from time to time.

2              THE COURT:  Is it going to be your view at trial that

3      there are differences in the responsibilities materially among

4      these eight employees?

5              MR. KEITH:  I think that the evidence will show that

6      as to individuals that worked in larger stores, for example,

7      that the case for the exempt status, in our view, is very

8      clear.  And to the extent the jury disagreed on an individual

9      who worked in, say, the large store in Chelsea or Tribeca where

10     we think the evidence would be overwhelming that the individual

11     meets the exemption, I think arguably there's a stronger case

12     for a good faith basis in a hypothetical example if someone is

13     in a store where she or he has 35 direct reports versus someone

14     who is in a store where they have five or six direct reports, I

15     think that's the case to be made there.

16             So we would propose that it be done --

17             THE COURT:  So, in other words, you believe there will

18     be a basis to differentiate as to liability as to individual

19     plaintiffs even though they had the same formal title?

20             MR. KEITH:  Correct.

21             THE COURT:  And, therefore, it follows that if the

22     jury disagrees with you on liability they may still find other

23     than willfulness or good faith in the closer cases?

24             MR. KEITH:  Yes, your Honor.

25             THE COURT:  And were the determinations, in fact, made

Ibt9thoc

1      at a store level or did Bed Bath as a corporate matter

2      automatically classify anyone who held this title as exempt.

3                MR. KEITH:  For the time periods at issue in the case

4      all the eight plaintiffs were classified as exempt as were all

5      other Assistant Store Managers in the State of New York.

6                THE COURT:  Were those decisions made at the store

7      level or was that at a broader policy level?

8                MR. KEITH:  That would have been a corporate level.

9                THE COURT:  So if that's the case, pushing back on

10     your theory, if the decision is not made with regard to the

11     facts and circumstances of any employee's employment, even if

12     its accuracy or not might depend on the individual employee, if

13     it's being done as a macro corporate level without regard to

14     the 35 direct reports or five, how can it be that the

15     willfulness or good faith decision differs by employee?

16               MR. KEITH:  I think the way that the jury could find

17     that it differs is one of the other things the evidence will

18     show is that people move in and out of a position; may move

19     from a lower level nonexempt department manager position into

20     an Assistant Store Manager role.  And to the extent there's

21     evidence that someone is moved from a nonexempt role to an

22     exempt role based on things like store size and number of

23     reports and people that they supervise, that that decision,

24     even though the actual classification decision is such, is done

25     at the corporate level.  Assistant Store Managers are salaried

Ibt9thoc

exempt positions.  To move someone into that role based on the

circumstances of the store and the need for managers and

supervision, that individual decision to move someone from

nonexempt to exempt is done with a good faith basis that

they're going to be able to meet the test for the exemption.

THE COURT:  But is that decision made at the level of

the individual employee or it's -- you know, regardless of

whether you were hired into the role of Assistant Store Manager

or promoted internally to get to that point, I think you're

saying to me that anyone who holds that title is automatically

treated as exempt.

MR. KEITH:  That is correct, your Honor.

THE COURT:  If that's the case -- we don't need to

decide this now, but I have some skepticism about the idea of

why I need to task the jury with making these findings separate

for each employee if ultimately the corporate decision maker

was -- and I don't mean this in a negative way -- blind to the

individual's facts and circumstances when an across-the-board

determination was made.

I don't know who this benefits or harms by making it

at a global level.  But as a matter of the way the evidence

will present as to what was before the decision maker, it

sounds like it's global assumptions as to responsibilities not

specific facts as to any individual.

MR. KEITH:  Understood.

Ibt9thoc

1          THE COURT:  Count me skeptical then of the need to

2     attach all these extra questions per employee.  We'll talk

3     about it as we get closer to trial.  But something to think

4     about.

5          Plaintiff, any further thoughts on that.

6          MS. LIU:  No.  But I agree this Court's position.  I

7     believe it's very, very difficult, even I do see some argument

8     on both sides, to ask a jury to assess individually.  Even if

9     you look at plaintiff Miglis, she moved -- I don't know -- four

10    to five stores during the relevant years.  It's very, very

11    difficult for them to have this mental exercise and to

12    determine for each period whether there was a willful

13    violation.

