# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term 2019

(Submitted: April 14, 2020          Decided: June 15, 2020)

Docket No. 19-1647-cv

————

DANYELL THOMAS, INDIVIDUALLY AND ON BEHALF OF ALL OTHER
EMPLOYEES SIMILARLY SITUATED, RASHAUN F. FRAZER, INDIVIDUALLY
AND ON BEHALF OF ALL OTHER EMPLOYEES SIMILARLY SITUATED, ANDRAE
WHALEY, INDIVIDUALLY AND ON BEHALF OF ALL OTHER EMPLOYEES
SIMILARLY SITUATED, CHERYL A. STRYCHARZ, INDIVIDUALLY AND ON
BEHALF OF ALL OTHER EMPLOYEES SIMILARLY SITUATED, DANIELLE
BROWN, INDIVIDUALLY AND ON BEHALF OF ALL OTHER EMPLOYEES
SIMILARLY SITUATED,

*Plaintiffs - Appellants,*

HECTOR CARABALLO, CUTHBERT BAPTISTE, ELIZABETH PADILLA, KARLA
REYNOSA, BYRAN LAFOREST, ROBERT GUY DESIR, RADICA KUTWARU,
ANDREW CERTOMA, VILLACRES BYRON, JOHN CUTAJAR, ALEXIS CARREE,
ANTHONY ROLLOCK, JOSE ALBERTO CASSIA, LATIA DIAZ, LEROY CLARKE,
TOMIKA M. BOYD, LOUISA PERRY, MARIA C. MAHAN, ELENI MIGLIS,

*Plaintiffs,*

v.

BED BATH & BEYOND INC.,

*Defendant - Appellee.*

————

1  Before: CALABRESI, PARKER, and LIVINGSTON, *Circuit Judges*.
2
3      Appellants are employees of Appellee Bed Bath & Beyond (BBB). Prior
4  to March 2015, BBB calculated appellants' overtime compensation using the
5  fluctuating workweek (FWW) method. Appellants contend that BBB was
6  precluded from using the FWW method and that BBB therefore owes
7  appellants compensation for unpaid overtime. We hold that appellants failed
8  to demonstrate a genuine dispute of material fact regarding whether their
9  wage payments were inconsistent with the FWW method. We therefore
10 AFFIRM the district court's order granting BBB's motion for summary
11 judgment and denying appellants' motion for summary judgment.
12
13  ───────────────────────────
14      JAMES E. MURPHY, Virginia & Ambinder, LLP, New York, NY, *for*
15          *Plaintiffs-Appellants*.

16      JONATHAN L. SULDS, Greenberg Traurig, LLP, New York, NY
17          (Justin F. Keith, Kelly M. Pesce, Greenberg Traurig, LLP, Boston,
18          MA, *on the brief*), *for Defendant-Appellee*.
19
20  ───────────────────────────

21  CALABRESI, *Circuit Judge*:

22      This dispute examines the limits of employers' ability to calculate

23  overtime compensation using the fluctuating workweek (FWW)

24  method. Section 207 of the Fair Labor Standards Act caps non-exempt

25  employees' non-overtime hours and requires employers to pay as

26  overtime compensation "a rate not less than one and one-half times the

27  [employee's] regular rate." 29 U.S.C. § 207. In a pair of decisions handed

28  down in 1942, the Supreme Court recognized what has come to be

1 known as the FWW method. This formula for calculating overtime

2 compensation—described in more detail below—may sometimes result

3 in decreasing the size of the "regular rate" which, under § 207, forms the

4 basis for determining required overtime pay. Employers seeking to use

5 the FWW method for establishing overtime pay must, however, comply

6 with certain requirements, including the payment of a guaranteed

7 weekly wage.

8     Appellants in this case allege that their employer was precluded

9 from using the FWW method and consequently that the employer

10 underpaid appellants for overtime work. Specifically, appellants assert

11 three violations of the FWW method: (i) that they did not receive fixed

12 and guaranteed weekly wages, (ii) that their schedules did not fluctuate

13 above and below the FLSA non-overtime limit of 40 hours per week, and

14 (iii) that employers using the FWW method may not permit employees

15 who work on holidays or previously scheduled days off to shift their

16 paid time off to later dates. We hold that appellants failed to

17 demonstrate a genuine dispute of material fact regarding whether they

18 received fixed and guaranteed weekly wages. We also hold that the

19 FWW method does not require employees' hours to fluctuate above and

1  below 40 hours per week, and that BBB's practice of permitting

2  employees to take days of paid time off on later dates after working on

3  holidays or previously scheduled days off is consistent with the FWW

4  method. We therefore **AFFIRM** the district court's order granting BBB's

5  motion for summary judgment and denying appellants' motion for

6  summary judgment.

7  **I. Factual and Legal Background**

8  **A.**

9  Appellants are Department Managers (DMs) currently or

10  formerly employed by appellee Bed Bath & Beyond (BBB), a home-

11  goods retailer. Until March 2015, BBB calculated appellants' overtime

12  compensation using the fluctuating workweek (FWW) method. After

13  March 2015, BBB switched to paying DMs overtime based on 150% of a

14  non-FWW hourly rate.