14         THE COURT:  But it really just depends whether

15    somebody is making a determination for each period.  If Bed

16    Bath actually was stepping back and saying as to Eleni Miglis

17    we need to now freshly assess whether she's exempt or not, the

18    jury would simply be tracking the decision-making process of

19    Bed Bath at each stage.

20         But if it's the case, as defense counsel concedes,

21    that the exemption follows from the title, not because it's

22    hard for the jury, but because it just tracks the way the

23    corporate decision making was made, it sounds like it's a

24    on/off switch as a one-inquiry-for-all-people decision.

25         MS. LIU:  Yes.  I can see that point as well because

Ibt9thoc

1    they are not making conscious decisions and tailored to each

2    store as to their circumstances.

3              THE COURT:  Right.

4              MS. LIU:  So can't ask them to do the jury.

5              THE COURT:  Right.

6              Look, I'm not saying the same decision applies for

7    each employee as to liability because they may have -- even

8    though they've got a kind of one-size-fits-all approach here,

9    or anyone who owns the title, has the title, is treated as

10   exempt, that doesn't mean they didn't get it right in some

11   circumstances and wrong in others, depending on what the facts

12   actually show as to the particular worker in question.

13             All right.  Let's now turn to the big question here

14   which is the length of the trial.

15             Earlier both of you projected the astonishing length

16   of an 18-day trial which was mind blowing to me that any jury

17   would be able to, if we're talking about the jury's aptitudes

18   and comfort level, sit through this for 18 days.

19             That said, at the time that an 18-day trial was

20   projected, the plaintiff was proposing to call seven plaintiffs

21   and potentially two Bed Bath witnesses.  And the defense was

22   intending to call 41 witnesses.  I didn't check whether the two

23   plaintiff witnesses are among the 41.  I think they are, but

24   I'm not sure.  But let's assume that they're not.  We would

25   have been at a total of 50 witnesses.

Ibt9thoc

1          My order from some months ago limited the defense to

2     calling 10 of the 30 witnesses whom it had failed to give prior

3     notice of and then empowered the plaintiff to take depositions

4     of those ten and the plaintiff wound up choosing to take

5     depositions of three of the ten that were identified.

6          The bottomline is the defense, rather than calling 41

7     witnesses, is now proposing to call 21, which is still

8     formidable but makes a certain amount of sense if its the case

9     that you have able people spanning a double digit number of

10    stores.

11         In any event, the defense witness list has been lopped

12    in half and my motion in limine rulings should also have taken

13    out of the case any attempt, in particular, to litigate

14    workplace bad behavior or disciplinary actions and whatnot by

15    plaintiffs which should further truncate the examination.  The

16    focus here really needs to be tightly around the employees' job

17    responsibilities as well as issues of willfulness and good

18    faith.

19         So with that it's my hope that what was once an

20    unmanageable 18-trial-day trial is probably, you know, more

21    like six to eight days or something like that.  I just can't

22    imagine after a point that we're going to have the same

23    repetitive testimony.  I assume you'll find ways of

24    shortcutting as, once the jury becomes aware of the general

25    nature of a Bed Bath store and the general nature of the

Ibt9thoc

1    responsibilities, I would like to think that successor

2    plaintiffs and, in particular, successive defense witnesses

3    will find a way to be more efficient.

4              Plaintiff, is that realistic?

5              MS. LIU:  The pure number of witnesses is very

6    intimidating.  I believe six to eight days is a little tight.

7    I propose maybe twelve days, if possible.

8              THE COURT:  Just tell me what's going to take twelve

9    days here.

10             In other words, each of -- the plaintiffs will tell

11   their story about what they do.  I'd be surprised if the direct

12   of a plaintiff is more than an hour.  I mean, right?  The jury

13   is going to go nuts and the same even more so with the defense.

14   But if you're -- if they can't explain what their

15   responsibilities are in an hour, I think the jury -- you're

16   going to lose the jury.

17             MS. LIU:  I agree.

18             THE COURT:  I'm not holding you to it, at least for

19   now I'm not giving anyone a chess clock, but I am trying to

20   have an intelligent conversation about how a jury is going to

21   take in this repetitive set of narratives.

22             MS. LIU:  I understand that.

23             I think my consideration is more giving a little

24   buffer instead of having it six or eight days and I'd rather

25   have a little wiggle room so if anything happens.