15  The FWW method operates as follows: for non-exempt employees

16  paid a fixed weekly salary,

(a) calculate the hourly "regular rate" for a given week by dividing a non-exempt employee's fixed weekly salary by the number of hours the employee actually worked during that week;

(b) divide the hourly "regular rate" for a given week in half; and

(c) pay non-exempt employees the fixed weekly rate, plus the hourly half-rate for each overtime hour. *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 580 (1942), *superseded by statute on other grounds as stated in Trans World Airlines, Inc. v. Thurson*, 469 U.S. 111, 128 n.22 (1985).

Each time BBB hired or promoted an appellant to the DM position, BBB provided that individual with documents explaining BBB's method for calculating overtime compensation. These documents included a Department Manager Acknowledgment form which stated:

> At the time I was hired, I was told what my anticipated weekly compensation will be and how it will be calculated.
>
> I understand that my weekly compensation consists of two components: (1) a base weekly salary; and (2) an additional amount for all hours above 40 that I work during a week.
>
> I understand that my base weekly salary is compensation for all hours I work in a week. I will get paid this base salary for each week I work, whether or not I work 40 hours in that week, subject to the Company's sick day and leave policies.

1      I further understand that I will be scheduled for no less than 47
2      hours per week, but that my actual hours worked will fluctuate
3      depending on the needs of my store.
4
5  *Thomas v. Bed Bath & Beyond, Inc.*, 309 F. Supp. 3d 121, 126 (S.D.N.Y.

6  2018). Similar documents that were provided to appellants at the time

7  they were hired and on later dates also described this payment

8  arrangement. *Id.*

9      BBB produced documents covering over 1,500 weeks during

10  which appellants worked for BBB prior to March 2015. These documents

11  reflect that "in almost every week at issue, the plaintiff DMs in fact either

12  worked 40 or more hours, or, when annual or sick leave time taken that

13  week was added to their actual hours worked, were credited with

14  having worked 40 or more hours." *Id.* at 127. During six weeks, however,

15  appellants performed no work and received no pay. During six other

16  weeks, appellants' pay stubs reflected some but fewer than 40 hours of

17  work or credited paid time off.[1] These latter instances are central to this

_____

[1] "Credited paid time off" refers to time away from work that an employer expressly permits and agrees to compensate in the same manner as it would time spent working. Employers use systems of credited paid time off to track and manage employees' paid leave. For example, an employer might stipulate that employees receive 150 hours of paid time off per year and credit 3 such hours for time spent at a

case, for they are also the only six instances in which appellants did not contemporaneously receive full weekly salaries (apart from the six weeks with no work and no pay).

On occasion, BBB asked DMs to work on holidays or previously scheduled days off. When this happened, BBB would permit DMs to take paid time off on later dates.

**B.**

On October 18, 2016, appellants filed a complaint on behalf of DMs and Assistant Managers (AMs) employed by BBB in New York, New Jersey, and Connecticut. Appellants filed their second amended complaint, the operative complaint in this case, on June 28, 2017.

Appellants' second amended complaint seeks overtime wages pursuant to the FLSA, 29 U.S.C. §§ 207, 216(b); New York Labor Law § 663; and 12 New York Codes, Rules, and Regulations §§ 146-1.4, 1.6.

---

doctor's appointment, without reducing that employee's pay. The FWW method does not preclude employers from managing paid leave in this way. The DOL has opined, however, that employers using the FWW method may not make deductions from employees' pay for time spent away from work, even "where there is no paid leave to substitute for employee absences." Opinion Letter, Dep't of Labor, 1999 WL 1002399, at *2 (May 10, 1999).

1   After the conclusion of discovery, the parties cross-moved in October

2   and November of 2017 for summary judgment on the issue of liability.

3       On February 21, 2018, the district court (Engelmayer, *J.*) granted

4   BBB's motion for summary judgment and denied appellants' motion for

5   summary judgment, both as to the DMs. *Thomas*, 309 F. Supp. 3d at 139.

6   The AMs' claims were subsequently settled. On May 6, 2019, the district

7   court entered final judgment, and appellants (DMs) timely filed a notice

8   of appeal on June 3, 2019.

9                           **C.**

10      Section 207 of the Fair Labor Standards Act (FLSA) limits covered

11  employees' weekly non-overtime hours (currently to 40) and requires

12  employers to pay as overtime compensation "a rate not less than one

13  and one-half times the [employee's] regular rate." 29 U.S.C. § 207. The

14  Supreme Court has observed that, "[b]y this requirement, although

15  overtime was not flatly prohibited, financial pressure was applied to

16  spread employment to avoid the extra wage and workers were assured

17  additional pay to compensate them for the burden of a workweek

18  beyond the hours fixed in the [FLSA]." *Missel*, 316 U.S. at 577–78.