Ibt9thoc

1          THE COURT:  We're not asking about wiggle room.  I'm

2     trying to get an estimate of in the real world what this is

3     going to take, not what I forecast to the jury during jury

4     selection, but I'm trying to get a real honest sense of how

5     long the trial is going to be.

6          MS. LIU:  I would say eight to ten days.

7          THE COURT:  Defense.

8          MR. KEITH:  I think the six to eight day range for

9     testimony and proof is something that is probably achievable

10    once we have a chance to go back and study how the motions in

11    limine are going to fully impact the exhibit list.  I continue

12    to believe that we're probably going to need three days for

13    jury selection, jury charge, opening.

14         THE COURT:  Jury selection in a civil case is very

15    fast.  In a case like this it is unlikely to stoke a lot of the

16    things that tend to inflame juries.  It will be a little longer

17    than in some cases because the promise of a three-day trial

18    tends to get people pretty comfortable before claiming

19    hardship.  But a two-week trial, which is the length of the

20    jury service, is not something that's likely to generate many

21    hardships.

22         Ordinarily, in a civil case I'll have eight jurors so

23    that we have room for a couple to drop.  This is a little

24    longer.  We'd probably have nine.  But the actual exercise in

25    jury selection should be done in a couple hours.

Ibt9thoc

1          MR. KEITH:  I tend to agree with plaintiff's counsel.

2     I think we'll probably be more in the ten to eleven day range

3     but certainly anything we can do to speed that along we want to

4     do.

5          THE COURT:  I'm going to assume for argument's sake

6     that, partly depending on whether I sit on Fridays, we should

7     be able to get this done in two weeks.  That would be ten days.

8          Let me ask you, plaintiff, you've got eight witnesses.

9     Each of them needs to tell their story, but I'd like to think

10    that as an accomplished advocate you can find a way once we get

11    to numbers three, four, five, six, seven, eight that you are

12    briskly moving through this and not requiring the same

13    explanations of recurrent processes or tasks to be done.

14         MS. LIU:  Yes.  That's my goal, your Honor.

15         THE COURT:  Defense.

16         MR. KEITH:  We would endeavor to do the same, yes.

17         THE COURT:  I'd like to think so.

18         An important job for me in a jury trial is being

19    mindful of the jury's time, and I'm very attentive to when they

20    are just enraged by lawyers indulging themselves and wasting

21    their time.  So I would urge each of you to figure out ways to

22    be as crisp as you can doing this.

23         I'm going to assume that I need to set aside ten trial

24    days here but I'm very much hopeful that includes all in, the

25    jury addresses, and deliberations.  But it's my hope that we

Ibt9thoc

1    can get this done substantially faster than all that.  All

2    right.

3              Let's go to the exhibit lists.  I recognize that these

4    are likely to change given the pretrial rulings.  But I want to

5    start with you, plaintiff.

6              Do you have your exhibit list in front of you?

7              MS. LIU:  Yes, your Honor.

8              THE COURT:  And before trial -- look I'm going to

9    direct in a couple of weeks that we get a revised joint

10   pretrial order which I expect will make excisions from

11   witnesses and from exhibits based on the motions in limine and

12   so forth but I will need, once we have that, a pair of binders

13   from each of you with respect to the exhibits you intend to

14   offer so that I can, at our final conference, be making rulings

15   that are with the exhibits in hand.

16             Let me understand from you, plaintiff, on your exhibit

17   list -- does everyone have it handy?

18             MS. LIU:  Yes.

19             THE COURT:  So your first eight exhibits are the work

20   schedules -- rather, the first one is defendant's answers.  Put

21   that aside.  Plaintiffs' 2 through 9 are the work schedules for

22   the eight witnesses and you indicate that there is no objection

23   to authenticity but evidently the defense objects to the

24   receipt of the work schedule.

25             Mr. Keith can that really be so?  What's the basis for

Ibt9thoc

1    objecting to the work schedule?

2           MR. KEITH:  The basis to the objection to the work

3    schedule is to the extent plaintiffs intend to introduce the

4    work schedules as evidence of the hours that were worked or the

5    minimum hours that they say were worked, we would --

6           THE COURT:  You're just objecting to an argument that

7    they would make about how much it proves.  But focus on

8    admissibility.  What's the coherent argument as to why the work

9    schedule doesn't get received even though you're at liberty to

10   cross-examine as to the extent as to which it was faithfully

11   adhered to?  How is that an issue of admissibility?