In order to assess compliance with § 207, courts must determine an employee's "regular rate." And Congress did not define this term in the FLSA. *Walling v. A. H. Belo Corp.*, 316 U.S. 624, 634–35 (1942).

### D.

This question of how to calculate "regular rates" generated a series of Supreme Court decisions in the 1940s. Of particular importance to the instant dispute are two of these opinions, issued on the same date in June 1942, which addressed the application of § 207 to weekly rates of pay.

In *Overnight Motor Transportation Co. v. Missel*, the Supreme Court faced the question of whether Congress possesses constitutional authority to impose overtime rules beyond requiring employers to pay the minimum wage for non-overtime hours and 150% of the minimum wage for overtime hours. 316 U.S. at 575–76. The Court held that Congress possessed such power and that the FLSA "unambiguous[ly] [] calls for 150% of the regular, not the minimum, wage." *Id.* at 577.

Having determined that the employee in *Missel* was entitled to 150% of his "regular rate," the Court needed to calculate that rate. The employee received a "salary [of] $25.50 per week and thereafter $27.50."

*Id.* at 574. His timesheets "show[ed] an average workweek of 65 hours, with a maximum of 80" and reflected "wide fluctuations in the time required to complete his duties." *Id.* Additionally, the district court in *Missel* observed that the employee "was paid his weekly salary regardless of absent time." *Missel v. Overnight Motor Transp. Co.*, 40 F. Supp. 174, 176 (D. Md. 1941).

The Supreme Court held that the employee's hourly "regular rate" for the purposes of § 207 was the quotient of his fixed weekly salary divided by the number of hours actually worked in a given week. *Missel*, 316 U.S. at 580. This meant that the employee's weekly wage constituted the employee's straight time pay for *all* hours worked in a given week— whether they were non-overtime or overtime hours. *See id.* This method of calculating the employee's "regular rate" resulted in an overtime premium (to be paid for each overtime hour) of 50% of the "regular rate." *See id.* In the parlance of FLSA litigation, the *actual* weekly wage supplied the "time" in "time-and-a-half" for all hours worked.

The Court's opinion in *Missel* thus recognized the following formula for determining the employee's proper § 207 compensation.

First, calculate the hourly "regular rate" for a given week by dividing the fixed weekly wage by the total number of hours the employee actually worked during that week. Second, divide this hourly "regular rate" for a given week in half. Third, multiply the hourly half-rate by the number of overtime hours and add that total to the employee's fixed weekly wage. *See id.*

Where the number of hours an employee works in a week varies, that employee's "regular rate" will fluctuate week to week, and weeks with more hours will yield decreasing "regular rates." The *Missel* Court reasoned that this result "is not an argument . . . against this method of determining the regular rate" because "[a]part from the [FLSA] if there is a fixed weekly wage regardless of the length of the workweek, the longer the hours the less are the earnings per hour." *Id.*

On the same date that the Supreme Court decided *Missel*, the Court also issued an opinion in *Walling v. A. H. Belo Corp.* ("*Belo*"), which like *Missel* involved the application of § 207 to a weekly wage. 316 U.S. at 630–35. The employment agreement in *Belo* introduced an additional wrinkle. That agreement precluded the employee from receiving any

1  compensation beyond the fixed weekly rate until the employee worked

2  over 54 ½ hours in a week (10 ½ hours over the then-prevailing FLSA

3  limit of 44 hours). *Id.* at 628–29.

4      The agreement accomplished this result by setting the employee's

5  "basic rate of pay" at $0.67 per hour for non-overtime hours and setting

6  the rate for overtime hours at "not less than one and one-half time such

7  basic rate," while also guaranteeing that the plaintiff "shall receive

8  weekly, for regular time and for such overtime as the necessities of the

9  business may demand, a sum not less than . . . $40." *Id.* at 628. The Court

10  interpreted this provision as establishing—and requiring payment of—

11  a fluctuating overtime rate of at least 150% of the "basic rate" for hours

12  worked between 44 and 54 ½ hours. *Id.* at 631–32. For example, "if an

13  employee works 50 hours in a given week, . . . his $40 wage consists of

14  $29.48 for the first 44 hour[s] (44 [times] $.67) plus $10.52 for the

15  remaining six hours." *Id.* at 632.

16      The Court acknowledged that "when the employee works less

17  than 54 ½ hours during the week his pay is determined by the $40

18  guaranty" and that the "basic rate" and fluctuating overtime rate were

1    in a sense "artificial[]." *Id.* at 632–33. However, the Court reasoned that

2    "nothing in the [FLSA] forbids such fluctuation" and that Congress had

3    not "provide[d] a rigid definition of 'regular rate.'" *Id.* at 632–34.

4          At the close of its opinion, the Court emphasized the security that

5    weekly guarantees offer. As the Court explained,

> 6    [w]here the question is as close as this one, it is well to follow the
> 7    Congressional lead and to afford the fullest possible scope to
> 8    agreements among the individuals who are actually affected. This
> 9    policy is based upon a common sense recognition of the special
> 10    problems confronting employer and employee in businesses
> 11    where the work hours fluctuate from week to week and from day
> 12    to day. Many such employees value the security of a regular
> 13    weekly income. They want to operate on a family budget, to make
> 14    commitments for payments on homes and automobiles and
> 15    insurance.