12          MR. KEITH:  I think -- I agree with that, your Honor.

13   I've think that as to admissibility, as business records of the

14   company, that those would be admissible.

15          THE COURT:  Hard to imagine anything more admissible

16   in a case like this than the schedule that the employee was

17   given, whether or not they rolled in late or worked late.

18          MR. KEITH:  Understood.

19          THE COURT:  Can I assume, please, that when I get the

20   revised joint pretrial order with the exhibits please be more

21   discerning then about what you're objecting to because my head

22   blew off when I saw that you're objecting to the plaintiff's

23   work schedule in an FLSA overtime case.

24          MR. KEITH:  We will, your Honor.

25          THE COURT:  Now, turning to the second page, the

Ibt9thoc

1    plaintiff had the idea of offering a bunch of declarations for

2    impeachment purposes of what looked to be twelve people.  What

3    is this?  Just explain to me what these exhibits are.

4             MS. LIU:  So those exhibits are declarations defense

5    has submitted in support of our position to the collective

6    action.  So that declarations includes their statements about

7    the policies, the structures, the stores, and some of their

8    interactions with specific plaintiffs.  So we intend to

9    introduce them only for the purpose of impeachment.

10            THE COURT:  Impeaching who?

11            MS. LIU:  That those witnesses that were on the list

12   of defense witnesses.

13            THE COURT:  I see.  So, in other words, if those

14   witnesses testify.

15            MS. LIU:  Yes.

16            THE COURT:  You would try -- and they don't admit the

17   prior statement.

18            MS. LIU:  Yes.

19            THE COURT:  You would try to introduce those things.

20            MS. LIU:  Yes, your Honor.

21            THE COURT:  I think as to impeachment matters -- look,

22   I appreciate the notice.  That's sufficiently contingent on the

23   way the trial plays out.  There is no value in a pretrial

24   ruling.  OK.  I understand it.

25            But, in other words, the idea is you would be offering

Ibt9thoc

1    that only as impeachment if you couldn't otherwise score the

2    point that's embedded in these documents.

3              MS. LIU:  Yes, your Honor.

4              THE COURT:  All right.  Defense, as to your exhibit

5    list, a lot of -- there are a lot of performance reviews that

6    are listed here.  There are also disciplinary notices.

7              Now you've heard my ruling that says none of the

8    denigrating information is in unless there's really no other

9    way to get at the job performance.  But having worked in the

10   private sector before, I remember that performance reviews

11   often start off with the name and dates and then the job

12   responsibilities, and then there's often another section or

13   zone where the judgmental stuff is described, and my point in

14   excluding evidence was really dealing with the judgmental

15   point.  Whether or not somebody was a good or a bad employee or

16   whether or not they were a scoundrel in their personal life is

17   really irrelevant to the FLSA question but the job

18   responsibilities matter.

19             How much does the motion in limine ruling affect the

20   documents you would be proposing to offer?  Do all of these

21   performance reviews, for example, contain in some segregable

22   place a description of the job responsibilities?

23             MR. KEITH:  There are really two categories of

24   performance reviews.  I apologize.  We probably could have made

25   this more clear on our witness list.

Ibt9thoc

1          Starting with the first category which are those

2     performance reviews of the individual eight plaintiffs

3     themselves, which are directly impacted by our motion in

4     limine, those will either have to be redacted or there may be

5     some which come off the list entirely in conformance --

6          THE COURT:  But your expectation is that for a lot of

7     these performance reviews there's some part of the performance

8     review that just gets to describing the duties that can survive

9     a redaction?

10          MR. KEITH:  There is but there's additional

11     categories.  Many of these documents, the ones that say

12     Associate Performance Review, the associate is the title given

13     to hourly employees, cashiers, people that are on the floor

14     helping customers and the like.

15          THE COURT:  People who have supervised by the

16     plaintiffs?

17          MR. KEITH:  Exactly.  So when Ms. Miglis, for example,

18     fills out a performance review for someone that we contend

19     worked under her and says this person is doing a good job, this

20     person is not doing a good job, or on the issue of discipline,

21     which directly bears on a plaintiff's exempt status, when one

22     of the eight plaintiffs here is issuing discipline, is

23     terminating someone, is suspending someone, those performance

24     reviews of people that are not parties to this case, these

25     are --

Ibt9thoc

1        THE COURT:  I see.  That actually shows Ms. Miglis

2   doing her job.