17    *Id.* at 635. In other words, according to the Court, the security of having

18    a $40 weekly wage offset any diminution in overtime pay that what

19    would become known as the FWW method might bring about.

20          Significantly, in the aftermath of *Missel* and *Belo*, the Supreme

21    Court decided a series of cases involving the application of § 207 to

1  payment structures that did not include weekly guarantees.[2] A common

2  thread linking these cases is the Court's effort to cabin the flexibility that

3  *Belo* promised employers to situations in which a fixed weekly wage was

4  in fact present. *See, e.g., Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37,

5  41–42 (1944).

6  These decisions culminated in *Bay Ridge Operating Co. v. Aaron*, in

7  which the Court expressly tied *Belo* to the presence of a weekly

8  guarantee. 334 U.S. 446, 462 (1948). The Court in *Bay Ridge* explained that

9  where "guaranteed weekly wages were involved, we have reaffirmed

10  [*Belo*] as a narrow precedent principally because of public reliance upon

11  a congressional acceptance of the rule there announced." *Id.*

12  **E.**

13  In 1968, the Department of Labor (DOL) issued an interpretive

14  rule, 29 C.F.R. § 778.114, elaborating on the method for calculating

15  overtime pay introduced in *Missel* and *Belo*. 33 Fed. Reg. 986, 990–91 (Jan.

---

[2] *See Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37 (1944); *United States v. Rosenwasser*, 323 U.S. 360 (1945); *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419 (1945); *Walling v. Harnischfeger Corp.*, 325 U.S. 427 (1945); *Walling v. Halliburton Oil Well Cementing Co.*, 331 U.S. 17 (1947); *149 Madison Ave. Corp. v. Asselta*, 331 U.S. 199 (1947).

1 26, 1968). The rule labeled this approach "the 'fluctuating workweek'

2 method of overtime payment." *Id.* at 991.[3]

3   Subsection (a) explains how to apply the fluctuating workweek

4 (FWW) method and why it is an application of, as opposed to an

5 exception to, § 207:

> An employee employed on a salary basis may have hours of work
> which fluctuate from week to week and the salary may be paid
> him pursuant to an understanding with his employer that he will
> receive such fixed amount as straight time pay for whatever hours
> he is called upon to work in a workweek, whether few or many.
> Where there is a clear mutual understanding of the parties that
> the fixed salary is compensation (apart from overtime premiums)
> for the hours worked each workweek, whatever their number,
> rather than for working 40 hours or some other fixed weekly work
> period, such a salary arrangement is permitted by the [FLSA] if
> the amount of the salary is sufficient to provide compensation to
> the employee at a rate not less than the applicable minimum wage
> rate for every hour worked in those workweeks in which the
> number of hours he works is greatest, and if he receives extra
> compensation, in addition to such salary, for all overtime hours
> worked at a rate not less than one-half his regular rate of pay.
> Since the salary in such a situation is intended to compensate the
> employee at straight time rates for whatever hours are worked in
> the workweek, the regular rate of the employee will vary from
> week to week and is determined by dividing the number of hours
> worked in the workweek into the amount of the salary to obtain

---

[3] The Department of Labor revised 29 C.F.R. § 778.114 in 2011, but its text remained virtually the same as it was in 1968. *Compare* 29 C.F.R. § 778.114 (2011), *with* 33 Fed. Reg. at 990–91. On June 8, 2020, following notice and comment, DOL issued a revised version of the regulation, with an effective date of August 7, 2020. 85 Fed. Reg. 34,970 (June 8, 2020).

the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

29 C.F.R. § 778.114(a).

Subsection (b) applies the FWW method to a hypothetical employee who, over the course of four weeks, "works 40, 37.5, 50, and 48 hours." *Id.* § 778.114(b). The hypothetical employee receives a guaranteed weekly rate of $600, exclusive of overtime premiums and regardless of time actually worked. *Id.* His total compensation for the four weeks comes out to $600, $600, $660, and $650, respectively. *Id.*

Subsection (c), reiterating much of the information contained in subsection (a), emphasizes the prerequisites for using FWW:

The "fluctuating workweek" method of overtime payment may not be used unless the salary is sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings from the salary fall below the minimum hourly wage rate applicable under the [FLSA], and unless the employee clearly understands that the salary covers whatever hours the job may demand in a particular workweek and the employer pays the salary even though the workweek is one in which a full schedule of hours is not worked. Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours and are in amounts agreed on by the parties as adequate straight-time compensation for long workweeks as well as short ones, under the circumstances of the employment as a whole.

Where all the legal prerequisites for use of the "fluctuating workweek" method of overtime payment are present, the [FLSA], in requiring that "not less than" the prescribed premium of 50 percent for overtime hours worked be paid, does not prohibit paying more. On the other hand, where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours, compliance with the [FLSA] cannot be rested on any application of the fluctuating workweek overtime formula.