3        MR. KEITH:  Yes, your Honor.

4        THE COURT:  So that doesn't implicate the issues that

5   I was concerned about.  There might be an individual one where

6   there's something poisonous about the subordinate, but that's

7   not the point of anybody's motion, and I assume you'll be

8   sensitive to not trashing some nonparties reputation.

9        Subject to that off-chance, there doesn't seem to be

10  any dispute that the performance review done by one of these

11  plaintiffs of an underling is properly in because it reveals

12  part of the nature of the job.

13       MR. KEITH:  That's right, your Honor.

14       One of the reasons for the generic titles in here, and

15  we've done the same thing in our summary judgment conditional

16  certification papers is tried to refer to the associates in

17  general terms or redact their names exactly for those concerns

18  that we don't want to unduly tarnish the reputation

19  of nonparties.

20       THE COURT:  That's helpful.

21       So the associate reviews are of other people?

22       MR. KEITH:  Yes, your Honor.

23       THE COURT:  But the performance reviews, for example,

24  D-1 through 4 of Ms. Miglis, you will now be taking a look at

25  the reviews of Ms. Miglis and redacting it to be consistent

Ibt9thoc

1    with the motion in limine.

2            MR. KEITH:  Yes, your Honor.

3            THE COURT:  I noted that none of these were objected

4    to by the plaintiff.  There are two stars here.

5    Notwithstanding the motion in limine, and I think I now

6    understand, that it's because there is some irreducible portion

7    of these performance reviews that is not judgmental of the

8    plaintiff but is descriptive of the plaintiff's duties.

9            MR. KEITH:  That's our position, your Honor.

10           THE COURT:  And plaintiff's counsel, Ms. Liu, is that

11   why you didn't object?

12           MS. LIU:  Yes.  Another reason is we did file a

13   separate motion that's part of our -- yes, your Honor.

14           THE COURT:  Well, no, no, no.  You've indicated you

15   don't have any objection to the admissibility.

16           MS. LIU:  Yes.

17           THE COURT:  I'm trying to get underneath why.

18           I've think what you're saying, help me out, is that

19   you acknowledge that even in the performance reviews of a

20   plaintiff there is some portion of it that is fair game and

21   that describes the job even if there's a portion that is

22   subject to your motion in limine which gets at, you know,

23   negative stuff.

24           MS. LIU:  Yes, your Honor.

25           THE COURT:  Continuing on.  D-21, there is the

Ibt9thoc

1    termination of Ms. Miglis.  Defense, that is objected to.

2    Again, unless there's something unique about her termination

3    that uniquely reveals her duties, I'd like to think that

4    that -- we can get rid of the word "termination" and make sure

5    the jury knows the end date of her employment.  I expect you'll

6    be flyspecking a document like that consistent with the motion

7    in limine.

8              MR. KEITH:  We will, your Honor.

9              THE COURT:  And there are one or two other single

10   asterisks here reflecting separations or things like that, but

11   I expect that defense counsel you will flyspeck those.

12             MR. KEITH:  Yes.

13             THE COURT:  It looks like a fairly low-exhibit case,

14   given the scale of the case of a two-week trial.  It does not

15   appear that there are going to be a lot of exhibits in the case

16   all in.  There are a lot of performance reviews of either the

17   plaintiffs or of their underlings by the plaintiffs.  There

18   will be wage statements and the like.

19             MR. KEITH:  That's right, your Honor.

20             THE COURT:  All right.  The next issue involves a

21   trial date.