*Id.* § 778.114(c).

The DOL has also published opinion letters considering the implications of FWW for time-off policies. Two opinion letters from May 1999 are representative. In the first, the DOL determined that "deductions may be made from vacation or sick leave banks because of absences for personal reasons or illness, as long as no deductions are made from an employee's salary," even "where there is no paid leave to substitute for employee absences." Opinion Letter, Dep't of Labor, 1999 WL 1002399, at *2 (May 10, 1999). The second May 1999 letter allows that "disciplinary deductions, which do not cut into the required minimum wage or overtime compensation, may be made for willful absences or tardiness or for a situation such as an employee being sent home from work because of drunkenness." Opinion Letter, Dep't of Labor, 1999 WL 1002415, at *2 (May 28, 1999); *see also* Opinion Letter, Dep't of Labor, 2006

WL 1488849, at *1 (May 12, 2006) (noting that, except for disciplinary actions, "an employer utilizing the fluctuating workweek method of payment may not make deductions from an employee's salary for absences occasioned by the employee").

\*     \*     \*

Congress, however, has not codified the FWW method in the FLSA. And our Court has not previously addressed the FWW approach in a published opinion.

## II. Application

### A.

Appellants allege that Bed Bath & Beyond (BBB) did not pay them truly fixed weekly wages. In support of this allegation, appellants identify six instances in which an appellant's hours worked and credited paid time off totaled fewer than 40 hours (the FLSA's applicable limit), and in which that appellant received an amount less than that appellant's supposedly fixed weekly wage.[4]

---

[4] As explained earlier, "credited paid time off" refers to time away from work that an employer agrees to compensate in the same manner as it would time spent working.

1    Out of the over 1,500 weeks' worth of pay records submitted to

2    the district court, these are also the only workweeks—excluding weeks

3    in which no work was performed—in which appellants' hours worked

4    and credited paid time off totaled fewer than 40 hours. In a nutshell,

5    therefore, appellants argue that they were not in fact recipients of

6    weekly wage guarantees, because the only times their hours worked

7    dropped below the FLSA non-overtime limit, BBB paid them an amount

8    less than their supposedly fixed weekly wages.

9    The six weeks in question are as follows:

10   (a) Underpayment in three weeks which BBB claims resulted from

11   "payroll errors." *Thomas*, 309 F. Supp. 3d at 133. BBB issued payments

12   rectifying two of these payroll errors prior to the date on which

13   appellants filed their complaint. BBB rectified the third payroll error,

14   which amounted to $50, on January 5, 2018.

15   (b) The fourth underpayment occurred in a week when an

16   appellant received an amount less than that appellant's weekly rate

17   because that appellant's last day of employment with BBB fell in the

18   middle of a workweek. *Id.*

1    (c) The fifth underpayment involved BBB's payment to Appellant

2    Reynosa for only 28.75 hours. *Id.* BBB and appellants agreed that this

3    reduction in pay resulted from unpaid vacation that Appellant Reynosa

4    negotiated with BBB at the time she was hired. *Id.*

5    (d) The sixth and final underpayment occurred when BBB

6    reduced Appellant Frazer's pay by one day on account of leave taken

7    pursuant to the Family and Medical Leave Act (FMLA). *Id.* Appellant

8    Frazer had been absent from work on FMLA leave throughout the entire

9    previous week, and his absence continued through the Monday of the

10   week in question. *Id.*

11   The Supreme Court decisions permitting the FWW method and

12   the DOL's regulations thereafter make the existence of a fixed weekly

13   wage guarantee for straight time pay a core prerequisite for the FWW

14   method. Courts must therefore take seriously allegations that weekly

15   rates were not in fact guaranteed. Both *Missel* and *Belo* involved weekly

16   guarantees, and *Belo* included an extended discussion of the value of

17   such guarantees. *Missel*, 316 U.S. at 580; *Belo*, 316 U.S. at 631–35. And the

18   Supreme Court's later decisions applying § 207 to employment

1   agreements lacking such guarantees further highlight the role that

2   weekly guarantees played in *Missel* and *Belo. E.g.*, *Bay Ridge Operating*

3   *Co.*, 334 U.S. at 462. Moreover, 29 C.F.R. § 778.114 expressly requires a

4   "clear[] understand[ing] that the salary covers whatever hours the job

5   may demand in a particular workweek" and that "the employer pays

6   the salary even though the workweek is one in which a full schedule of

7   hours is not worked."[5] 29 C.F.R. § 778.114(c).