22             MS. LIU:  Your Honor, if I may, just one thing about

23   Exhibit D-49.  It's plaintiff's resume.

24             THE COURT:  Yes.

25             MS. LIU:  We objected for very similar reasons we

47

Ibt9thoc

```
1    stated in our motion in limine.  It's a resume.  Everyone puffs
2    up their resume.  They make statements that's higher than what
3    they actually did.  And we believe it's not a true reflection
4    of the responsibility.
5              THE COURT:  Wait.  You're saying your client lied on
6    his resume?
7              MS. LIU:  I would say dressed up.
8              THE COURT:  I'm sorry.  This is a separate issue here.
9    I had been under the impression that -- the motions in limine
10   dealt with other issues.
11             MS. LIU:  Yes.
12             THE COURT:  The motions in limine dealt with
13   employment deficiencies of the sorts I imagined and I didn't
14   treat those as impeachment issues but rather as irrelevant,
15   negative information about a person and found those easily
16   excluded.
17             Lying on a resume raises a simply different legal
18   question which is whether or not a lie to the employer affects
19   trial credibility.  That's just not been briefed.  I'm not
20   going to rule on it now.
21             MS. LIU:  Yes, your Honor.
22             THE COURT:  I appreciate that's why -- you're
23   objecting because you don't want the puffed-up stuff -- what is
24   it that Mr. Caraballo puffed up?
25             MS. LIU:  Glorified what he actually did.
```

Ibt9thoc

1           THE COURT:  At Bed Bath?

2           MS. LIU:  Yes.

3           THE COURT:  Wait a minute.  You're trying to

4    exclude -- you're not saying he lied about his military service

5    or his college degree?

6           MS. LIU:  No.

7           THE COURT:  You're saying he held himself out at Bed

8    Bath to have a more glorified job than you now contend he did.

9           MS. LIU:  I'd say some of his descriptions are more

10   puffery.

11          THE COURT:  I'm going to tell you right now if he's

12   describing his job at Bed Bath, that comes in.  You're at

13   liberty to explain to the jury that he was puffing.  But if you

14   had told me he said he was a major general in the Army and

15   actually he was a private, I would have considered whether that

16   was fair ground for impeachment given the nature of the claim

17   here.

18          But if you're saying that he described himself as

19   having more supervisory-ish or exempt responsibilities at Bed

20   Bath, it's hard to imagine a more relevant statement.

21          You're at liberty to say that he was puffing and that

22   everyone puffs on their resume.  Good luck with that.  You're

23   at liberty to do that.

24          But the only reason that is prejudicial is that it's

25   fairly, not unfairly prejudicial under Rule 403.  If your

Ibt9thoc

```
 1    client appears to have described his job in terms that might
 2    make the exemption fit better, that's for a jury to decide
 3    whether to credit him now or then.  It's not for me to exclude
 4    the bad stuff.
 5              MS. LIU:  Yes, your Honor.
 6              THE COURT:  I mean really.  OK.
 7              Your objection is noted.  I'm telling you right now
 8    unless there's something more to this, it's overruled.
 9              MS. LIU:  Thank you, your Honor.
10              THE COURT:  But in any event -- all right.  Look.
11    Let's talk about a trial date.  I need to set aside
12    approximately two weeks.  I have in April a possible, but not
13    certain, criminal trial that begins on April 1.  But we do not
14    know if it is, in fact, going to go.  I am inclined to schedule
15    this trial in mid-April on the assumption that that case which
16    is essentially a holding date for spillover defendants who are
17    ostensibly going, if they are, in January, that it won't go, or
18    it won't go very long to the extent there's a hangover
19    defendant.  So I'm inclined to schedule this trial something on
20    the order of April 22 or so.  I can give you the entirety of
21    that week and I can give you the first three days of the week
22    after.  I think I'm out the next few days.  We can then
23    continue into the next week if need be.  It's possible we can
24    even start this the week before if the criminal trial doesn't
25    go.
```

Ibt9thoc

1          Any reason not to schedule this somewhere either

2     April 15 or April 22, somewhere in that April timeframe?

3          MR. KEITH:  Cards on the table, purely candidly, I

4     have nonrefundable plane tickets the start of April, so the 22

5     would --

6          THE COURT:  Would be what?

7          MR. KEITH:  April 22, it would not be a problem at all

8     for me.

9          THE COURT:  When and where are you going?

10          MR. KEITH:  I'm taking my wife to Hawaii for an

11     anniversary trip.

12          THE COURT:  When are you due back?

13          MR. KEITH:  They took my phone so I don't have the

14     exact date.  I believe I'm back I think the 12th or the

15     13th.

16          THE COURT:  So from your perspective, while you

17     literally could do something like the 15th it's -- that would

18     be an inconvenience because you'd be -- have a very tight

19     turnaround?