8       On a more fundamental level, treating a guaranteed weekly wage

9   as the central prerequisite for use of the FWW method follows from the

10  method's status as an *application of* and not an exception to § 207. It is

11  only because a guaranteed weekly wage serves as straight time pay for

12  all hours worked in a week regardless of the number of hours actually

13  worked that the Supreme Court permitted use of such a wage to

14  calculate an employee's FLSA "regular rate" even when an employee's

15  hours exceed the non-overtime limit. In contrast, a purported weekly

---

[5] Courts have generally found the version of 29 C.F.R. § 778.114 currently in effect to be a persuasive interpretation of the Supreme Court's FWW decisions. *See, e.g.*, *O'Brien v. Town of Agawam*, 350 F.3d 279, 287 n.15 (1st Cir. 2003). The weight to be given to 29 C.F.R. § 778.114 has not been squarely presented in this case.

rate that decreases when hours drop below a certain level cannot be a fixed weekly wage for the purposes of § 207. Rather, it is an hourly rate paid on a weekly basis and thus would not justify the FWW method, which leads to decreasing "regular rates" as hours actually worked increase above the non-overtime limit.

While courts must take seriously allegations that employees have not received truly fixed weekly wages, such skepticism should be just that and nothing more, and we are satisfied that the district court proceeded appropriately in this case. BBB's correction, *prior to the commencement of litigation*, of the payroll errors responsible for two of the disputed weeks indicates that the three weeks involving payroll errors are not cause for alarm. Although BBB did not resolve the third week until after the district court issued its order, the amount ($50) was small relative to the appellants' weekly wages. Similarly, the week in which an appellant's last day of employment fell in the middle of the week is of no concern. BBB had no obligation to pay appellants their wages for days after their employment ended.

1      The remaining two instances of alleged nonpayment of a fixed

2  weekly wage require more attention. At first glance, BBB's agreement at

3  the time of Appellant Reynosa's hiring to permit Appellant Reynosa to

4  take unpaid vacation during negotiated periods of time may seem to

5  flout the FWW method. Given BBB's active negotiation of this

6  arrangement, it might even suggest the absence of an understanding

7  that appellants' weekly wages were guaranteed. And such an

8  interpretation might perhaps be justified in a different context. But here,

9  where BBB provided multiple written notices explaining the FWW

10  method and where appellants do not identify any other instance of

11  similar arrangements for unpaid vacation, the record cannot support an

12  inference of actual absence of a fixed weekly wage.

13      Appellant Frazer's unpaid day while on FMLA leave is puzzling.

14  The DOL has promulgated a regulation permitting employers using the

15  FWW method to pay employees temporarily according to a different

16  method when employees take time off from work pursuant to the

17  FMLA. 29 C.F.R. § 825.206(b). Specifically, "the employer, during the

18  period in which intermittent or reduced schedule FMLA leave is

19  scheduled to be taken, may compensate an employee on an hourly basis

1  and pay only for the hours the employee works." *Id.* In such

2  circumstances, an employee's hourly rate is "determined by dividing

3  the employee's weekly salary by the employee's normal or average

4  schedule of hours worked during weeks in which FMLA leave is not

5  being taken." *Id.* However, "[i]f an employer chooses to follow this

6  exception from the fluctuating workweek method of payment, the

7  employer must do so uniformly, with respect to all employees paid on a

8  fluctuating workweek basis for whom FMLA leave is taken on an

9  intermittent or reduced leave schedule basis." *Id.*

10  The district court did not assess BBB's compliance with 29 C.F.R.

11  § 825.206(b), instead assuming for the purposes of its decision that this

12  one instance of alleged underpayment was inconsistent with the FWW

13  method. *Thomas*, 309 F. Supp. 3d at 136. It is not clear from the record

14  whether BBB in fact met all the conditions of 29 C.F.R. § 825.206(b).

15  As with Appellant Reynosa's negotiated unpaid vacation,

16  however, we think the totality of facts in the instant case precludes an

17  inference from this single day of possible underpayment that BBB did

18  not generally pay appellants guaranteed weekly wages. This is

1 especially true given that 29 C.F.R. § 825.206(b) expressly permits

2 temporary departures from the FWW method when employees take

3 leave pursuant to the FMLA.

4 We must, however, also view the six alleged instances of

5 nonpayment of a fixed weekly wage together in the total context of the

6 over 1,500 weeks' worth of pay records submitted in the case before us.

7 That the six weeks in which appellants received less than their weekly

8 rates were—according to appellants—also the *only* weeks for which

9 appellants' actual hours worked and credited paid time off totaled fewer

10 than 40 hours is perhaps appellants' strongest argument. The essence of

11 a guaranteed weekly wage is an employee's receipt of that wage for

12 weeks with less than 40 hours of actual work. And BBB does not

13 expressly identify any weeks during which an appellant received a full

14 weekly rate where that appellant's actual hours worked and credited

15 paid time off totaled fewer than 40 hours.

16 Nevertheless, we agree with the district court that appellants fall

17 short of establishing a genuine dispute of material fact. With a different

18 record, the absence of weeks with fewer than 40 hours of actual work

and credited paid time off in which full pay was given might well weigh heavily in our analysis. *Cf. Yourman v. Giuliani*, 229 F.3d 124, 130 (2d Cir. 2000) (recognizing the relevance of many fact-intensive factors for evaluating allegedly impermissible pay deductions from salaried employees). Here, however, we view as salient that the two more puzzling instances of alleged underpayment bear no connection to each other or to the other four disputed weeks. And we also give weight to BBB's prompt correction prior to the initiation of litigation of the alleged payroll errors that led to underpayment. After the corrections, these do constitute instances of full payment when less than 40 hours were worked. Moreover, BBB's distribution of multiple clear documents explaining the FWW method to appellants counters any possible suggestion of hidden attempts to undercut a fixed weekly wage.