20          MR. KEITH:  Yes, your Honor.

21          THE COURT:  Plaintiff, any issues on your end?

22          MS. LIU:  No, your Honor.

23          THE COURT:  One moment.  Let me talk with

24     Mr. Smallman.

25          (Pause)

Ibt9thoc

1        THE COURT:  Counsel how about April 22 then and I

2   think with that point we've cleared Passover, have we not,

3   Mr. Smallman.  I think we have.

4            (Discussion off the record)

5        THE COURT:  I'm sorry.  I put Mr. Smallman on the

6   spot.  I'm pretty sure I checked this and we're fine.

7        We'll put it down for April 22.  Let's operate on the

8   assumption that we're going to sit all five days the first

9   week.  I can give you the first three days of the week after.

10  I am personally out the Thursday and Friday of the second week.

11  And if it goes more than eight days, we would carry on into the

12  following week.  OK.  But I think that gives you a reasonably

13  prompt trial date and something to work towards.

14        Mr. Smallman tells me the first day of Passover is

15  April 20.  That's a Saturday.  It's a two-day holiday.  By the

16  22nd we're not going to have a problem with the jury.

17        I will need to set a final pretrial conference just to

18  go over the sorts of blocking and tackling with exhibits as

19  prompted by the joint pretrial order.

20        So, Mr. Keith, you're back on the 12th or 13th or

21  something?

22        MR. KEITH:  Yes, your Honor.

23        THE COURT:  So let's just do some day the week before.

24        Mr. Smallman, can I have a slot of a couple hours the

25  week before April 22?

Ibt9thoc

1              (Discussion off the record)

2              THE COURT:  How about April 18 at 10 a.m. for our

3      final pretrial conference?

4              MR. KEITH:  Thank you.

5              THE COURT:  That works for everybody?

6              MS. LIU:  Yes, your Honor.

7              THE COURT:  Look, I need you then to get me a revised

8      joint pretrial order.  You're not to be adding new things.  But

9      this is now to zap out the 20 defense witnesses who were

10     earlier removed.  It is to zap out anybody else you no longer

11     think you're going to call.  It's to conform the exhibit list

12     to the rulings that I have made.  And I will need with it two

13     binders from each of you, one for me and one for my law clerk,

14     of the exhibits you're going to propose to offer.

15              It's not urgent that I get this, obviously, just given

16     the holidays.  Under ordinary circumstances I would have said

17     two weeks but -- and if you've got the time to do it now it

18     would make sense to get it done while it's fresh but I'm also

19     not going to burden you with makework which could be done in

20     January.

21              Ms. Liu, any reason for you why two weeks would be an

22     inconvenience?  You're really just tweaking an existing

23     document.

24              MS. LIU:  No, your Honor.

25              THE COURT:  Defense?

Ibt9thoc

1          MR. KEITH:  No, your Honor.

2          THE COURT:  So within two weeks of today get me a

3     revised pretrial order as well as two exhibit binders from each

4     side.

5          All right.  The final issue I want to take up is

6     settlement.  I see from the docket sheet I have not yet

7     referred this to the magistrate judge for settlement purposes.

8     We have here the terrific Barbara Moses who is a magistrate

9     judge who in her first two to three years on the bench has, in

10    the cases of mine, been a gem at successfully settling tough

11    cases.  It would be my strong preference to refer this to her

12    for settlement purposes if there's any chance you're going to

13    use that resource.  But you know you are now about to start

14    gearing up for a regrettably longish trial that will take a lot

15    of time and energy.  There's obviously risk on both sides here.

16         It would seem to me that this is the time before all

17    that hard trial prep work gets going for you to see if there's

18    a way of settling the case.

19         I do not want to hear anybody's settlement position.

20    There is no purpose in exposing me to that.  But is there any

21    reason why I shouldn't refer it to the magistrate judge for

22    settlement purposes?

23         MR. KEITH:  No, your Honor.  This is a topic that

24    we've actually had the opportunity to discuss.  I think we're

25    both in agreement that a referral to the magistrate program

54

Ibt9thoc

1    would be beneficial to both sides.

2              THE COURT:  Ms. Liu.

3              MS. LIU:  Yes, your Honor.

4              THE COURT:  Ms. Liu, do you represent any of the

5    plaintiffs in any of the other case or cases raising such

6    issues?

7              MS. LIU:  No, I don't.

8              THE COURT:  And defense, without telling me anything

9    you don't want to, is there anything you can tell me about the

10   ability to settle this case independent of those other

11   litigations?