Given all these circumstances, we hold that appellants have failed to establish a genuine dispute of material fact as to whether appellants' weekly wages were truly fixed and guaranteed.

**B.**

Appellants also challenge the district court's determination that the limited fluctuations in their weekly schedules did not preclude use of the FWW method. Appellants contend (a) that non-exempt employees' weekly hours must both fall below and rise above the FLSA non-overtime limit of 40 hours with some frequency in order for employers to use the FWW method, and (b) that their weekly schedules did not fluctuate in this manner.[6]  The district court rejected this argument, concluding that appellants' schedules need not fluctuate above and below 40 hours and that appellants' schedules were not fixed. *Thomas*, 309 F. Supp. 3d at 137–38.

Appellants' argument is unavailing. Nothing in § 207, *Missel*, *Belo*, or 29 C.F.R. § 778.114 compels fluctuation in weekly schedules above and below 40 hours. And, as explained earlier, it is instead the weekly

---

[6] In their reply brief before this Court, appellants also argue that their schedules did not fluctuate at all. "[A]rguments not raised in an appellant's opening brief, but only in [a] reply brief, are not properly before an appellate court . . . ." *McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005). Accordingly, we decline to consider whether the fluctuating workweek method requires some minimum degree of fluctuation in schedules. We take no position on that issue, but we note that the latest revisions to 29 C.F.R. § 778.114 address the question. *See* 85 Fed. Reg. at 34,992.

1   guarantee that is foundational to the FWW method. Neither *Missel* nor

2   *Belo* restricts the FWW method to situations where employees' weekly

3   schedules fluctuate above and below the limit on non-overtime hours

4   set by the FLSA, and the formula that these decisions recognized

5   contains no internal principle for imposing such a limitation. In *Missel*,

6   the Supreme Court reasoned simply that because a fixed weekly wage

7   may be divided by the number of hours actually worked, "[n]o problem

8   is presented in assimilating the computation of overtime for employees

9   under contract for a fixed weekly wage for regular contract hours which

10   are the actual hours worked, to similar computations for employees on

11   hourly rates." 316 U.S. at 580. In *Missel* and *Belo* the Court did apply this

12   formula to situations in which employees' schedules were irregular, but

13   the formula's logic in no way required hours to fluctuate above and

14   below the FLSA limit.

15       The facts of *Missel* itself, moreover, contradict the notion that

16   weeks with hours under the FLSA limit must balance weeks with hours

17   over the FLSA limit. In *Missel*, the employee's timesheets "show[ed] an

18   average workweek of 65 hours, with a maximum of 80." 316 U.S. at 574.

19   With an average workweek well above the then-prevailing non-

1    overtime limit, it would have been impossible for the employee's weeks

2    with fewer hours than the limit to "make up" for the longer weeks. And

3    *Missel* expressly confronted the problem of decreasing marginal hourly

4    rates and dismissed that objection. *Id.* at 580 ("It is true that the longer

5    the hours the less the rate and the pay per hour. This is not an argument,

6    however, against this method of determining the regular rate of

7    employment for the week in question. Apart from the [FLSA] if there is

8    a fixed weekly wage regardless of the length of the workweek, the

9    longer the hours the less are the earnings per hour.").

10       Likewise, although 29 C.F.R. § 778.114 uses the label "fluctuating

11   workweek," the text of the regulation observes merely that, "*[t]ypically*,

12   such salaries are paid to employees who do not customarily work a

13   regular schedule of hours." 29 C.F.R. § 778.114(c) (emphasis added). This

14   permissive language stands in contrast to the regulation's clear

15   commands with respect to what *is* required if the FWW method is to be

16   used. The FWW method "may not be used unless the salary is

17   sufficiently large to assure that no workweek will be worked in which

18   the employee's average hourly earnings from the salary fall below the

19   minimum hourly wage." *Id.* And FWW cannot be used "unless the

1  employee clearly understands that the salary covers whatever hours the

2  job may demand in a particular workweek and the employer pays the

3  salary even though the workweek is one in which a full schedule of

4  hours is not worked." *Id.*

5      Appellants cite a few cases in which courts have suggested that

6  an employee's schedule must fluctuate both above and below the FLSA

7  limit of 40 hours so that weeks with fewer hours and higher hourly

8  regular rates balance out weeks with longer hours and lower hourly

9  regular rates. Tellingly, all of these decisions also identify alternative

10  grounds for their holdings. For example, the Seventh Circuit once

11  remarked that a group of employees "d[id] not fit the [FWW] model

12  because [they] . . . *never* work[ed] fewer than [their scheduled hours]"

13  and there was consequently "no shortfall of time (and correspondingly

14  higher hourly rate) in one pay period that might make up for longer

15  work in another." *Heder v. City of Two Rivers*, 295 F.3d 777, 780 (7th Cir.