12             MR. KEITH:  Yes, your Honor.  I've shared this

13   information with Ms. Liu as well.  In one of the other cases

14   pending in the Northern District of Illinois, the Przytula

15   case, which I believe we brought to the Court's attention at

16   prior conferences.

17             THE COURT:  Yes.

18             MR. KEITH:  The parties spent two days in mediation

19   there and we've reached an agreement in principle to settle

20   that case.  And that's a nationwide collective FLSA settlement.

21   As part of that, because this case was pending, that settlement

22   carved out those eight people.  As soon as that deal was

23   reached, we let plaintiffs' counsel here know so that there

24   would be no unfair surprises.  And we've started to have some

25   preliminary conversations about what the settlement would look

Ibt9thoc

1    like for these eight individuals were they to be treated on the

2    same basis --

3              THE COURT:  I see.

4              MR. KEITH:  -- as the plaintiffs there.  And that's

5    information that I'm getting ready to hit send on, to send to

6    Ms. Liu.

7              THE COURT:  I take it, without committing you to

8    anything, because I'm not here to do that, but a safe premise

9    here would be that terms that are resembling of the terms in

10   the nationwide settlement may be on the table here for these

11   plaintiffs.

12             MR. KEITH:  Yes, your Honor.

13             THE COURT:  OK.  That's important information.  I'm

14   glad you shared it with me.  All the more reason why it's good

15   that I put this trial off in April because it's my hope that

16   you will now have serious settlement discussions.  You may or

17   may not need Magistrate Judge Moses, but I will issue the order

18   referring it to her today.  And what I'm going to do is I'm

19   going to write on the order what I always write on these orders

20   in counseled cases, which is it's on plaintiff's counsel to

21   reach out to the magistrate judge to schedule the settlement

22   conference but only when both of you are ready.  I'm putting

23   the scheduling onus on the plaintiff just because it's my

24   practice.  There is no magic to that.  It's just you're not

25   going to get on the phone with her to do that until you've both

Ibt9thoc

1    agreed that the time is right.

2            Let me urge you that before work gets going, it would

3    be useful for me, it would be use for plaintiffs, it would be

4    useful for everyone to get closure on this.  If this is

5    destined to settle, please let's not have this settle in April.

6    It's just an enormous waste of time because, apart from the

7    photocopying and work that you're going to be doing over the

8    next two weeks; defense, you've got 30 witnesses to prep;

9    plaintiff, you've got eight clients to prep.  There's a lot

10   going on and more than a little bit of logistics.

11           If you're going to talk settlement, if you're going to

12   try to get this accomplished consistent with an otherwise

13   global settlement, may I urge you to -- I'm putting a lightning

14   charge for you to do this before the holidays.  Let's try to do

15   that.

16           Can you both agree to give intense, focused attention

17   in the next two weeks to this?

18           MS. LIU:  Yes, your Honor.

19           MR. KEITH:  Yes, your Honor.

20           THE COURT:  I'm holding open two weeks of my schedule.

21   I've got other people bidding for trial dates.  You've been out

22   there for a while.  I wanted to get you a date.  But I now see

23   a route to a settlement here that seems very plausible.  It

24   would certainly be an act of kindness to the Court to let me

25   know sooner rather than later whether the case is going away.

Ibt9thoc

1          MR. KEITH:  Of course, your Honor.

2          MS. LIU:  Yes, your Honor.

3          THE COURT:  Anything further from the plaintiffs?  Is

4    there anything that would be useful for me to address while I

5    have you here?

6          MS. LIU:  Nothing, your Honor.

7          THE COURT:  Anything from the defense?

8          MR. KEITH:  No, your Honor.

9          THE COURT:  So I'm going to issue an order that simply

10   sets out the fact that I've resolved the motions in limine,

11   gives you two weeks to submit an amended joint pretrial order

12   and exhibit binders, sets the date of the trial, and sets the

13   date of the final pretrial conference, and I will issue a

14   separate order that refers the case for settlement purposes to

15   Magistrate Judge Moses.

16         All right.  I wish you all a happy and healthy New

17   Year and look forward before then to hearing from you, I hope.

18   Thank you.  We stand adjourned.

19         (Adjourned)

20

21

22

23

24

25