16  2002). But that decision turned at least in part—if not entirely—on the

17  court's conclusion that the employees' pay *in fact* decreased in weeks of

1     fewer than 40 hours. *Id.* Thus, the key guaranteed fixed weekly wage

2     requirement for the use of the FWW method was not met.[7]

3         Accordingly, we reject appellants' argument and hold that the

4     FWW method does not require weekly schedules to fluctuate above and

5     below the FLSA non-overtime limit of 40 hours per week. So long as

6     employees receive as compensation for straight time pay a weekly rate

7     that is truly fixed and guaranteed, and so long as employers and

8     employees come to a clear mutual understanding regarding the FWW

9     method, employers may calculate overtime using that method

10     irrespective of whether the number of hours employees work each week

11     fluctuates above and below the FLSA limit.[8]

---

[7] The other cases—all from district courts—cited by appellants also provide alternate grounds for decision. *See Costello v. Home Depot USA, Inc.*, 944 F. Supp. 2d 199, 206-07 (D. Conn. 2013) (absence of a clear mutual understanding that the employer would use the FWW method); *Hasan v. GPM Invs., LLC*, 896 F. Supp. 2d 145, 150 (D. Conn. 2012) (same); *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 61 (D.D.C. 2006) (same); *Spataro v. Gov't Emp'rs Ins. Co.*, No. 13-cv-5020, 2014 WL 3890222, at *3 (E.D.N.Y. Aug. 6, 2014) (failure to allege nonpayment of overtime premium for hours worked in excess of 40); *Blotzer v. L-3 Commc'ns. Corp.*, No. 11-cv-274, 2012 WL 6086931, at *10–11 (D. Ariz. Dec. 6, 2012) (holding that the FWW method is inapplicable in misclassification cases).

[8] Although the latest revisions to 29 C.F.R. § 778.114 do not go into effect until August 2020, we note that our holding today is consistent with these revisions. *See* 85 Fed. Reg. at 34,975 ("The [DOL] is . . . clarifying that the regulation does not require that an employee's hours must sometimes fluctuate below forty hours per week . . . .").

1       **C.**

2       Appellants also argue that BBB's practice of permitting employees

3   to take days of paid time off on later dates after working on holidays or

4   previously scheduled days off is inconsistent with the FWW method. [9]

5   And some courts have held that hours-based bonuses or "shift

6   differentials" are inconsistent with the FWW method because such

7   amounts increase employees' straight time pay, and 29 C.F.R. § 778.114

8   requires that employees receive "a fixed amount as straight time pay for

9   whatever hours [worked] . . . whether few or many." *O'Brien*, 350 F.3d

10  at 288–90.

11      But even assuming *arguendo* that hours-based bonuses preclude

12  use of the FWW method, BBB's time-off policy did not involve any such

13  bonuses. Under BBB's policy, if an employee worked during a holiday

14  or on a previously scheduled day off, BBB would permit that employee

_____

[9] In their reply brief before this Court, appellants contend that BBB's policy results in additional compensation because the New York Labor Law implies a private cause of action to recover the value of unused days of paid time off. We decline to consider this argument. *McCarthy*, 406 F.3d at 186.

1    to take a paid day off on a later date of the employee's choosing. And,

2    as the district court held, this practice "does not lead to such an

3    employee's receipt of any *additional* compensation for hours worked."

4    *Thomas*, 309 F. Supp. 3d at 132. It therefore does not amount to payment

5    of hours-based bonuses.

6        Nothing in the FLSA, *Missel*, *Belo*, or 29 C.F.R. § 778.114 prohibits

7    BBB's practice, and the DOL's opinion letters applying § 778.114 suggest

8    that employers enjoy broad latitude in allocating days of paid time off,

9    so long as they do not dock employees' pay. Far from docking

10   employees' pay, BBB merely shuffled days of paid time off so as not to

11   penalize employees who worked on holidays or previously scheduled

12   days off.[10]

13                           **CONCLUSION**

14       We hold that appellants failed to establish a genuine dispute of

15   material fact regarding whether they received guaranteed weekly

---

[10] We note that this holding also is consistent with the recently announced revisions to 29 C.F.R. § 778.114, which "clarify that bonus payments, premium payments, and other additional pay are consistent with using the fluctuating workweek method of compensation" provided that such payments are "included in the calculation of the regular rate" as appropriate under the FLSA. *See* 85 Fed. Reg. at 34,974.

1  wages, that the FWW method of calculating overtime compensation

2  does not require employees' schedules to fluctuate above and below the

3  FLSA non-overtime limit of 40 hours per week, and that BBB's policy of

4  permitting employees to take days of paid time off on later dates after

5  working on holidays or previously scheduled days off is consistent with

6  the FWW method. We therefore **AFFIRM** the district court's grant of

7  BBB's motion for summary judgment and its denial of appellants'

8  motion for summary judgment.